**Nos. 16-70496 & 16-70497**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ALTERA CORPORATION & SUBSIDIARIES,
*Petitioner – Appellee*,

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent – Appellant*.

---

Appeal from the United States Tax Court, Nos. 6253-12, 9963-12

---

# BRIEF FOR THE APPELLEE

---

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Telephone:(202) 452-7000
Facsimile: (202) 452-7074

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
dfalk@mayerbrown.com

Brian D. Netter
Travis Crum
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Counsel for the Appellee*

## CORPORATE DISCLOSURE STATEMENT

Intel Corporation ("Intel") is the parent corporation of Altera Corporation and subsidiaries. Intel is a publicly traded corporation.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i
TABLE OF AUTHORITIES .......... iv
INTRODUCTION .......... 1
STATEMENT OF JURISDICTION .......... 4
STATEMENT OF THE CASE .......... 4
A. The Parity Principle And The Arm's-Length Standard .......... 4
1. The introduction of the arm's-length standard. .......... 4
2. Section 482 incorporates the parity principle and arm's-length standard. .......... 7
3. The commensurate-with-income provision is added. .......... 10
B. Stock-Based Compensation Under Section 482 .......... 14
1. *Xilinx* and the early efforts to require the sharing of stock-based compensation .......... 14
2. The rulemaking proceedings .......... 17
3. The Final Rule .......... 23
C. Factual Background .......... 27
D. Proceedings Below .......... 29
SUMMARY OF ARGUMENT .......... 32
ARGUMENT .......... 36
I. The Commissioner's New Arguments Cannot And Do Not Cure The Failure of Reasoned Decisionmaking That Invalidates The Final Rule. .......... 38
A. *Chenery* bars the Commissioner's novel argument. .......... 42
B. If the Secretary had taken the position advanced by the Commissioner, it would represent an unacknowledged change in agency policy. .......... 47

**TABLE OF CONTENTS**
**(continued)**

**Page**

C. The Commissioner's interpretation of Section 482 is unreasonable and therefore not entitled to deference. ....... 56

1. The failure of reasoned decisionmaking precludes *Chevron* deference. .................................................. 57

2. The proffered statutory interpretation is unreasonable. .......................................................... 58

a. The new interpretation conflicts with the parity purpose of Section 482. ........................... 59

b. The rule disfavoring statutory amendments by implication bars the new interpretation of Section 482. .................................................. 62

c. The 1986 legislative history does not justify the new statutory interpretation. ...................... 65

d. The new interpretation conflicts with treaties. .......................................................... 69

e. The Final Rule reflects an unreasonable statutory interpretation because it imposes an absolute rule that is diametrically opposed to all evidence of specific unrelated-party conduct. ................................................. 71

D. The rulemaking record contradicts the Commissioner's treatment of stock-based compensation as a cost. .............. 72

II. The Tax Court Correctly Held That The Secretary Failed To Engage in Reasoned Decisionmaking. ......................................... 76

III. The Tax Court's Remedy Was Correct. ........................................ 79

CONCLUSION ....................................................................... 81

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Advance Cloak Co. v. Commissioner*,
B.T.A. Memo 1933-78, 1933 B.T.A.M. (P-H) ¶ 33,078 (1933) ..... 5

*Advance Mach. Exch., Inc. v. Commissioner*,
196 F.2d 1006 (2d Cir. 1952) ..... 9, 39

*Am. Mining Cong. v. EPA*,
965 F.2d 759 (9th Cir. 1992) ..... 77

*Auer v. Robbins*,
519 U.S. 452 (1997) ..... 59

*Blanchette v. Conn. Gen. Ins. Corps.*,
419 U.S. 102 (1974) ..... 63

*Brown-Hunter v. Colvin*,
806 F.3d 487 (9th Cir. 2015) ..... 47

*Cal. Communities Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ..... 80

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 834 (1984) ..... *passim*

*Colwell v. Dep't of Health & Human Servs.*,
558 F.3d 1112 (9th Cir. 2009) ..... 36

*Commissioner v. First Sec. Bank of Utah*,
405 U.S. 394 (1972) ..... 8, 60

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Eli Lilly & Co. v. Commissioner*,
84 T.C. 996 (1985), *aff'd in part and rev'd in part*,
856 F.2d 855 (7th Cir. 1988) .................................................... 41

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .................................................... 37, 52, 57

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005) .................................................... 65

*FCC v. Fox Television Studios*,
556 U.S. 502 (2009) .................................................... 48, 55

*FERC v. Elec. Power Supply Ass'n*,
136 S. Ct. 760 (2016) .................................................... 37, 73, 77

*Florida Bankers Ass'n v. U.S. Dep't of the Treasury*,
799 F.3d 1065 (D.C. Cir. 2015) .................................................... 79

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) .................................................... 78

*Good Samaritan Hosp. v. Shalala*,
508 U.S. 402 (1993) .................................................... 58

*Humane Soc. of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .................................................... 79

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .................................................... 81

*Ill. Pub. Telecomm. Ass'n v. FCC*,
117 F.3d 555 (D.C. Cir. 1997) .................................................... 37, 54

*Judulang v. Holder*,
132 S. Ct. 476 (2011) .................................................... 37, 42, 59, 72

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Koppers Co. v. Commissioner*,
2 T.C. 152 (1943) .......... 7

*Local Fin. Corp. v. Commissioner*,
407 F.2d 629 (7th Cir. 1969) .......... 9, 39

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) .......... 58

*Mayo Found. v. United States*,
562 U.S. 44 (2011) .......... 36

*Medtronic, Inc. v. Commissioner*,
T.C. Memo. 2016-112 (2016) .......... 41

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) .......... 43, 47, 58

*Miguel-Miguel v. Gonzales*,
500 F.3d 941 (9th Cir. 2007) .......... 58

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... *passim*

*Murray v. The Charming Betsy*,
6 U.S. (2 Cranch) 64 (1804) .......... 70

*Natural Res. Def. Council, Inc. v. EPA*,
526 F.3d 591 (9th Cir. 2008) .......... 58

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .......... 37, 43

*Organized Vill. of Kake v. USDA*,
795 F.3d 956 (9th Cir. 2015) (en banc) .......... 48

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Peck v. Commissioner*,
752 F.2d 469 (9th Cir. 1985) ........ 9, 60

*Pelikan v. Commissioner*,
436 Fed. App'x 786 (9th Cir. 2011) ........ 78

*Petit v. Dep't of Educ.*,
675 F.3d 769 (D.C. Cir. 2012) ........ 72

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ........ 37, 80

*Procacci v. Commissioner*,
94 T.C. 397 (1990) ........ 39

*Seagate Tech., Inc. v. Commissioner*,
80 T.C.M. (CCH) 912 (2000) ........ 14

*Seagate Tech., Inc. v. Commissioner*,
102 T.C. 149 (1994) ........ 41

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........ 33, 34, 74

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ........ 42

*Sierra Club v. EPA*,
346 F.3d 955 (9th Cir. 2003) ........ 76

*Sykes v. Commissioner*,
479 Fed. App'x 90 (9th Cir. 2012) ........ 78

*Tenn.-Ark. Gravel Co. v. Commissioner*,
B.T.A. Memo 1938-240, 1938 B.T.A.M. (P-H) ¶ 38,240
(1938) ........ 6

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75 (D.C. Cir. 2006) ........................ 77

*United States v. Dahl*, 314 F.3d 976 (9th Cir. 2002) ........................ 63

*United States v. Stuart*, 489 U.S. 353 (1989) ........................ 70

*United States v. Welden*, 377 U.S. 95 (1964) ........................ 63

*United States v. Woods*, 134 S. Ct. 557 (2013) ........................ 80

*Xilinx Inc. v. Commissioner*, 125 T.C. 37 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010) ........................ 15

*Xilinx Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010) ........................ *passim*

*Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ........................ 78

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A) ........................ 37

I.R.C. (26 U.S.C.):
§ 83(h) ........................ 74
§ 421(b) ........................ 75
§ 422 ........................ 75
§ 423 ........................ 75
§ 482 ........................ *passim*
§ 6213 ........................ 80
§ 7421(a) ........................ 79

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

48 C.F.R.:
§ 1.101 .......... 21
§ 31.205-6(i) .......... 22

Allocation of Income and Deductions Among Taxpayers,
33 Fed. Reg. 5848 (Apr. 16, 1968) .......... 8

Article 45-1(b), Regulations 86 (1935) .......... 5

Compensatory Stock Options Under Section 482,
67 Fed. Reg. 48,997 (July 29, 2002) .......... 11, 17, 18, 43

Compensatory Stock Options Under Section 482,
68 Fed. Reg. 51,171 (Aug. 26, 2003) .......... *passim*

FAR 31.205-6(i) .......... 22

Internal Revenue Code of 1954,
68A Stat. 162 .......... 7

Pub. L. No. 99-514,
100 Stat. 2085 .......... 10

Revenue Act of 1928, Section 45
ch. 852, 45 Stat. 791, 806 .......... 4

Section 482 Cost Sharing Regulations,
60 Fed. Reg. 65,553 (Dec. 20, 1995) .......... 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Treas. Reg. (26 C.F.R.):
§ 1.482-1 .......... 50, 54
§ 1.482-1(a)(1) .......... 64
§ 1.482-1(b)(1) .......... 8, 13, 16, 49, 64
§ 1.482-1(b)(2)(i) .......... 53
§ 1.482-1(c)(1) .......... 40
§ 1.482-1(c)(2) .......... 50
§ 1.482-1(c)(2)(i) .......... 40, 51
§ 1.482-1(c)(2)(ii) .......... 40
§ 1.482-1(d)(1) .......... 40

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Treas. Reg.:
§ 1.482-1(h)(2) .......... 53
§ 1.482-2(a)(2)(iii) .......... 56
§ 1.482-2(b)(3) .......... 51
§ 1.482-2(c)(2)(ii) .......... 56
§ 1.482-2(c)(2)(iii)(B)(1) .......... 51
§ 1.482-2(d)(4) .......... 8
§ 1.482-4(a) .......... 50
§ 1.482-4(f)(2)(i) .......... 51
§ 1.482-4(f)(2)(ii)(A) .......... 50
§ 1.482-4(f)(2)(ii)(B) .......... 50
§ 1.482-4(f)(2)(ii)(C) .......... 50
§ 1.482-5(a) .......... 50
§ 1.482-5(c)(2)(i) .......... 40
§ 1.482-6(c)(2) .......... 50
§ 1.482-6(c)(3) .......... 50
§ 1.482-6(c)(3)(i)(A) .......... 50
§ 1.482-6(c)(3)(i)(B) .......... 50
§ 1.482-7 .......... 40, 54, 55
§ 1.482-7(a)(3) .......... 23, 53
§ 1.482-7(d)(1) .......... 15, 16, 59
§ 1.482-7(d)(2)(iii)(A)(1) .......... 75
§ 1.482-7(f)(3)(ii) .......... 40
§ 1.482-7(g) .......... 67
§ 1.482-7(g)(2) .......... 67
§ 1.482-7(h)(1) .......... 67

**OTHER AUTHORITIES**

*A Study of Intercompany Pricing Under the Code*,
IRS Notice 88-123, 1988-2 C.B. 458 .......... *passim*

Convention Concerning Double Taxation, Fr.-U.S., art. IV,
Apr. 27, 1932, 49 Stat. 3145 (1935) .......... 6

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Belg.-U.S., Nov. 27, 2006, S. Treaty Doc. No. 110-3 (2007) .......... 9

IRS, Report on Application and Administration of Section 482 (Apr. 9, 1992) .......... 13, 53

I.R.S. Publication 3218, Report on the Application and Administration of Section 482 (April 21, 1999) .......... 66

H.R. Conf. Rep. No. 99-8412 (1986) .......... 11

H.R. Rep. No. 99-426 (1985) .......... 68

H.R. Rep. No. 70-2 (1927) .......... 4

Mitchell B. Carroll, *Evolution of U.S. Treaties to Avoid Double Taxation of Income, Part II*, 3 Int'l Law. 129 (1968) .......... 6

Opening Brief for Respondent, *3M Co. v. Commissioner*, No. 5816-13 (T.C. filed Mar. 21, 2016) .......... 53

Restatement (Third) of the Foreign Relations Law of the United States § 114 (1987) .......... 70

S. Rep. No. 70-960 (1928) .......... 4

U.S. Model Income Tax Convention of Sep. 20. 1996 .......... 9, 69

U.S. Model Income Tax Convention of Nov. 15, 2006 .......... 9, 69

U.S. Model Income Tax Convention of Feb. 17, 2016 .......... 69

W. Baumol & B. Malkiel, Status of Stock Options in Shared-Cost Contracts .......... 20, 22

## INTRODUCTION

The Commissioner has remarkably little to say about the reasoning underlying the Tax Court's 15-0 decision. He has little choice. That court correctly applied established administrative-law principles to the one-sided rulemaking record. When measured against what the Secretary of the Treasury said in the rulemaking, the decision below is beyond meaningful challenge.

That is why the Commissioner's position here bears no discernible relation to the rationale expressed in the rulemaking. Unable to disturb the Tax Court's conclusion that the Secretary failed to engage in reasoned decisionmaking, and unwilling to engage with the Tax Court's reasoning on that point, the Commissioner strays still further from administrative law norms. The Commissioner's new, litigation-driven position asks the Court to upend the tax treatment of related-party transactions that has prevailed for more than 80 years. Yet the Commissioner relies on a statutory amendment that—as the Commissioner and Treasury pointedly assured Congress, treaty partners, and taxpayers at the time—did nothing of the sort.

Under I.R.C. § 482, transactions between commonly controlled taxpayers are governed by a long-standing rule: the prices set for these transactions must be on parity with prices that would prevail in transactions between uncontrolled taxpayers acting at arm's length. The tax parity principle and arm's-length standard are deeply embedded in the Internal Revenue Code, its implementing regulations, and our Nation's tax treaties, and by their very nature require an intensely factual analysis.

This case concerns the treatment of stock-based compensation offered to employees of U.S. companies that jointly develop intangibles—such as patents—with their foreign affiliates, and share the costs of doing so. The Secretary initiated rulemaking proceedings ostensibly to determine the arm's-length approach. But after all evidence in the rulemaking record established that unrelated parties would *never* share stock-based compensation, the Secretary imposed an absolute rule requiring that related parties in cost-sharing arrangements must *always* share stock-based compensation.

The Tax Court unanimously refused to enforce that rule. The court found that, by disregarding evidence that uniformly contradicted

the rule's premise, the Secretary had failed to engage in reasoned decisionmaking. The record provided *no* support for the Secretary's factual conclusion that unrelated parties "generally" would share stock-based compensation when developing "high-profit intangibles" whenever stock-based compensation was "significant." To the contrary, the record established that unrelated parties would not share stock-based compensation in *any* type of agreement. And the Secretary's equivocal factual conclusion even on its own terms could not possibly support a rule applying to *all* cost-sharing arrangements, even those not involving high-profit intangibles and significant stock-based compensation.

In the rulemaking, the Secretary recognized that the proffered arm's-length evidence was relevant but mistakenly discounted it. Here, the Commissioner takes a strikingly different tack. He contends that the arm's-length standard is a mere "term of art" (Br. 69) that Treasury can define at will, regardless of evidence of real-world transactions. The Commissioner asserts that—despite decades of precedent and the Secretary's representations during this very rulemaking—the Secretary was free to disregard how parties act at arm's length, so long as he

*labeled* his rule as "arm's length." In short, the Commissioner's view of the arm's-length standard—a view that was not expressed in the rulemaking and that therefore cannot support the rule—has nothing to do with how companies actually transact at arm's length.

That new argument violates every significant principle of administrative law and fails to honor Congress's statutory scheme. The Tax Court was correct to hold the rule unenforceable, and its judgment should be affirmed.

## STATEMENT OF JURISDICTION

Appellee Altera Corp. agrees with the statement of jurisdiction in the appellant's brief.

## STATEMENT OF THE CASE

### A. The Parity Principle And The Arm's-Length Standard

#### 1. The introduction of the arm's-length standard.

In order to "reflect … true tax liability," H.R. Rep. No. 70-2, at 16-17 (1927); S. Rep. No. 70-960, at 24 (1928), Congress enacted section 45 of the Revenue Act of 1928, ch. 852, 45 Stat. 791, 806. That provision authorized the Secretary to allocate income between related entities "in order to prevent evasion of taxes or clearly to reflect the income of any of such trades or businesses." 45 Stat. 791, 806 (1928). The Board of Tax

Appeals recognized from the outset that the statute's "purpose … is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other." *Advance Cloak Co. v. Commissioner*, B.T.A. Memo 1933-78, 1933 B.T.A.M. (P-H) ¶ 33,078, at 108 (1933).

After former section 45 was reenacted verbatim as the same section of the 1934 Revenue Act, the Secretary similarly explained Congress's intent:

> The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer…. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Article 45-1(b), Regulations 86 (1935). Thus, from the beginning, the recognized purpose of the statutory phrase "clearly to reflect the income" was to put related parties "on a tax parity" with unrelated parties "dealing at arm's length" in similar transactions.

The arm's-length standard was universally understood as the foundation of American transfer-pricing law. And soon after it was introduced, the United States began to export the arm's-length standard through its tax treaties designed to prevent double taxation. In the Nation's first tax treaty, the U.S.-France accord ratified in 1935, both countries agreed to tax multinational companies operating in the United States and France by determining whether a transaction between an "American enterprise" and a related "French enterprise" involved "commercial or financial" terms "different from those which would be made with a third enterprise." Convention Concerning Double Taxation, Fr.-U.S., art. IV, Apr. 27, 1932, 49 Stat. 3145, 3146-47 (1935). That treaty provision was modeled on section 45. *See* Mitchell B. Carroll, *Evolution of U.S. Treaties to Avoid Double Taxation of Income, Part II*, 3 Int'l Law. 129, 150 (1968).

Likewise, in 1938, the Board of Tax Appeals found it "obvious" that section 45 was designed "to place a controlled taxpayer on a parity with an uncontrolled taxpayer for purposes of determining tax liability, … in order clearly to reflect petitioner's true income." *Tenn.-Ark. Gravel Co. v. Commissioner*, B.T.A. Memo 1938-240, 1938 B.T.A.M. (P-H)

¶ 38,240, at 418 (1938). Accordingly, when the Tax Court first considered an attempt to use former section 45 to allocate income between related parties in a manner *inconsistent* with "what would have passed between [the taxpayer] and an uncontrolled corporation in a similar transaction," the court rejected the Commissioner's allocation. *Koppers Co. v. Commissioner*, 2 T.C. 152, 157 (1943).

### 2. Section 482 incorporates the parity principle and arm's-length standard.

The core principle of parity remained unchanged when the same "clearly to reflect the income" language was incorporated into section 482 of the Internal Revenue Code of 1954:

> In any case of two or more organizations, trades, or businesses … owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

68A Stat. 162.

In 1968, Treasury issued regulations under section 482 providing comprehensive rules for the pricing of related-party transactions.

Following the parity principle, the 1968 regulations emphasized the use of data derived from "comparable transactions" entered into between unrelated parties dealing at arm's length. For example, with respect to cost-sharing arrangements—in which parties agree to share the costs of developing intangible property—the regulations prohibited allocations "except as may be appropriate to reflect each participant's arm's length share of the cost and risks of developing the property." Allocation of Income and Deductions Among Taxpayers, 33 Fed. Reg. 5848, 5854 (Apr. 16, 1968) (codified at Treas. Reg. § 1.482-2(d)(4) (1968)). These regulations further provided that, "[i]n order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions must be comparable to those which would have been adopted by unrelated parties similarly situated had they entered into such an arrangement." *Id.*

The courts have repeatedly emphasized that the parity principle is central to section 482. The Supreme Court has recognized that the "'purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer.'" *Commissioner v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting Treas. Reg. § 1.482-1(b)(1)

(1971)). This Court has reached the same conclusion. *See Peck v. Commissioner*, 752 F.2d 469, 472 (9th Cir. 1985) ("The purpose [of section 482] is to place controlled taxpayers on an equal footing with uncontrolled taxpayers so that the true taxable income of the controlled taxpayer is equivalent to that of an uncontrolled taxpayer."). So, too, have other Circuits.[1]

And since that first tax treaty in 1935, the President has signed and the Senate has ratified dozens of treaties obligating the United States to adhere to the parity principle—including treaties signed and ratified after the rulemaking at issue in this case.[2] Indeed, the United States has forged an international consensus on the arm's-length standard: the rule of parity "is embodied in all U.S. tax treaties," appears "in each major model treaty, including the U.S. Model Convention," and has been adopted by foreign nations as the standard for domestic transfer pricing laws. *A Study of Intercompany Pricing*

[1] *See, e.g.*, *Local Fin. Corp. v. Commissioner*, 407 F.2d 629, 632 (7th Cir. 1969); *Advance Mach. Exch., Inc. v. Commissioner*, 196 F.2d 1006, 1007-08 (2d Cir. 1952).

[2] *See, e.g.*, Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Belg.-U.S., art. 9, Nov. 27, 2006, S. Treaty Doc. No. 110-3 (2007); *see also* U.S. Model Income Tax Convention of Sept. 20. 1996, art. 9; U.S. Model Income Tax Convention of Nov. 15, 2006, art. 9.

*Under the Code*, IRS Notice 88-123, 1988-2 C.B. 458, 493 ("White Paper"); *see also Xilinx Inc. v. Commissioner*, 598 F.3d 1191, 1198 n.1 (9th Cir. 2010) (Fisher, J., concurring) (noting that the U.S.-Ireland treaty, "and others like it, reinforce the arm's length standard as Congress' intended touchstone for § 482").

### 3. The commensurate-with-income provision is added.

The Tax Reform Act of 1986 added a second sentence to section 482. The existing language was left intact, but the new second sentence provided: "In the case of any transfer (or license) of intangible property … , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562.

The commensurate-with-income provision clarifies that the Commissioner's review of a related-party transfer or license of an intangible should account not just for the *ex ante* expectations of the contracting parties but also for the income *actually generated* by the intangible. As the IRS explained, "[t]he legislative history reflects Congressional concern that, by confining an analysis of an appropriate transfer price to the time a transfer was made, taxpayers could …

justify use of an inappropriate royalty rate by claiming that they did not know that the product would become successful." White Paper, 1988-2 C.B. at 472.[3] *See* H.R. Conf. Rep. No. 99-8412, at II-637 (1986) ("Uncertainty exists regarding what transfers are appropriate to treat as 'arm's-length' comparables and regarding the significance of profitability, including major changes in profitability of the intangible after the transfer.").

Because Congress did not explicitly address how the commensurate-with-income provision was intended to interact with the arm's-length standard, treaty partners expressed concern that the statute's new sentence might undermine the arm's-length standard. Treasury swiftly allayed those fears by releasing statements from senior officials "that Congress intended no departure from the arm's length standard, and that the Treasury Department would so interpret the new law." White Paper, 1988-2 C.B. at 475 & n.149. As now-

[3] The White Paper represents Treasury and the IRS's contemporaneous understanding of Congress's intent with respect to the 1986 amendment. As such, Treasury and the IRS continue to rely upon the White Paper, including in the rulemaking at issue (Proposed Rule, 67 Fed. Reg. at 48,998) and in the Commissioner's arguments before this Court (*see, e.g.*, Comm'r Br. 9, 12, 36, 59).

Professor (and Commissioner's amicus) Stephen Shay explained at the time:

> The touchstone for determining acceptable related party pricing arrangements remains the pricing that would have been made between unrelated parties in similar circumstances. It would be both bad tax policy and unwise administration of our tax laws to jettison entirely a standard that has worked well for decades and become a fixture in the international tax system because certain cases failed to arrive at the right result.

Remarks of Stephen E. Shay, International Tax Counsel of the Department of Treasury before the International Fiscal Association (February 12, 1987).[4]

As promised, Treasury and the IRS's 1988 White Paper confirmed that the commensurate-with-income clause was "fully consistent" with the arm's-length standard. White Paper, 1988-2 C.B. at 458. The agencies explained that the commensurate-with-income provision arose from Congress's concern that there was "little clear guidance in the absence of comparables" and reflected the determination that "a refocused approach was necessary in the absence of true comparables." *Id.* at 472. But the agencies made clear that "intangible income must be

---

[4] http://www.taxnotes.com/imp/6486981 (subscription required).

allocated on the basis of comparable transactions if comparables exist." *Id.* at 474.

The agencies supported their interpretation by invoking the Nation's treaty obligations. Noting "overwhelming evidence" that the "international norm for making transfer pricing adjustments … is the arm's length standard," the agencies deemed it necessary to respect the arm's-length standard to "avoid[] extreme positions by other jurisdictions and [to] minimiz[e] the incidence of disputes over primary taxing jurisdiction in international transactions." *Id.* at 475.

In subsequent years, the IRS has consistently reaffirmed its position that the arm's-length standard governs all cases. In 1992, the IRS explained to Congress that "[a]ny deviation from the arm's length standard would contradict long-standing international norms and would raise substantial concerns among U.S. treaty partners." IRS, Report on Application and Administration of Section 482 (Apr. 9, 1992). Moreover, Treasury has left in place its regulation providing that, "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied ***in every case*** is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1)

(emphasis added). As the Tax Court observed, "Treasury has since repeatedly reinforced this conclusion in technical explanations to numerous income tax treaties." ER58 (collecting citations).

### B. Stock-Based Compensation Under Section 482

#### 1. *Xilinx* and the early efforts to require the sharing of stock-based compensation.

To align the incentives of employees with their employers, many companies offer stock-based compensation to their employees. In the 1990s, the Commissioner asserted in examinations of taxpayers that, when controlled parties agree to share costs, they must share amounts attributable to stock-based compensation. That position ultimately was based on an interpretation of the Secretary's 1995 cost-sharing regulations, which permitted the Commissioner to "make each controlled participant's share of the costs … of intangible development … equal to its share of reasonably anticipated benefits attributable to such development." Section 482 Cost Sharing Regulations, 60 Fed. Reg. 65,553, 65,558 (Dec. 20, 1995).[5] The 1995 regulations defined

[5] The Commissioner previously tried to allocate stock-based compensation under the 1968 regulations as well, but was forced to concede that he did not have "evidence or knowledge of an actual arm's

"intangible development costs" to mean "all of the costs incurred by … [a controlled] participant related to the intangible development area," Treas. Reg. § 1.482-7(d)(1) (1995), which the Secretary took to mean that stock-based compensation was a "cost[]" that needed to be shared.

*Xilinx Inc. v. Commissioner*, 125 T.C. 37 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010), resolved a challenge to deficiencies asserted under the 1995 regulations. Like the appellees here, Xilinx and its affiliates compete in the programmable logic device industry. *Id.* at 39. After a ten-day trial in which 23 expert witnesses testified, the Tax Court found that the Commissioner had "presented ***no*** evidence or testimony establishing that his determinations are arm's length." *Id.* at 54 (emphasis added). Accordingly, the Tax Court rejected the Commissioner's position. *See id.* at 62. The Tax Court also rejected another of the Commissioner's litigating positions, that the commensurate-with-income provision "supplant[ed] the arm's length standard": "Nothing in section 482, its accompanying regulations, or its

---

length transaction where stock options were shared." *Seagate Tech., Inc. v. Commissioner,* 80 T.C.M. (CCH) 912, 914 (2000).

legislative history indicates that internal measures of cost and profit should be used to the exclusion of the arm's-length standard." *Id.* at 57.

This Court affirmed. In construing the "all … costs" language in section 1.482-7(d)(1) (1995) in light of section 1.482-1(b)(1)'s arm's length standard, this Court held that "purpose is paramount," concluded that the regulations' "purpose … is parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions," and held that "[t]he regulations are not to be construed to stultify that purpose." 598 F.3d at 1196. Indeed, the Court reasoned that "the purpose of the statute is frustrated" if "the standard of arm's length [may] be trumped" by a rule forcing the sharing of stock-based compensation. *Id.* The Court also concluded that "our foreign treaty partners and responsible negotiators in the Treasury thought that arm's length should function as the readily understandable international measure." *Id.* at 1197. So without evidence to establish that parties at arm's length shared amounts attributable to stock-based compensation—and the Commissioner did not contest his complete failure of proof on this point (*see id.* at 1194)—the Commissioner was not entitled to adjust Xilinx's return. Simply put, "If Xilinx cannot

deduct all its stock option costs, Xilinx does not have tax parity with an independent taxpayer." *Id.* at 1196.

**2. The rulemaking proceedings.**

During the *Xilinx* litigation, the Secretary proposed a regulation that would codify the Commissioner's litigating position. *See* Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997 (July 29, 2002) ("Proposed Rule"). The Proposed Rule reaffirmed the Secretary's long-standing view that "Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard," *id.* at 48,998 (citing White Paper), and proposed that the arm's-length standard would be satisfied if "[a] controlled participant's operating expenses include all costs attributable to compensation, including stock-based compensation." *Id.* at 49,002 (Prop. Treas. Reg. § 1.482-7(d)(2)).

While the *Xilinx* litigation turned on what an arm's-length result would look like for the specific taxpayer in that case—and resulted in a finding, uncontested on appeal, "that unrelated parties would not share [employee stock options] as a cost" (*Xilinx*, 598 F.3d at 1194)—the Proposed Rule did not set forth any evidence that unrelated parties in

any cost-sharing arrangement—or any other type of arrangement—would share amounts attributable to stock-based compensation. The Secretary did not otherwise provide any facts or evidence to the public in connection with publication of the 2002 Proposed Cost Sharing Regulations. ER113-15.

That is not to say that the Secretary indicated that the arm's-length treatment of stock-based compensation was irrelevant or had been superseded. As noted, the Secretary acknowledged that the commensurate-with-income provision and arm's-length standard were to be applied "consistently." Proposed Rule, 67 Fed. Reg. at 48,998; *see id*. at 49,000 (heading one section "Coordination of Cost Sharing With the Arm's Length Standard").

In response to the Proposed Rule, 13 commentators provided written comments, and four people spoke at a public hearing. The commentators were unanimous: because parties transacting at arm's length do not share amounts attributable to stock-based compensation, the Proposed Rule violated the arm's-length standard by requiring controlled participants in a cost-sharing arrangement to share amounts attributable to stock-based compensation in the cost pool. *See, e.g.*,

SER021, SER075, SER166, SER186. The comments supported their factual conclusion with six principal categories of evidence.

*First*, commentators identified representative arm's-length agreements. Those agreements showed that, although parties agree to share a wide variety of costs, including compensation expenses, they do ***not*** agree to share amounts attributable to stock-based compensation. *See, e.g.*, SER027, SER029-34, SER159, SER179, SER181; SER192-93.[6] The model accounting procedures for sharing costs from the Council of Petroleum Accountant Societies ("COPAS") explained why. SER175. "COPAS does not recommend directly charging the Joint Account for … stock option[s]" because "[s]tock options do not lend themselves to a

[6] For example, the American Electronics Association identified (and PricewaterhouseCoopers provided) a 1997 collaboration agreement between pharmaceutical companies Amylin Pharmaceuticals Inc. and Hoechst Marion Roussel Inc. ("HMR") that did not include stock options in the pool of costs to be shared. *See* SER030-34, SER356-425. Similarly, PricewaterhouseCoopers identified a joint development agreement between the biotechnology company AgraQuest Inc. and Rohm and Haas under which only "out-of-pocket costs" would be shared—not stock option grants. *See* SER226. PricewaterhouseCoopers also identified a 1999 cost sharing agreement between software companies Healtheon Corporation and Beech Street Corporation ("BSC") that expressly excluded stock options from the pool of expenses to be shared. *See* SER225 ("'[i]n the event that Healtheon decides to provide any of the … Employees with Healtheon stock options, Healtheon agrees that it will not charge BSC any expenses associated with any such grants.'").

reasonable method of calculating value." COPAS Model Form Interpretation #37, SER178.[7]

*Second*, the American Electronics Association ("AeA") submitted a survey of its membership. AeA member-companies reviewed their arm's-length co-development and joint venture agreements and found none in which the parties shared stock-based compensation. For those agreements that did not explicitly address the treatment of stock-based compensation, the member-companies reviewed accounting records and found that "in no case were any costs associated with … stock options charged out." SER029.

*Third*, commentators provided the results of searches of the SEC's EDGAR system, which archives all submissions from public companies to the SEC since 1996. Among the thousands of arm's-length agreements, commentators found many in which unrelated parties did not share amounts related to stock-based compensation, but "[n]ot one

---

[7] Other commentators also provided evidence stemming from actual agreements between unrelated parties. *See, e.g.*, W. Baumol & B. Malkiel, "Status of Stock Options in Shared-Cost Contracts," at SER106-07, SER138-41 (referencing a "very substantial number" of "arm's-length contracts from which consideration of stock options is precluded"); SER159 ("[T]he … mandated result ignores the reality that taxpayers enter into cost-sharing arrangements with unrelated parties without sharing stock-based compensation costs.").

agreement … in which an independent party agrees to share or reimburse another party for its employee stock options." SER224-25, SER233-34; *see also* SER030.

*Fourth*, commentators having deep firsthand experience with joint development and collaboration agreements informed the Secretary that they knew of no transaction between unrelated parties in which the parties agreed to share or reimburse amounts attributable to stock-based compensation. *See* SER029, SER163, SER180-81; *see also* ER117-18.

*Fifth*, commentators evaluated the practice of the federal government, which has entered into billions of dollars of cost-reimbursement contracts at arm's length. *See* SER027. They found that no such contracts provided for reimbursement of amounts attributable to stock-based compensation. SER029; *see also* ER118; SER086, SER171, SER229. Indeed, the Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 1.101 *et seq.*, *prohibit* contractors from charging the government for "[c]ompensation based on changes in the prices of corporate securities or corporate security ownership" granted to or

exercised by employees working on service contracts. FAR 31.205-6(i), 48 C.F.R. § 31.205-6(i).

*Sixth*, commentators explained why, from an economic perspective, rational parties acting at arm's length would not agree to share amounts attributable to stock-based compensation. PricewaterhouseCoopers, AeA, and the Global Competitiveness Coalition explained that unrelated parties would not agree to share or reimburse any such amounts because the value of stock-based compensation was speculative, uncertain, potentially large, and completely outside the parties' control. *See* SER034-37, SER164, SER193, SER230-31.

The Software Finance and Tax Executives Council provided a detailed economic analysis by noted economists William Baumol and Burton Malkiel, who reached the same conclusion and further concluded that there is no net economic cost to a corporation or its shareholders from the issuance of stock-based compensation. *See* W. Baumol & B. Malkiel, Status of Stock Options in Shared-Cost Contracts, SER097-158; *see also* SER427 (explaining that a company's

"decision to grant options to employees … does not change its operating expenses").

No comments to the Proposed Rule provided any evidence that any party to a cost-sharing agreement, or any other agreement, reached at arm's length had agreed to share the costs of an unrelated party's stock-based compensation.

**3. The Final Rule.**

On August 26, 2003, the Secretary issued the Final Rule, which adopted the Proposed Rule without material change in its treatment of stock-based compensation in the context of cost-sharing arrangements. Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171 (codified at Treas. Reg. §§ 1.482-7(a)(3) and (d)(2)).

The Secretary rejected the "comments that assert that taking stock-based compensation into account in the QCSA [qualified cost-sharing arrangement] context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances." 68 Fed. Reg. at 51,172. The Secretary conceded that, "[w]hile the results actually realized in similar transactions under similar circumstances

ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard," such data "*may* not be available" with respect to "QCSAs." *Id.* at 51,172-73 (emphasis added).

Applying that standard, the Secretary concluded that the examples submitted by the commentators "do not share enough characteristics of QCSAs *involving the development of high-profit intangibles* to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." *Id.* at 51,173 (emphasis added).

Although he rejected the evidence provided by the commentators, the Secretary did not identify any facts or evidence supporting the conclusion that unrelated parties *would* agree to share amounts attributable to stock-based compensation in a cost-sharing arrangement. Indeed, the Commissioner has since conceded that the Secretary had no evidence to support his position. The Secretary did not identify a single written cost-sharing agreement, or any other agreement, between unrelated parties that supported his position. ER125-27. He did not collect any empirical data in support of his

position. ER124. He did not obtain expert analysis in support of his position. ER123-24. He did not obtain published or unpublished articles or papers, surveys, or reports in support of his position. ER124-25. He did not conduct any searches of databases that might contain agreements relevant to the issue. ER125. In fact, the Commissioner has never identified a single arm's-length agreement of any type in which unrelated parties agreed to share or reimburse amounts attributable to stock-based compensation. ER127.

Instead, the preamble to the Final Rule relied on the Secretary's mere *beliefs*: "Treasury and the IRS do not *believe* that there is any basis for distinguishing between stock-based compensation and other forms of compensation" in the context of cost-sharing arrangements. 68 Fed. Reg. at 51,172 (emphasis added). The preamble further indicated that "Treasury and the IRS continue to *believe* that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard." *Id.* (emphasis added).

The preamble identified no facts supporting the Secretary's "belie[f]"; the only explanation was a thought experiment:

> For example, assume that two parties are negotiating an arrangement similar to a QCSA in order to attempt to develop patentable pharmaceutical products, and that they anticipate that they will benefit equally from their exploitation of such patents in their respective geographic markets. Assume further that one party is considering the commitment of several employees to perform research with respect to the arrangement. That party would not agree to commit employees to an arrangement that is based on the sharing of costs in order to obtain the benefit of independent exploitation rights unless the other party agrees to reimburse its share of the compensation costs of the employees. Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

68 Fed. Reg. at 51,173.

The Secretary did not acknowledge that the agreements in his possession—including a collaborative pharmaceutical-development agreement—established that parties in his hypothetical circumstance in fact chose *not* to share amounts attributable to stock-based compensation. *See* ER29, ER68-69; n. 6, *supra*; SER030-34; SER356-425.

### C. Factual Background

Altera US is a Delaware corporation headquartered in San Jose, California; during the tax years in question, it was the publicly held parent company of a group of U.S. and foreign companies (collectively, "the Altera Group").[8] The Altera Group develops, manufactures, markets, and sells programmable logic devices ("PLDs") and related hardware and software.

One member of the Altera Group is Altera International, a Cayman Islands company. In 1997, Altera US and Altera International entered into a Master Technology License Agreement (as amended and restated, the "Technology License Agreement"). Under the Technology License Agreement, Altera US licensed to Altera International the right to use and exploit, outside the United States and Canada, all existing intangible property of Altera US relating to PLDs and associated programming tools. In return, Altera International paid royalties to Altera US in each year from 1997 through 2003, and by the end of 2003 owned a fully paid-up license to use the preexisting intangible property in its territory.

[8] Altera US was acquired by Intel Corp. in 2015.

Altera US and Altera International concurrently entered into a Technology Research and Development Cost Sharing Agreement (as amended and restated, the "Cost Sharing Agreement"), under which they agreed to pool their respective resources to conduct research and development using the "Pre-Cost Sharing Intangible Property." Under the Cost Sharing Agreement, Altera US and Altera International agreed to share the risks and costs of research and development activities performed on or after May 23, 1997. The Cost Sharing Agreement was continuously in effect from May 23, 1997 through 2007.

During each taxable year from 2004 through 2007, Altera US granted stock-based compensation to certain employees who performed research and development activities subject to the Cost Sharing Agreement. These employees' cash compensation was included in the cost pool under that Agreement. Their stock-based compensation was not.

In its corporate income tax returns for tax years 2004 through 2007, Altera US did not include stock-based compensation in the pool of expenses to be shared pursuant to the Cost Sharing Agreement. The Commissioner issued statutory notices of deficiency, invoking section

482 to increase Altera International's cost-sharing payments to Altera US, thereby increasing Altera US's domestic tax liability.

The Commissioner's adjustments were designed solely to bring Altera into compliance with Treasury Regulation section 1.482-7(d)(2). The adjustments were not based on any actual transactions between unrelated parties or any evidence of what unrelated parties bargaining at arm's length would have done in a similar cost-sharing transaction.

### D. Proceedings Below

Altera filed petitions for review of the Commissioner's cost-sharing adjustments in the Tax Court. Altera challenged Treasury Regulation section 1.482-7(d)(2) as invalid because, in promulgating the regulation, the Secretary failed to follow the procedures prescribed by the Administrative Procedure Act, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ("*State Farm*"), and because the regulation is an impermissible construction of section 482, *see Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 834 (1984).

In a reviewed opinion joined by all 15 participating judges, the Tax Court granted summary judgment to Altera. ER9-78. After

concluding that the Final Rule is a legislative rule because it has the force and effect of law, the Tax Court carefully analyzed the administrative record and determined that the Secretary had failed to engage in reasoned decisionmaking in four respects:

*First*, the Tax Court found that the Final Rule lacks a basis in fact. It held that the Secretary "necessarily decided an empirical question when it concluded that the final rule was consistent with the arm's-length standard," but did so without any supporting evidence. ER53, ER57-64.

*Second*, the Tax Court found that the Secretary failed to "rationally connect the choice [he] made with the facts [he] found." ER56. His thought experiment—his only "facts"—revealed only his "belief that unrelated parties entering into QCSAs to develop 'high-profit intangibles' would share stock-based compensation if the stock-based compensation was a 'significant element' of the compensation." ER68-69. Yet he used that belief to require the sharing of stock-based compensation irrespective of whether the intangibles were "high-profit" and whether the stock-based compensation was "significant." ER68-69.

*Third*, the court held that the Secretary failed to respond to significant comments submitted during the rulemaking process. For example, he "never directly responded" to survey evidence that the Tax Court had found to be relevant in *Xilinx*. ER67. And he deemed an exemplar arm's-length agreement not comparable because it "provide[d] for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement," even though the agreement did no such thing. ER68-69. In all, The Tax Court identified at least seven separate points made by commentators that received a facially inadequate response or no response at all. ER67-73.

*Fourth*, the Tax Court found that the Secretary's factual belief about how unrelated parties would share stock-based compensation was contrary to the evidence in the administrative record. ER73-74. In other words, the evidentiary record demonstrated that parties transacting at arm's length would *not* share amounts attributable to stock-based compensation.

## SUMMARY OF ARGUMENT

The Tax Court correctly held that the Secretary did not engage in reasoned decisionmaking when he imposed an absolute rule requiring in *every* case a sharing of stock-based compensation that parties dealing at arm's length would not share in *any* case. As the Tax Court explained—and as the Commissioner does not meaningfully dispute—the Secretary's conclusions lacked a basis in fact, contradicted the evidence in the rulemaking record, failed to connect the final decision with the facts he did find, and inadequately responded to comments when he did so at all. Each of these is an independent flaw sufficient to prevent enforcement of the rule here.

Rather than engage with the Tax Court's reasoning, the Commissioner mistakenly accuses the Tax Court of overlooking an argument that is missing from the administrative record. The Commissioner now contends that adding the "commensurate with income" clause to Section 482 changed the meaning of the Section's untouched first sentence. As a result, the Commissioner says, he may skip the intensely factual analysis under the arm's-length standard—a standard that the Commissioner concedes is implicit in the text of the

first sentence. The Commissioner maintains that he is now authorized to substitute a "purely internal" analysis of related-party dealings for the traditional inquiry into how unrelated parties would transact under similar circumstances. To top it off, the Commissioner asserts that this purely internal, fact-free analysis reaches an "arm's length result" even though it has nothing to do with the way parties transact or would transact at arm's length—on the premise that anything the Secretary says is "arm's length" must be so.

Unsurprisingly, the Secretary did not surface this reasoning during the rulemaking. Publishing that position—which reverses years of contrary rules and statements by Treasury—would have set off a political firestorm.

The Secretary's failure to announce this bold step in the rulemaking precludes consideration of the Commissioner's new argument here. Under *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (*Chenery I*)—a case the Tax Court repeatedly relied upon, but which the Commissioner does not acknowledge—this Court must evaluate the rule based on the reasoning supplied at the time, not on a later litigating position that avoided the public notice-and-comment process. Indeed,

the Tax Court correctly relied upon *Chenery* to reject the Commissioner's trial court variation of his new commensurate-with-income argument because it was missing from the administrative record. *See* ER57-59.

Even if the Commissioner's new position had been articulated during the rulemaking, it could not survive reasoned-decisionmaking review. The new position—that a "purely internal" inquiry into whether an allocation is "commensurate with income" supplants the established and intensely factual analysis of arm's-length behavior—represents an abrupt, unacknowledged, and unexplained change in agency position. Treasury has consistently represented that the commensurate-with-income provision did *not* change the arm's-length standard, but rather supplied only a new tool to be used consistently with arm's-length analysis rooted in evidence. Under the Commissioner's new litigating position, the arm's-length standard merely provides a label that Treasury may apply to a sharply different, purely speculative analysis.

The Commissioner contends that the "coordinating amendments" bless this approach, but his "coordinating amendments" simply assert that anything that satisfies the cost-sharing regulation—including its

mandatory sharing of stock-based compensation—is “arm’s length.” That sort of circular reasoning amounts to nothing more than *ipse dixit* and does not authorize the Secretary to take positions that conflict with all evidence of what parties would do at arm’s length.

In any event, the Commissioner’s underlying statutory interpretation is unreasonable under *Chevron*. His interpretation—that a “purely internal” analysis that is “commensurate with income” complies with the arm’s-length standard *per se*—departs from the recognized purpose of Section 482 to place controlled taxpayers at parity with uncontrolled taxpayers, and contravenes the arm’s-length analysis implicit in the statute’s first sentence. Under established principles of statutory construction, it is unreasonable for the Commissioner to construe the addition of the second sentence to fundamentally alter the meaning of the unchanged first sentence. And that is especially so because the second sentence explicitly applies only to *transfers* of intangibles, yet the Commissioner has recognized that a cost-sharing agreement to co-develop new intangibles does *not* involve such a transfer. The commensurate-with-income provision could not empower

him to make related parties share categories of purported costs that unrelated parties do not and would not share.

Finally, the Commissioner does not meaningfully challenge the Tax Court's thorough analysis of the rulemaking's failure to meet the standards of the Administrative Procedure Act or *Chevron*. That analysis is beyond reproach and the Tax Court's decision should be affirmed.

## ARGUMENT

The Commissioner contends that he may treat a related-party transaction in a manner inconsistent with the arm's-length conduct of unrelated parties. For that proposition, the Commissioner relies exclusively on the Final Rule, but that rule is unenforceable for the reasons articulated by a unanimous Tax Court in the decision below.

The Administrative Procedure Act ("APA") applies with full force to Treasury Regulations. *See Mayo Found. v. United States*, 562 U.S. 44, 55-57 (2011). "Under the APA, a federal administrative agency is required to follow prescribed notice-and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009). The most fundamental

requirement is that an agency must engage in "reasoned decisionmaking." *Judulang v. Holder*, 132 S. Ct. 476, 483-84 (2011). A rule that is not the product of reasoned decisionmaking is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *State Farm*, 463 U.S. at 43.

Reasoned decisionmaking requires an agency to "cogently explain its actions and demonstrate a rational connection between the facts it found and the choice it made." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 & n.15 (9th Cir. 2007). In particular, courts must ensure that the agency "weighed competing views, selected a [rule] with adequate support in the record, and intelligibly explained the reasons for making that choice." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 784 (2016); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (invalidating approval of pesticide based on an "absence of sufficient data" before the agency). An agency's "*ipse dixit* conclusion, coupled with [a] failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and

capricious decisionmaking." *Ill. Pub. Telecomm. Ass'n v. FCC*, 117 F.3d 555, 564 (D.C. Cir. 1997).

The Secretary defied the APA's procedural requirements by promulgating a rule that ignores all of the evidence before the agency as well as eight decades of statutory, regulatory, judicial, and treaty precedents. The Commissioner now seeks to defend that Final Rule under a new theory—that "purely internal" measures may be used to mandate results contrary to all evidence of arm's-length behavior—bearing no resemblance to the Secretary's actual reasoning in promulgating the rule.

## I. The Commissioner's New Arguments Cannot And Do Not Cure The Failure of Reasoned Decisionmaking That Invalidates The Final Rule.

When related parties transact, Section 482 permits the Commissioner to allocate income, deductions and other tax items between them to ensure that the result of the related-party transaction is on parity with the results of similar transactions entered into by unrelated parties acting at arm's length. As the Commissioner admits, "[i]mplicit in [the statutory] language is the recognition that, in order to clearly reflect income, commercial transactions between commonly

controlled entities should be priced as though the parties had been dealing at arm's length (i.e., the arm's-length standard)." Comm'r Br. 49-50.

As the Commissioner recognizes, the arm's-length standard is inherent in the statutory language requiring that any adjustment "clearly … reflect … income." By definition, the prices to which unrelated parties do or would agree in arm's-length transactions clearly reflect the income of each party. If the Commissioner adjusts the prices in a related-party transaction to some amount other than that which would prevail among unrelated parties dealing at arm's length, that result cannot clearly reflect the income from the related-party transaction.

"[T]he determination under section 482 is essentially and intensely factual." *Procacci v. Commissioner*, 94 T.C. 397, 412 (1990); *see also Local Fin. Corp.*, 407 F.2d at 632 (explaining that the "determination under section 482 'is essentially one of fact'") (quoting *Advance Mach.*, 196 F.2d at 1007-08). The regulations under section

482 repeatedly emphasize the factual nature of the inquiry.[9] It could not be otherwise. The first sentence of Section 482 only authorizes the Commissioner to make an adjustment to "clearly … reflect the income" of the specific taxpayer subject to the adjustment. That inquiry requires consideration of facts pertaining to the taxpayer and its dealings with related parties.

The arm's-length standard "implicit" in the first sentence of Section 482 (Comm'r Br. 31) requires consideration of available facts about what unrelated parties do or would do in the real world, in order to ensure that any adjustment reflects the prices that would be agreed

---

[9] Contrary to the Commissioner's current fact-free stance, the other section 482 regulations that were finalized in 1994—in response to the 1986 legislation—set forth a dense network of factually intensive methods to determine arm's-length prices. There are no fewer than 90 references to "facts and circumstances" or "factors." *See, e.g.*, Treas. Reg. § 1.482-1(c)(1) ("The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result"); *id.* § 1.482-5(c)(2)(i) ("The determination of the degree of comparability between the tested party and the uncontrolled taxpayer depends upon all the relevant facts and circumstances …."); *id.* § 1.482-1(d)(1) ("[T]he comparability of transactions and circumstances must be evaluated considering all factors that could affect prices or profits in arm's length dealings."). The cost-sharing regulations do not carve out a fact-free bubble. *See id.* § 1.482-7(f)(3)(ii) ("In determining which of two bases of measurement of reasonably anticipated benefits is most reliable, the factors set forth in § 1.482-1(c)(2)(ii) (Data and assumptions) must be taken into account.").

to in arm's-length dealings.[10] Reflecting this emphasis on real-world practices and circumstances, the reported section 482 decisions involve extensive factual discussions. *See*, *e.g.*, *Eli Lilly & Co. v. Commissioner*, 84 T.C. 996 (1985) (196 pages), *aff'd in part and rev'd in part*, 856 F.2d 855 (7th Cir. 1988); *Seagate Tech., Inc. v. Commissioner*, 102 T.C. 149 (1994) (174 pages); *Medtronic, Inc. v. Commissioner*, T.C. Memo. 2016-112 (2016) (144 pages).

As the Tax Court correctly found, relying on decades of precedent, "Treasury necessarily decided an empirical question when it concluded that the final rule was consistent with the arm's-length standard." ER53. Nevertheless, the Commissioner now argues that the arm's-length standard may be applied without considering any facts at all. The Commissioner even contends that a result reflects what unrelated parties would do at arm's length when all available evidence contradicts this conclusion. Under that view, the Secretary can identify the characteristics of an arm's-length transaction without consulting the

[10] With respect to cost-sharing itself, the Commissioner admits that "various other aspects of § 1.482-7 implicate traditional comparability analysis where appropriate." Comm'r Br. 52 n.14.

real-world evidence—or, as here, by pointedly *disregarding* uniform evidence of how parties transact at arm's length.

The Commissioner contends that the "commensurate-with-income requirement" in the second sentence of Section 482 is an independent, "internal standard" that "does not *require* consideration of transactions between unrelated parties." Comm'r Br. 51. Thus, the Commissioner contends that "Treasury did not decide an empirical question when it determined that requiring the sharing of stock-based compensation costs is consistent with the arm's length standard." *Id.* at 30.

That argument fails for at least three reasons. *First*, the Commissioner is not permitted to defend the Final Rule with arguments not adopted by the Secretary. *Second*, the Secretary is not permitted to alter the regulatory interpretation of a statute without acknowledging and justifying the change. And *third*, the commensurate-with-income provision simply does not mean what the Secretary now says that it means.

### A. *Chenery* bars the Commissioner's novel argument.

While exercising its "important" role "in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang*, 132 S. Ct. at 484,

"a reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). A court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *State Farm*, 463 U.S. at 43, but "may uphold agency action only on the grounds upon which the agency acted." *Michigan v. EPA*, 135 S. Ct. 2699, 2711 (2015); *see Nw. Envtl. Def. Ctr.*, 477 F.3d at 688 (rejecting appellate counsel's post-hoc rationalization for agency action).

The Commissioner asserts that "Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis." Comm'r Br. 64. That striking claim is sharply at odds, however, with what the Secretary actually did and found. Nowhere in the regulatory history did the Secretary suggest that he "was statutorily authorized to dispense with comparability analysis."

To the contrary, in the preamble to the Proposed Rule, the Secretary noted that "Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard." 67 Fed. Reg. at 48,998 (citing White Paper, 1988-2 C.B. at 458, 477). In the preamble to the

Final Rule, the Secretary further indicated his belief that the regulation was "consistent with the commensurate with income standard, and therefore consistent with the arm's length standard." 68 Fed. Reg. at 51,172. Nowhere did the Secretary contend that the commensurate-with-income provision was an *exception* to the arm's-length standard—or that the commensurate-with-income provision changed the arm's-length standard into a "term of art," with no independent meaning tethered to the real world, that could be applied to any allocation that reached a preferred result.

Far from dismissing the relevance of comparability analysis, the Secretary agreed that "results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard." *Id.* The Secretary then superficially reviewed the various types of uncontrolled transactions supplied by commenters but rejected them as insufficiently comparable to "QCSAs involving the development of high-profit intangibles." *Id.* at 51,172-51,173. *See* pp. 24-26, *supra*. As the Tax Court observed in rejecting a commensurate-with-income argument below, "[t]he preamble … did not dismiss any of the evidence

submitted by commentators regarding unrelated party conduct as addressing an irrelevant or inconsequential factor." ER54.[11]

In fact, the Secretary's expressed basis for the Final Rule was his "belief" as to what parties transacting at arm's length "generally" would do when they agreed to share the costs of developing "high-profit intangibles," at least where stock-based compensation was "significant." 68 Fed. Reg. at 51,173. Although that "belief" had no evidentiary basis, the Secretary nowhere indicated that his "belief" about what unrelated parties would do was superseded by a "purely internal" statutory standard. The Preamble created out of thin air an imaginary comparable transaction limited to "high-profit intangibles"—while rejecting the uniform evidence of the closest comparables available, namely, every known variety of unrelated-party cost-sharing

[11] In the Tax Court summary judgment hearing, the Commissioner conceded that the arm's-length standard turns on comparability, acknowledging that, "[i]n the absence of comparables, [the IRS] will aim for an arm's-length result by constructing a reasonable set of rules designed to figure out what the parties in an uncontrolled transaction should have done or would have done." SER004. But the Commissioner imposed a question-begging definition of "comparable" under which "the only comparable uncontrolled transaction that could be considered … is one that includes stock-based compensation as a cost." SER003.

agreement.[12] But the Preamble never suggested that comparable transactions were irrelevant, just that they were not as comparable as the transaction that the Secretary made up.

In any event, the stated concern as to comparability is a pure red herring. The administrative record demonstrates that unrelated parties do not share stock-based compensation in any transaction of any type—not in a services arrangement, a contract with the federal government, a cost-sharing arrangement, or any other kind of transaction. *See supra* pp. 19-22. And commentators provided ample and uncontroverted evidence explaining why parties acting at arm's length would not share stock-based compensation. *See supra* pp. 22-23.

The Commissioner dismisses the Secretary's actual rationale for the Final Rule by saying that "the 2003 preamble contains some extraneous observations" (Comm'r Br. 64)—"extraneous observations" that happen to include almost everything the Secretary actually said.

---

[12] The comparable transaction that the Secretary hypothesized conflicts with the Amylin-HMR agreement in the record. ER69-70. It also is at odds with the COPAS standards for joint operating agreements for oil exploration. COPAS Model Form Interpretation #37, SER178. Agreements subject to those standards share critical characteristics with agreements to develop high-profit intangibles: highly variable outcomes and high profit potential if the project succeeds. The Secretary did not respond to this evidence. ER70.

The Commissioner's attempt to sweep the Preamble's actual reasoning under the rug underscores his 180-degree shift from the Secretary's rulemaking posture. There is no way to discern the Commissioner's current theory from what was said in the Proposed Rule or the Final Rule. This Court "cannot engage in … substitution" to provide the reasoning that the Commissioner now wishes the Secretary had provided, *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015), but "may uphold agency action only upon the grounds on which the agency acted." *Michigan*, 135 S. Ct. at 2710.

### B. If the Secretary had taken the position advanced by the Commissioner, it would represent an unacknowledged change in agency policy.

Even if the Commissioner's litigating position on the role of factual analysis under Section 482 bore a discernible resemblance to the reasoning actually provided for the Final Rule, it would fail for another threshold reason. The assertion that the commensurate-with-income clause supplants the arm's-length standard with a "purely internal" analysis is a sharp—but unacknowledged—reversal from Treasury's long-standing prior policy.

An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Studios*, 556 U.S. 502, 515 (2009). Rather, "a policy change complies with the APA" only

> if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox*, 556 U.S. at 515-16).

The Commissioner's litigating position in this case is just such a "policy change." The Commissioner now maintains that the addition to Section 482 of the commensurate-with-income provision authorized a "purely internal" approach to clear reflection of income analysis that has nothing to do with the fact-based arm's-length standard—except that the Commissioner claims the power to apply an "arm's-length" label to the result of that fact-free analysis. Under that analysis, the Commissioner maintains, the Secretary need not even consider factual

evidence as to arm's length behavior—and is entitled to adopt a rule that directly contradicts all evidence of how parties acting at arm's length would proceed.

That is not how Treasury has construed or applied the 1986 amendment from its enactment until now. Beginning no later than the 1988 White Paper, Treasury and the IRS repeatedly have declared that "intangible income must be allocated on the basis of comparable transactions if comparables exist." White Paper, 1988-2 C.B. at 474. And they have repeatedly recognized that the addition of the commensurate-with-income provision to Section 482 did not permit the Commissioner to disregard arm's-length evidence.

*First*, Treasury Regulations (finalized in 1994 and still in force today) provide that, "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1) (emphasis added). The regulations define "arm's length" in terms of a real-world analysis, looking to uncontrolled transactions involving "the same transaction under the same

circumstances (arm's length result)," or "comparable transactions under comparable circumstances." *Id.*

Responding to concerns about the adequacy of some transaction-based comparables, the regulations strongly reaffirmed the critical importance of "[d]ata" from "transactions between unrelated parties," *id.* § 1.482-1(c)(2), but authorized new pricing approaches using profits data derived from uncontrolled parties.[13] And the *only* regulation actually applying the commensurate-with-income standard at the time of the rulemaking made clear that the standard merely allowed the Commissioner to periodically adjust the results of transactions already priced by using one of the fact-based methods specifically provided for evaluating related-party transfers or licenses of intangible assets. *Id.* § 1.482-4(f)(2)(i).[14] As this regulation confirmed, any commensurate-

[13] The Comparable Profits Method employs profit measures derived from "uncontrolled taxpayers that engage in similar business activities under similar circumstances." *Id.* § 1.482-5(a). The Profit Split Method employs either a "Comparable Profit Split," *id.* § 1.482-6(c)(2), or a "Residual Profit Split," *id.* § 1.482-6(c)(3). The latter uses arm's-length data to price "routine contributions," *id.* § 1.482-6(c)(3)(i)(A), and divides the residual profit by using "external market benchmarks" or common intangible property valuation techniques, *id.* § 1.482-6(c)(3)(i)(B).

[14] Significantly, the regulation limited periodic adjustments depending upon whether the transaction was priced based upon the transfer of the same intangible under substantially the same circumstances, the

with-income adjustments "shall be consistent with the arm's length standard and the provisions of § 1.482-1." *Id.* § 1.482-4(f)(2)(i).

*Second*, the transfer pricing methods provided in the regulations were (and still are) profoundly factual in nature. Even where they provided general rules, the regulations uniformly allowed taxpayers to show that a different result should apply based on evidence of arm's-length behavior. During the years at issue, for example, the price of non-integral services was deemed equal to cost "unless the taxpayer establishe[d] a more appropriate charge under the standards set forth in the first sentence of this subparagraph [i.e., an arm's length charge]." Treas. Reg. § 1.482-2(b)(3) (1994). Similarly, while the rental charge for a sublease was deemed equal to the deductions claimed by the owner with respect to the property, that presumption did "not apply if … [t]he taxpayer establishe[d] a more appropriate rental charge under the general rule set forth in paragraph (c)(2)(i) of this section [i.e., an arm's length charge]." *Id.* § 1.482-2(c)(2)(iii)(B)(1) (1994).

---

transfer of a comparable intangible under comparable circumstances, or another of the fact-based pricing methods provided under Treas. Reg. § 1.482-4(a). *See id.* § 1.482-4(f)(2)(ii)(A) to (C).

*Third*, Treasury has continued to tell our treaty partners that the commensurate-with-income provision was not intended to override the arm's-length standard. *See* ER58 (collecting citations). Treasury has made the same or similar representations to Bangladesh, Belgium, Bulgaria, Denmark, Estonia, Finland, Hungary, Iceland, India, Ireland, Italy, Japan, Latvia, Lithuania, Luxembourg, Malta, Poland, Slovenia, South Africa, Sri Lanka, Switzerland, Thailand, the United Kingdom, and Venezuela—as recently as 2013.[15] As the Supreme Court emphasized this past Term, "an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016). Those interests are especially acute in the context of tax treaties. *See Xilinx*, 598 F.3d at 1196-97; *see id.* at 1198 & n.1 (Fisher, J., concurring).[16]

---

[15] *See* Treasury Department Technical Explanation of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Poland-U.S., Feb. 13, 2013.

[16] One amicus supporting the Commissioner argues that the Final Rule is consistent with the treaties because they do not *define* the arm's length standard. Harvey Br. 31-32. Yet this Court has expressly found that "responsible negotiators in the Treasury thought that arm's length should function as the readily understandable international measure"

*Fourth*, public statements by the Secretary and the Commissioner have consistently rejected the suggestion that the commensurate-with-income provision permits results inconsistent with the arm's-length standard. In reports to Congress in 1988 and 1992 and in public statements by agency officials, the Secretary and the Commissioner articulated Treasury's clear position that the commensurate-with-income standard did not depart from, let alone contravene, the arm's-length standard. *See, e.g.*, White Paper, 1988-2 C.B. at 475; IRS, Report on Application and Administration of Section 482 (Apr. 9, 1992); *see also* pp. 11-14, *supra*.

*Fifth*, the Commissioner continues to insist in other cases being litigated *right now* that Section 482 requires the Commissioner to put related parties on tax parity with unrelated parties. *See* Opening Brief for Respondent at 103, *3M Co. v. Commissioner*, No. 5816-13 (T.C. filed Mar. 21, 2016) (defending Treas. Reg. § 1.482-1(h)(2) as a construction of Section 482 because "it promotes the goals articulated in the statutory text and the statutory purpose of tax parity"); *see also id.* (dismissing contrary approach that "frustrates parity").

---

and informed our "foreign treaty partners" of that position. *Xilinx*, 598 F.3d at 1197.

The Commissioner's only apparent response (Comm'r Br. 30) is to assert that what he calls "coordinating" amendments promulgated in the same rulemaking "make clear that comparability analysis plays no role in determining the costs that must be shared under a QCSA." In particular, he cites Treas. Reg. § 1.482-1(b)(2)(i) (2003), which states that § 1.482-7 "provides the specific method to be used to evaluate whether a [QCSA] produces results consistent with an arm's length result," and § 1.482-7(a)(3), which provides that a QCSA produces an arm's length result "if, and only if" it complies with the rules specified in Treas. Reg. § 1.482-7. Comm'r Br. 35-36.

Yet the so-called "coordinating amendments" are no more than agency *ipse dixit* declaring that certain allocations represent an arm's-length result, and as such are arbitrary *per se. See Ill. Pub. Telecomm.*, 117 F.3d at 564. Far from acknowledging and justifying the abrupt change in position, they paper over the Secretary's use of circular reasoning to abandon established tax policy. A "result" that fundamentally contradicts all evidence of the conduct of unrelated parties does not become "arm's length" simply because the Secretary says it is, not even if he claims that his unsupported conclusions

"coordinate the rules of § 1.482-7 regarding QCSAs with the arm's length standard as set forth in § 1.482-1." 68 Fed. Reg. at 51,172.[17]

Thus, even if the Secretary had tried to support the Final Rule by articulating the rationale now presented in the Commissioner's brief, he would not have complied with the *Fox Television* requirements. He did not display awareness that Treasury had previously refused to disregard arm's-length evidence, nor did he justify the new policy or explain why the reasons underlying the prior policy should be set aside. And he failed to offer any justification to overcome the reliance interests embodied in extant Treasury Regulations and U.S. tax treaties—or by the companies that have relied on those authorities and the Secretary's long-standing policies to structure their transactions.

Accordingly, because the Secretary failed to acknowledge or justify a change in position, the Final Rule cannot be upheld on the basis of the Commissioner's argument here.[18]

---

[17] The rulemaking acknowledged these amendments but did not rely on them as the Commissioner now does. *See also* 68 Fed. Reg. at 51,171 (noting that the Final Rule "clarif[ies] the coordination of the rules regarding QCSAs with the arm's length standard").

[18] One amicus argues that cost-sharing is a safe harbor that, as an artifice of regulatory grace, can be treated however the IRS desires. *See* Harvey Amicus Br. 5. The Commissioner did not make, and thus

### C. The Commissioner's interpretation of Section 482 is unreasonable and therefore not entitled to deference.

Turning to the substance of the new argument, Section 482 cannot reasonably be interpreted to permit the Commissioner to disregard the arm's-length standard and the parity principle. That would flout the admitted purpose of the statute and thus would be unreasonable and impermissible under *Chevron*.

An agency may be entitled to deference when it construes a statute that it has been empowered to administer. *Chevron*, 467 U.S. at 842-43. *Chevron* analysis involves two steps: (1) determining whether "the intent of Congress is clear," in which case it is dispositive, and, (2)

---

waived, that contention—and sensibly, because viewing the Final Rule as a safe harbor would constitute another unexplained change of position.

*First*, the Secretary has sought to "dispel the misconception that cost sharing is a safe harbor." Section 482: Methods to Determine Taxable Income in Connection With a Cost Sharing Agreement, Proposed Rule, 70 Fed. Reg. 51,116, 51,128 (Aug. 29, 2005). In contrast to the regulation at issue here, the actual safe harbors in effect during the years at issue—*e.g.*, Treas. Reg. § 1.482-2(a)(2)(iii) (safe haven interest rate); *id.* § 1.482-2(c)(2)(ii) (grandfathered safe haven rental charge)—clearly announce themselves as such and allow taxpayers to rely on arm's-length data to support a result outside the safe harbor.

*Second*, the White Paper rejected the development of "additional section 482 safe harbors" for cost sharing or anything else. White Paper, 1988-2 C.B. at 482.

if not, determining "whether the agency's answer is based on a permissible construction of the statute" and thus may receive deference. *Id.* No deference is warranted here.

#### 1. The failure of reasoned decisionmaking precludes *Chevron* deference.

The Commissioner has suggested that the Court should disregard the Secretary's procedural shortcomings, and instead should defer to the new statutory interpretation that he now says implicitly underlies the Final Rule. On the contrary, "where a proper challenge is raised to the agency procedures, and those procedures are defective, a court should not accord *Chevron* deference to the agency interpretation." *Encino Motorcars*, 136 S. Ct. at 2125. As explained above (at pp. 42-47), neither an assertion of the sweeping power to adjust income *contrary* to the conduct of parties at arm's length, nor any reasoning supporting it, may be discerned from the administrative record. Those procedural defects preclude deference to the Commissioner's proffered interpretation here.

### 2. The proffered statutory interpretation is unreasonable.

Even if deference were not foreclosed at the threshold, the interpretation does not fall "within the bounds of reasonable interpretation." *Michigan*, 135 S. Ct. at 2507 (internal quotation marks omitted). The question is whether the agency's interpretation "is permissible in light of the statute's text, structure and purpose," *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007), taking account of "the consistency of an agency's position." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *accord Nat. Res. Def. Council, Inc. v. EPA*, 526 F.3d 591, 602 (9th Cir. 2008). An agency's interpretation fails when it is "unmoored from the purposes and concerns" of the underlying statutory regime. *Judulang*, 132 S. Ct. at 490.

The Secretary's interpretation fails that test "because it is unreasonable in light of the statute's text, history, structure, and context." *Loving v. IRS*, 742 F.3d 1013, 1022 (D.C. Cir. 2014). An application of section 482 can be reasonable only if it comports with the statute's recognized purpose. Thus, any section 482 regulation that would allocate income and expenses in a way that does not reflect parity

between controlled and uncontrolled taxpayers is "arbitrary and capricious in substance." *Judulang*, 132 S. Ct. at 484 n.7; *see Xilinx*, 598 F.3d at 1196 ("If the standard of arm's length is trumped by [Treas. Reg. § 1.482-7(d)(1)], the purpose of the statute is frustrated.").

As noted above, the statutory interpretation advanced here would reverse long-standing agency positions. Where the historical interpretations of the agency, established principles of statutory construction, and our commitments and representations to our treaty partners all dictate a single outcome, no other interpretation is reasonable.[19]

**a. The new interpretation conflicts with the parity purpose of Section 482.**

Before the 1986 legislation, the first sentence of Section 482 permitted the Commissioner to adjust related-party transactions only if they were inconsistent with arm's-length results. Construing the

---

[19] One amicus suggests (Harvey Br. 28-31) that this Court should uphold the Final Rule based on *Auer v. Robbins*, 519 U.S. 452 (1997). Under *Auer*, a court will sometimes defer to an agency's interpretations of its own regulations, an issue not pertinent here, where the Commissioner does not request *Auer* deference. To the extent this Court were inclined to address *Auer*, we preserve for further review the arguments that the *Auer* doctrine should be abrogated and that this Court should not expand its reach.

statutory phrasing, which permits the Commissioner to adjust tax items "clearly to reflect … income," the Supreme Court and this Court agreed long ago that the "purpose of section 482 [was] to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." *First Security*, 405 U.S. at 391 n.1, 400; *see Peck*, 752 F.2d at 472. Those judicial constructions are consistent with contemporaneous regulatory interpretations, *see supra* pp. 7-10, and with the conduct of the Secretary, the President, and the Senate in negotiating, signing, and ratifying tax treaties. *See Xilinx*, 598 F.3d at 1197 (discussing representations made during treaty negotiations); ER21-23; ER58-59.

Indeed, the Commissioner agrees that this purpose, and "the arm's length standard" itself, are "[i]mplicit in th[e] language" of Section 482. Comm'r Br. 49-50. That language reflects the "recognition" of Congress and Treasury alike "that, in order to clearly reflect income, commercial transactions between commonly controlled entities should be priced as though the parties had been dealing at arm's length (i.e., the arm's-length standard)." *Id.*

Nevertheless, the Commissioner now also insists that the arm's-length standard does not derive its substance from facts concerning

what unrelated parties do or would do at arm's length, but instead means essentially whatever the Commissioner wants it to mean. Under that topsy-turvy view, the real-world "evidence (or lack thereof) of transactions between unrelated parties" (Comm'r Br. 51-52) is irrelevant to the arm's-length standard, contrary to what generations of courts and predecessor Commissioners have understood.

In contrast with the factually intensive analysis required under the arm's-length standard, the Commissioner could not be clearer about the *counter*factual nature of the "purely internal" analysis he now prefers: he derides what unrelated parties do—the cornerstone of the arm's-length standard—as a "deviation[]" from "purely internal" analysis (Comm'r Br. 51). In this brave new world, reliance on real-world evidence of arm's-length practice would amount to a "taxpayer veto" (Comm'r Br. 54). The Commissioner asserts that he is free to disregard such "deviations" and "veto[es]" at will, and need not let his assumptions be disturbed by facts.

Thus, when it suits the Commissioner, the arm's-length standard is governed by evidence as to what parties do or would do when dealing at arm's length. But when the Commissioner would rather make

allocations that do not reflect anything parties at arm's length ever do or would do, he can disregard the evidence of actual arm's-length conduct as mere deviations from his ideal of the way uncontrolled parties ought to conduct their business. That is not a reasonable interpretation of a statute designed to achieve parity between controlled and uncontrolled taxpayers, and it exceeds the authority to "clearly … reflect … income."

#### b. The rule disfavoring statutory amendments by implication bars the new interpretation of Section 482.

The Commissioner does not dispute that, before 1986, section 482 required controlled and uncontrolled taxpayers to be placed on tax parity. And he acknowledges that the arm's-length principle remains "implicit in the first sentence of § 482." Comm'r Br. 31. But he contends that the meaning of section 482's first sentence *changed* in 1986 such that the arm's-length standard ceased to have independent meaning whenever the Commissioner has the option to make an allocation that is "commensurate with income."

The 1986 addition of a sentence to section 482 cannot bear that weight. The "clearly to reflect … income" language was not amended. So

the Commissioner's argument would require the conclusion that—without touching the pertinent language—Congress silently intended the addition of the new sentence to fundamentally change a well-known and well-understood requirement.

Such "[a]mendments by implication, like repeals by implication, are not favored." *United States v. Welden*, 377 U.S. 95, 123 n.12 (1964). "A new statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old that cannot be reconciled." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) (internal quotation marks omitted); *see United States v. Dahl*, 314 F.3d 976, 978 (9th Cir. 2002) ("Amendment … by implication may only be found where legislative intent is clear and manifest.").

As the Secretary and the Commissioner recognized from the very outset, however, there is nothing approaching "positive repugnancy" here. To the contrary, as the White Paper explained, section 482's two sentences can and must be read in harmony: The first sentence imposes the tax parity approach to clear reflection of income, while the second sentence provides a *method* of exercising that authority where there has

been a transfer of an intangible by allowing the Commissioner to make periodic adjustments to the parity-based pricing in light of actual profit experience. *See* White Paper, 1988-2 C.B. at 485-88 (explaining application of "commensurate with income" when analyzing "exact" and "inexact" comparables). Thus, just as Congress left the first sentence of Section 482 undisturbed, the Secretary left in place the regulations requiring tax parity and mandating that the arm's length standard apply in every case. *See* Treas. Reg. 1.482-1(a)(1), (b)(1).

As the White Paper explained, actual unrelated party transactions are always relevant under section 482: "[I]ntangible income must be allocated on the basis of comparable transactions if comparables exist." White Paper, 1988-2 C.B. at 474. For "high profit" intangibles, where finding precisely comparable transactions may be "rare," "the royalty rate must be set on the basis of the comparable because that remains the best measure of how third parties would allocate intangible income." *Id.* at 473. And in any event, "enactment of the commensurate with income standard would not justify royalty increases in excess of arm's length rates." *Id.* Thus, while adding the commensurate-with-income provision permitted the Commissioner to consider actual

profitability experience and make periodic adjustments, the Commissioner remained obliged to consider evidence of unrelated-party dealings.

The amendment-by-implication rule therefore precludes the Commissioner's new interpretation.

#### c. The 1986 legislative history does not justify the new statutory interpretation.

Finding no support elsewhere, the Commissioner retreats to the 1986 legislative history. For even the simplest enactments, "legislative history is … often murky, ambiguous, and contradictory," essentially "an exercise in looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2005) (internal quotation marks omitted). The invocation of legislative history is singularly inapt here.

The Commissioner's new thesis is that the commensurate-with-income provision was introduced to absolve the Commissioner from any obligation to consider evidence derived from unrelated-party transactions. Br. 52-57. But the statute, the legislative history, and the Commissioner's contemporaneous interpretation of the statute all belie his new approach.

To begin with, the statutory text precludes the Commissioner's effort to use the commensurate-with-income provision to alter the application of the parity principle with respect to cost-sharing agreements. By its express terms, the commensurate-with-income provision applies only to the "transfer (or license) of intangible property." I.R.C. § 482. Historically, the Commissioner has recognized that no "transfer (or license)" occurs when entities develop intangibles jointly. As the White Paper concluded, "[t]he [1986] legislative history envisions the use of bona fide research and development cost sharing arrangements as an appropriate method of attributing the ownership of intangibles *ab initio* to the user of the intangible, *thus avoiding section 482 transfer pricing issues related to the licensing or other transfer of intangibles*." 1998-2 C.B. at 474 (emphasis added).[20] The Commissioner's historic view is obvious enough; a group of partners

---

[20] The Commissioner repeated this explanation in a subsequent report to Congress. I.R.S. Publication 3218, Report on the Application and Administration of Section 482, at 2.II.B (Apr. 21, 1999) ("The cost sharing regulations set forth rules under which affiliates may share ownership of intangibles by sharing the ownership costs, thereby obviating the need to apply the transfer of intangible property rules to determine an arm's length royalty."). The agency's advice to its field agents also reflected this view. *See* IRS FSA 200003010 (Jan. 21, 2000) ("With respect to intangibles developed by means of cost sharing, there would be no transfer or license for purposes of section 482.").

who develop inventions together do not transfer the rights of the inventions to each other; they own fractional interests from the beginning.

Thus, the cost-sharing framework—following arrangements between uncontrolled parties for the joint development of intangibles—allows participants to jointly develop new intangibles without the need to transfer or license them.

To be sure, the contribution of *existing* intangible property to a cost-sharing arrangement constitutes a "transfer" of such property and implicates the "commensurate with income" clause. *See* Treas. Reg. § 1.482-7(g) (2003) ("Allocations of income, deductions or other tax items *to reflect transfers of intangibles (buy-in)*") (emphasis added); *id.* § 1.482-7(g)(2) (treating buy-in payments as "consideration for a transfer of an interest in the intangible property"). In contrast, the participants' ongoing cost-sharing payments—the object of dispute in the present case—are not payments for a transfer or license. Instead, these payments are "considered costs of developing intangibles of the payor and reimbursements of the same kind of costs of developing intangibles of the payee." *Id.* § 1.482-7(h)(1).

The Commissioner points out (Br. 52) that the Ways and Means Report recognized that the "absence of comparable arm's length transactions between unrelated parties" was a "recurrent problem" under Section 482. H.R. Rep. No. 99-426, at 423 (1985). But Congress believed that its solution followed "present law" in which "all the facts and circumstances are to be considered in determining what pricing methods are appropriate." *Id.* at 426. And, as noted above (at pp. 50-51), the regulations promulgated to apply the commensurate-with-income standard where it actually applies—to transfers and licenses of intangible property—use pricing methods based on arm's-length evidence. In seeking support for his new interpretation of the commensurate-with-income provision to require an absolute rule divorced from any consideration of the facts, the Commissioner has looked out at the crowded field of legislative history and simply picked out different friends.

The legislative history thus cannot salvage the Commissioner's new repudiation of his and Treasury's contemporaneous understanding of the statute.

**d. The new interpretation conflicts with treaties.**

Likewise, the Commissioner's interpretation of the commensurate-with-income provision is belied by United States tax treaties signed before and after its adoption.

The Nation has bound itself to the arm's-length standard in a series of treaties, as well as the 1996 Model Income Tax Convention and all model conventions after the rulemaking. *See* pp. 9-10, *supra*. Article 9 of each convention provides that the profits of related enterprises engaging in cross-border transactions may be adjusted to match those "that would have been made between independent enterprises." U.S. Model Income Tax Conventions of Sept. 20, 1996, Nov. 15, 2006, and Feb. 17, 2016.

Moreover, in a series of technical explanations affirming that U.S. law comports with Article 9, Treasury has told our treaty partners that "the 'commensurate with income' standard … does not represent a departure in U.S. practice or policy from the arm's-length standard." Treasury Department, Technical Explanation of the Convention For the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital and Certain Other Taxes,

Ger.-U.S., art. 9, Aug. 29, 1989. *See supra* p. 14. "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *United States v. Stuart*, 489 U.S. 353, 369 (1989); *accord Xilinx*, 598 F.3d at 1198 n.1 (Fisher, J., concurring).

And absent a clear contrary statement, a statute cannot be construed to conflict with treaty obligations. *See Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 114 (1987). Like the Commissioner's former interpretation of the amended Section 482, the treaties require consideration of how a transaction would have proceeded at arm's length. In contrast, the Commissioner's new, litigation-driven interpretation of section 482 would permit taxation *contrary to* what would have resulted "between independent enterprises." That interpretation cannot be sustained.

**e. The Final Rule reflects an unreasonable statutory interpretation because it imposes an absolute rule that is diametrically opposed to all evidence of specific unrelated-party conduct.**

Whether or not viewed as the product of the Commissioner's new statutory interpretation, the Final Rule construes section 482 to require controlled taxpayers to share stock-based compensation in every case without any showing that unrelated parties would ever do so. That absolute rule—entirely untethered and contrary to empirical evidence—is inconsistent with the purpose of the statute to impose tax parity between controlled and uncontrolled taxpayers. And, as noted above (at pp. 44-47), the preamble's ostensible concern about sufficient comparability is a pure red herring, since the administrative record established that unrelated parties would not share stock-based compensation in *any* type of transaction.

If stock-based compensation were always shared, as in the hypothetical arrangement the Final Rule labels as the "arm's length result," then the Secretary would have examples of such transactions at arm's length—and every fact-based challenge to the Commissioner's allocation of stock-based compensation would have failed. But the exact

opposite occurred in litigation. *See* pp. 14-17, *supra* (discussing *Xilinx* and *Seagate*). Facing empirical evidence that unrelated parties *never* agree to share stock-based compensation in any context, the Secretary cannot reasonably interpret Section 482 *always* to require related parties to share stock-based compensation.[21] Accordingly, because it creates an absolute rule for stock-based compensation, requiring related parties to share a purported cost that unrelated parties never would share, the Final Rule is arbitrary and capricious in substance, and therefore unenforceable under *Chevron*. *See Judulang*, 132 S. Ct. at 484 n.7 (noting overlap between failure to construe statute reasonably and failure of reasoned decisionmaking under *State Farm*).

### D. The rulemaking record contradicts the Commissioner's treatment of stock-based compensation as a cost.

Even if (as the Commissioner's new statutory interpretation asserts) the Secretary were entitled to ignore the available evidence of

---

[21] That lack of support in the administrative record contrasts sharply with *Chevron* itself, where the Court upheld the agency's interpretation in part because "its reasoning [was] supported by the public record developed in the rulemaking process, as well as by certain private studies." 467 U.S. at 863 (footnote omitted); *accord Petit v. Dep't of Educ.*, 675 F.3d 769, 786-87 (D.C. Cir. 2012) (relying upon comments in rulemaking record in assessing reasonableness of agency interpretation).

arm's-length dealings, the Final Rule still would fail for want of reasoned decisionmaking. As the Tax Court found, the rulemaking record contradicted the Secretary's conclusion that stock-based compensation constitutes a cost. ER33-34, ER71-72.

Although Profs. Baumol and Malkiel provided analysis concluding that stock-based compensation imposes "no net economic cost" to a corporation or its shareholders—and the Secretary "identified this evidence" in the Final Rule preamble—the Secretary "did not directly respond to it." ER71. The Secretary similarly ignored Professor Grundfest's comments that companies "do not factor stock-based compensation into their pricing decisions." ER72. And the Commissioner has admitted that the Secretary did not collect a single bit of evidence—no countervailing expert analysis, not even an article—to support his conclusions. See ER123-27. In contrast with the Secretary's silence here, the agency in *Electric Power Supply* responded to challengers' similarly sophisticated economic analysis by producing a reply affidavit from a preeminent regulatory economist. *See* 136 S. Ct. at 782-83. In light of the void in the rulemaking record here, the Tax Court found that the Secretary "never explained why unrelated parties

would share stock-based compensation costs—or how the commensurate with income standard could justify the final rule—if stock-based compensation is not an economic cost." ER72.

The Commissioner's only response is to heap brand-new explanation upon brand-new explanation in hopes that this Court will forget *Chenery*. The Commissioner first asserts that whether stock-based compensation is a cost is not "an empirical question." Comm'r Br. 66. But the preamble to the Final Rule did not object to the evidence on this ground, but rather simply insisted that including stock-based compensation in the cost base "is consistent with the arm's length standard." ER71 (internal quotation omitted). The Commissioner then invokes financial accounting principles that were finalized *after* the Final Rule. Comm'r Br. 68. As the Tax Court found, however, "Treasury expressly disavowed reliance on financial reporting standards when it issued the final rule." ER76.

Moreover, the Commissioner incorrectly implies (Comm'r Br. 67-68) that "tax" "principles" recognize that stock-based compensation constitutes a cost, pointing to deductions allowed under I.R.C. § 83(h). But not all types of stock-based compensation give rise to a deduction.

*See* I.R.C. §§ 421(b), 422 (no deduction for incentive stock options except in the case of a "disqualifying disposition"); *id.* §§ 421(b), 423 (similar rule for employee stock purchase plans). And the Secretary did not base the Final Rule upon deductibility; the rule requires the sharing of stock-based compensation even when it is not deductible. Treas. Reg. § 1.482-7(d)(2)(iii)(A)(1).

Thus, even if Section 482 permitted an "internal" measure of profitability, Treasury still would need a reasoned basis to determine what constitutes a "cost" that the "internal" measure must take into account. The "cost" issue could be answered empirically by evaluating what is understood to be a "cost" in industry—by parties acting at arm's length. The record evidence on that point uniformly contradicts the Secretary's assertion.[22]

[22] One amicus supporting the Commissioner points to Altera securities filings discussing stock-based compensation. Alstott Amicus Br. at 26-27. These statements were not in the rulemaking record and thus cannot be considered. Furthermore, the statements reflect changes in financial reporting standards that also cannot be taken into account because they post-date the Final Rule's promulgation. In any event, one well-known attraction of stock-based compensation was the ability to offer employees the incentive of potentially significant future income without incurring a corresponding cost to the company, essentially letting the equities markets be the paymaster. *See* ER33-34.

## II. The Tax Court Correctly Held That The Secretary Failed To Engage in Reasoned Decisionmaking.

Setting aside his new commensurate-with-income argument, the Commissioner does not defend the Secretary's actual determination in the rulemaking: that parties at arm's length would share amounts attributable to stock-based compensation. Accordingly, the Court should affirm the Tax Court's conclusion that the Final Rule cannot be enforced because it does not rest on reasoned decisionmaking.

As explained in detail above (at pp. 29-31), the Tax Court held that the Secretary had failed to comply with *State Farm* in four respects: (1) his Final Rule lacks a basis in fact; (2) he did not rationally connect his regulatory choice with the few facts he addressed; (3) he ignored significant comments during the rulemaking process; and (4) he promulgated a rule contrary to the evidence in the record.

Before this Court, the Commissioner does not challenge any of those conclusions. In particular, although a rule is arbitrary and capricious if it is "without substantial basis in fact," *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003), the Commissioner does not deny that the Secretary's Final Rule lacked any basis in fact. Rather, the Final Rule was "founded on unsupported assertions" that did not reflect even

"reasonable extrapolations from some reliable evidence." *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 83 (D.C. Cir. 2006) (internal quotation marks omitted).

The Commissioner does not challenge the Tax Court's conclusion that the Final Rule, which reaches all cost-sharing agreements, was not rationally connected even to the Secretary's "belief" that unrelated parties that agreed to share development of "'high-profit intangibles'" would share stock-based compensation if that form of compensation was a "'significant element'" of total compensation. ER64-65 (quoting 68 Fed. Reg. at 51,173).

Moreover, the Commissioner does not deny that the Secretary did not adequately respond to the comments on his Proposed Rule. *Cf. Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (a rule is invalid if its failure meaningfully to address comments "reveals that the agency's decision was not based on consideration of the relevant factors"); *contrast Elec. Power Supply*, 136 S. Ct. at 782 (noting that agency responded to comments with reply affidavit of "eminent regulatory economist"). And the Commissioner does not take issue with the Tax Court's conclusion (ER67-73) that the Final Rule rests on

factual findings that "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. Indeed, "every indication in the record points the other way." *Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011).[23] In this Court, the Commissioner simply insists that facts are irrelevant to the Final Rule.

The Commissioner has therefore waived any challenge to the Tax Court's well-supported findings and conclusions. *See, e.g.*, *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) (issues not raised in opening brief deemed waived); *Pelikan v. Commissioner*, 436 Fed. App'x 786 (9th Cir. 2011) (principle applied to appeal from Tax Court); *Sykes v. Commissioner*, 479 Fed. App'x 90 (9th Cir. 2012) (same).[24]

[23] The amici supporting the Commissioner suggest that the cost-sharing comparables presented by commentators were not meaningfully close because the incentives of related parties in cost-sharing agreements differ from the incentives of unrelated parties in similar agreements. But related parties' incentives always differ from those of unrelated parties: that is the premise of section 482 and its animating principle of parity between related and arm's-length parties.

[24] One amicus contends that invalidating the Final Rule would have severe policy consequences and would reduce federal revenue. Alstott Br. 30-31. The revenue impact may explain why the Secretary contorted Section 482 and flouted the APA, but it has no bearing on whether the Secretary unlawfully changed his position, whether he engaged in reasoned decisionmaking during the rulemaking process, or whether

## III. The Tax Court's Remedy Was Correct.

As explained above, Treas. Reg. § 1.482-7(d)(2) (2003) is invalid and formed the sole basis for the Commissioner's deficiency determination. Accordingly, Altera is entitled to a redetermination of the deficiency in its favor. The amici supporting the Commissioner contend that the Tax Court should instead have remanded the regulation to the Secretary of Treasury without redetermining the deficiency in Altera's tax asserted by the Commissioner. Alstott Amicus Br. 29-30; Harvey Amicus Br. 32-33.

The Commissioner has not requested that extraordinary relief; accordingly, he is not entitled to it. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). Moreover, to the extent remand without vacatur is ever available, it would be available only in a petition for review of agency action. Yet the government's position is that the Anti-Injunction Act, I.R.C. § 7421(a), precludes pre-enforcement review of Treasury Regulations. *See Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065 (D.C. Cir. 2015).

---

the Final Rule reflects a permissible construction of the statute. Whenever a revenue-enhancing rule is invalidated, the result will reduce federal revenue, but that is no reason to give the Secretary a free pass to dodge his obligations.

In contrast, in a case filed in the Tax Court under I.R.C. § 6213, the validity of Treasury Regulations may be challenged only as to an individual taxpayer. *United States v. Woods*, 134 S. Ct. 557, 562-63 (2013) (describing how individual taxpayers can challenge deficiency). The Tax Court is not sitting in direct review of the Secretary's regulation. Indeed, the Secretary is not even a party to this action. So remanding to the Secretary for further consideration is not an available remedy.

In any event, even if this were a direct-review action and remand without vacatur were theoretically available, it would not be appropriate here. This Court will order a remand without vacatur only in "limited circumstances … when equity demands." *Pollinator*, 806 F.3d at 532. In deciding whether to grant that extraordinary remedy, the court considers both "the seriousness of the agency's errors" and the "disruptive consequences of an interim change that may itself be changed." *Id.* Remand without vacatur is appropriate only where vacatur could cause irreparable harm (often to the environment) or disruptive consequences in a regulated market. *See, e.g.*, *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)

("economically disastrous" disruption to power supply); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995) (extinction of a species). Here, the errors are serious and there is no risk of harm to anyone, much less the kind of irreparable harm that can justify remand without vacatur.

## CONCLUSION

The decision of the Tax Court should be affirmed.

Respectfully submitted,

Dated: September 9, 2016

/s/ Donald M. Falk

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
dfalk@mayerbrown.com

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter
Travis Crum
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Telephone:(202) 452-7000
Facsimile: (202) 452-7074

*Counsel for the Appellee*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Cir. R. 28-2.6, counsel for Altera are not aware of any cases related to the instant appeal that are pending in this Court.

September 9, 2016

/s/ Donald M. Falk
Donald M. Falk
*Counsel for Altera Corp.*

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(a) and Ninth Cir. R. 32-1, the undersigned hereby certifies that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 15,171 words, exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B). *See* Ninth Cir. R. 32–2(b) ("automatically" allowing additional 1,400 words for brief responding to multiple briefs); Cir. Adv. Note to R. 32–2 ("A litigant responding to the opposing party's brief as well as an amicus curiae brief filed under FRAP 29(a) is also eligible to file a longer brief automatically.")

2. The brief has been prepared in proportionally-spaced typeface using Microsoft Word 2007 in 14-point Century Schoolbook font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word-count feature of this word-processing system in preparing this certificate.

September 9, 2016

/s/ Donald M. Falk
Donald M. Falk
*Counsel for Altera Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 9, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system, with the exception of the participant listed below, whom we will serve by U.S. mail.

Robert R. Di Trolio
Clerk, U.S. Tax Court
400 Second Street, N.W.
Washington, D.C. 20217

September 9, 2016

/s/ Donald M. Falk
Donald M. Falk
*Counsel for Altera Corp.*