Nos. 16-70496, 16-70497

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**ALTERA CORPORATION AND SUBSIDIARIES,**
*Petitioner-Appellee,*

vs.

**COMMISSIONER OF INTERNAL REVENUE,**
*Respondent-Appellant.*

---

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12
Hon. L. Paige Marvel, Tax Court Judge, Presiding

---

**AMICI CURIAE BRIEF SUPPORTING APPELLEE AND AFFIRMANCE ON BEHALF OF SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION, FINANCIAL EXECUTIVES INTERNATIONAL, INFORMATION TECHNOLOGY INDUSTRY COUNCIL, SILICON VALLEY TAX DIRECTORS GROUP, SOFTWARE FINANCE AND TAX EXECUTIVES COUNSEL, NATIONAL ASSOCIATION OF MANUFACTURERS, AMERICAN CHEMISTRY COUNCIL, BSA | THE SOFTWARE ALLIANCE, NATIONAL FOREIGN TRADE COUNCIL, BIOTECHNOLOGY INNOVATION ORGANIZATION, COMPUTING TECHNOLOGY INDUSTRY ASSOCIATION, THE TAX COUNCIL, UNITED STATES COUNCIL FOR INTERNATIONAL BUSINESS, SEMICONDUCTOR INDUSTRY ASSOCIATION**

---

Bennett Evan Cooper
STEPTOE & JOHNSON LLP
201 E. Washington St., Suite 1600
Phoenix, Arizona 85004-2382
(602) 257-5200

Charles G. Cole
Michael C. Durst
Alice E. Loughran
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

Attorneys for Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

In accordance with FRAP 26.1(a), each of the amicus parties is a not-for-profit corporation organized under the laws of the referenced jurisdiction and has no stock, and therefore no publicly traded company owns 10 percent or more of its stock:

| | |
|---|---|
| Silicon Valley Tax Directors Group | California |
| Software Finance and Tax Executives Council | D.C. |
| National Association of Manufacturers | New York |
| National Foreign Trade Council | D.C. |
| Software and Information Industry Association | D.C. |
| Information Technology Industry Council | D.C. |
| Biotechnology Innovation Organization | D.C. |
| Financial Executives International | New Jersey |
| BSA \| The Software Alliance | D.C. |
| American Chemistry Council | New York |
| Computing Technology Industry Association | D.C. |
| The Tax Council | D.C. |
| United States Council for International Business | New York |
| Semiconductor Industry Association | California |

## TABLE OF CONTENTS

*Page*


INTEREST OF THE AMICI CURIAE ........ 1

A. Who are Amici? ........ 1

B. Why are Amici so concerned about this appeal? ........ 5

INTRODUCTION ........ 7

ARGUMENT ........ 10

I. The arm's-length standard is the foundation of transfer pricing laws that the United States developed and exported to other nations. ........ 10

A. Under U.S. law, the arm's-length standard imposes a fact-intensive test that looks to how transactions between unrelated parties are handled. ........ 10

B. At the United States' urging, the arm's-length standard has been adopted in international treaties, under which it helps prevent double taxation. ........ 14

II. Treasury's final rule eviscerates the arm's-length standard. ........ 17

A. Treasury arbitrarily failed to consider substantial reliance interests. ........ 17

B. The Commissioner should not be allowed to depart from the position taken during the rulemaking. ........ 22

C. The Commissioner's new position empties a well-recognized concept of its established meaning. ........ 26

III. The remaining arguments of the Commissioner and its supporting Amici academics are immaterial to the issues presented. ........ 29

A. The magnitude of the tax revenues that might be implicated by Treasury's final rule should not affect the Court's standard of review. ........ 29

B. There are no grounds for allowing the final rule to remain in effect. ........ 30

CONCLUSION ........................................................................................ 32
CERTIFICATE OF COMPLIANCE ................................................................ 33
CERTIFICATE OF SERVICE ....................................................................... 34

## TABLE OF AUTHORITIES

*Pages*

### CASES

*Advance Cloak Co. v. Comm'r*,
B.T.A.M. (P-H) ¶ 33,078, 1933 WL 4800 (1933) .................................. 10

*Alsea Valley All. v. Dep't of Commerce*,
358 F.3d 1181 (9th Cir. 2004) .................................. 31

*Bausch & Lomb, Inc. v. Comm'r*,
92 T.C. 525 (1989), *aff'd*, 933 F.2d 1084 (2d Cir. 1991) .................................. 13

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009) .................................. 31

*Comm'r v. First Sec. Bank of Utah*,
405 U.S. 394 (1971) .................................. 13

*Davis v. United States*,
282 F.2d 623 (10th Cir. 1960) .................................. 13

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .................................. 19

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) .................................. 25

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife*,
378 F.3d 1059 (9th Cir. 2004) .................................. 24, 25

*Ho v. Donovan*,
569 F.3d 677 (7th Cir. 2009) .................................. 28

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .................................. 32

*Judulang v. Holder*,
132 S. Ct. 476 (2011) .................................. 26

*Local Fin. Corp. v. Comm'r*,
407 F.2d 629 (7th Cir. 1969) .......... 14

*Michigan v. EPA*,
135 S. Ct. 2699 (2015) .......... 9, 17

*Miller v. Standard Nut Margarine Co. of Fla.*,
284 U.S. 498 (1932) .......... 22

*Mobile Comm'ns Corp. v. FCC*,
77 F.3d 1399 (D.C. Cir. 1996) .......... 18

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 9, 17, 24, 28

*Nat. Res. Def. Council v. EPA*,
658 F.3d 200 (2d Cir. 2011) .......... 9

*Phillipp Bros. Chems., Inc. (N.Y.) v. Comm'r*,
435 F.2d 53 (2d Cir. 1970) .......... 14

*Procacci v. Comm'r*,
94 T.C. 397 (1990) .......... 14

*Righthaven LLC v. Hoehn*,
716 F.3d 1166 (9th Cir. 2013) .......... 26

*Robles-Urrea v. Holder*,
678 F.3d 702 (9th Cir. 2012) .......... 28

*Russian River Watershed Prot. Comm'n v. City of Santa Rosa*,
142 F.3d 1136 (9th Cir. 1998) .......... 31

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 9

*Shizuko Kumanomido v. Nagle*,
40 F.2d 42 (9th Cir. 1930) .......... 17

*Simon J. Murphy Co. v. Comm'r*,
231 F.2d 639 (6th Cir. 1956) .......... 13

*United States v. Byrum*,
408 U.S. 125 (1972) .......... 21

*Util. Air Regulatory Group v. EPA*,
134 S. Ct. 2427 (2014) .......... 22

*Ventress v. Japan Airlines*,
486 F.3d 1111 (9th Cir. 2007) .......... 16

*Veritas Software Corp. v. Comm'r*,
133 T.C. 297 (2009) .......... 18

*Xilinx Inc. v. Comm'r*,
125 T.C. 37 (2009) .......... 20, 21, 23, 27

*Xilinx, Inc. v. Comm'r*,
567 F.3d 482 (9th Cir. 2009) .......... 27

*Xilinx Inc. v. Comm'r*,
598 F.3d 1191 (9th Cir. 2010) .......... 11, 12, 27, 20

*Zango Inc. v. Kaspersky*,
568 F.3d 1169 (9th Cir. 2008) .......... 30

**STATUTES**

26 U.S.C. § 482 .......... 7, 10-11, 14, 18-20, 25, 27

26 U.S.C. § 7421(a) .......... 29

**TREATIES & TREASURY DEPARTMENT TECHNICAL EXPLANATIONS**

Convention Concerning Double Taxation, U.S.-Fr. Art. IV, Apr. 27, 1932, 49 Stat. 3145, 3146-47 (1935) .......... 15

U.S.-United Kingdom Income Tax Treaty, art. 9 (July 24, 2001), 7 Tax Treaties (CCH) ¶ 10,901.09 at 201,019 .......... 15, 16

1996 Treasury Department Technical Explanation of the U.S. Model Income Tax Convention, 1 Tax Treaties (CCH) ¶ 216 ........... 20

2006 Treasury Department Technical Explanation of the U.S. Model Income Tax Convention, 1 Tax Treaties (CCH) ¶ 215 ........... 20

7 Tax Treaties (CCH) ¶ 10,901.09 ........................................................ 16

**ADMINISTRATIVE RULEMAKINGS AND POSITION PAPERS**

*A Study of Intercompany Pricing under Section 482 of the Code*, IRS Notice 88-123, 1988-2 C.B. 458, 53 Fed. Reg. 43,522 (Oct. 27, 1988) ......................................................................... 12, 14, 15

*Compensatory Stock Options under Section 482,* 68 Fed. Reg. 51171 (Aug. 26, 2003) ......................................... 8, 19, 22

**ARTICLES AND BOOKS**

David Herbert Donald, *Lincoln* (1995) .................................................. 27

Robert G. Clark, Comment, *Transfer Pricing, Section 482, and International Tax Conflict: Getting Harmonized Income Allocation Measures from Multinational Cacophony*, 42 Am. U.L. Rev. 1155 (1993) ..................................................................... 16

## INTEREST OF THE AMICI CURIAE[1]

### A. Who are Amici?

Amici curiae are trade associations and industry membership organizations representing companies from every sector of our economy, with operations in every region of the world.

The Silicon Valley Tax Directors Group is composed of 85 high technology companies with operations in Silicon Valley. Since its inception in 1981, the group's purpose has been to promote sound, long-term tax policies that support the global competitiveness of the U.S. high-technology industry.

The Software Finance and Tax Executives Council (SoFTEC) is a trade association providing software industry-focused public policy advocacy in the areas of tax, finance and accounting. SoFTEC is the voice of the software industry on matters of state, federal, and international tax policy. SoFTEC submitted comments in connection with the notice of proposed rulemaking that resulted in the promulgation of the stock-based compensation Treasury regulations at

[1] All parties have consented to the filing of this amicus brief. Pursuant to FRAP 29(c)(5), amici curiae state that no counsel for any party to this proceeding authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amici curiae or their members contributed money that was intended to fund preparing or submitting this brief.

issue in this case. SoFTEC also appeared and presented evidence at the November 20, 2002 hearing on the proposed regulations and its witness testified that parties dealing at arm's length with respect to a cost-sharing agreement would not agree to share costs associated with stock-based compensation.

The National Association of Manufacturers is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs over 12 million men and women, contributes roughly $2.1 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for two-thirds of private-sector research and development.

The National Foreign Trade Council (NFTC), founded in 1914, is the oldest U.S. business association dedicated to international tax, trade, and human resource matters. The NFTC's approximately 250 members, representing the largest U.S. companies, are active advocates of free trade and a rules-based economy. The NFTC encourages policies that will expand U.S. exports and enhance the competitiveness of U.S. companies by eliminating major tax inequities in the treatment of U.S. companies operating abroad.

The Software & Information Industry Association (SIIA) is the principal trade association for the software and digital information industries. The 700-plus software companies, data and analytics firms,

information service companies, and digital publishers that constitute its membership serve nearly every segment of society, including business, education, government, healthcare, and consumers. Many of SIIA's members have operations and affiliates abroad and are subject to taxation in multiple countries.

The Information Technology Industry Council represents the interests of the information and communications technology industry, including member companies that are among the global leaders in innovation from all areas in information and communications technology, including hardware, services, and software.

The Biotechnology Innovation Organization (BIO) is the world's largest biotechnology trade association, representing approximately 1,000 members worldwide. BIO members research and develop innovative healthcare, agricultural, industrial, and environmental biotechnology products. Many of BIO's members are multinational biotech companies that have entered into related-party cost-sharing arrangements. Accordingly, BIO has a strong interest in the appropriate resolution of the issues being addressed in this case.

The Financial Executives International is a professional association representing the interests of more than 10,000 chief financial officers and other senior financial executives from over 8,000 major companies in the United States and Canada.

BSA | The Software Alliance is an association that advocates on behalf of the world's leading software and hardware technology companies for policies that foster innovation, growth, and a competitive marketplace for commercial information technology.

The American Chemistry Council (ACC) represents the leading companies engaged in the business of chemistry. ACC members apply the science of chemistry to make innovative products and services that make people's lives better, healthier and safer. The business of chemistry is a $797 billion enterprise and a key element of the nation's economy. It is the nation's largest exporter, accounting for fourteen percent of all U.S. exports. Chemistry companies are among the largest investors in research and development.

The Tax Council is a non-partisan Washington D.C. membership organization promoting sound tax and fiscal policies since 1966, and is comprised of Fortune 500 companies, leading advisory firms and major business trade associations.

The Computing Technology Industry Association is a non-profit trade association that addresses the needs of the information technology industry. It has more than 2,000 members, 3,000 academic and training partners and tens of thousands of registered users spanning the entire information communications and technology industry.

The United States Council for International Business (USCIB) promotes open markets, competitiveness and innovation, sustainable development, and corporate responsibility, supported by international engagement and prudent regulation. Its members include top U.S.-based global companies and professional services firms from every sector of our economy, with operations in every region of the world. USCIB provides business views to policy makers and regulatory authorities worldwide, and works to facilitate international trade and investment.

The Semiconductor Industry Association is the voice of the U.S. semiconductor industry, one of America's top export industries and a key driver of America's economic strength, national security, and global competitiveness. Semiconductors are the microchips that control all modern electronics and the semiconductor industry directly employs nearly a quarter of a million people in the U.S.

### B. Why are Amici so concerned about this appeal?

The Commissioner seeks to upend an area of law that has been settled for over 80 years. The United States and other countries have long used the arm's-length standard as the common measuring stick for evaluating cross-border transactions between related corporate entities. Under the arm's-length standard, the transaction is judged by looking at how the parties would price it if they were two independent entities, not parts of the same group of related entities. This consistent

approach is key to avoiding double taxation on cross border transactions. Yet the Commissioner now seeks to depart from this longstanding approach and *define* a result as "arm's length" even when unrelated parties would do the opposite.

Amici and their members are uniquely situated to explain the broader implications of the Commissioner's arguments. They participate in the sale and licensing of intellectual property across country borders. Treasury's required adherence to the empirical arm's-length standard has guided their business and investment planning for decades. Amici strongly believe that in today's rapidly globalizing economy it is more important than ever that countries around the world—including the United States—follow a consistent standard in evaluating transfer prices for tax purposes. A proliferation of different rules and principles would give rise to taxation in more than one jurisdiction. With each nation having a parochial interest in raising revenues through taxation, Amici's members could be forced to pay billions of additional taxes in different jurisdictions—money that would otherwise be spent to create jobs, invest in innovative new technologies, enter new markets, and provide workers with important benefits that give them a stake in the company. Amici urge this Court to affirm the unanimous Tax Court opinion.

## INTRODUCTION

Eighty years of law and practice establish that the arm's-length standard imposes a fact-intensive test. The standard to be employed "in every case" is "the results that would have been realized if uncontrolled taxpayers had engaged in the same transactions under the same circumstances (arm's length result)." Treas. Reg. § 1.482-1(b)(1); Opening Br. 4 n.2. Where identical transactions are not available, Treasury looks to comparable transactions under comparable circumstances in applying the arm's-length standard. Treas. Reg. § 1.482-1(b)(1). The arm's-length standard is embedded in law that the United States developed here and encouraged abroad. (ER16, 21-22, 75-76.) Amici and their members have relied upon Treasury's adherence to this longstanding definition of the arm's-length standard in pricing their intercompany transactions under 26 U.S.C. § 482.

Treasury initially embraced this factual definition of the arm's-length standard as the basis for the regulations. As Treasury explained, the 2003 regulations "have as their focus reaching results consistent with what parties at arm's length generally would do" in comparable circumstances. (ER37-38.) Several Amici and others submitted evidence of what unrelated parties would do at arm's length including actual agreements negotiated by unrelated parties at arm's length. (ER30-33; ER67-73; SER75-158; SER175-78; SER181.) This evidence showed that arm's length parties do not and would not share

stock-based compensation. (ER30-33; ER67-73.) Treasury considered some of this evidence but found that the particular transactions were not sufficiently comparable to serve as objective evidence. (ER37, 68-70, 72-73.) At least seven times in the preamble, Treasury reasserted its verbal allegiance to the arm's-length standard. *See* 68 Fed. Reg. 51171, 51172-74, 51176 (Aug. 26, 2003) (final regulation is "consistent with the arm's length standard").

In the wake of the adverse Tax Court decision, the Commissioner now tries to rewrite the regulatory history. The en banc Tax Court unanimously found that Treasury's premise in issuing the 2003 regulation—that there were no comparable transactions—ran counter to the evidence before the agency and therefore constituted a failure of reasoned decision-making. (ER67-74, 77.) Unable to defend what its preamble actually says, the Commissioner now claims that it was under no obligation to consider available empirical evidence in evaluating its proposed regulation. In effect, the Commissioner tries to convert an empirical question into a philosophical conclusion that, according to the Commissioner's position on appeal, is not susceptible to factual disputation.

The Commissioner's ambitious reinterpretation of the 2003 preamble thirteen years later should be rejected. "[T]he foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the

action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp*., 318 U.S. 80, 87 (1943)). The *Chenery* principle precludes the Commissioner from selectively repudiating the explanations on which the agency relied upon in its preamble. *Id.* "Although [the Court] may 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned,' [the Court] 'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Nat. Res. Def. Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

Judged by familiar APA principles, Treasury's final rule has all the hallmarks of arbitrary and capricious agency action. Treasury never squared its rule with the rulemaking record, never gave proper notice of its new non-empirical approach to the longstanding arm's-length standard, and never reconciled its new, asserted definition of arm's length with the central concept of the arm's-length standard that has long been embodied in U.S. and international law. Although the United States urged and built an international standard for pricing cross-border transactions, it now seeks to abandon that approach. This could have broad ranging consequences for U.S. companies that have relied upon the longstanding arm's-length standard. The fifteen Tax Court judges who joined in the *Altera* opinion properly invalidated the final rule.

## ARGUMENT

### I. The arm's-length standard is the foundation of transfer pricing laws that the United States developed and exported to other nations.

#### A. Under U.S. law, the arm's-length standard imposes a fact-intensive test that looks to how transactions between unrelated parties are handled.

In applying the arm's length standard, Treasury was not writing on a clean slate. Under § 482, the Commissioner may reallocate income or deductions among commonly controlled entities if doing so "is necessary in order to prevent evasion of taxes or clearly reflect … income …." 26 U.S.C. § 482 (previously codified at 26 U.S.C. § 45 (1928)). For more than eight decades, the courts and Treasury have recognized that the actual results of transactions between unrelated parties form the basis on which to evaluate related-party transactions.

The first cases arose before Treasury had promulgated regulations on the subject. In 1933, the Board of Tax Appeals expressly recognized that the arm's-length standard is the statutory measure of whether income had been clearly reflected in transactions between related parties. "[T]he purpose of this section of the income tax statutes is to place transactions between related trades or businesses owned or controlled by the same interests upon the same basis as if such businesses were dealing at arm's length with each other." *Advance Cloak Co. v. Comm'r*, B.T.A.M. (P-H) ¶ 33,078, 1933 WL 4800, at *4 (1933).

Two years later, Treasury agreed with the courts' analysis. The 1935 regulations declared that "the purpose" of what is now § 482 "is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer." Art. 45-1, Regulation 86 (1935). The "true net income" was in turn defined as the net income "which would have resulted to the controlled taxpayer, had it in the conduct of its affairs … dealt with the other member or members of the group at arm's length." Art. 45-1(a)(6), Regulation 86 (1935). Treasury mandated: "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Art. 45-1(b), Regulation 86 (1935).

Thirty-three years later, Treasury reaffirmed this 1935 formulation. Treasury again explained that "the purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer …." Treas. Reg. § 1.482-1(b)(1) (1969). "The standard to be applied *in every case* is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." *Id.* (emphasis added). Those principles remain in the regulations today. Treas. Reg. §§ 1.482-1(a)(1), (b)(1) (2016). "[T]he language is unequivocal: this arm's length standard is to be applied 'in every case.'" *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1196 (9th Cir. 2010).

In 1968, Treasury promulgated regulations on cost-sharing arrangements, which are arrangements among controlled taxpayers for jointly bearing the costs of developing and owning intangibles. The 1968 regulations recognized that cost sharing is subject to the arm's-length standard: "In order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions must be comparable to those which have been adopted by unrelated parties similarly situated had they entered into such an arrangement." Treas. Reg. § 1.482-2(d)(4) (1969). Treasury directed that "the district director shall not make allocations with respect to such [cost-sharing agreement] except as may be appropriate to reflect each participant's arm's length share of the costs and risks of developing the property." Treas. Reg. § 1.482-2(d)(4) (1969). Thus, since the original development of the 1968 regulations, Treasury has based the cost-sharing provisions on what arm's-length parties actually do.[2]

This longstanding arm's-length standard defines and limits the Commissioner's powers. It limits the IRS's ability to make reallocations

---

[2] The IRS subsequently recognized the real world usage of cost-sharing arrangements. "Cost sharing arrangements have long existed at arm's length between unrelated parties." IRS, *A Study of Intercompany Pricing under Section 482 of the Code*, IRS Notice 88-123, 1988-2 C.B. 458, 53 Fed. Reg. 43,522, 43,555 (Oct. 27, 1988) [hereafter *1988 White Paper*].

to transactions between controlled parties where the results are consistent with the results of comparable transactions among unrelated parties. Courts have consistently recognized this point. *See Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 407 (1971) (rejecting Commissioner's reallocation because it deviated from tax results that the taxpayer would have achieved if it had engaged in uncontrolled transaction with uncontrolled party).[3] If a transaction meets the arm's-length standard, then by definition common control—the statutory premise for Treasury action—has not distorted either party's income or led to any evasion.

Because the arm's-length standard requires an analysis of facts concerning the behavior of unrelated parties, it imposes what is necessarily a fact-intensive empirical test. Thus, the regulations contain 90 references to "facts and circumstances" or "factors" in

[3] *See also Bausch & Lomb, Inc. v. Comm'r*, 92 T.C. 525, 593 (1989), *aff'd*, 933 F.2d 1084, 1091 (2d Cir. 1991) (rejecting IRS reallocation as contrary to arm's-length standard); *Davis v. United States*, 282 F.2d 623, 627 (10th Cir. 1960) (rejecting IRS position when parties' bargain was similar to what "parties dealing at arm's length would have made"); *Simon J. Murphy Co. v. Comm'r*, 231 F.2d 639, 644 (6th Cir. 1956) ("allocation is not permitted" where controlled parties "deal with each other at arms length as they would deal with strangers in the respective courses of their business activities").

addressing the application of the arm's-length standard.[4] The circuit courts have similarly recognized that a "determination by the Commissioner under Section 482 'is essentially one of fact.'" *Phillipp Bros. Chems., Inc. (N.Y.) v. Comm'r*, 435 F.2d 53, 57 (2d Cir. 1970) (quotation omitted); *Local Fin. Corp. v. Comm'r*, 407 F.2d 629, 632 (7th Cir. 1969) (same). The Tax Court agrees: "the determination under section 482 is essentially and intensely factual." *Procacci v. Comm'r*, 94 T.C. 397, 412 (1990).

### B. At the United States' urging, the arm's-length standard has been adopted in international treaties, under which it helps prevent double taxation.

The arm's-length standard is not a peculiar feature of U.S. tax law. To the contrary, the United States has long championed the standard and made it "the international norm." *1988 White Paper*, 53 Fed. Reg. at 43,523. As a result, the arm's-length standard is reflected in the network of international tax treaties that were negotiated in part by the United States. The key objective was to ensure all nations are

[4] *See, e.g.*, Treas. Reg. § 1.482-1(d)(1) (comparability of transactions "must be evaluated considering *all factors* that could affect prices or profits in arm's length dealings" (emphasis added)); Treas. Reg. § 1.482-1(d)(1) (degree of comparability "between the tested party and the uncontrolled taxpayer depends upon *all the relevant facts and circumstances*" (emphasis added)).

using a consistent approach in determining how profits and deductions are allocated among related parties.

In 1935, the United States was quick to incorporate the arm's-length standard of § 482's predecessor into its first tax treaty with France. *See* Convention Concerning Double Taxation, U.S.-Fr. Art. IV, Apr. 27, 1932, 49 Stat. 3145, 3146-47 (1935). Over the next 75 years, largely as the result of vigorous efforts by the United States, the arm's-length standard has been adopted as the international norm by which countries allocate revenues, costs and profits among related entities. As Treasury has explained, "[t]he arm's length standard is embodied in all U.S. tax treaties," and "is incorporated into most tax treaties to which the United States is not a party." *1988 White Paper*, 53 Fed. Reg. at 43,539, 1988 WL 561206 at *32. Indeed, "virtually every major industrial nation takes the arm's length standard as its frame of reference in transfer pricing cases." *Id*.

Under U.S. bilateral tax treaties, the arm's-length standard looks to what unrelated parties do or would do in comparable circumstances. For example, the income tax treaty with the United Kingdom provides: "if the conditions made between the two enterprises had been those that *would have been made between independent enterprises*, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits." 2001 U.S.-United Kingdom Income

Tax Treaty, art. 9 (July 24, 2001), 7 Tax Treaties (CCH) ¶ 10,901.09 at 201,019 (emphasis added).

Amici's members have a significant interest in the uniform application of the arm's-length standard to avoid double taxation in a global operating environment. The network of treaties applying the arm's-length standard provides a predictable standard for both taxpayers and tax administrators. The goal of the United States and its treaty partners has been to have a single uniform standard for transfer pricing to facilitate cross-border trade and minimize the risks of double taxation. "Double taxation generally occurs in the context of transfer pricing adjustments, where tax authorities in competing jurisdictions disagree over income allocations attributable to transfer pricing." Robert G. Clark, Comment, *Transfer Pricing, Section 482, and International Tax Conflict,* 42 Am. U.L. Rev. 1155, 1157 & n.9 (1993).

The treatment of stock-based compensation illustrates the need for consistent treatment as a bulwark against double taxation. If the United States were to depart unilaterally from the arm's-length standard, it may be allocating costs to a country that did not recognize the costs as ones that arm's-length parties would share, risking double taxation by both countries of the same income. Treasury may not disregard this country's treaty obligations and thereby disrupt the international convention under the arm's-length standard. *See Ventress v. Japan Airlines*, 486 F.3d 1111, 1115 (9th Cir. 2007) ("Federal law

must be … strictly construed to avoid conflict with treaty obligations."); *Shizuko Kumanomido v. Nagle*, 40 F.2d 42, 44 (9th Cir. 1930).

## II. Treasury's final rule eviscerates the arm's-length standard.

The Commissioner now seeks to radically change the nature of the arm's-length standard from a factual inquiry to a legal inquiry—only because stubborn real-world facts are in the Commissioner's way. He argues on appeal that he may simply declare a result as "arm's length" even when the record evidence shows that parties at arm's length actually do otherwise. *See* Opening Br. 34, 38, 46-47, 57-58. As Altera explains, Treasury's regulation must be judged solely on the reasoning actually invoked by the agency in the rulemaking. *See* Altera Br. 42-47. Further, the problems with the Commissioner's arguments on appeal are not limited to what the agency said in the rulemaking; they extend to what Treasury *failed* to consider in the rulemaking.

### A. Treasury arbitrarily failed to consider substantial reliance interests.

Blackletter administrative law instructs that an agency may not ignore an important aspect of the problem it is addressing. *State Farm*, 463 U.S. at 43 (agency rule is normally arbitrary "if the agency has … entirely failed to consider an important aspect of the problem"). Courts have held that the APA requires agencies to give due consideration to substantial reliance interests. *See, e.g.*, *Michigan v. EPA*, 135 S. Ct. at 2711 (EPA's failure to consider costs, including costs to the industry,

violated APA's ban on arbitrary and capricious action); *Mobile Comm'ns Corp. v. FCC*, 77 F.3d 1399, 1407 (D.C. Cir. 1996) (FCC did not engage in reasoned rulemaking where the agency "reversed itself at the eleventh hour" and "failed to address … whether its new position was consistent with the [petitioner's] reliance interests"). Here, the Commissioner has reversed himself—not at the eleventh hour but long after the stroke of midnight—and has ignored the reliance interests of Amici's members.

Those interests are significant. In planning and implementing their global business transactions and investments, Amici's members relied on well-established understandings of the applicable statutes and regulations. Amici's members navigate international legal waters by reference to objective landmarks set by well-established precedent. Amici's members, who engage annually in trillions of dollars of cross-border intercompany transactions, rely heavily upon U.S. and international recognition of the arm's-length standard for all their cross-border transactions, including transactions involving the joint development of intangibles.[5] In light of these industry reliance

[5] Taxpayers who comply with the plain language of the valid regulations at § 1.482-7—i.e., without the final rule in § 1.482-7(d)(2)—therefore are not properly subject to IRS adjustment under § 482. "Taxpayers are merely required to be compliant, not prescient." *Veritas Software Corp. v. Comm'r*, 133 T.C. 297, 316 (2009).

interests, the Commissioner "needed a more reasoned explanation for [his] decision to depart from … existing … policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

Yet Treasury has never considered these reliance interests or justified the change. In the preamble, Treasury asserted that its new regulation was "consistent with … the arm's length standard (and therefore with the obligations of the United States under its income tax treaties …)." 68 Fed. Reg. at 51172. Treasury reached this conclusion in large part because of its belief that "there is little, if any, public data regarding high-profit intangibles." *See id.* at 51172-73. The Commissioner now takes the position that the examination of arm's-length data is unnecessary and that § 482 allows a result directly contrary to all of the evidence derived from arm's-length dealings. Opening Br. 30, 34. But he fails to explain how this stance is consistent with the duty in the income tax treaties to look to arm's-length transactions.

The Commissioner has not informed U.S. treaty partners that there had been any change to its longstanding understanding of arm's length. The United States has made no changes to the relevant language in Article 9 of the U.S. Model Tax Treaty, which "incorporates … the arm's length principle reflected in U.S. domestic transfer pricing

provisions, particularly Code section 482."[6] Article 9 further provides: "It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's length standard."[7]

In *Xilinx*, this Court looked to precisely this international understanding of the arm's-length standard: "It is enough that our foreign treaty partners and responsible negotiators in the Treasury thought that arm's length should function as the readily understandable international measure." *Xilinx*, 598 F.3d at 1197. The Court's ultimate holding in *Xilinx* followed a crowd of submissions by foreign tax officials and U.S treaty negotiators, all of whom pointed out the risks engendered by Treasury's refusal to consider uncontroverted evidence of transactions that actually have taken place on an arm's length basis. *See, e.g.*, Xilinx Pet. Reh'g Ex. E (letter signed by former tax officials in Switzerland, France, Australia, England, Germany,

[6] 1996 Technical Explanation, 1 Tax Treaties (CCH) ¶ 216, at 10,691-26; *see also* 2006 Technical Explanation, 1 Tax Treaties (CCH) ¶ 215, at 10,640-41 (same).

[7] 1996 Technical Explanation, 1 Tax Treaties (CCH) ¶ 216, at 10,691-26; 2006 Technical Explanation, 1 Tax Treaties (CCH) ¶ 215, at 10,641 (same). *See also* ER58 ("Treasury has … repeatedly reinforced this conclusion in technical explanations to numerous income tax treaties.").

Japan, and Mexico), filed in Ninth Circuit docket no. 06-74246 on August 12, 2009 (Dkt. 77).

Despite the pivotal role that international understanding and consensus played in *Xilinx*, the Commissioner has never grappled with the full effects of his unexplained reformulation of the arm's-length standard. The Commissioner's revisionist view could have ramifications beyond stock-based compensation. The arm's-length standard was adopted in international tax treaties to prevent multiple taxation by having a consistent approach for pricing transactions between related parties. The Commissioner now believes that he can impose terms on qualified cost-sharing arrangements even when those terms are not consistent with the arm's length standard. If the Commissioner can depart from the arm's-length standard here, then the agency can invoke the same principle with regard to many other kinds of transactions. Other countries could seize on the Commissioner's new approach and adopt similar approaches to favor their own fiscs. In these circumstances, the carefully woven fabric of international agreements—held together by reliance on the arm's-length standard—could unravel, subjecting U.S. companies to multiple taxation.

"Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far reaching consequences." *United States v. Byrum*, 408 U.S. 125, 135 (1972). The Commissioner's attempt

to depart from decades of settled law is particularly unfortunate in the tax field, where the Supreme Court has long recognized a special need to avoid subjecting taxpayers to unanticipated economic burdens. *See, e.g.*, *Miller v. Standard Nut Margarine Co. of Fla.*, 284 U.S. 498, 508 (1932) ("It is elementary that tax laws are to be interpreted liberally in favor of taxpayers ...."). "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014).

In sum, the Commissioner cannot now—through his litigation position thirteen years after the final rule—eviscerate the reliance interests of Amici's members engendered by decades of precedent, administrative positions, and tax treaties.

### B. The Commissioner should not be allowed to depart from the position taken during the rulemaking.

The Commissioner's "no-facts-needed" approach should be rejected because it represents a departure from the position the agency took during its own rulemaking. In that rulemaking, Treasury said: "The regulations ... have as their focus reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." 68 Fed. Reg. at 51173. Amici's members relied upon decades of

precedent defining the arm's-length standard when submitting comments in response to Treasury's proposed notice of rulemaking.

While Treasury engaged in a superficial analysis of certain data in the rulemaking, the Tax Court unanimously rejected Treasury's analysis because it ran counter to all record evidence before the agency. (ER73-74.) The record showed, as the Tax Court explained, that unrelated parties do not and would not share stock-based compensation in *any* kind of transaction. (ER68-70.) "Several commentators identified arm's-length agreements in which stock-based compensation was not shared or reimbursed." (ER32, 68.) Other parties searched their databases and files, finding "no evidence of any transaction between unrelated parties that required one party to reimburse the other party for amounts attributable to stock-based compensation." (ER67.) The evidence showed that unrelated parties would not share the burden of stock-based compensation because its "value … is speculative, potentially large, and completely outside the control of the parties." (ER33, 71.)[8] The record revealed no transactions of any kind

[8] In *Xilinx v. Commissioner,* the Commissioner's own expert agreed that unrelated parties would not share such costs because they "would find it hard to agree how to measure such value and because doing so would leave them open to potential disputes." *Xilinx Inc. v. Comm'r*, 125 T.C. 37, 58 (2009); *see also* ER25. Also in *Xilinx*, the Tax Court rejected the Commissioner's argument that related parties *implicitly* share stock-based compensation. *See* 125 T.C. at 59 (explaining that the Commissioner offered no credible evidence

in which unrelated parties shared stock-based compensation. Because Treasury "offered an explanation for its decision that runs counter to the evidence before the agency" (*State Farm*, 462 U.S. at 43), the Tax Court found the final rule to be invalid under the APA. (ER73-74.)

The Commissioner now makes no effort to defend the empirical analysis articulated in the preamble. Before this Court—thirteen years after the rulemaking—the Commissioner declares that the empirical findings in the preamble were "extraneous" and posits that its rule can rest solely on abstract reasoning without *any* empirical foundation. Opening Br. 65. Under the Commissioner's current view, the presence or absence of arm's-length evidence is irrelevant.[9] "The short—and sufficient—answer to [Treasury's] submission is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *State Farm*, 462 U.S. at 50. "[W]e may only rely on what the agency said in the record to determine what the agency decided and why." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife*, 378 F.3d 1059, 1072

---

supporting this argument and that the taxpayer refuted this argument through the credible testimony of numerous witnesses).

[9] Amici supporting the Commissioner suggest that the agency can depart from the arm's-length standard by framing the cost sharing rules as a safe harbor, where Treasury can set the rules however it chooses. *See* Amicus Br. of J. Richard Harvey et al. 5, 32-33. The Tax Court properly disposed of this argument in its opinion. (ER65 n.21.)

& n.9 (9th Cir. 2004); *see id.* ("we will not delve into the unexpressed thought processes of an agency").

The Commissioner's change in position is not justified by the "commensurate-with-income" (CWI) language added to § 482 in 1986. As Altera explains, this language is not an authorization to uproot the arm's-length standard. Altera Br. 62-68. The CWI language applies only to licenses or transfers of intangibles. 26 U.S.C. § 482. And, as the Tax Court found, Congress never intended for the CWI standard to supplant the arm's-length standard. (ER57-58.) In fact, Treasury has repeatedly taken the position that Congress intended for CWI to work consistently with the arm's-length standard. (ER58.) "The preamble to the final rule does not indicate that Treasury intended to abandon this conclusion and [the Tax Court] conclude[d] that it did not." (ER58-59.)

The Commissioner acknowledges on appeal that his current view of the regulations "change[s] the legal landscape" (Br. 30) but Treasury never acknowledged such a change in the rulemaking. If it had, Treasury would have needed to supply in the rulemaking good reasons for its change of course. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515-16 (2009). Treasury did not explain how a non-empirical standard is consistent with the statute. Treasury did not explain why a non-empirical standard is better than an empirical one. Treasury did not address the reliance interests of Amici and its members in the

longstanding definition of the arm's-length standard. The final rule cannot stand.

### C. The Commissioner's new position empties a well-recognized concept of its established meaning.

Even if Treasury had announced its position at the time of proposal of the regulation, it would still be invalid. Agency action "cannot pass muster under ordinary principles of administrative law" when it is "unmoored from the purposes and concerns" of the federal laws. *See Judulang v. Holder*, 132 S. Ct. 476, 490 (2011).

Treasury's regulation insists on calling "arm's length" a result that has no connection to what actually happens at arm's length. Treasury attempts to convert the arm's-length standard's empirical analysis of how unrelated parties price transactions into a vehicle for announcing the agency's policy preference. But setting the arm's-length standard adrift from the mooring of actual arm's-length practice would make its name a misnomer and its premise a pretext. "Arm's length" simply becomes a cover for administrative fiat. To paraphrase Lincoln, calling something "arm's-length" doesn't make it so—particularly when arm's-length companies do the opposite.[10] To accept the

---

[10] As this Court recounted, "Abraham Lincoln told a story about a lawyer who tried to establish that a calf had five legs by calling its tail a leg. But the calf had only four legs, Lincoln observed, because calling a tail a leg does not make it so." *Righthaven LLC v. Hoehn*, 716 F.3d

Commissioner's position would require related parties to share burdens that unrelated parties do not share.

Treasury resorted to redefining words of well-established meaning after this Court recognized in *Xilinx* that Treasury could not prevail based on that established meaning. In this Court's initial decision in *Xilinx*, the panel unanimously agreed that the inclusion of stock-based options in cost-sharing agreements is "simply not an arm's length result." *Xilinx, Inc. v. Comm'r*, 567 F.3d 482, 491 (9th Cir. 2009) ("If unrelated parties operating at arm's length would not share the [employee stock options] cost, requiring controlled parties to share it is simply not an arm's length result."); *id.* at 498, 500 (Noonan, J. dissenting). On rehearing, the majority held that the taxpayer's approach was consistent with the "parity" purpose of the § 482 regulations and the understanding of U.S. treaty partners. *Xilinx*, 598 F.3d at 1196-97; *see id.* at 1198 & n.2 (Fisher, J. concurring) (taxpayer's reading of regulation was more reasonable in light of industry's settled practice and expectations regarding the arm's-length standard).

Even today, Treasury's regulations maintain the long-standing definition of the arm's-length standard. Section 1.482-1(b)(1) is unequivocal that the arm's-length standard applies "in every case," and

---

1166, 1167 (9th Cir. 2013) (citing David Herbert Donald, *Lincoln* 396 (1995)).

thus Treasury cannot adjust the results of a transaction if the results are consistent with those of unrelated parties engaging in a comparable transaction on comparable terms. Treas. Reg. § 1.482-1(b)(1) (emphasis added). The Commissioner now declares that what uncontrolled taxpayers do is irrelevant but this is the definition of arbitrary. Opening Br. 34. "An agency that does both A and not-A at the same time is engaged in self-contradiction. Trying to have things both ways is arbitrary." *Ho v. Donovan*, 569 F.3d 677, 681 (7th Cir. 2009).

The Commissioner asserts that the so-called coordinating amendments harmonize the long-standing arm's-length standard in § 1.482-1(b)(1) with the new direction as to cost-sharing arrangements in § 1.482-7(d)(2). Opening Br. 21. But the coordinating amendments do not reconcile them. They do no more than dictate that the result under § 1.482-7(d)(2) is consistent with the arm's-length standard. It is completely circular to argue that an amendment "coordinates" other regulations when it does no more than name them. *See State Farm*, 463 U.S. at 43; *Robles-Urrea v. Holder*, 678 F.3d 702, 709 (9th Cir. 2012) ("*ipse dixit* lacks any reasoned foundation").

## III. The remaining arguments of the Commissioner and its supporting Amici academics are immaterial to the issues presented.

### A. The magnitude of the tax revenues that might be implicated by Treasury's final rule should not affect the Court's standard of review.

Amici supporting the Commissioner express concern that the outcome would reduce federal revenues by substantial sums. *See* Amicus Br. of Anne Alstott et al. 31. This argument is unacceptable on its face: it would mean that regulations or administrative interpretations that significantly increase taxpayers' aggregate tax liabilities would receive less scrutiny under the APA. Compliance with the APA is required for the operation of a fair and transparent tax system, and the amount of money involved in a particular violation of procedural rules is legally irrelevant.

Delays relating to taxpayer challenges of Treasury regulations are a built-in feature of the U.S. tax collection system. Absent an express statutory exception, the Tax Anti-Injunction Act bars any suit "for the purposes of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a) (2012). It is Treasury's position that U.S. taxpayers cannot challenge the validity of Treasury regulations through an injunction action before additional tax has been assessed and, in the case of refunds, paid. That Treasury should have to forgo or repay taxes to which it was never entitled is no cause to shortchange the American people of fair and transparent administrative procedures.

This Court should not be swayed by Amici's alarmist argument that, if the 2003 Treasury regulation falls, "[v]irtually every existing tax regulation could be challenged on procedural grounds." Amicus Br. of Anne Alstott et al. 31. Each regulation must be addressed based on its own circumstances. In this case, the Tax Court recognized that the Treasury's handling of the 2003 rulemaking was especially egregious; it "epitomize[d] arbitrary and capricious decision-making" and was based on an "*ipse dixit* conclusion, coupled with [a] failure to respond to contrary arguments resting on solid data." (ER77-78) (quotations and citation omitted). The Court would open no floodgates by affirming the Tax Court opinion here. This final rule was adopted without satisfying even the most basic requirements of reasoned decision-making.

**B. There are no grounds for allowing the final rule to remain in effect.**

Amici supporting the Commissioner suggest that the 2003 regulation, even if held to be unjustified, should remain in place during a remand and reformulation. *See* Amicus Br. of J. Richard Harvey et al. 32-33; Amicus Br. of Anne Alstott et al. 29-30. Of course, this issue is waived because Treasury did not raise it before the Tax Court or in its opening brief. As this Court has repeatedly admonished, "arguments not raised by a party in an opening brief are waived," and "amicus curiae generally cannot raise new arguments on appeal." *Zango Inc. v. Kaspersky*, 568 F.3d 1169, 1177 & n.8 (9th Cir. 2008) (citations

omitted); *see also Russian River Watershed Prot. Comm'n v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998) (declining to address argument because "as [amicus curiae] candidly acknowledges, it is raised for the first time on appeal, and not by any party"). Furthermore, as Altera explains, amici's request for remand without vacatur is particularly inappropriate here. This case arises from a tax deficiency challenge and is not a direct challenge to the regulations. *See* Altera Br. 79-80.

In any event, Treasury is not entitled to a "do-over" thirteen years after the final rule is promulgated. "[V]acatur of an unlawful agency rule normally accompanies a remand." *Alsea Valley All. v. Dep't of Commerce*, 358 F.3d 1181, 1185 (9th Cir. 2004). The circumstances here do not warrant an exception. As the Tax Court determined, Treasury's failure in 2003 was manifest and panoramic. The final rule had no basis in fact. The final rule was contrary to evidence before agency in 2003. Treasury failed to rationally connect choices it made with the facts it found. Treasury failed to respond to significant comments. With these serious flaws, the final rule cannot be rehabilitated. *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 8-9 (D.C. Cir. 2009) (vacating agency rule where the agency's "dereliction in this case is particularly egregious" and noting that "[i]n the past we have not hesitated to vacate a rule when the agency has not responded to empirical data or to an argument inconsistent with its conclusion").

Moreover, maintaining the 2003 final rule is not necessary to prevent the kind of irreversible harm at issue in the few "exceptional" cases where remand without vacatur has been used. *E.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (leaving invalid regulation in place because "[i]n the present case, concern exists regarding the potential extinction of an animal species"). The Commissioner's position on cost sharing does not raise the same concerns. *See* Altera Br. 80-81; TechNet Amicus Br. 17.

## CONCLUSION

The Court should affirm the judgment of the Tax Court.

DATED this 23rd day of September, 2016.

STEPTOE & JOHNSON LLP

By s/ Alice E. Loughran
Charles G. Cole
Michael Durst
Alice E. Loughran
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

Bennett Evan Cooper
201 E. Washington Street, Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for Amici Curiae

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and 32(a)(7)(B)(i) because it contains 6970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Century Schoolbook.

DATED this 23rd day of September, 2016.

s/ Alice E. Loughran
Alice E. Loughran

## CERTIFICATE OF SERVICE

I certify that on September 23, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Alice E. Loughran
Alice E. Loughran