**Nos. 16-70496, 16-70497**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ALTERA CORPORATION AND SUBSIDIARIES,
*Petitioner-Appellee*,

vs.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellant*.

# AMICUS CURIAE BRIEF SUPPORTING APPELLEE AND AFFIRMANCE ON BEHALF OF CISCO SYSTEMS, INC.

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12
Hon. L. Paige Marvel

Roderick K. Donnelly
Neal A. Gordon
MORGAN, LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone No. (650) 843-7289
Facsimile No. (650) 843-4001

Thomas M. Peterson
MORGAN, LEWIS & BOCKIUS LLP
One Market Street, Spear Tower
San Francisco, CA 94105
Telephone No. (415) 442-1000
Facsimile No. (415) 442-1001

Attorneys for Amicus Curiae
Cisco Systems, Inc.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1(a), Cisco Systems, Inc. certifies that it is a California corporation whose organized under the laws of the referenced jurisdiction. Cisco Systems, Inc. has no parent company and no publicly held company owns more than 10 percent of its stock.

Dated: September 23, 2016

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

# TABLE OF CONTENTS

Page


INTEREST OF AMICUS CURIAE ........................................................ 1

SUMMARY ........................................................................................ 1

ARGUMENT ....................................................................................... 3

I. CWI PROVIDES NO BASIS TO OVERTURN THE TAX COURT'S DECISION ........................................................ 3

A. The language of CWI does not apply to co-development of intangibles under a cost sharing arrangement...................... 3

B. The purpose of CWI is consistent with its language................. 7

II. THE DISCUSSION OF COST SHARING IN THE CONFERENCE COMMITTEE REPORT RELATING TO CWI IS NOT A BASIS TO OVERRIDE THE ARM'S LENGTH STANDARD ............................................................... 14

A. Conference Report language about cost sharing does not trump the statutory language ................................................ 16

B. The Conference Report language regarding cost sharing neither requires inclusion of stock-based compensation, nor changes application of the arm's length standard............ 17

III. CONCLUSION ........................................................................ 21

STATEMENT OF RELATED CASES .................................................. 23

CERTIFICATE OF COMPLIANCE...................................................... 24

CERTIFICATE OF SERVICE ............................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abrego Abrego v. The Dow Chemical Co.*,
443 F.3d 676 (9th Cir. 2006) .................................................... 16

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011)................................................................... 17

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005)................................................................... 16

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .................................................... 16

## STATUTES

I.R.C. § 482 .................................................................................. *passim*

Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100
Stat. 2085, 2563 (1986) ........................................................ 3, 11, 16, 17

## OTHER AUTHORITIES

*General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984*.......................................................................... 6, 7

FRAP 29(c)(5) ...........................................................................................1

H.R. 3838, 99th Cong. (as passed by the Senate on June 24,
1986), *available at* 132 Cong. Rec. 16,061 (1986) ................................ 11

H. R. 3838, 99th Cong. § 641 (1985) (as passed by the House of
Representatives on Dec. 17, 1985) ......................................................... 11

H.R. Conf. Rep. No. 99-841, at II-638 (1986) ......................................... 15

H.R. Rep. No. 99-426, at 423–24 (1985).......................................................8

T.D. 6952, 33 Fed. Reg. 5848.............................................................. 16, 20

T.D. 8470, 58 Fed. Reg. 5263 .......................................................................... 13

T.D. 8552, *Intercompany Transfer Pricing Regulations Under Section 482*, 59 Fed. Reg. 34971 ............................................ 9, 11, 13, 18

Treasury Department, *Technical Explanation of the Convention Between the Government of the United States of America and the Government of the United Kingdom Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and on Capital Gains*, Article 9, 2001 .................................. 13

## INTEREST OF AMICUS CURIAE

This brief is submitted by amicus curiae Cisco Systems, Inc. with the consent of both parties.[1] Cisco is a large technology company and a recognized leader in networking and communications technology. Cisco designs, manufactures, and sells networking and other products, and spends billions of dollars each year on research and development. Cisco uses cost sharing for global research and development projects that facilitate its ability to compete in the global marketplace. Cisco has a direct and substantial interest in the Court's disposition of the appeal. Cisco is concerned about the Commissioner's misuse in this case of the commensurate-with-income rule and its legislative history.

## SUMMARY

On appeal from the Tax Court's holding invalidating § 1.482-7(d)(2) (the "***final rule***"), the Commissioner asserts that Treasury's 2003 rulemaking was justified by language in a 1986 Conference Report discussing consistency of the newly-added § 482 commensurate-with-income ("***CWI***") provision with cost sharing arrangements. The

[1] All parties have consented to the filing of this amicus brief. Pursuant to FRAP 29(c)(5), amicus curiae states that no counsel for any party to this proceeding authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amicus curiae contributed money that was intended to fund preparing or submitting this brief.

Commissioner asserts on appeal that, as an expression of purported 1986 Congressional will to change the arm's length standard for cost sharing arrangements, certain so-called "coordinating amendments" promulgated by Treasury along with the final rule are valid under *Chevron* and *State Farm*. According to the Commissioner, the effect of the coordinating amendments is that, for cost sharing, satisfaction of the arm's length standard *is no longer* a factual matter; and the final rule is valid because the Commissioner can ignore evidence of third-party behavior.

The overarching issue here is whether the Tax Court correctly held Treasury's 2003 promulgation of the final rule is invalid as an administrative law matter. We believe this Court should uphold the Tax Court's decision for the reasons Altera Corporation explains in its brief.

The Commissioner asserts that language from the 1986 congressional legislative history (especially the conference committee report) accompanying the CWI change to § 482 sanctions modification of the arm's length standard for sharing costs under cost sharing arrangements—i.e., to impose a result different from that which would prevail among unrelated parties acting at arm's length.

Amicus curiae Cisco writes to explain how the Commissioner, in his appellate argument, seriously misinterprets § 482's CWI provision and its

legislative history. Controlling statutory language and the legislative history belie the Commissioner's arguments. Contrary to the Commissioner's argument, CWI doesn't apply to co-development of intangibles in a cost sharing arrangement, and so it is entirely inapplicable here. The language in the 1986 Conference Report doesn't mean what the Commissioner says it means; Congress wasn't trying to change the arm's length standard for cost sharing arrangements when it adopted CWI. And the language in the legislative history does not support the result the Commissioner advocates.

## ARGUMENT

### I. CWI Provides No Basis to Overturn the Tax Court's Decision.

#### A. The language of CWI does not apply to co-development of intangibles under a cost sharing arrangement.

CWI was added to § 482 in 1986 via an amendment entitled "Treatment of Certain Royalty Payments:"

> In the case of any transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2563 (1986) (the "**1986 Act**").

CWI makes no mention of costs or cost sharing. Instead, CWI applies to any "transfer (or license)" of intangible property. § 482. The distinction

is critical because "transfers or licenses" and "cost sharing arrangements" trigger different treatment under the rules of § 482.

*As for "transfers or licenses*," when an entity unilaterally develops intangible property, it owns that property. The entity may not license or otherwise transfer the intangible to a related party without charging an arm's length royalty or other compensation. Under § 482, arm's length compensation is determined by considering the amount unrelated parties would charge for the intangible. The goal is to establish compensation for related-party licenses or other transfers of intangibles by reference to "comparable uncontrolled transactions" ("comparables"), which provide prices from actual transactions between unrelated parties for licenses or transfers of the same or similar property. It is often difficult, however, to find unrelated party transactions involving comparable intangibles—a difficulty that, as discussed below, led to the 1986 enactment of CWI.

*Under a cost sharing arrangement, in contrast*, related parties agree to co-develop intangibles by jointly bearing costs of developing the intangibles.[2] Rights in co-developed intangibles spring upon creation to

---

[2] As relevant in 2003, § 1.482-7(a)(1) provided that "[a] cost sharing arrangement is an agreement under which the parties agree to share the costs of development of one or more intangibles in proportion to their shares of reasonably anticipated benefits from their individual

each participant—there is no transfer or license of co-developed intangibles from one participant to the other. As a result, parties to a cost sharing arrangement don't need to pay each other an arm's length charge to use the co-developed intangibles. Cost sharing thus enables multinational taxpayers to develop intangibles for global use without the need for licenses or other transfers of the developed intangibles.

The Commissioner knows that related parties have long employed cost sharing for this reason. In the 1988 study of transfer pricing that Congress directed Treasury to conduct in connection with the enactment of CWI, Treasury confirmed:

> The legislative history envisions the use of bona fide research and development cost sharing arrangements as an appropriate method of attributing the ownership of intangibles *ab initio* to the user of the intangible, *thus avoiding section 482 transfer pricing issues related to the licensing or other transfer of intangibles*.

*A Study of Intercompany Pricing under Section 482 of the Code* (hereafter "**White Paper**"), IRS Notice 88-123, 1988-2 C.B. 458, 474 (emphasis added).

The fact that rights in cost-shared intangibles arise *ab initio* to the cost sharing participants—thereby avoiding licensing or transfer issues—was

---

exploitation of the interests in the intangibles assigned to them under the arrangement."

recognized before CWI was adopted in 1986. Immediately after the sentence quoted in the preceding paragraph, the *White Paper* references a 1984 Congressional Joint Committee on Taxation publication discussing a 1984 precursor to CWI, and indicating that a "transfer" of an interest in intangible property does not include the development of intangible property under a cost sharing arrangement. *Id*. at n. 147. In language that directly contradicts the Commissioner's attempt in this appeal to apply the "license or transfer" language to cost sharing arrangements, the Joint Committee said: "[T]he special rule for intangibles *will have no application to bona fide cost-sharing arrangements (under which research and development expenditures are shared by affiliates as or before they are incurred, instead of being recouped by licensing or selling the intangible after successful development)*." Staff of the Jt. Comm. on Tax'n, 98th Cong., *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984*, at 433 (Jt. Comm. Print 1984) (emphasis added). In other words, the statutory condition for CWI to apply—a transfer or license of an intangible—never comes into play with intangibles co-developed under a cost sharing arrangement.

This means that the Commissioner is wrong in asserting that CWI applies to "intangibles *transactions* in general, and cost sharing

arrangements in particular" (Appellant's Br. at 57 (emphasis added)). CWI does not apply to co-development of intangibles under a cost sharing arrangement, and the Commissioner is wrong to try to so apply it.

**B. The purpose of CWI is consistent with its language.**

The plain language of CWI controls and defeats the Commissioner's effort to invoke it in this case. Of course, unambiguous statutory language controls—there is no need to look to legislative history. Nevertheless, even if this Court examines the legislative history relating to CWI, it will find nothing even remotely suggesting that the purpose of CWI is to allow the Commissioner to ignore comparable transfers or licenses of intangibles, let alone to ignore comparable transactions concerning cost sharing arrangements.[3]

[3] The Commissioner misinterprets this silence in the legislative history, arguing first that "nothing in the 1986 House Report suggests that the periodic-adjustment requirement contemplated . . . would be subject to taxpayer veto based on evidence that agreements between unrelated parties do not provide for such adjustments," (Appellant's Br. at 54) and later that "nothing in the 1986 Conference Report suggests that a taxpayer would be entitled to modify the basic parameters of the permissible cost-sharing arrangement envisioned in that report by marshaling evidence that allegedly comparable agreements between unrelated parties do not conform to those parameters in some respect." *Id*. at 56. The Commissioner's arguments ignore the arm's length standard forming the legal backdrop of the 1986 CWI changes, as we discuss below.

Two aspects of the legislative history of CWI are particularly noteworthy.

First, Congress was concerned with, and addressed, the *absence* of reliable arm's length comparable transaction evidence in situations involving the license or transfer of certain high-value intangible assets. The House Report on CWI explains:

> A recurrent problem is the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables.
>
> *     *     *
>
> The problems are particularly acute in the case of high-profit potential intangibles.

H.R. Rep. No. 99-426, at 423–24 (1985) ("***House Report***"). The *White Paper* also underscored that CWI's genesis traces back to the frequent lack of evidence of comparable transfers or licenses of intangibles.[4] In simple terms, Congress sought to provide a rule to fill the gap for licenses or transfers of intangibles when reliable evidence of arm's length comparables does not exist. CWI was intended to fill such gaps, permitting use of *additional* empirical evidence from the (actual) related-party transfer or license of intangibles if evidence of comparable arm's length transfers or

4 "Congress therefore decided that a refocused approach was necessary in the absence of true comparables." *White Paper*, 1988-2 C.B. at 472.

licenses of intangibles is difficult to find. CWI was not meant to *preclude* evidence of such comparables.

This view is consistent with 1994 Treasury regulations implementing CWI adjustments under the "periodic adjustment" rule in § 1.482-4(f)(2), applicable to transfers or licenses of intangibles.[5] The periodic adjustment rule permits CWI adjustments in *certain* circumstances in which actual profitability exceeds expectations, but (a) any such adjustments "shall be consistent with the arm's length standard;"[6] (b) no such adjustments can be made if the pricing is based on comparable transfers or licenses of intangibles;[7] and (c) any such adjustments are a "backstop" to the mandatory requirement that controlled taxpayers determine their pricing for transfers or licenses of intangibles using a reliable, fact-intensive method taking evidence of comparable transfers or licenses into account.[8]

Congress sought to address situations in which U.S. taxpayers develop intangible property with a high potential for profitability, such as

---

[5] Promulgated in T.D. 8552, *Intercompany Transfer Pricing Regulations Under Section 482*, 59 Fed. Reg. 34971, 35018 (July 8, 1994).

[6] § 1.482-4(f)(2)(i), *Id*.

[7] §§ 1.482-4(f)(2)(ii)(A) & (B), 59 Fed. Reg. at 35019.

[8] § 1.482-4(a) ("The arm's length amount in a controlled transfer of intangible property must be determined under one of the four methods listed in this paragraph (a)."). 59 Fed. Reg. at 35016.

pharmaceutical patents, and then license them to foreign affiliates. *See* House Report at 423–27. Congress believed evidence of uncontrolled transactions that were truly comparable to licenses of such specialized intangibles often was unavailable. U.S. taxpayers frequently were receiving relatively low royalties based upon comparisons to licenses of more mundane and garden-variety intangibles. Congress believed that the profitability of the licensed intangible often would prove greater than the taxpayer originally had projected, so that the royalty rate should have been higher than the taxpayer had established.[9]

With such concerns in mind, Congress enacted CWI to clarify that, when evaluating the sufficiency of a royalty rate or other compensation for the license or other transfer of intangible property, evidence of actual profits earned by using the intangibles should be considered, even if such information did not exist when the intangible property was transferred and the royalty rate was established.[10] Thus, CWI established a rule under which after-the-fact evidence can be taken into account, in some circumstances,

---

[9] In the words of the House Report: "Taxpayers may transfer . . . intangibles to foreign related corporations or to possession corporations at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product." House Report at 424.

[10] *Id.*

when evaluating whether a royalty agreement for a transfer or license of intangibles achieved an arm's length result. *See* § 1.482-4(f)(2) (T.D. 8552, 59 Fed. Reg. at 35018–350202).

Second, when Congress enacted CWI, Treasury made clear CWI was consistent with the arm's length standard. After the House of Representatives first proposed CWI in 1985,[11] taxpayers in technology-intensive industries expressed concern that such a rule would separate § 482 from its historical grounding in the arm's length standard.[12] The Senate consequently omitted the proposed CWI provision in its version of the 1986 amendment.[13] The conference committee, however, later reinserted the rule into what became the final version of the *1986 Act*.

The enactment of CWI provoked concerns it would be enforced in a manner inconsistent with prevailing international standards. Foreign

[11] *See* H. R. 3838, 99th Cong. § 641 (1985) (as passed by the House of Representatives on Dec. 17, 1985).

[12] For example, the Chemical Manufacturers' Association observed: "The proposed standard is . . . so amorphous that it would be virtually impossible to attain any certainty in its application without years of extensive litigation." *Tax Reform Act of 1986, Part III*, Hearing Before the S. Finance Comm., 99th Cong. 533 (1986). Similarly, a spokesperson for the Emergency Committee for American Trade testified that the provision "is complicated and arbitrary, and will increase planning uncertainties and administrative expenses." *Id.* at 128.

[13] *See* H.R. 3838, 99th Cong. (as passed by the Senate on June 24, 1986), *available at* 132 Cong. Rec. 16,061 (1986).

governments objected strongly to any application of the new rule in a manner inconsistent with the arm's length standard, which was embodied in all U.S. income tax treaties with foreign nations.[14] In response to this outpouring of protest, Treasury stated plainly and repeatedly that it would not interpret CWI in a manner permitting the imposition of results inconsistent with the behavior of unrelated parties acting at arm's length.[15] Treasury also reassured our tax treaty partners on that point.[16]

---

[14] The *White Paper* explains:

> Shortly after passage of the 1986 Act, various U.S. taxpayers and representatives of foreign governments expressed concern that the enactment of the commensurate with income standard was inconsistent with the "arm's length" standard as embodied in tax treaties and adopted by many countries for transfer pricing matters. As a result, they argued, the application of the commensurate with income standard would lead to double taxation for which no remedy would exist under treaties, because of application of transfer pricing standards by the United States that would be inconsistent with those applied by various other foreign governments.
>
> To allay fears that Congress intended the commensurate with income standard to be implemented in a manner inconsistent with international transfer pricing norms and U.S. treaty obligations, Treasury officials publicly stated that Congress intended no departure from the arm's length standard, and that the Treasury Department would so interpret the new law. Treasury and the Service continue to adhere to that view, and believe that what is proposed in this study is consistent with that view.

*White Paper*, 1988-2 C.B. at 475 (footnote omitted).

[15] *See id.*

[16] *See, e.g.*, Treasury Department, *Technical Explanation of the Convention Between the Government of the United States of America and the*

Most importantly, when Treasury later wrote regulations in 1993[17] and 1994,[18] Treasury incorporated an express requirement that CWI be applied consistently with the arm's length standard. "Adjustments made pursuant to this [§ 1.482-4(f)(2)] *shall be consistent with the arm's length standard and the provisions of 1.482-1*." § 1.482-4(f)(2) (emphasis added).[19]

Therefore, and crucially for purposes of this appeal, even when CWI applies, i.e., with respect to a "transfer (or license) of intangible property," the Commissioner may not ignore the arm's length standard and impose a non-arm's-length result upon related parties. *A fortiori*, and contrary to the Commissioner's position on appeal, CWI does not support the coordinating

---

*Government of the United Kingdom Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and on Capital Gains*, Article 9, 2001 ("It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard."); Altera Br. at 69–70.

[17] T.D. 8470, 58 Fed. Reg. 5263, 5288 (January 21, 1993).

[18] T.D. 8552, 59 Fed. Reg. at 35018.

[19] Paragraph 1.482-4(f)(2) prohibits the use of CWI in situations in which, based on evidence of licenses between unrelated parties acting at arm's length, it was clear that a license conformed to evidence of a comparable transaction among unrelated parties, notwithstanding that income ultimately might have proven higher than anticipated. *See* § 1.482-4(f)(2)(ii).

amendments modifying the arm's length standard for cost sharing arrangements so that "the arm's length standard does *not* require consideration of actual transactions between unrelated parties." (Appellant's Br. at 34).

## II. The Discussion of Cost Sharing in the Conference Committee Report Relating to CWI is Not a Basis to Override the Arm's Length Standard.

The Commissioner's brief insists that, notwithstanding the plain language of the 1986 CWI amendment and the arm's length standard, the language in the Conference Committee Report on CWI authorized Treasury's 2003 coordinating amendments to the regulations. According to the Commissioner, such report eliminated the relevance of evidence of unrelated party transactions when evaluating cost sharing arrangements. (Appellant's Br. at 31–32, and 56). The Commissioner invokes the following language from the Report:

> In revising section 482, the conferees do not intend to preclude the use of certain bona fide research and development cost-sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, *if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each. Under such a bona fide cost-sharing arrangement, the cost-sharer would be expected to bear its portion of* ***all*** *research and development costs,* on unsuccessful as well as successful products within an appropriate product area, and the costs of research and development at all relevant development

> stages would be included. In order for cost-sharing arrangements to produce results consistent with the changes made by the Act to royalty arrangements, it is envisioned that the allocation of R&D cost-sharing arrangements generally should be proportionate to profit as determined before deduction for research and development. In addition, to the extent, if any, that one party is actually contributing funds toward research and development at a significantly earlier point in time than the other, or is otherwise effectively putting its funds at risk to a greater extent than the other, it would be expected that an appropriate return would be required to such party to reflect its investment.

H.R. Conf. Rep. No. 99-841, at II-638 (1986) (hereafter "***Conference Report***") (emphasis added).

The Commissioner's assertion is easily refuted. The simplest answer is in CWI itself, which doesn't even apply to intangible development costs to be shared under a cost sharing arrangement. The language of the statute, not any committee report, is the governing law.

Furthermore, CWI doesn't override the arm's length standard or allow a result different from the result reached by parties dealing at arm's length. Even if the concept of CWI were applicable to intangible development costs shared under a cost sharing arrangement, the Conference Report's language does not support a regulation modifying—for cost sharing—the arm's length standard to preclude "consideration of actual transactions between unrelated parties."

### A. Conference Report language about cost sharing does not trump the statutory language.

The Conference Report reassures taxpayers the *1986 Act* did not preclude cost sharing, which has formally been approved since 1968. *See* § 1.482-2(d)(4), *as promulgated in* T.D. 6952, 33 Fed. Reg. 5848, 5854 (April 16, 1968). The Conference Report states that "the conferees do not intend to preclude" cost sharing. Thereafter, the Conference Report's language explains what Congress "expects" and "envisions" as to cost sharing. It does not set forth a rule of law.

The Conference Report's brief discussion of cost sharing in any case cannot override the language of CWI itself. Both the Supreme Court and this Circuit have repeatedly held that legislative history comprising comments like those in the Conference Report has no binding force. *E.g., Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material."); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007) ("committee report language unconnected to the text of an enacted statute has no binding legal import"); and *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 686 (9th Cir. 2006) ("[the statute's] silence, coupled with

a sentence in a legislative committee report untethered to any statutory language," does not alter a longstanding rule).

Further, the 1986 Conference Report cannot be used to explain what an earlier Congress intended. The first sentence of § 482[20] was enacted in 1954 and was unchanged by the *1986 Act*. The arm's length standard is "implicit" in that sentence. (Appellant's Br. at 31). "Post-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011).

### B. The Conference Report language regarding cost sharing neither requires inclusion of stock-based compensation, nor changes application of the arm's length standard.

Even assuming the legislative history of CWI could have some bearing on the proper interpretation of the arm's length standard "implicit" in the first sentence of § 482, the Commissioner misconstrues that legislative history. The Commissioner asserts the Conference Report "provides the

[20] The sentence states: "In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or business, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." 68A Stat. 162. Altera's brief discusses the language of predecessor statutes. (Altera Br. at 4–7).

clearest indication that the coordinating amendments are based on a permissible construction of § 482," (Appellant's Br. at 55), calling out five "significant" aspects of the Conference Report. But these lend no support to the Commissioner's position.

The Commissioner's first and second points are intertwined. The Commissioner points first to language conditioning continued use of related-party cost sharing arrangements on their being "consistent with the purposes" of the CWI provision. (Appellant's Br. at 56). The Commissioner then invokes the Conference Report statement that "the division of income [from an intangible] between related parties reasonably reflect[s] the relative economic activity undertaken by each" and claims this frames the purpose of CWI "in strictly economic terms." *Id.* This is wrong. Before this litigation, Treasury itself made the point that "a transaction at arm's length naturally would reflect the 'relative economic activity undertaken' . . . ." T.D. 8552, 59 Fed. Reg. at 34976.[21] Adherence to the arm's length standard thus *ensures* the relative economic activity undertaken

[21] The *White Paper* made this same point six years previously: "Looking at the income related to the intangible and splitting it according to relative economic contributions is consistent with what unrelated parties do. The general goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible." *White Paper*, 1988-2 C.B. at 472.

is properly reflected. The Commissioner cannot require related parties to share stock-based compensation that unrelated parties do not share under the guise of reflecting their "relative economic activity."

Third, the Commissioner references language in the Conference Report to the effect that a cost-sharing arrangement will generally satisfy "that objective" (presumably, the objective of being consistent with CWI) if costs are shared in proportion to profits. This principle of sharing costs in proportion to profits was implemented by the Commissioner in § 1.482-7(f) (1995), which provides that a participant's share of costs must be compared to its share of reasonably anticipated benefits under the arrangement. But this consistency with the purposes of CWI relates only to *how* R&D costs should be shared ("proportionate to profit"), not to *what* costs must be shared. The Conference Report does not even hint that the Commissioner can require related parties to share stock-based compensation if unrelated parties wouldn't do so.

Fourth, the Commissioner asserts that the Conference Report "supports the notion that the cost pool should be comprehensive in scope" (Appellant's Br. at 56), presumably referencing the statement that a cost sharer "would be expected to bear its portion of all research and development costs, on unsuccessful as well as successful products, and the

costs of research and development at all relevant development stages would be included." Conference Report at II-638. In referring to "all" the costs, however, the conference committee wasn't responding to changes made in 1986 and it wasn't empowering the Commissioner to dictate sharing of certain items in all cost sharing arrangements. The Conference Report's reference to "all" costs simply picked up pre-existing regulatory language from 18-year-old (1968) regulations governing cost sharing.[22] When the entire language of the Conference Report passage is read, rather than just the two words "all costs," the context shows that Congress was addressing the concern that cost sharing should not allow taxpayers to "cherry pick" the products to be covered but should include intangible development costs from all relevant stages of development. "All costs" would be subject to the arm's length standard ("implicit" in the first sentence of § 482), meaning only costs unrelated parties would agree to share.

Finally, the Commissioner asserts that "nothing in the 1986 Conference Report suggests . . . a taxpayer would be entitled to modify the basic parameters of the permissible cost sharing arrangement envisioned in

---

[22] Former § 1.482-2(d)(4), as it was promulgated in 1968 and stood in 1986, provided that a bona fide cost sharing arrangement "must reflect an effort in good faith by the participating members to bear their respective shares of all the costs and risks of development on an arm's length basis." T.D. 6952, 33 Fed. Reg. at 5854.

that report by marshaling evidence that allegedly comparable agreements between unrelated parties do not conform to those parameters in some respect." Appellant's Br. at 56. The Commissioner's assertion ignores the backdrop against which the 1986 CWI amendment to § 482 was made—i.e., the arm's length standard—which *necessarily* requires consideration of actual transactions between unrelated parties, and which, as explained above, CWI did not supplant. There's nothing in the legislative history of CWI suggesting abrogation of the arm's length standard. Simply put, the Conference Report didn't suggest a taxpayer could muster empirical evidence of relevant arm's length behavior because that was a given.

## III. Conclusion.

CWI, by its plain language, doesn't apply to intangible development costs to be shared under cost sharing arrangements. The legislative history of CWI doesn't signal any Congressional intent to ignore consideration of transactions between unrelated parties. Treasury stated, and the Tax Court held, that Congress intended CWI to work consistently with the arm's length standard. The Commissioner's argument on appeal must fail; the Tax Court's decision should be affirmed.

Dated: September 23, 2016

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, at the time of filing undersigned counsel is not aware of any related cases pending in this Court.

Dated: September 23, 2016

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rules 28-4 and 32 1, I certify that the attached brief is proportionately spaced using Microsoft Word, version 2010, is set in Times New Roman Font, has a typeface of 14 points or more, and contains 4,737 words.

Dated: September 23, 2016

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly