MAYER • BROWN

Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112

Main Tel +1 650 331 2000
Main Fax +1 650 331 2060
www.mayerbrown.com

Donald M. Falk
Direct Tel +1 650 331 2030
Direct Fax +1 650 331 4530
dfalk@mayerbrown.com

October 4, 2017

Molly Dwyer, Clerk
United States Court of Appeals
for the Ninth Circuit
95 7th Street
San Francisco, CA 94103

Re: *Altera Corp. v. Commissioner of Internal Revenue*, No. 16-70496 –**Oral argument scheduled for October 11, 2017**

Dear Ms. Dwyer:

We represent appellees Altera Corp. and Subsidiaries and write to bring the Court's attention to two recent D.C. Circuit decisions supporting affirmance here. *See* Fed. R. App. P. 28(j).

In *Clean Air Council, Inc. v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (per curiam) (Tatel & Wilkins, JJ.), the court of appeals rebuffed an agency's reliance on reasoning not present in the stay order it was defending. Rejecting appellate counsel's belated adoption of one argument, the court held that the agency "cannot now justify its action on a rationale it failed to invoke when it imposed the stay." *Id.* at 11 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Likewise, the court declined to consider a brand-new legal argument based on the agency's "inherent authority" because, "when [the agency] granted reconsideration and imposed the stay of the … rule, it did not rely on its so-called inherent authority." *Id.* at 9 (citing *Chenery*). *See* Altera Br. 42-47.

The same Circuit in another case emphasized the "central principle of administrative law … that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *American Wild Horse Preservation Campaign, Inc. v. Perdue*, 865 F.3d 691, 701 (D.C. Cir. 2017) (Millett, J.); *see also id.* at 706. The agency cannot escape this obligation by

Mayer Brown LLP operates in combination with other Mayer Brown entities (the "Mayer Brown Practices"), which have offices in North America, Europe and Asia and are associated with Tauil & Chequer Advogados, a Brazilian law partnership.

asserting that "nothing changed" (*id.* at 701); "after-the-fact claims about agency intentions do not work when agency actions evince the opposite" (*id.* at 702). *See* Altera Br. 47-55. Noting that "record facts are the grist of agency decisionmaking," 865 F.3d at 709, the court also held that an agency cannot rely on a "*post hoc* rationalization that was not part of the record before the [agency]." *Id.* at 704. *See* Altera Br. 39-51, 61.

Please circulate this letter to the panel.

Sincerely,

*/s/ Donald M. Falk*

Donald M. Falk

# ATTACHMENT A

862 F.3d 1
United States Court of Appeals,
District of Columbia Circuit.

CLEAN AIR COUNCIL, et al., Petitioners
v.
E. Scott PRUITT, Administrator, Environmental Protection Agency and Environmental Protection Agency, Respondents
American Petroleum Institute, et al., Intervenors

No. 17-1145
|
Decided July 3, 2017

**Synopsis**
**Background:** Environmental organizations filed emergency motion for a stay or, in the alternative, summary vacatur of the Environmental Protection Agency's (EPA) decision to stay, pending reconsideration, implementation of portions of a final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by the oil and natural gas industries.

**Holdings:** The Court of Appeals held that:

[1] EPA's decision to stay portions of rule was a "final action" subject to judicial review;

[2] Clean Air Act (CAA) did not authorize stay of provision subjecting low-production wells to fugitive emissions requirement;

[3] CAA did not authorize stay of provision permitting regulated entities to demonstrate compliance with emissions regulations by alternative means;

[4] CAA did not authorize stay of provision requiring regulated entities to obtain certification by qualified professional engineer that closed vent system was properly designed; and

[5] CAA did not authorize stay of provision exempting well-site pneumatic pumps from emission control based on certification from professional engineer.

Motion granted.

Brown, Circuit Judge, filed dissenting opinion.

West Headnotes (13)

[1] **Environmental Law**
Air pollution

Environmental Protection Agency's (EPA) decision to stay, pending reconsideration, portions of final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by the oil and natural gas industries was a "final action" under the Clean Air Act (CAA), and thus was subject to judicial review; stay was essentially an order delaying rule's effective date, which was tantamount to amending or revoking the rule, and stay, which was made retroactive to one day before deadline for complying with requirement that regulated entities conduct an initial monitoring survey to identify leaks, also affected entities' rights or obligations by relieving those entities of liability they otherwise would have faced for failing to comply with the deadline. Clean Air Act § 307, 42 U.S.C.A. § 7607(b)(1); 40 C.F.R. § 60.5397a(f).

Cases that cite this headnote

[2] **Administrative Law and Procedure**
Finality; ripeness

An agency's decision to grant a petition to reconsider a regulation is not reviewable final agency action.

Cases that cite this headnote

[3] **Administrative Law and Procedure**
Finality; ripeness

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

To be final, and thus reviewable, agency action must mark the consummation of the agency's decisionmaking process and be one by which rights or obligations have been determined, or from which legal consequences will flow.

Cases that cite this headnote

[4] **Federal Courts**
Supersedeas or Stay of Proceedings

Four-factor standard applies to request for a stay pending judicial review: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Cases that cite this headnote

[5] **Administrative Law and Procedure**
Statutory basis and limitation

Administrative agencies may act only pursuant to authority delegated to them by Congress.

Cases that cite this headnote

[6] **Environmental Law**
Regulations and rulemaking in general

Environmental Protection Agency (EPA) did not act pursuant to its alleged inherent authority to issue stay of a final rule when it imposed 90-day stay, pending reconsideration, on final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by the oil and natural gas industries; instead, EPA expressly acted pursuant to the Clean Air Act (CAA) provision setting forth the requirements for mandatory reconsideration of a rule. Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. § 60.5397a.

Cases that cite this headnote

[7] **Environmental Law**
Regulations and rulemaking in general

Clean Air Act (CAA) provision setting forth the requirements for mandatory reconsideration of a rule limited Environmental Protection Agency's (EPA) authority to issue a stay to those circumstances where it was mandated to convene reconsideration proceedings; statutory text authorized EPA to grant a stay during "such reconsideration," which referred back to the reconsideration that EPA had to undertake when the requirements for mandatory reconsideration were met. Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B).

Cases that cite this headnote

[8] **Administrative Law and Procedure**
Notice and comment, sufficiency

A final rule is the logical outgrowth of a proposed rule, as required to satisfy notice requirement of the Administrative Procedure Act (APA), if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice and comment period; a final rule fails the logical outgrowth test if interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule. 5 U.S.C.A. § 553.

Cases that cite this headnote

[9] **Environmental Law**
Notice and comment

It was not impracticable for industry groups to object during notice and comment period for final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by oil and natural gas industries to provision subjecting low-production wells to fugitive emissions requirements, and thus Clean Air Act (CAA) did not authorize Environmental Protection Agency (EPA) to stay provision pending reconsideration; although notice of proposed rulemaking (NPRM) proposed to exclude low-production well sites, it went on to solicit comment on whether such an exclusion would be warranted and, if not, whether they should have a less frequent monitoring requirement, industry groups responded with comments, and EPA responded to the comments in the final rule, explaining that it decided not to exempt low-production wells because stakeholders indicated that well site fugitive emissions were not correlated with levels of production, but rather were based on the number of pieces of equipment and components. 5 U.S.C.A. § 553; Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. § 60.5397a.

Cases that cite this headnote

[10] **Environmental Law**
Preservation of error in administrative proceeding

On judicial review of Environmental Protection Agency's (EPA) decision to stay implementation, pending reconsideration, of final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by oil and natural gas industries, EPA could not rely on argument that stay was warranted because rule provision subjecting low-production wells to fugitive emissions requirements was inconsistent with the rule's definition of well "modification," since it was not a rationale on which EPA relied when it granted reconsideration and stayed the rule. Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. § 60.5397a.

Cases that cite this headnote

[11] **Environmental Law**
Notice and comment

It was not impracticable for industry groups to object during notice and comment period for final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by oil and natural gas industries to provision which permitted regulated entities to demonstrate compliance with emissions regulations by alternative means, and thus Clean Air Act (CAA) did not authorize Environmental Protection Agency (EPA) to stay provision pending reconsideration; in notice of proposed rulemaking (NPRM), EPA expressly solicited comments on criteria it could use to determine whether and under what conditions new or modified well sites operating under corporate fugitive monitoring programs could be deemed to meet the equivalent of the rule's standards, sought comments on how to address enforceability of such alternative approaches, in response, industry groups commented on the issue, requesting a "streamlined approval process" for deeming regulated entities compliant by alternative means, and final rule adopted such a process. 5 U.S.C.A. § 553; Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. §§ 60.5397a, 60.5398a.

Cases that cite this headnote

[12] **Environmental Law**
Notice and comment

It was not impracticable for industry groups to object during notice and comment period for final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by oil and natural gas industries to requirement that regulated entities obtain certification by qualified professional engineer that closed vent system was properly designed, and thus Clean Air Act (CAA) did not authorize Environmental Protection Agency (EPA) to stay

those provisions pending reconsideration, even though provisions were not included in proposed rule; notice of proposed rulemaking (NPRM) requested comments as to whether EPA should specify criteria by which the engineer verified closed vent system was designed to accommodate all streams routed to facility's control system, sought comments on types of "cost-effective" measures for vent system design, and included lengthy discussion of "costs and benefits" of the rule, and, in response, industry groups submitted many comments on the requirement. 5 U.S.C.A. § 553; Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. § 60.5397a.

Cases that cite this headnote

[13] **Environmental Law**
Notice and comment

It was not impracticable for industry groups to object during notice and comment period for final rule establishing new source performance standards for fugitive emissions of methane and other pollutants by oil and natural gas industries to provisions which exempted well-site pneumatic pumps from emission control based on certification by professional engineer that it was technically infeasible to capture and route pneumatic pump emissions to control device or process, but excluded new facilities from the exemption, and thus Clean Air Act (CAA) did not authorize Environmental Protection Agency (EPA) to stay those provisions pending reconsideration; notice of proposed rulemaking (NPRM) stated that operators of oil and natural gas facilities had to connect pneumatic pump affected facility through a closed vent system and, in response, industry group proposed precisely the technical infeasibility language EPA adopted in the final rule, suggested that an engineer certify technical infeasibility, and justified its proposed exemption based on a lengthy description of why existing sites were not designed to handle proposed requirements. 5 U.S.C.A. § 553; Clean Air Act § 307, 42 U.S.C.A. § 7607(d)(7)(B); 40 C.F.R. § 60.5397a.

Cases that cite this headnote

***4** On Emergency Motion For A Stay Or, In the Alternative, Summary Vacatur

**Attorneys and Law Firms**

Susannah L. Weaver, Sean H. Donahue, David Doniger, Meleah Geertsma, Tim Ballo, Joel Minor, Adam Kron, Peter Zalzal, Alice Henderson, Vickie Patton, Tomás Carbonell, Andres Restrepo, Joanne Marie Spalding, Ann Brewster Weeks, and Darin Schroeder were on the emergency motion for a stay or, in the alternative, summary vacatur and reply to responses in opposition to emergency motion for a stay or, in the alternative, summary vacatur.

Jeffrey H. Wood, Acting Assistant Attorney General, U.S. Department of Justice, and Benjamin Carlisle, Attorney, were on EPA's opposition to petitioners' emergency motion for a stay or, in the alternative, summary vacatur.

William L. Wehrum, Felicia H. Barnes, Stacy R. Linden, John Wagner, Samuel B. Boxerman, Joel F. Visser, Sandra Y. Snyder, James D. Elliott, Shannon S. Broome, Charles H. Knauss, and John R. Jacus were on the industry intervenor-respondents' response in opposition to petitioners' emergency motion for a stay or, in the alternative, summary vacatur.

Before: Tatel, Brown, and Wilkins, Circuit Judges.

**Opinion**

Dissenting Opinion filed by Circuit Judge Brown.

Per Curiam:

Petitioners, a group of environmental organizations, challenge the Environmental Protection Agency's decision to stay implementation of portions of a final rule concerning methane and other greenhouse gas emissions. For the reasons set forth in this opinion, we conclude that EPA lacked authority under the Clean Air Act to stay the rule, and we therefore grant petitioners' motion to vacate the stay.

**I.**

In June 2016, EPA Administrator Gina McCarthy issued a final rule establishing "new source performance standards" for fugitive emissions of methane and other pollutants by the oil and natural gas industries. 81 Fed. Reg. 35,824 (June 3, 2016). The methane rule took effect on August 2, 2016, *id.*, and required regulated entities to conduct an "initial monitoring survey" to identify leaks by June 3, 2017, 40 C.F.R. § 60.5397a(f).

After EPA published the rule, several industry groups—including the American Petroleum Institute (API), the Texas Oil and Gas Association (TXOGA), and the Independent Petroleum Association of America (IPAA)—filed administrative petitions seeking reconsideration under section 307(d)(7)(B) of the Clean Air Act (CAA). 42 U.S.C. § 7607(d)(7)(B); *see also* 82 Fed. Reg. 25,731 (June 5, 2017). That provision sets forth the circumstances under which ***5** EPA *must* reconsider a rule. It provides that "[i]f the person raising an objection can demonstrate to the Administrator that [1] it was impracticable to raise such objection within [the notice and comment period] ... and [2] if such objection is of central relevance to the outcome of the rule, the Administrator *shall* convene a proceeding for reconsideration of the rule ...." 42 U.S.C. § 7607(d)(7)(B) (emphasis added). The statute also provides that the "effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months." *Id.* The industry associations argued that CAA section 307(d)(7)(B) required EPA to reconsider the final rule because several of its provisions "were not included in the proposed rule and ... [they were therefore unable] to raise an objection during the public comment period." *See, e.g.*, API, Request for Administrative Reconsideration of EPA's Final Rule "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources," at 1 (Aug. 2, 2016) ("API Reconsideration Request"). They also sought a stay "pending reconsideration." *Id.*

By letter dated April 18, 2017, the Administrator, now Scott Pruitt, stated that EPA "[found] that the petitions have raised at least one objection to the fugitive emissions monitoring requirements" that warrants reconsideration "under 307(d)(7)(B) of the CAA." Letter from E. Scott Pruitt to Howard J. Feldman, Shannon S. Broome, James D. Elliott, & Matt Hite, Convening a Proceeding for Reconsideration, at 2 (Apr. 18, 2017). Accordingly, the Administrator announced, "EPA is convening a proceeding for reconsideration" of two specific provisions of the methane rule. *Id.* The letter also stated that "EPA intend[ed] to exercise its authority under CAA section 307 to issue a 90-day stay of the compliance date" for the fugitive emissions requirements. *Id.*

On June 5—just two days after the deadline for regulated parties to conduct their first emissions surveys and begin repairing leaks, *see* 40 C.F.R. § 60.5397a(f)—EPA published a "[n]otice of reconsideration and partial stay" in the Federal Register, 82 Fed. Reg. at 25,730. Relying on CAA section 307(d)(7)(B), EPA granted reconsideration on four aspects of the methane rule: (1) the decision to regulate low-production wells, (2) the process for proving compliance by "alternative means," (3) the requirement that a professional engineer certify proper design of vent systems, and (4) the decision to exempt pneumatic pumps from regulation only if a professional engineer certified that it was "technically infeasible" to route such pumps "to a control device or a process." 82 Fed. Reg. at 25,731–32. In addition, the notice "stay[ed] the effectiveness of the fugitive emissions requirements, the standards for pneumatic pumps at well sites, and the certification by a professional engineer requirements" for 90 days "pending reconsideration." 82 Fed. Reg. at 25,732. The notice explained that the stay had gone into effect on June 2, 2017—that is, three days before the notice was published in the Federal Register. 82 Fed. Reg. at 25,731.

On June 16, EPA published a notice of proposed rulemaking (NPRM) announcing its intention to extend the stay "for two years" and to "look broadly at the entire 2016 Rule" during "the reconsideration proceeding." 82 Fed. Reg. 27,645 (June 16, 2017). Comments on that NPRM are due July 17, or if any party requests a hearing, by August 9. *Id.*

After EPA suspended implementation of the methane rule, six environmental groups—Environmental Defense Fund, Natural Resources Defense Council, Environmental ***6** Integrity Project, Earthworks, Clean Air Council, and Sierra Club—filed in this court an "emergency motion for a stay or, in the alternative, summary vacatur." According to Environmental Petitioners, EPA's stay violates CAA section 307(d)(7)(B) because "all of the issues Administrator Pruitt identified could have been, *and actually were*, raised (and extensively deliberated) during the comment period." Environmental Petitioners' Mot. 5 (emphasis in original). EPA opposes the motion, as do intervenors, a group of oil and gas associations including API, IPAA, and TXOGA. Together, they argue that we lack jurisdiction to review the stay, and that even if it were justiciable, the stay is lawful. We consider these arguments in turn.

## II.

[1]We begin with jurisdiction. Both EPA and Industry Intervenors argue that an agency's decision to grant reconsideration of a rule is unreviewable because it does not constitute "final action" under 42 U.S.C. § 7607(b)(1). EPA Opp. 8; Intervenors' Opp. 6. Industry Intervenors argue that for the same reason we lack jurisdiction to review the stay. Intervenors' Opp. 8.

[2] [3]It is true that an agency's decision to grant a petition to reconsider a regulation is not reviewable final agency action. *See Portland Cement Association v. EPA*, 665 F.3d 177, 185 (D.C. Cir. 2011) (noting that review is available "if reconsideration is *denied*" (emphasis added)). To be "final," agency action must "mark the consummation of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations and internal quotation marks omitted). By itself, EPA's decision to grant reconsideration, which merely begins a process that could culminate in no change to the rule, fails this test.

The imposition of the stay, however, is an entirely different matter. By staying the methane rule, EPA has not only concluded that section 307(d)(7)(B) requires reconsideration, but it has also suspended the rule's compliance deadlines. EPA's stay, in other words, is essentially an order delaying the rule's effective date, and this court has held that such orders are tantamount to amending or revoking a rule. As we explained in a very similar situation, where an agency granted an application for interim relief from a safety standard while it reconsidered that standard: "In effect, the Administrator has granted a modification of the mandatory safety standard for the entire period of time that the petition is pending. There is no indication that the Secretary intends to reconsider this decision or to vacate the grant of interim relief. Thus, the Secretary's decision represents the final agency position on this issue, has the status of law, and has an immediate and direct effect on the parties. Therefore, we have no difficulty concluding that the Secretary has issued a final decision ...." *International Union, United Mine Workers of America v. Mine Safety & Health Administration*, 823 F.2d 608, 614–15 & n.5 (D.C. Cir. 1987) (citation omitted); *see also Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802, 813 (D.C. Cir. 1983) ("[S]uspension of the permit process ... amounts to a suspension of the effective date of regulation ... and may be reviewed in the court of appeals as the promulgation of a regulation."); *Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 579 nn.26 & 28 (D.C. Cir. 1981) (rejecting the argument that the court lacked jurisdiction to review an order ***7** "defer[ring] the implementation of regulations").

In addition to "mark[ing] the consummation of ... [EPA's] decisionmaking process" with respect to the final rule's effective date, the stay also affects regulated parties' "rights or obligations." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154 (citation and internal quotation marks omitted). Absent the stay, regulated entities would have had to complete their initial monitoring surveys by June 3 and repair any leaks within thirty days. *See* 40 C.F.R. § 60.5397a(f), (h). Failure to comply with these requirements could have subjected oil and gas companies to civil penalties, citizens' suits, fines, and imprisonment. *See* 42 U.S.C. § 7413(b)-(d) (providing for civil and criminal penalties for failure to comply with emissions rules); *id.* § 7604(a) (authorizing citizens' suits for alleged violations of emissions standards); 40 C.F.R. § 19.4 (establishing the schedule of fines for CAA violations). The stay—which EPA made retroactive to one day *before* the June 3 compliance deadline—eliminates that threat, *see* 82 Fed. Reg. at 25,731, and thus relieves regulated parties of liability they would otherwise face.

The dissent draws a sharp distinction between the denial of a stay, which would have required regulated entities to comply with the rule, and the imposition of the stay, which erased that obligation. As the dissent sees it, only forced compliance has "obvious consequences" for regulated parties. Dissent at 17. But this one-sided view of final agency action ignores that, by staying the rule's effective date and its compliance duties, EPA has determined "rights or obligations ... from which legal consequences will flow." *Bennett*, 520 U.S. at 178, 117 S.Ct. 1154. The dissent's view is akin to saying that incurring a debt has legal consequences, but forgiving one does not. A debtor would beg to differ.

The dissent also stresses that EPA's proceedings concerning the methane rule are ongoing. Dissent at 15; *see* 82 Fed. Reg. at 27,645; 82 Fed Reg. 27,641 (June 16, 2017). But as we have explained, "the applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016) (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971)). Here, because the stay relieves regulated parties of any obligation to meet the June 3 deadline—indeed EPA has proposed to extend the stay for years, *see* 82 Fed. Reg. at 27,645—the "order is sufficiently final to warrant review," *Friedman*, 841 F.3d at 542. *Cf. Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Once

the agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review.").

EPA's argument that courts have no authority to review CAA section 307(d)(7)(B) stays is also at odds with the statute's language. Section 307(d)(7)(B) authorizes not only the Administrator, but also *courts* to stay a final rule. 42 U.S.C. § 7607(d)(7)(B) (authorizing "the Administrator or the court" to issue a three-month stay). Given that Congress granted this court the power to enter a stay, it seems quite anomalous that it did not also confer upon us the lesser power to review the Administrator's decision to issue a stay.

Indeed, EPA's reading would have the perverse result of empowering this court to act when the agency denies a stay but not when it chooses to grant one. Under section 307(d)(7)(B), if EPA had granted ***8** reconsideration but declined to impose a stay, the industry groups could have come to this court seeking a stay. *See Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 558 (D.C. Cir. 2015) (declining to grant a stay during the pendency of a reconsideration proceeding because petitioners had failed to demonstrate irreparable harm). Yet, in EPA's view, where, as here, it grants reconsideration *and imposes a stay*, we have no power to hear the case. Nothing in section 307—or any other provision cited by the parties or the dissent—suggests that this court's jurisdiction turns on whether EPA grants as opposed to denies a stay.

EPA and Industry Intervenors argue that Environmental Petitioners' motion amounts to a collateral attack on the underlying reconsideration proceeding. *See also* Dissent at 15. But CAA section 307(d)(7)(B) expressly links EPA's power to stay a final rule to the two requirements for mandatory reconsideration, *i.e.*, that it was "impracticable to raise" an objection during the public comment period and the objection is "of central relevance to the outcome of the rule." Only when these two conditions are met does the statute authorize the Administrator to stay a lawfully promulgated final rule. Accordingly, to determine whether the stay was lawful—that is, to assess EPA's final action—we must consider whether the agency met the statutory requirements for reconsideration. In other words, although absent a stay we would have no authority to review the agency's decision to grant reconsideration, because EPA chose to impose a stay suspending the rule's compliance deadlines, we must review its reconsideration decision to determine whether the stay was authorized under section 307(d)(7)(B).

## III.

[4]Environmental Petitioners seek two types of relief: a "judicial stay" of EPA's administrative stay, and in the alternative, "summary disposition and vacatur" of EPA's stay "because the stay is clearly unlawful." Environmental Petitioners' Mot. 1. To consider the former, we would have to assess Environmental Petitioners' motion under the four-factor standard for a stay pending judicial review: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (citation omitted).

For reasons explained below, however, we agree with Environmental Petitioners that the 90-day stay was unauthorized by section 307(d)(7)(B) and was thus unreasonable. Accordingly, we have no need to consider the criteria for a stay pending judicial review. *Cf. United States Association of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017) ("When ... the ruling under review rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, we may resolve the merits even though the appeal is from the entry of a preliminary injunction." (citation and internal quotation marks omitted)). We shall therefore vacate the stay as "arbitrary, capricious, [and] in excess of statutory ... authority." 42 U.S.C. § 7607(d)(9)(A), (C).

### A.

Defending the stay, EPA repeatedly invokes its "broad discretion" to reconsider its own rules. EPA Opp. 6. Agencies obviously have broad discretion to reconsider a regulation at any time. To do so, however, ***9** they must comply with the Administrative Procedure Act (APA), including its requirements for notice and comment. 5 U.S.C. § 553; *see Perez v. Mortgage Bankers Association*, ––– U.S. ––––, 135 S.Ct. 1199, 1206, 191 L.Ed.2d 186 (2015) ( "[T]he D.C. Circuit correctly read § 1 of the APA to mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."). As we have explained, "an

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked" and "may not alter [such a rule] without notice and comment." *National Family Planning and Reproductive Health Association, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992).

EPA argues that it nonetheless has "inherent authority" to "issue a brief stay" of a final rule—that is, not to enforce a lawfully issued final rule—while it reconsiders it. *See* EPA Opp. 6, 10, 13. This argument suffers from two fundamental flaws.

[5]First, EPA cites nothing for the proposition that it has such authority, and for good reason: as we have made clear, it is "axiomatic" that "administrative agencies may act only pursuant to authority delegated to them by Congress." *Verizon v. FCC*, 740 F.3d 623, 632 (D.C. Cir. 2014) (alteration and citations omitted); *see Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (rejecting the contention that the Department of Energy had "inherent power" to suspend a duly promulgated rule where no statute conferred such authority and contrasting the Energy Policy and Conservation Act with the reconsideration provision in the Clean Air Act at 42 U.S.C. § 7607(d)(7)(B)). Accordingly, EPA must point to something in either the Clean Air Act or the APA that gives it authority to stay the methane rule, and as we explain below, the only provision it cites—CAA section 307(d)(7)(B)—confers no such authority.

[6]Second, when EPA granted reconsideration and imposed the stay of the methane rule, it did not rely on its so-called inherent authority. *See Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) ("[A] reviewing court ... must judge the propriety of [agency] action solely by the grounds invoked by the agency" when it acted). Instead, EPA expressly acted "pursuant to section 307(d)(7)(B) of the CAA," 82 Fed. Reg. at 25,732, which clearly delineates when stays are authorized. As noted above, that section empowers EPA to stay a final rule if a petitioner demonstrates impracticability and central relevance, the two requirements for mandatory reconsideration.

[7]EPA insists that "the statutory text [of section 307] suggests that Congress did not intend to cabin EPA's authority to issue a stay to only those circumstances where EPA is *mandated* to convene reconsideration proceedings ...." EPA Opp. 12 (emphasis in original). The language of section 307(d)(7)(B) is to the contrary: it authorizes the agency to grant a stay during "such reconsideration," a term that quite obviously refers back to the reconsideration that EPA "shall" undertake when someone presents an objection of "central relevance" that was "impracticable" to raise during the period for public comment. 42 U.S.C. § 7607(d)(7)(b).

## B.

Under CAA section 307(d)(7)(B), then, the stay EPA imposed is lawful only if reconsideration was mandatory. Accordingly, the question before us is whether the industry groups that sought a stay of the methane rule met the two requirements for mandatory reconsideration.

***10** The parties disagree about the appropriate standard of review for considering this issue. EPA argues that its view of whether it was "impracticable" to object during the notice and comment period is subject to arbitrary and capricious review. *See* EPA Opp. 5. For their part, Environmental Petitioners argue that "[l]imited deference on these notice questions makes sense" because "EPA has no greater expertise than this [c]ourt in determining whether a certain issue was impracticable to raise during the comment period." Environmental Petitioners' Reply 7 (internal quotation marks omitted). We need not resolve this dispute, however, because EPA's decision to stay the methane rule was arbitrary and capricious—that is, unlawful even under the more deferential standard.

[8]We begin—and ultimately end—with impracticability. Environmental Petitioners and EPA agree that this issue turns on whether industry groups had an opportunity to raise their objections during the comment period, which in turn depends on whether the NPRM provided adequate notice of the final methane rule. This case hinges, then, on whether the final rule was a logical outgrowth of the NPRM. A final rule is the "logical outgrowth" of a proposed rule if "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citation and internal quotation marks omitted). A final rule "fails the logical outgrowth test" if "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id.* (citations and alterations omitted).

EPA granted reconsideration and stayed the emissions standards on four grounds: (1) industry groups had no opportunity to object to provisions concerning "low production well sites," (2) the final rule included a process for demonstrating "alternative means" of

compliance that was not in the NPRM, (3) without adequate notice or consideration of costs, the final rule required "certification by a professional engineer" that regulated entities had a proper closed vent system, and (4) without adequate notice, the final rule predicated an exemption from regulation for "well site pneumatic pumps" on a professional engineer's certification that "it is technically infeasible to route the pneumatic pump to a control device or a process." 82 Fed. Reg. at 25,731–32. An examination of the record demonstrates that each of these statements is inaccurate and thus unreasonable.

### Low-Production Wells

[9]The final rule subjects low-production wells to fugitive emissions requirements. 81 Fed. Reg. at 35,856. After EPA promulgated the rule, industry groups petitioned for reconsideration, arguing that the agency should have exempted such wells from regulation. *See, e.g.*, API Reconsideration Request, at 12. One group, IPAA, also argued that the low-production well provision conflicted with EPA's definition of when an existing well site has been "modifi[ed]." IPAA, Request for Administrative Reconsideration, at 6 (Aug. 2, 2016) ("IPAA Reconsideration Request").

When EPA granted reconsideration and imposed the stay, however, it invoked a wholly different rationale: acting pursuant to CAA section 307(d)(7)(B), EPA concluded that "the final rule differs significantly from what was proposed in that it requires these well sites to comply with the fugitive emissions requirements based on information ***11** and [a] rationale not presented for public comment during the proposal stage." 82 Fed. Reg. 25,731. EPA, in other words, justified the stay on the ground that the final rule failed the logical outgrowth test.

Although it is true that the NPRM for the final methane rule proposed to *exclude* low-production well sites, EPA and Industry Intervenors ignore the fact that the notice went on to solicit comment on whether such an exclusion would be warranted. The NPRM states: "To more fully evaluate the exclusion, we solicit comment on the air emissions associated with low production wells .... [W]e solicit comment on the relationship between production and fugitive emissions over time." 80 Fed. Reg. 56,639 (Sept. 18, 2015). The NPRM also states that EPA "solicit[s] comment on whether [it] should include low production well sites for fugitive emissions and *if these types of well sites are not excluded*, should they have a less frequent monitoring requirement." *Id.* (emphasis added).

Many regulated entities responded with comments, including the industry groups that later sought reconsideration. *See, e.g.*, API, Comments on EPA's NSPS for the Oil and Natural Gas Sector, at 103 (Dec. 4, 2015) ("API Comments"). API, for instance, submitted extensive comments on low-production wells, noting its support for an exemption and clarifying that "fugitive emissions [from such wells] do not correlate to production." *Id.*

Responding to these comments in the final rule, EPA explained that it had decided not to exempt low-production wells because, among other reasons, "[i]n discussions with us, stakeholders indicated that well site fugitive emissions are not correlated with levels of production, but rather based on the number of pieces of equipment and components." 81 Fed. Reg. at 35,856. The final rule thus responded directly to comments and information EPA now claims it was impracticable for industry groups to have presented.

[10]Perhaps sensing the flimsiness of its claim that regulated entities had no opportunity to comment on low-production wells, EPA argues that the stay was also warranted because the low-production well provision is inconsistent with the rule's definition of well "modification." EPA Opp. 17–18. As noted above, this was one of IPAA's arguments for reconsideration. *See supra* 15. It was not, however, the rationale on which EPA relied when it granted reconsideration and stayed the rule. EPA cannot now justify its action on a rationale it failed to invoke when it imposed the stay. *See* Chenery, 332 U.S. at 196, 67 S.Ct. 1760.

### Alternative Means of Compliance

[11]The final rule permits regulated entities to demonstrate that they comply with emissions regulations by alternative means, and thus, ought not be subject to the rule. Specifically, the rule provides that regulated entities may "submit an application requesting that the EPA approve certain state requirement [*sic*] as 'alternative means of emission limitations' under the NSPS ...." 81 Fed. Reg. at 35,871. The rule then lays out the process for filing such applications. *Id.*; *see also* 40 C.F.R. § 60.5398a.

After the rule was promulgated, TXOGA requested reconsideration of the process "for determining State Equivalency," *i.e.*, the alternative-means process. Administrative Petition for Reconsideration by the Texas Oil and Gas Association, No. EPA-HQ-OAR-2010-0505,

at 2–3 (Aug. 2, 2016). EPA granted this request and stayed the rule on the ground that the alternative-means "process and criteria were included ***12** in the [final] 2016 Rule without having been proposed for notice and comment." 82 Fed. Reg. at 25,731.

In the NPRM, however, EPA expressly solicited "comments on criteria we can use to determine whether and under what conditions all new or modified well sites operating under corporate fugitive monitoring programs can be deemed to be meeting the equivalent of the NSPS standards ...." 80 Fed. Reg. at 56,638. The NPRM continued: "We also solicit comment on how to address *enforceability* of such alternative approaches ...." *Id.* (emphasis added). In response, industry groups commented on the issue, and API specifically requested a "streamlined approval process" for deeming regulated entities compliant by alternative means. API Comments at 138. The final rule adopted just such a process.

Here, too, the final rule was a logical outgrowth of the NPRM. No regulated entity had to "divine the agency's unspoken thoughts," *CSX Transportation*, 584 F.3d at 1080 (alteration omitted), in order to comment on the "alternative means" approval process. To the contrary, we know that affected parties anticipated the final rule because they expressly requested a streamlined approval process and commented on its contours.

### Vent System Certification

[12]The final rule requires regulated entities to obtain "certification by a qualified professional engineer [PE] that the closed vent system is properly designed ...." 81 Fed. Reg. at 35,871. API sought reconsideration on the grounds that "[t]he provisions [for] PE certification were not included in the proposed rule" and API was therefore unable "to raise an objection during the public comment period." API Reconsideration Request, at 1. Agreeing with API, EPA granted reconsideration because the agency "had not analyzed the costs associated with the PE certification requirement" before promulgating the rule, making it "impracticable for petitioners to provide meaningful comments during the comment period on whether the improved environmental performance this requirement may achieve justifies the associated costs and other compliance burden[s]." 82 Fed. Reg. at 25,732.

Yet again, even a brief scan of the record demonstrates the inaccuracy of EPA's statements. The NPRM "request[s] comment as to whether [EPA] should specify criteria by which the PE verifies that the closed vent system is designed to accommodate all streams routed to the facility's control system ...." 80 Fed. Reg. at 56,649. In the very next line, the NPRM "request[s] comment as to what types of cost-effective pressure monitoring systems can be utilized to ensure" proper design of closed vent systems. *Id.* The NPRM also includes a lengthy discussion of the "costs and benefits" of the rule. *Id.* at 56,596–97.

In response, industry groups submitted many comments on the PE certification requirement. API itself commented that requiring a PE to review vent system design was "unnecessary" because "[o]il and natural gas company engineering staff ... are able to design systems effectively." API Comments at 48–49. API also expressed concern about the burden the PE requirement would impose on regulated parties, *id.* at 49, and argued that the certification requirement was an effort to shift the cost of enforcement from EPA to the industry, *id.* at 48. Separately, IPAA commented that the entire rule's "increased record-keeping and reporting requirements" imposed unreasonable costs on regulated parties. IPAA & American Exploration & Production Council, Comments for Three Regulatory Proposals, at 28 (Dec. 4, 2015).

***13** These comments demonstrate that industry groups had an opportunity to express their views on PE certification of vent systems, including the rule's costs. As noted above, the NPRM not only sought comment on types of "cost-effective" measures for vent system design, 80 Fed. Reg. at 56,649, but it also included an analysis of the entire rule's costs and benefits, *id*. at 56,596–97. Had commenters been concerned about the cost of PE certification of vent systems, they could have argued that the cost-benefit analysis failed to address that specific provision of the regulation. It was thus entirely practicable for industry groups to lodge their objections to the PE certification requirement during the comment period.

### Pneumatic Pumps

[13]Finally, the 2016 rule exempts well-site pneumatic pumps from the final rule so long as a professional engineer has certified that it is "technically infeasible to capture and route pneumatic pump emissions to a control device or process ...." 81 Fed. Reg. at 35,850. The rule explained that this exemption would not apply to "entirely new" facilities because "circumstances that could otherwise make control of a pneumatic pump technically infeasible at an existing location can be addressed in the site's design and construction." *Id.*

In its petition for reconsideration, IPAA objected to the idea that a professional engineer must certify "technical infeasibility," arguing that the final rule "added a variety of requirements associated with 'technical infeasibility' that were not purposed [*sic*] or even mentioned in the proposed rule." IPAA Reconsideration Request at 7. API mounted a similar objection to the pneumatic pump exemption, arguing that it had "no opportunity to comment" on the distinction between new construction sites (known as "greenfield" sites) and older emissions sites ("brownfield" sites). *See* API Reconsideration Request at 2.

Embracing these arguments, EPA granted reconsideration on the ground that it had never "propose[d] or otherwise suggest[ed] exempting well site pneumatic pumps from emission control based on such [PE] certification." 82 Fed. Reg. at 25,732. EPA added that the specific details of the exemption, including the distinction between old and new sites, "were included ... without having been proposed for notice and comment." *Id.*

After proposing that a professional engineer certify regulated entities' closed vent systems, the NPRM states that operators of oil and natural gas facilities must also "connect the pneumatic pump affected facility through a closed vent system ...." 80 Fed. Reg. at 56,649, 56,666. In response, API submitted extensive comments on the challenges of connecting pneumatic pumps to "an existing control device." API Comments at 78. API explained that given the design of many *existing* sites, the pneumatic pump requirement was "not technically feasible." *Id.* Accordingly, API expressly requested that EPA "provide [an] exclusion in the rule such that routing a pneumatic pump affected source to an existing control device or closed vent system is not required *if it is not technically feasible* ...." *Id.* (emphasis added). The comment continued: "If needed, EPA could provide provisions in the rule for an operator to make *an engineering determination* that an existing control device cannot technically handle the additional gas from a pneumatic pump affected source exhaust, document this determination, and make such a determination available for inspection by EPA or other competent authority." *Id.* (emphasis added). API, in other words, proposed precisely the technical infeasibility language ***14** EPA adopted in the final rule, suggested that an engineer certify technical infeasibility, and justified its proposed exemption based on a lengthy description of why existing sites were not designed to "handle" EPA's proposal. *Id.*

Given this, it was perfectly logical for EPA to adopt an exception to its proposed rule that requires a professional engineer's certification of infeasibility, and to limit that exception to sites that had already been designed in a way that made compliance infeasible. The record thus belies EPA's claim that no industry group had an opportunity to comment on the "scope and parameters" of the pneumatic pump exemption. EPA Opp. 22.

## IV.

The administrative record thus makes clear that industry groups had ample opportunity to comment on all four issues on which EPA granted reconsideration, and indeed, that in several instances the agency incorporated those comments directly into the final rule. Because it was thus not "impracticable" for industry groups to have raised such objections during the notice and comment period, CAA section 307(d)(7)(B) did not require reconsideration and did not authorize the stay. EPA's decision to impose a stay, in other words, was "arbitrary, capricious, [and] ... in excess of [its] ... statutory ... authority." 42 U.S.C. § 7607(d)(9)(A), (C). We shall therefore grant Environmental Petitioners' motion to vacate the stay.

We emphasize, however, that nothing in this opinion in any way limits EPA's authority to reconsider the final rule and to proceed with its June 16 NPRM. Although EPA had no section 307(d)(7)(B) *obligation* to reconsider the methane rule, it is free to do so as long as "the new policy is permissible under the statute ..., there are good reasons for it, and ... the agency *believes* it to be better." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).

*So Ordered.*

Brown, Circuit Judge, dissenting:

My colleagues are quick to claim we have jurisdiction to hear this motion, but I disagree. While we presumptively possess jurisdiction over "final agency action," the Administrative Procedure Act deprives us of jurisdiction when, *inter alia*, "agency action is committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). The Court acknowledges EPA's decision to grant reconsideration "is not reviewable final agency action" as it "merely begins a process that could culminate in no change to the rule." Op. 6. The Court further claims the Clean Air Act provision at issue here "expressly links EPA's power to stay a final rule to the two requirements for mandatory reconsideration ...." *Id.* at 8. Indeed it does. *See* 42 U.S.C.

§ 7607(d)(7)(B) ("Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.").[1] Nevertheless, the Court ***15** concludes EPA's decision to stay the rule pending reconsideration is subject to judicial review, claiming the stay is "final agency action" "with respect to" complying with the rule. *See* Op. 6. It also characterizes the stay as "essentially an order delaying the rule's effective date." *Id.* at 6. But hitting the pause button is the antithesis of ending the matter. The Court presumes a certain outcome from EPA's reconsideration, one that a stay alone gives us no basis to presume. A stay is, of course, "final" as to whether one must comply with the rule during reconsideration—just as a trial court's evidentiary determination is "final" until the time for appeal ripens. That some agency action resolves itself does not render it "final." If it did, every interlocutory action that leaves compliance to the discretion of the regulated party would justify judicial review. The stay is "essentially" nothing but a stay, and it does not qualify as "final agency action" under the two-part inquiry set forth by the Supreme Court.

1 It is far from clear that designating the judiciary as an alternative forum to seek a stay, as the statute does, makes EPA action on stays subject to judicial review. *But see* Op. 7. The text's obvious reading is to give private parties power to seek a stay without having to ask the agency. Given the statutory context, this makes sense; an agency may not want to reconsider its rule, let alone stay its implementation to facilitate an undesired reconsideration. By establishing the judiciary as an alternative, the statute ensures stays result from factual warrant and not simply because the agency wills one. Even if the statute could be read to authorize judicial review of agency action on stays, there is no basis to conclude review extends beyond *denied* stays. A denied stay in this statutory context—reconsideration based on new grounds or grounds "impracticable" to raise during rulemaking—might be judicially reviewable for the same reason the denial of such reconsideration petitions are reviewable. *Cf. Sendra Corp. v. Magaw*, 111 F.3d 162, 166 (D.C. Cir. 1997) ("An agency's denial of a petition ... for reconsideration is not itself subject to judicial review if the petition alleges only 'material error' in the agency's original decision. ... On the other hand, if an agency denies a petition for reconsideration alleging 'new evidence' or 'changed circumstances,' the agency's denial is reviewable as a final agency action ...."). But, EPA *granting* a stay does not present the same risk of agency short shrift toward reconsideration. Nothing about the text or its context justifies importing a new purpose into the statute to authorize judicial review of granted stays.

As EPA's stay here is "of a[n] ... interlocutory nature," it cannot satisfy the first element of "final agency action:" consummation of the agency's decision-making process. *See Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("Agency action is considered final to the extent it imposes an obligation, denies a right, or fixes some legal relationship."). Here, EPA's ninety-day stay is limited to specific requirements within the rule that are among the subjects of reconsideration—requirements for fugitive emissions, pneumatic pump standards, and certification requirements for professional engineers. *See* Pet'r Attach. 4–5. A temporary stay facilitates reconsidering these discrete issues; it does not resolve them. This is not the kind of agency action considered "final." *Cf. Reliable*, 324 F.3d at 731 ("The agency's conduct thus far amounts to ... a statement of the agency's intention to make a preliminary determination ... and a request for voluntary corrective action."). The Environmental Petitioners will be able to raise their arguments regarding the alleged harms of revisiting EPA's rule during the reconsideration process, and once again during the litigation that will surely follow EPA's reconsideration. With these available avenues, it belies the virtue of "final agency action" to include an agency's intermediate stay within the standard's ambit. *See id.* at 733 ("So long as Reliable retains the opportunity to convince the agency that it lacks jurisdiction over Reliable's sprinkler heads, it makes no sense for a court to intervene. It conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken."); *Ciba-Geigy Corp. v. U.S. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986) ("Judicial review at [this] stage improperly intrudes into the agency's decisionmaking process. ***16** It also squanders judicial resources since the challenging party still enjoys an opportunity to convince the agency to change its mind.").

The Court relies on a series of pre-*Bennett* cases to equate EPA's stay with instances where this court has reviewed an agency amending or revoking a rule. *See* Op. 6. None of these cases are apposite.[2] And while *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 823 F.2d 608 (D.C. Cir. 1987) may seem analogous, it does not involve the sort of neutral, time-limited stay involved here.[3]

2 *Environmental Defense Fund, Inc. v. Gorsuch*, 713 F.2d 802 (D.C. Cir. 1983) holds "an agency decision which effectively suspends the implementation of important and duly promulgated standards ... constitutes rulemaking subject to notice and comment

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

....” *Id.* at 816 (citing *Council of the Southern Mountains, Inc. v. Donovan,* 653 F.2d 573 (D.C.Cir.1981) and *Nat. Res. Def. Council, Inc. v. EPA,* 683 F.2d 752 (3d Cir. 1982) as “stand[ing] for the [same] proposition”). It is not credible to suggest that, absent submitting its stay pending reconsideration through notice and comment rulemaking, EPA's action is *ultra vires* and thereby subject to judicial review.

3 The question in *Int'l Union* was the following: Whether an administrative law judge could order the Mine Safety & Health Administration to grant a party “interim relief” from a mine-safety standard while that party awaited a decision on whether it could receive a “mine-specific exemption from [the] mandatory standard.” *See* 823 F.2d at 610–12. Exemptions were only granted when the agency determined “an alternative method” to the mandatory standard could “guarantee no less than the same measure of protection” afforded by the standard “at all times.” *See id.* at 611. But subjecting a particular regulated entity to a different compliance standard via an exemption is not the same as staying a rule pending its reconsideration—that exemption *alters* the *status quo* (the mandatory rule) as to one party, while here, staying the rule *preserves* the *status quo* (no rule in effect) as to everyone. Further, in the exemption context, the “interim relief” is akin to an injunction; an ALJ is ordering the agency not to enforce the existing standard as to the exemption-petitioning party, *and ordering the petitioning party* to comply with an interim standard. *See id.* at 612–13. In the context of this stay, however, EPA is not ordering anyone to do anything. The agency is merely announcing that it has decided to allocate its resources towards reconsideration rather than enforcing the rule. Despite the Court's contrary intimations, enjoining conduct is not the same action as issuing a stay. *Cf. Nken v. Holder*, 556 U.S. 418, 428–29, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (“A stay pending appeal certainly has some functional overlap with an injunction .... Both can have the practical effect of preventing some action before the legality of that action has been conclusively determined. But a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in question—not by directing an actor's conduct.”).

In contrast to our precedent, the Court's opinion concludes a particular administrative proceeding has innumerable final agency actions, including intermediate decisions. No authority supports this proposition. The majority contends *Friedman v. FAA*, 841 F.3d 537 (D.C. Cir. 2016) does, Op. 7–8, but *Friedman* was *sui generis*; it spoke only to the “specific facts presented,” a “constructive denial of Friedman's application for a first class [medical] certificate.” 841 F.3d at 541. Here, unlike in *Friedman*, the agency has not placed Environmental Petitioners in an indefinite “holding pattern” preventing “any explicitly final determination.” *Cf. id.* at 542. Rather, EPA has authorized a time-limited stay during which it will proceed through the rule reconsideration process—a process where, as mentioned above, the Environmental Petitioners are free to voice their objections and then sue the agency if they disagree with the agency's actions. *Cf. Ciba-Geigy*, 801 F.2d at 437 (finding “final agency action” when EPA's action, unlike the stay here, “gave no indication that [its ***17** position was] subject to further agency consideration or possible modification”). This is a far cry from an agency “clearly communicat[ing] it will not reach a determination on a petitioner's submission ... [while] simultaneously refus[ing] to deny the petitioner's submission.” *Friedman*, 841 F.3d at 542.

As a rule of decision, the Court's unbounded reading of *Friedman* creates a peculiar backdoor: The Court insists, correctly, EPA's decision to reconsider the rule is within the agency's discretion. But if the stay is not, and the stay is tied up with the reconsideration authority, deeming the stay “final agency action” allows the Court to review the basis for reconsideration itself. *See* Op. 8. Certainly, the rule of law would benefit from the judiciary shedding its unfortunate sheepishness towards reviewing agency action. But that noble goal does not absolve us from “carefully consider[ing] why and when we are meant to” review agency action. *See AKM LLC v. Sec'y of Labor*, 675 F.3d 752, 769 (D.C. Cir. 2012) (Brown, J., concurring). Yes, the “reflex of deference” can be dangerous. *Id.* But so is an aneurysm of activism that enlarges a doctrine by engorging judicial prerogatives to the point of rupturing the separation of powers. *See Santa Monica Beach, LTD. v. Superior Court*, 19 Cal.4th 952, 81 Cal.Rptr.2d 93, 968 P.2d 993, 1040 (1999) (Brown, J., dissenting) (“Judicial review is properly conceived in narrow terms. It is not a license to supersede the exercise of power by a coordinate branch which acts well within constitutional boundaries.”). If an intermediate stay is the *consummation* of an agency's decision-making, we have conflated the agency *preserving the status quo*, *i.e.*, forestalling the rule's requirements in order to reconsider them, with the agency *completing* a course of action, *i.e.*, ordering compliance. In my view, this is erroneous.

Turning to the second element of “final agency action,” the Court establishes nothing by asserting the stay creates obvious consequences for the regulated parties. *See, e.g.*, Op. 7. Agency actions of various kinds, “final” or not, come with consequences. The relevant question is whether the consequences have a “legal force or practical effect” *beyond* “the disruptions that accompany” the agency making a decision to “initiate proceedings.” *See*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241, 243, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).

Here, EPA's unreviewable decision to reconsider its rule is akin to an agency making "a precatory finding of [a] 'reason to believe' " legal action is warranted. *Cf. Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 173 F.Supp.2d 41, 44 (D.D.C. 2001) (quoting *Standard Oil Co.*, 449 U.S. at 234, 101 S.Ct. 488). The stay—designed so EPA can devote resources to reconsidering the rule rather than enforcing it, and so industry can avoid implementing changes that reconsideration may later obviate—is subsidiary to the reconsideration itself. If "final agency action" cannot encompass the decision to reconsider the rule, "it cannot possibly encompass the ... steps that the [agency] has taken to date" to facilitate reconsideration. *See id.* at 44. EPA is not compelling compliance here. If a regulated entity wants to comport its conduct to the requirements of the stayed rule, it is free to do so. By issuing the stay, all the EPA has indicated it that it will not, legally or practically, enforce the rule under reconsideration. The stay's consequences therefore do not impose legal or practical requirements on anyone—separating them from the kind of consequences encompassed by "final agency action." *Cf. Reliable*, 324 F.3d at 735 ("The discovery orders in *ARCO* were legally binding orders, whereas here, there is no order, only the ***18** possibility of Reliable having to defend itself at an enforcement hearing if Reliable does not undertake certain voluntary action, and if the agency decides to proceed against it.").

The Court is thus in error to claim *Ciba-Geigy*. *See* Op. 7. *Ciba-Geigy* was a "comply-or-else" case; "the next step was not further adjudication, but an enforcement action in federal court." *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 32 (D.C. Cir. 2014) (explaining *Ciba-Geigy*). Here, Environmental Petitioners are not presented with agency conduct demonstrating EPA will take no additional action. EPA's stay does not ask anyone to alter their conduct, so "judicial review must wait." *See id.* That Petitioners are anxious to see their victory implemented and impatient with delay does not make EPA's action final. It may be annoying, disappointing, ill-advised, even unlawful, but that does not transform a stay to facilitate reconsideration into "final agency action."

Without either element of the "final agency action" inquiry satisfied, I cannot conclude EPA's stay falls within our jurisdictional reach. Section 7607(d)(7)(B) renders a stay a mere means to facilitate a decision we lack the authority to review. Accordingly, I would dismiss the Environmental Petitioners' motion on the grounds that we lack jurisdiction to review EPA's stay, and not reach the remaining issues. As the Court does otherwise, I respectfully dissent from the Court's decision to grant the motion and vacate EPA's stay.

**All Citations**

862 F.3d 1, 84 ERC 1999

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# ATTACHMENT B

865 F.3d 691
United States Court of Appeals,
District of Columbia Circuit.

AMERICAN WILD HORSE PRESERVATION CAMPAIGN, et al., Appellants
v.
Sonny PERDUE, Secretary, U.S. Department of Agriculture, et al., Appellees

No. 15-5332
|
Argued January 11, 2017
|
Decided August 4, 2017

**Synopsis**

**Background:** Wild horse preservationists brought action under the Administrative Procedure Act (APA) against federal officials, challenging Forest Service's management plan for wild horse territory (WHT) in national forest, which adjusted territory's borders and population threshold, as arbitrary and capricious. Parties cross-moved for summary judgment, and private landowners with land near WHT and users of public land resources with national forest intervened and moved for summary judgment. The United States District Court for the District of Columbia, Amy Berman Jackson, J., 133 F.Supp.3d 200, granted summary judgment for Service, concluding, inter alia, that Service permissibly found that disputed middle section of territory was never incorporated into WHT, and that any reference to single, contiguous territory was mere "administrative error." Preservationists appealed.

**Holdings:** The Court of Appeals, Millett, Circuit Judge, held that:

[1] Service's decision to eliminate middle section of WHT was arbitrary and capricious, in that Service failed to acknowledge and adequately explain its change in policy regarding management of wild horses in that section as part of single, contiguous protected WHT;

[2] Service's excision of middle section from WHT did not make "significant" change to forest plan so as to require Service to comply with heightened procedural requirements under the Forest Management Act; and

[3] Service's decision to eliminate middle section of WHT was arbitrary and capricious, in that Service failed to consider adequately whether an Environmental Impact Statement (EIS) was required under the National Environmental Policy Act (NEPA).

Reversed in part and remanded.

West Headnotes (26)

[1] **Game**
Game on public lands or waters
**Woods and Forests**
Forest reservations, preserves, or parks

United States Forest Service is responsible for implementing the Wild Horses Act within the National Forest System. 16 U.S.C.A. § 1331 et seq.; 36 C.F.R. § 222.60(a).

Cases that cite this headnote

[2] **Environmental Law**
Duty of government bodies to consider environment in general

NEPA obligates federal agencies to analyze the environmental consequences of proposed federal actions. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

Cases that cite this headnote

[3] **Environmental Law**
Significance in general

Under NEPA, federal agencies must conduct an Environmental Assessment to determine whether a proposed federal action will have a significant effect on the environment. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; 40 C.F.R. §§

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

1508.9(a), 1508.13.

Cases that cite this headnote

[4] **Environmental Law**
Significance in general

Under NEPA, if an Environmental Assessment indicates that the environmental impacts of proposed federal action will not be significant, the agency must issue a finding of no significant impact, explaining why the agency action will not substantially affect the environment. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; 40 C.F.R. §§ 1501.4(e), 1508.13.

1 Cases that cite this headnote

[5] **Administrative Law and Procedure**
Report or opinion; reasons for decision
**Administrative Law and Procedure**
Arbitrary, unreasonable or capricious action; illegality

Administrative Procedure Act (APA) prohibits arbitrary and capricious actions by federal agencies and mandates that they give reasoned explanation for the actions that they do take. 5 U.S.C.A. § 551 et seq.

Cases that cite this headnote

[6] **Federal Courts**
Summary judgment

Court of Appeals reviews district court's grant of summary judgment de novo.

Cases that cite this headnote

[7] **Administrative Law and Procedure**
Report or opinion; reasons for decision
**Administrative Law and Procedure**
Arbitrary, unreasonable or capricious action; illegality

Administrative Procedure Act's (APA) "arbitrary and capricious" standard obligates federal agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[8] **Administrative Law and Procedure**
Validity

Under the Administrative Procedure Act (APA), a rule generally is arbitrary and capricious if the agency: (1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) offers an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[9] **Administrative Law and Procedure**
Stare decisis; estoppel to change decision

Central principle of administrative law is that, when agency decides to depart from decades-long past practices and official policies, agency must at a minimum acknowledge the change and offer a reasoned explanation for it.

1 Cases that cite this headnote

[10] **Administrative Law and Procedure**

Stare decisis; estoppel to change decision

Agency may not depart from a prior policy sub silentio.

Cases that cite this headnote

[11] **Game**
Game on public lands or waters
**Woods and Forests**
Forest reservations, preserves, or parks

Decision of United States Forest Service, to eliminate 23,000-acre middle section of Wild Horse Territory (WHT) in national forest, which section, though never formally incorporated into WHT, had been included on map of WHT between territory's two original, separate, non-contiguous parcels, was arbitrary and capricious, in that Service failed to acknowledge and adequately explain its change in policy regarding management of wild horses in that section as part of single, contiguous protected WHT; Service's inclusion of disputed section in WHT so as to link original parcels into larger and unified wild horse territory was not some sort of inconsequential and passing "administrative error," but was well-documented in the administrative record, including in official forest plan, and was reconfirmed repeatedly by two decades of agency practice and official pronouncements, such that agency, at minimum, had to acknowledge the change and offer a reasoned explanation for it. 5 U.S.C.A. § 706(2)(A); 16 U.S.C.A. § 1331 et seq.; Forest and Rangeland Renewable Resources Planning Act of 1974, § 2 et seq., 16 U.S.C.A. § 1600 et seq.; National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.; 36 C.F.R. § 222.60(a).

1 Cases that cite this headnote

[12] **Administrative Law and Procedure**
Arbitrary, unreasonable or capricious action; illegality

There is no "oops" exception to the duty of federal agencies to engage in reasoned decisionmaking. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[13] **Administrative Law and Procedure**
Arbitrary, unreasonable or capricious action; illegality

In determining whether agency action is arbitrary and capricious, after-the-fact claims about agency intentions do not work when agency actions evince the opposite. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[14] **Environmental Law**
Plants and wildlife; endangered species

E-mail that was, at best, a post hoc rationalization that was not part of the record before United States Forest Service when Service issued its decision adjusting borders for wild horse territory (WHT) in national forest, could not help agency when its decision was later challenged as arbitrary and capricious under the Administrative Procedure Act (APA). 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[15] **Game**
Game on public lands or waters
**Woods and Forests**
Forest reservations, preserves, or parks

United States Forest Service's alleged failure to comply with requirements of the Wild Horses Act or the Administrative Procedure Act (APA) in incorporating additional land in wild horse territory (WHT) would not have rendered the change to the territory void from its inception. 5

U.S.C.A. § 551 et seq.; 16 U.S.C.A. § 1331 et seq.

Cases that cite this headnote

[16] **Administrative Law and Procedure**
Judicial Review of Administrative Decisions

Agency's assumption that a purported past mistake would excuse agency's current missteps was wrong; in administrative law, as elsewhere, two wrongs do not make a right.

Cases that cite this headnote

[17] **Administrative Law and Procedure**
Judicial Review of Administrative Decisions

Whatever an agency's past transgressions, courts cannot condone the "correction" of one error by the commitment of another.

Cases that cite this headnote

[18] **Administrative Law and Procedure**
Stare decisis; estoppel to change decision

Although, under the Administrative Procedure Act (APA), an agency is free to change its policies going forward if doing so is reasonable, the agency first must at least display awareness that it is changing position and show that there are good reasons for the new policy. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[19] **Administrative Law and Procedure**
Stare decisis; estoppel to change decision

If an agency glosses over or swerves from prior precedents without discussion, it may cross the line from the tolerably terse to the intolerably mute. 5 U.S.C.A. § 706(2)(A).

Cases that cite this headnote

[20] **Woods and Forests**
Forest reservations, preserves, or parks

Under the Forest Management Act, if "amendment" of a forest plan would result in a significant change in the plan, the United States Forest Service must comply with heightened procedural requirements, including public participation through a three-month study, public meetings, and compliance with the Multiple Use Sustained Yield Act of 1960. 16 U.S.C.A. §§ 528-531; Forest and Rangeland Renewable Resources Planning Act of 1974 § 6, 16 U.S.C.A. §§ 1604(d), 1604(e), 1604(f)(4).

Cases that cite this headnote

[21] **Game**
Game on public lands or waters
**Woods and Forests**
Forest reservations, preserves, or parks

United States Forest Service's excision of middle section from Wild Horse Territory (WHT) did not make "significant" change to forest plan so as to require Service to comply with heightened procedural requirements under the Forest Management Act; although elimination of middle section, which had linked original two parcels of WHT into larger and unified wild horse territory, worked an important and consequential change in the WHT itself, removal of those 23,000 acres had no material impact on forest plan governing 1.6 million acres of national forest, which plan had been formulated only after Service balanced a panoply of considerations, including air quality, cultural resources, biodiversity, fire management, mineral leasing, pest control, range conditions, range management, livestock grazing, recreational uses, riparian resources,

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

soil and water quality, timber clearance, and wildlife protection, of which wild horse management was just a factor of a factor of a factor. Forest and Rangeland Renewable Resources Planning Act of 1974 § 6, 16 U.S.C.A. §§ 1604(d), 1604(e), 1604(f)(4).

Cases that cite this headnote

[22] **Environmental Law**
Land use in general

Decision of United States Forest Service, to eliminate 23,00-acre middle section of Wild Horse Territory (WHT) in national forest, which section, though never formally incorporated into WHT, had been included on map of WHT between WHT's two original, separate, non-contiguous parcels, thus linking those parcels into larger and unified wild horse territory, was arbitrary and capricious, in that Service failed to consider adequately whether an Environmental Impact Statement (EIS) was required under the National Environmental Policy Act (NEPA); in finding no significant environmental impact that would warrant an EIS, Service's NEPA analysis never came to grips with its departure from past practice, and thus never analyzed the potential environmental significance on area's wild horse population of agency's decision to contract boundaries of WHT by approximately ten percent. 5 U.S.C.A. § 706(2)(A); National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

Cases that cite this headnote

[23] **Environmental Law**
Assessments and impact statements

Court of Appeals' role in reviewing an agency's decision not to prepare an Environmental Impact Statement (EIS) is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

1 Cases that cite this headnote

[24] **Environmental Law**
Assessments and impact statements

Task of the Court of Appeals, in reviewing an agency's decision not to prepare an Environmental Impact Statement (EIS), is to ensure that the agency, in finding no significant impact, accurately identified the relevant environmental concern, took a "hard look at the problem" in making its decision, has made a convincing case for its finding of no significant impact, and has shown that even if there is an impact of true significance, an EIS is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

1 Cases that cite this headnote

[25] **Environmental Law**
Duty of government bodies to consider environment in general

NEPA requires that an agency's environmental analysis candidly confront relevant environmental concerns. National Environmental Policy Act of 1969, § 2 et seq., 42 U.S.C.A. § 4321 et seq.

Cases that cite this headnote

[26] **Federal Courts**
Specification of errors; points and arguments

Appellant's footnoted allegation was insufficient to preserve its argument on appeal.

Cases that cite this headnote

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

***695** Appeal from the United States District Court for the District of Columbia (No. 1:14-cv-00485)

**Attorneys and Law Firms**

David Zaft argued the cause for appellants. With him on the briefs was William S. Eubanks II. Katherine A. Meyer entered an appearance.

Mark R. Haag, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were John C. Cruden, Assistant Attorney General at the time the brief was filed, Meredith L. Flax and Stuart Gillespie, Attorneys, U.S. Department of Justice, and Steven F. Hirsch, Attorney-Advisor, U.S. Department of Agriculture.

Caroline Lobdell was on the brief for defendants-intervenors-appellees.

Before: Tatel, Millett, and Wilkins, Circuit Judges.

**Opinion**

Millett, Circuit Judge:

Since 1975, the United States Forest Service has protected and managed wild horses in the Devil's Garden section of the Modoc National Forest in Northern California. That wild horse territory originally consisted of two separate tracts of land of roughly 236,000 acres. But at some point in the 1980s, a Forest Service map added in an approximately 23,000 acre tract of land known as the Middle Section and, in so doing, linked the two territories into a larger and unified wild horse territory of approximately 258,000 acres. For more than two decades, the Service continued to describe the territory as a single contiguous area and to manage wild horses in the Middle Section.

In 2013, the Forest Service publicly acknowledged the cartographic confusion, declared the expansion reflected in the 1980s map to be an administrative error, and without further analysis redrew the wild horse territory's lines to exclude the Middle Section and to revert to two disjoined tracts of land. The American Wild Horse Preservation Campaign and other ***696** plaintiffs filed suit alleging that the Service's revamping of the territorial lines violated numerous federal laws. We agree. A 23,000 acre tract of land and two decades of agency management cannot be swept under the rug as a mere administrative mistake. We accordingly reverse in part and remand for the Service to address rather than to ignore the relevant history.

## I

The Modoc National Forest comprises approximately 1.6 million acres of federally managed land in Northern California. Included within the Forest are several hundred thousand acres of protected wild horse land that make up the Devil's Garden Wild Horse Territory. The Forest Service's management of the Devil's Garden Wild Horse Territory is subject to a Matryoshka doll of nesting federal statutes.

*First*, the Wild and Free-Roaming Horses and Burros Act of 1971 ("Wild Horses Act"), 16 U.S.C. § 1331 *et seq.*, charges the Secretaries of Interior and Agriculture with "protect[ing] and manag[ing] wild free-roaming horses and burros" on federal lands, *id.* § 1333(a). The Secretaries "may designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation," and "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance[.]" *Id.* The Secretaries also "shall maintain a current inventory" and set "appropriate management levels" for "wild free-roaming horses and burros," to ensure a "thriving natural ecological balance" and to "protect the range from the deterioration associated with overpopulation." *Id.* § 1333(b)(1), (2). Wild horses are to be treated "in the area where presently found" as an integral component "of the natural system of the public lands." *Id.* § 1331.

[1]The Service is responsible for implementing the Wild Horses Act within the National Forest System. 36 C.F.R. § 222.60(a). In 1980, the Service promulgated regulations providing that it "shall: * * * [e]stablish wild horse and burro territories" ("Wild Horse Territories"), and then "[a]nalyze," "develop[,] and implement a management plan" for each Wild Horse Territory. *Id.* § 222.61(a)(3)–(4). The Service may "update[ ]" the Wild Horse Territory Plans "whenever needed, as determined by conditions on each territory." *Id.* § 222.61(a)(4). The Service must also "[m]aintain a current inventory of [wild horses] on each [Wild Horse Territory] to determine * * * where excess animals exist[,]" *id.* § 222.61(a)(5), set "appropriate management levels" for those horses and burros, and "remov[e] or destr[oy] * * * excess animals," *id.* § 222.61(a)(6); *see also id.* § 222.69.

Service regulations further define "[w]ild free-roaming horses and burros" to mean "all unbranded and unclaimed horses and burros and their progeny that" either "have used lands of the National Forest System on or after December 15, 1971," or that "do hereafter use these lands

as all or part of their habitat." 36 C.F.R. § 222.60(b)(13). Those animals retain federal protection even if they "move to lands of other ownership or jurisdiction as a part of their annual territorial habitat pattern or for other reasons." *Id.* § 222.65.

*Second*, the National Forest Management Act of 1976 ("Forest Management Act"), 16 U.S.C. § 1600 *et seq.*, "requires the Secretary of Agriculture to 'develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System.' " ***697** *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 728, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (quoting 16 U.S.C. § 1604(a)). The Secretary has delegated his authority under the Act to the Service. 36 C.F.R. § 200.3(b).

The Forest Management Act establishes a two-step procedure for managing National Forest System lands. The Service must (i) "develop, maintain, and, as appropriate, revise land and resource management plans" for national forests ("Forest Plans"), and (ii) ensure that all "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands," including Wild Horse Territory Plans, are "consistent with the [Forest Plans]." 16 U.S.C. § 1604(a), (i).

The Forest Management Act sets out several general conditions with which the development of Forest Plans must comply. *See* 16 U.S.C. § 1604(f). For instance, the Service must "provide for public participation in the development, review, and revision of [Forest Plans]." *Id.* § 1604(d). In addition, the Plans must "be embodied in appropriate written material, including maps and other descriptive documents," *id.* § 1604(f)(2), and "be prepared by an interdisciplinary team," *id.* § 1604(f)(3). The Forest Service may amend Forest Plans "in any manner whatsoever after final adoption [.]" *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 227 (D.C. Cir. 2009) (quoting 16 U.S.C. § 1604(f)(4)); *see also* 36 C.F.R. § 219.13(a). But if an "amendment" of a Forest Plan "would result in a significant change," the amendment process must comply with heightened procedural requirements. *See* 16 U.S.C. § 1604(f)(4). Regardless of whether an amendment is significant, however, the Forest Service must allow for public participation in the amendment process. *Id.*

Service regulations elaborate upon the procedures for developing and amending Forest Plans. 36 C.F.R. §§ 219.1–219.19. As relevant here, the Service must develop Forest Plans in coordination with the statutorily required interdisciplinary team, extensive public participation and comment, and related efforts of other federal agencies, state and local governments, and Indian tribes. *Id.* §§ 219.4, 219.5. Formulation of such Plans must take into consideration, *inter alia*, "fish and wildlife species," "grazing and rangelands," "habitat and habitat connectivity," "[h]abitat conditions," and "[l]and status and ownership, use, and access patterns relevant to the [Forest Plan] area." *Id.* § 219.10(a). The Plan must also "maintain the diversity of plant and animal communities" within the forest. *Id.* § 219.9.

[2] [3] [4]*Third*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, obligates federal agencies to analyze the environmental consequences of proposed federal actions. *See generally id.* § 4332. Under NEPA, federal agencies must conduct an Environmental Assessment to determine whether a proposed federal action will have a significant effect on the environment. 40 C.F.R. §§ 1508.9(a), 1508.13. If that Assessment indicates that the environmental impacts will not be significant, the agency must issue a "finding of no significant impact," *id.* § 1501.4(e), explaining why the agency action will not substantially affect the environment, *id.* § 1508.13. But if the Assessment indicates that the proposed action will "significantly affect[ ] the quality of the human environment," the agency must prepare an Environmental Impact Statement detailing: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of [the] environment and ***698** the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.2.

[5]*Fourth*, the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, prohibits arbitrary and capricious actions by federal agencies and mandates that they give reasoned explanation for the actions that they do take. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–52, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result[.]").

## II

While this dispute concerns a 2013 decision by the Service to change the boundaries of the Devil's Garden Wild Horse Territory, the origins of the controversy reach back four decades.

**A**

In 1975, the Service issued its first Devil's Garden Wild Horse Territory Plan. The Wild Horse Territory specified in that plan consisted of two separate areas of land totaling approximately 236,000 acres. The Territory did not include a parcel of land of approximately 23,000 acres, known as the Middle Section, which conjoined those two separate tracts.

Sometime in the 1980s, a Forest Service map depicted the Devil's Garden Wild Horse Territory as a single contiguous area of land that included the Middle Section. According to the Service, the map's "revised boundary" "incorporated about another 23,631 acres of land," resulting in a Wild Horse Territory of "approximately 258,000 acres in size." J.A. 261.

Then, in 1991, the Service issued a Forest Plan for the Modoc National Forest. While the Plan did not include a map of the Wild Horse Territory, the Forest Plan acknowledged that the Service "is legally obligated to manage horses within a 258,000-acre wild horse territory," J.A. 584, and announced that "[t]he Forest has one wild horse territory of about 258,000 acres," J.A. 585.

The 1991 Forest Plan also stated that the Service "prepared the Wild Horse [Territory] Plan in 1985, which identifies a population objective of 275–335 animals to manage." J.A. 585–586.[1] The interdisciplinary team that prepared the 1991 Forest Plan expressly denominated the "Wild Horse [Territory] Plan" to be "consistent with, and still appropriate for, the [1991] Forest Plan." J.A. 578. As a result, the Wild Horse Territory Plan, which the interdisciplinary team understood to include a single 258,000 acre territory, was expressly "incorporated by reference" into the 1991 Forest Plan. J.A. 578; *see also* J.A. 588 (describing "Wild Horse [Territory] Plan" as an "[e]xisting [p]lan[ ] [r]etained and [i]ncorporated by [r]eference into the [1991] Forest Plan and *[u]pdated to be [c]onsistent*") (emphasis added). When the 1991 Forest Plan was finally approved, it "supersede[d] most previous Forest resource management plans." J.A. 578.

[1] The Service denies that there was a 1985 Wild Horse Territory Plan.

Over the next two decades, the Service actively managed and recorded wild horses in the Middle Section, as evidenced by official Wild Horse Inventory Reports from that time period.

***699 B**

The Modoc National Forest is divided into grazing "allotments." Generally speaking, the Wild Horse Territory boundaries do not hew precisely to those of the grazing allotments. Rather, the Wild Horse Territory covers portions of various allotments. The disputed Middle Section consists of portions of five allotments: the Triangle, Avanzino, Carr, Timbered Mountain, and Big Sage Allotments. In 1971, when the Wild Horses Act was adopted, two portions of allotments in the Middle Section were privately held: the Triangle portion, and the Avanzino portion. In total, those private lands covered approximately 5,923 acres. The other portions—the Carr, Timbered Mountain, and Big Sage portions—were publicly held in 1971. Consequently, as stipulated by the Service, the "majority of the lands in the [Middle Section] were publicly held in 1971 [.]" J.A. 66.

In 1976, the Service acquired the Triangle Allotment as public land. That means that, in 1991, when the Service adopted the Forest Plan that included the Middle Section in the Wild Horse Territory, only one portion of the Middle Section was privately held: the Avanzino portion. That private land covered approximately 10% of the Middle Section's acreage.

**C**

In July 2011, the Service issued a scoping letter proposing to update the Devil's Garden Wild Horse Territory Plan. That letter indicated that the Wild Horse Territory was "approximately 268,750 acres in size," J.A. 757, and included a map depicting the Wild Horse Territory as a single, contiguous area of land including the Middle Section.

A year later, the Service turned its attention to the discrepancy between the Wild Horse Territory boundaries in the 1991 Forest Plan and the boundaries in the original 1975 Wild Horse Territory Plan. The Forest Service issued a new scoping letter in December 2012 stating that,

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

"[d]uring the mid-1980's, the [Modoc National Forest's Devil's Garden and Doublehead Ranger Districts] appear [ ] to have adjusted the [Wild Horse Territory] boundary for administrative convenience" to "incorporate[ ] about [an additional] 23,631 acres of land." J.A. 731. The December 2012 scoping letter called this an "administrative error" and "propose[d] to return to the management of wild horses within the [Wild Horse Territory] boundary established in 1975." J.A. 732.

In August 2013, the Service released a Final Environmental Assessment to accompany its proposed revisions to the size of the Wild Horse Territory. Like the scoping letter, the Final Environmental Assessment labeled the inclusion of the Middle Section "[a]n administrative error," J.A. 264, 708, and "propose[d] to return to the management of wild horses within the [Wild Horse Territory] boundary" as originally established, J.A. 264, 710. The Service also issued a Decision Notice and Finding of No Significant Impact, incorporating the Final Environmental Assessment by reference. That Decision formally adopted the proposed action set forth in the Final Environmental Assessment and concluded that contracting the Wild Horse Territory as proposed would not have a sufficiently significant environmental impact to necessitate an Environmental Impact Statement.

Also in August 2013, the Service issued its new Devil's Garden Wild Horse Territory Plan. The 2013 Wild Horse Territory Plan indicated that the boundaries of the Wild Horse Territory would mirror those of the 1975 Wild Horse Territory Plan, which did not include the disputed Middle Section.

***700 D**

After exhausting their administrative remedies, plaintiffs, the American Wild Horse Preservation Campaign, Return to Freedom, and Carla Bowers (collectively, "Campaign"), all of which advocate for the protection of wild horses, filed suit in the United States District Court for the District of Columbia. They contend that the Service's 2013 revision of the Devil's Garden Wild Horse Territory violated the Administrative Procedure Act, the Wild Horses Act, the Forest Management Act, and NEPA. *See American Wild Horse Preservation Campaign v. Vilsack*, No. 14-0485, Docket Entry No. 1 (D.D.C. Mar. 24, 2014) (Compl. ¶¶ 58–91).[2]

[2] The Campaign also originally challenged the management level for horses set by the Service, but does not press that issue on appeal.

On September 30, 2015, the district court granted summary judgment for the Service. *American Wild Horse Preservation Campaign v. Vilsack*, 133 F.Supp.3d 200 (D.D.C. 2015). The court concluded that the Service permissibly found that the Middle Section was never incorporated into the Wild Horse Territory, and that any reference to a single, contiguous Wild Horse Territory was a mere "administrative error." *Id.* at 212; *see also id.* at 212–218. The district court also ruled that the Service's redrawing of the boundaries of the Wild Horse Territory did not amount to a "significant" amendment warranting formal procedures under the Forest Management Act, as the Service was already managing the Wild Horse Territory as two noncontiguous units. *Id.* at 219–220. The district court similarly reasoned that, because the Service's "boundary adjustment simply corrected an administrative error and resulted in the continued management of the [Middle Section] as distinct from the [Wild Horse Territory]," the Service reasonably determined that its boundary correction would not significantly affect the quality of the human environment, within the meaning of NEPA. *Id.* at 221.

**III**

[6] [7] [8]We review the district court's grant of summary judgment *de novo*. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). Under the Administrative Procedure Act, we must set aside the Service's actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). That standard obligates the agency to examine all relevant factors and record evidence, and to articulate a reasoned explanation for its decision. *See State Farm*, 463 U.S. at 52, 103 S.Ct. 2856. Generally, a rule is arbitrary and capricious if the agency: "(1) 'has relied on factors which Congress has not intended it to consider,' (2) 'entirely failed to consider an important aspect of the problem,' (3) 'offered an explanation for its decision that runs counter to the evidence before the agency,' or (4) [offers an explanation that] 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *United States Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856).

We hold that the Service's decision to eliminate the

Middle Section of the Devil's Garden Wild Horse Territory Plan was arbitrary and capricious in two respects. First, the Service failed to acknowledge and adequately explain its change in policy regarding the management of wild horses in the Middle Section as part of a single, contiguous protected Wild Horse Territory. Second, the Service failed to consider adequately whether an Environmental Impact Statement was required under ***701** NEPA. Accordingly, we reverse the district court's grant of summary judgment for the Service.

### A

[9]A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it. *See Encino Motorcars, LLC v. Navarro*, ––– U.S. ––––, 136 S.Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice[.]' ") (second alteration in original) (quoting *National Cable & Telecomms. Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005)); *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. Failing to supply such analysis renders the agency's action arbitrary and capricious.") (internal quotation marks and citation omitted); *United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984) ("[A]gencies must give a reasoned analysis for departures from prior agency practice[.]") (citing *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).[3]

[3] *See also Mistick PBT v. Chao*, 440 F.3d 503, 512 (D.C. Cir. 2006) ("Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.") (quoting *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003)); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) ("If an agency decides to change course * * * we require it to supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks and citation omitted); *National Classification Comm. v. United States*, 779 F.2d 687, 696 (D.C. Cir. 1985) ("[A]n agency may depart from past policies or practices *if* the agency also provides a reasoned explanation for its actions.")

(emphasis added).

[10]For that reason, we have long held that "[a]n agency may not * * * depart from a prior policy *sub silentio*[.]" *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 707 (D.C. Cir. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009)); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014) (same); *Comcast Corp. v. FCC*, 600 F.3d 642, 659 (D.C. Cir. 2010) (same).

[11]The Service's main defense in this case, however, has been to insist that nothing changed in 2013. In the Service's view, the Middle Section was never part of the Devil's Garden Wild Horse Territory, and so there was nothing to change. That argument flatly defies the plain text of the official 1991 Forest Plan, repeated official agency statements, and two decades of agency practice. Blinders may work for horses, but they are no good for administrative agencies.

The Service argues secondly that the inclusion of the Middle Section must be ignored because it lacked the legal authority to add it in the mid-1980s. That argument never even leaves the starting gate.

#### 1

[12]The Service tries to shrug off its inclusion of the Middle Section in the Wild Horse Territory as some sort of inconsequential and passing "administrative error," as though that label nullifies any agency duty to reasonably explain its ***702** about-face. But there is no "oops" exception to the duty of federal agencies to engage in reasoned decisionmaking. Accordingly, the Service's decision runs aground on both the facts and the law.

As a matter of factual reality, this case involves far more than an errant map. The Service's inclusion of the Middle Section in the Wild Horse Territory is well documented in the administrative record, and it was reconfirmed repeatedly by two decades of agency practice and official pronouncements.

Most significantly, the official 1991 Forest Plan formally documented that the Modoc National Forest "has one wild horse territory of about 258,000 acres," J.A. 585, and that the Service "is legally obligated to manage horses within [that] 258,000-acre wild horse territory," J.A. 584. That language was no divagation. The Forest Plan was the

product of more than ten years of formal study by the Service involving participation by: (i) hundreds of members of the public who submitted numerous comments and gave 105 testimonials at almost 50 public meetings, (ii) five other federal government agencies, (iii) eleven state agencies, (iv) various local governments, agencies, and elected officials; (v) four tribal communities, and (vi) various industry and non-profit groups. Such extensive study and wide participation renders fanciful the notion that 23,000 acres of wild horse territory simply slipped in unnoticed.

The Service notes that the record contains no affirmative indications that the Service "intended to expand the boundaries of the existing Territory when it adopted the [1991] Forest Plan." Service's Br. 16. True. But that is because the Forest Plan treated the determination of the Wild Horse Territory's size as a decision that had already been made in an earlier Service plan. *See* J.A. 585–586 ("The [Modoc National] Forest has one wild horse territory of about 258,000 acres * * * * Fulfilling requirements of the [Wild Horse] Act the [Service] prepared the Wild Horse Management Plan in 1985[.]"). To be sure, the Service denies that there was such a 1985 plan. Service's Br. 15 n.7. But that misses the point: The 1991 Forest Plan that the Service drafted, and in the formulation of which it was the key player, described the Wild Horse Territory's expanded 258,000 acreage as a *fait accompli* by 1991. So the absence of expansion talk in the Forest Plan is no surprise.

What the 1991 Forest Plan did do was formally document a single, contiguous, 258,000 acre Wild Horse Territory that could only exist through inclusion of the Middle Section, incorporate that status into the Plan through a notice-and-comment process, and set a herd management level within that territory of "275–335 animals to manage," J.A. 586. In addition, the Forest Plan's explicit description of the size and management levels for the Wild Horse Territory largely repudiates the Service's claims that the plan was "of no practical consequence for the management of the disputed area because the Forest Service never set appropriate management levels for horses on the [portions of allotments] within the disputed area." Service's Br. 44.

[13]The Service also argues that it did not intend to expand the territory. But after-the-fact claims about agency intentions do not work when agency actions evince the opposite. And the Service's actions for at least twenty years corroborated the Middle Section's inclusion in the Wild Horse Territory.

More specifically, Wild Horse Inventory Reports for the Devil's Garden Wild Horse Territory documented the Service's treatment of portions of the Middle Section as ***703** part of the Territory after the 1991 Forest Plan. In 1992 and 1993, the Wild Horse Inventory Reports counted the "total [number of] horses[,] mules & burros" in ten regions within the Modoc National Forest. J.A. 859, 861. Big Sage, which is partially contained within the Middle Section, and Boles Meadow, which is entirely within the Middle Section, were both excluded from the original 1975 Wild Horse Territory boundaries. But they are listed as two of the ten main regions that Service observers surveyed for wild horses in 1992 and 1993. The 1992 Wild Horse Inventory Report documented 33 horses in Big Sage and Boles Meadow combined—more than ten percent of the total headcount of 321 horses for the entire Wild Horse Territory. The 1993 Wild Horse Inventory Report documented five horses in Big Sage and Boles Meadow combined, out of 58 horses in total.

In addition, statements accompanying the 1992 and 1993 Wild Horse Inventory Reports implicitly treated Big Sage and Boles Meadow as within the Wild Horse Territory. For example, in the 1992 Wild Horse Inventory Report, the Service noted that some of the wild horses spotted were located outside the Wild Horse Territory. *See, e.g.*, J.A. 862 (1992 Wild Horse Inventory Report: "Ten horses were observed in the West Grizzlie * * * Allotment. This area is outside of the wild horse territory. Every effort should be made to return these animals to the territory and/or [have them] removed."). By implication, the remaining wild horses that the Service counted—including those wild horses in Big Sage and Boles Meadow—were considered to be inside the Wild Horse Territory. Moreover, the 1993 Wild Horse Inventory Report recommended that certain wild horses found outside the Wild Horse Territory be relocated to Boles Meadow. J.A. 860 (1993 Wild Horse Inventory Report: "There are 3 [wild horses] in the Blue Mtn. Allotment that need to be *relocated to the Boles [Meadow]*. The Blue Mtn. Allotment is outside of the Territory.") (emphasis added). That has to mean that the Service considered Boles Meadow (in the Middle Section) to be within the Wild Horse Territory. Why else would the Service devote scarce resources to shuffling horses from one location outside the Territory to another one also outside the Territory?

Starting in 1994, the Wild Horse Inventory Reports began not only reporting the number of wild horses identified in specific areas, but also listing "designated management herd minimum size[s]" (which appear to be analogous to what the Service now terms "appropriate management levels") for each region. Those post-1994 reports continued to treat portions of the Middle Section as part

of the Wild Horse Territory by designating a management herd minimum size for "Big Sage" and "Boles [Meadow]." J.A. 857.

All subsequent Wild Horse Inventory Reports in the record—for the years 1996, 1997, 1998, 2002, 2004, and 2010—also established "designated management herd minimum sizes" for Big Sage and Boles Meadow. *See, e.g.*, J.A. 851.[4] On top of that, the 2002 and 2010 Wild Horse Inventory Reports listed "Avanzino"—also contained in the Middle Section—as one of the regions surveyed.

4 If, as it appears, "designated management heard minimum sizes" are synonymous with "appropriate management levels," the presence of those figures contradicts the Service's claim that levels were never set.

The pattern continues in the post-1994 Wild Horse Inventory Reports. For instance, the 1998 Wild Horse Territory Report recommended the relocation of wild ***704** horses found in Boles Meadow. *See* J.A. 852 (1998 Wild Horse Inventory Report: "Our plans in 1999 are to capture and relocate 100 adult horses on the Emigrant Spring, *Boles*, Pine Springs, [and] Surveyor's Valley allotments.") (emphasis added). Other Wild Horse Inventory Reports recommended that wild horses found outside the Wild Horse Territory be relocated *to* Boles Meadow. *See, e.g.*, J.A. 856 (1996 Wild Horse Inventory Report: "Horse sign has been observed in the Garden Tank and Lower Fletcher Creek areas. Th[ese] area [s] [are] outside of the Wild Horse Territory and these horses should be moved back over to the Timbered Ridge Area (*Boles [Meadow]*).") (emphasis added); J.A. 858 (same for 1994 Wild Horse Inventory Report).

Further, the 1997 Wild Horse Inventory Report inventoried 289 wild horses in total, but noted that 40 of those wild horses were found in the "Mtn. Dome Area," which was "outside * * * the * * * Devil's Garden Wild [H]orse Territor [y]." J.A. 854. The remaining 249 wild horses—including 17 wild horses in Big Sage and 36 wild horses in Boles Meadow—were deemed to be "within the territory." *Compare* J.A. 853 (inventory chart), *with* J.A. 854 ("Actual horses counted were 249 head within the territory."). Similarly, in the 2002 Wild Horse Inventory Report, the Service stated that the "[a]ctual horses counted were 500 head *within the wild horse territory*." J.A. 850 (emphasis added). The inventory report shows that this 500 figure included 88 wild horses in Big Sage, 11 wild horses in Avanzino, and 64 wild horses in Boles Meadow. J.A. 850. Further, to reduce this 500 figure, the Service planned "to capture and adopt 160 adult horses on the Emigrant Spring, Big Sage, and Avanzino allotments." J.A. 850. And "additional * * * horses [would] need to be removed *to be compliant with the Devil's Garden [Wild Horse Territory Plan]*." J.A. 850 (emphasis added).[5]

5 The Wild Horse Inventory Reports also consistently surveyed, and set appropriate management levels for, wild horses in the Timbered Mountain Allotment. Most of the Timbered Mountain Allotment is part of the original two-part Wild Horse Territory, but part of it is in the Middle Section. The pasture within the Timbered Mountain Allotment that is most heavily used by wild horses includes area within the Middle Section.

The Service does not deny what the Inventory Reports say or their treatment of wild horses in the Middle Section. Instead, the Service says we should pay no mind to those reports because those horses were "included solely for administrative convenience." Service's Br. 36–37. For that proposition, the Service points to a 2014 e-mail from a retired Service employee who purportedly was responsible for creating the 1980s-era Service map that first depicted the single, contiguous Wild Horse Territory. The email states that the retired employee "assigned Administrative [Appropriate Management Levels] to the Grazing Allotments for ease of managing the existing horses & the areas they were inhabiting." J.A. 767 (emphasis omitted). The email further states that "[t]he Administrative map & [Appropriate Management Levels] were never intended to change the [Wild Horse Territory] Plan," and were only made "for ease of managing the existing situation within the [Wild Horse Territory]." J.A. 767.

**[14]**That email is at best a *post hoc* rationalization that was not part of the record before the Service when it issued its 2013 decision, and thus cannot help the Service here. *See District Hosp. Partners v. Burwell*, 786 F.3d 46, 55 (D.C. Cir. 2015) ("To ensure that we review only those documents that were before the agency, we do not allow parties to supplement the ***705** record unless they can demonstrate unusual circumstances justifying a departure from this general rule.") (internal quotation marks and citation omitted); *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

On top of that, the email explanation makes little sense. What administrative ease or convenience is there for counting in an inventory horses that should not count? Clearly the Service understood the relevant boundaries of Big Sage and Boles Meadow; otherwise, it could not have counted the wild horses in those areas when preparing the

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

Wild Horse Inventory Reports. So if Big Sage and Boles Meadow were simply not part of the Wild Horse Territory, all the Service had to do was not include those wild horses in the Wild Horse Inventory Reports, or note that Big Sage and Boles Meadow were not part of the Wild Horse Territory. That was not hard to do; the Service repeatedly did it for other wild horses found outside the Wild Horse Territory. Convenience alone, then, does not explain why the Service not only monitored and managed wild horses in the Middle Section, but did so at the same time it refused to count all of the other horses that it deemed to be outside of the Wild Horse Territory.[6]

[6] That is just the beginning of the e-mail's credibility problems. For instance, the email states that the retired employee "developed the Administrative map lumping the [Wild Horse] [T]erritory into one in the early 1990's." J.A. 767 (emphasis omitted). But the parties agree that the map in question actually originated in the 1980s. The email further asserts that, "[i]n the early 1980's Triangle was acquired through a land exchange," and "[b]ecause we had horses in the areas," he "lump[ed] them in with [the Wild Horse Territory]." J.A. 767. But there is no dispute that the Service acquired the Triangle lands in 1976.

In sum, the formal and published 1991 Forest Plan along with at least two decades of official Wild Horse Inventory Reports and the management activities they document together demonstrate that for twenty years the Service officially treated portions of the Middle Section as part of a single, contiguous Devil's Garden Wild Horse Territory. Given that longstanding practice, it is unsurprising that the Service's 2011 scoping letter for the revision at issue here treated the Middle Section as part of the Wild Horse Territory. While the agency tries to whistle past that factual graveyard, the established pattern of agency conduct and formalized positions cannot be evaded. The Service's failure even to acknowledge its past practice and formal policies regarding the Middle Section, let alone to explain its reversal of course in the 2013 decision, was arbitrary and capricious. *See, e.g., Encino Motorcars*, 136 S.Ct. at 2126; *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 12 (D.C. Cir. 2014) (vacating agency action because, *inter alia*, the agency "provided no reasoned explanation for how its decision comports with * * * prior agency practice"); *accord Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687, 690 (9th Cir. 2007) (invalidating an agency action because the agency "depart[ed] from its long-standing practice" and "two-decade-old precedent without supplying a reasoned analysis for its change of course").

**2**

[15]The Service also trots out would-be legal impediments to the Forest Plan's inclusion of the Middle Section in the Wild Horse Territory, insisting that it lacked the legal authority to incorporate the Middle Section and failed to comply with the procedural requirements for such a measure. But the Service's supposed failure to comply with all of the applicable laws for ***706** amending the boundaries of a Wild Horse Territory a quarter century ago does not mean that the expansion never happened. A failure to comply with the requirements of the Wild Horses Act or Administrative Procedure Act would not render the change to the territory void from its inception.

[16] [17]The Service's assumption that a purported past mistake would excuse the agency's current missteps is wrong. In administrative law, as elsewhere, two wrongs do not make a right. In addition, regardless of whether the Service's original decision was lawful, the Service never grappled with the 1991 Forest Plan's formal recognition of the unitary wild horse territory, the inventory reports, or its actions monitoring and regulating wild horses in the Middle Section for twenty years. Accordingly, whatever the Service's past transgressions, "we cannot condone the 'correction' of one error by the commitment of another." *Gray v. Mississippi*, 481 U.S. 648, 663, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987); *see also Natural Res. Def. Council v. Thomas*, 805 F.2d 410, 435 (D.C. Cir. 1986).

**3**

[18] [19]Of course, the Service is free to change its policies going forward if doing so is reasonable. But the agency first must at least "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515, 129 S.Ct. 1800. If instead "an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Boston*, 444 F.2d at 852, *quoted in State Farm*, 463 U.S. at 57, 103 S.Ct. 2856; *see also Encino Motorcars*, 136 S.Ct. at 2125 ("Agencies are free to change their existing policies so long as they provide a reasoned explanation for the change.").[7]

[7] *See also Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367,

 © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

37 L.Ed.2d 350 (1973) (plurality opinion) ("Whatever the ground for the departure from prior norms, however, it must be clearly set forth [by the agency] so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").

Accordingly, if the Service wishes now to formally revert to the 1975 territorial lines, it must acknowledge that it is actually changing course and explain its reasons for doing so. Whatever the cause of the initial incorporation of the Middle Section into the Wild Horse Territory, that action morphed into a multi-decade agency policy—formalized in part by the 1991 Forest Plan—that cannot be abandoned without some reasoned explanation. The Service's attempt to slam shut the barn door after the horse already bolted is not sufficient.

**B**

**[20]**The Campaign next challenges the Service's determination that the removal of the Middle Section did not constitute a significant amendment under the Forest Management Act. The Forest Management Act provides that, if "amendment" of a Forest Plan "would result in a *significant change* in such [Forest Plan]," the Service must comply with heightened procedural requirements including public participation through a three-month study, public meetings, and compliance with the Multiple Use Sustained Yield Act of 1960, 16 U.S.C. §§ 528–531. *See* 16 U.S.C. § 1604(d), (e), (f)(4) (emphasis added).

In its Final Environmental Assessment, the Service concluded that amending the 1991 Forest Plan to redraw the Wild Horse Territory boundary was a "non-significant" ***707** action, and thus did not trigger the formal amendment process. The Service instead complied with the Act's less rigorous procedural requirements for alterations to a Forest Management Plan, 16 U.S.C. § 1604(d); *see id.* § 1604(f)(4).

**[21]**The Campaign argues that excision of the Middle Section from the Wild Horse Territory made a "significant" change to the Forest Plan itself, and thus triggered the Forest Management Act's more formal and elaborate review process. That is not correct. While elimination of the Middle Section worked an important and consequential change in the Wild Horse Territory itself, the removal of those 23,000 acres had no material impact on the 1991 Forest Plan governing 1.6 million acres of the Modoc National Forest.

In interpreting the Forest Management Act, the Forest Service has explained that non-significant changes include "[a]djustments of management area boundaries or management prescriptions resulting from further on-site analysis when the adjustments do not cause significant changes in the multiple-use goals and objectives for long-term land and resource management." FOREST SERV., U.S. DEP'T OF AGRICULTURE, FOREST SERVICE MANUAL § 1926.51 (2015). By contrast, to constitute a "significant change" to a Forest Plan, the change would have to "significantly alter the long-term relationship between levels of multiple-use goods and services originally projected," "have an important effect on the entire [Forest Plan]," or "affect land and resources throughout a large portion of the planning area during the planning period." *Id.* § 1926.52.[8]

[8] The Forest Service Manual is a compendium of "legal authorities, responsibilities, delegations, and general instruction[s]," 36 C.F.R. § 216.2(a), that "establish[es] the general framework for the management and conduct of Forest Service programs," *id.* § 216.2(c).

Viewed against the comprehensive scope and operation of the 1991 Forest Plan, the Service's reworking of the Wild Horse Territory boundaries was not a significant change. The 1991 Forest Plan governs the entire Modoc National Forest. In formulating the plan, the Service balanced a panoply of considerations, including air quality, cultural resources, biodiversity, fire management, mineral leasing, pest control, range conditions, range management, livestock grazing, recreational uses, riparian resources, soil and water quality, timber clearance, and wildlife protection.

Within the Forest Plan, wild horse management is just one consideration, among a multitude of others, that fall within the broader consideration of the Plan's range-management sub-component. Other factors that the Service considers in developing a range management program are livestock management and diversity of ecological conditions. For instance, one objective of range management is "to produce desired expressions of" "herbaceous, shrub, and forest vegetation" through livestock grazing. J.A. 585. And even within the subject of wild horse management, the physical dimensions of the wild horse territory are just one element.

In other words, wild horse management is a factor of a factor of a factor that the Service considered when developing the Modoc Forest Plan. In addition, the Service's proposed reduction of the Wild Horse Territory

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 

by approximately 23,000 acres represents at most a 1.5% change in the status of an area that will still remain within the federally managed Modoc National Forest. Even then, the Service will continue to superintend the remaining Wild Horse Territory, balancing wild horse management against livestock management ***708** and range biodiversity, and then balancing all of those range-management considerations against such concerns as air, soil, and water quality, and all of the other aspects of forest management.

When viewed in that context, the Service reasonably concluded that its proposed modification of the Wild Horse Territory's boundaries would likely have at most a slight effect on the "multiple-use" goals of the Forest Plan in the "long-term," and will not affect the "entire" Forest Plan or a "large portion" of the planning area.[9]

[9] The Campaign does not challenge the criteria set forth in the Forest Service Manual for a "significant" change. Accordingly, we need not determine what level of deference is properly afforded to the Service's interpretation of the Act. *Cf. Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226, 228 (D.C. Cir. 2009).

Finally, because we hold that the boundary change was not a "significant" change for purposes of the Forest Management Act, we need not address the Campaign's argument that NEPA requires an Environmental Assessment for significant changes under the Forest Management Act.

### C

[22]The Campaign's final argument arises under NEPA and the APA. Specifically, the Campaign argues that the Service's failure to prepare an Environmental Impact Statement addressing the boundary changes violated NEPA and was the product of arbitrary and capricious decisionmaking. We agree. In finding no significant environmental impact that would warrant an Environmental Impact Statement, the Service's NEPA analysis never came to grips with its departure from past practice, and thus never analyzed the potential environmental significance of its 2013 decision to contract the boundaries of the Wild Horse Territory by approximately ten percent.

[23] [24]Our "role in reviewing an agency's decision not to prepare an [Environmental Impact Statement] is a 'limited' one, 'designed primarily to ensure that no arguably significant consequences have been ignored.' " *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015) (quoting *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)). Our task in particular is to ensure that the Service, in finding no significant impact, (i) "accurately identified the relevant environmental concern," (ii) took a "hard look at the problem" in making its decision, (iii) has made "a convincing case for its finding of no significant impact," and (iv) "has shown that even if there is an impact of true significance, an [Environmental Impact Statement] is unnecessary because changes and safeguards in the project sufficiently reduce the impact to a minimum." *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting *TOMAC*, 433 F.3d at 861); *see also Sierra Club v. Department of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985).

[25]The Service failed that task because its environmental analysis did not "*accurately* identif[y] the *relevant* environmental concern." *Van Antwerp*, 661 F.3d at 1154 (emphases added; internal quotation marks and citation omitted). Here, the relevant environmental concern was the effect of the boundary modification on the wild horse population in the Devil's Garden area. The Service not only failed to address that concern, it denied its very existence. The Service insisted that the redrawn boundary lines would have "no effect" on the ground because it was only "correct[ing] a boundary established for ***709** administrative convenience." J.A. 372. That is, the only sense in which the Service "identified" the effect of the boundary modification on wild horses was by insisting that there *was* "no effect" and that nothing had ever really changed. That head-in-the-sand approach to past agency practice is the antithesis of NEPA's requirement that an agency's environmental analysis candidly confront the relevant environmental concerns.[10]

[10] In its August 2013 Environmental Assessment, the Service also referred to the inclusion of the Middle Section as an "administrative error." J.A. 264. Saying something was both done for "administrative convenience" and because of "an administrative error" is incoherent. The former is purposeful; the latter is not.

More to the point, because the Service actually managed wild horses within portions of the Middle Section for two decades as though they were within the Wild Horse Territory, the 2013 boundary change entailed far more than scratching out a few lines in the 1991 Forest Plan. Yet the Service refused to even consider the possibility of that broader, real-world impact. Thus, while the Service

"identifie[d]" some effects on wild horses as an environmental concern, the Service did not forthrightly and "*accurately* identif [y] the *relevant* environmental concern"—the actual effects of the boundary modification on wild horses in the Devil's Garden area. *Van Antwerp*, 661 F.3d at 1154 (emphases added; internal quotation marks and citation omitted).

Likewise, the Service's Finding of No Significant Impact not only failed to take a "hard look" at the consequences of the boundary change, it averted its eyes altogether. *Van Antwerp*, 661 F.3d at 1154. As a result, the Service's analysis entirely omitted a "discussion of the relevant issues and opposing viewpoints," *Myersville*, 783 F.3d at 1325 (internal quotation marks and citation omitted), because the Service refused even to entertain the opposing premise that the boundary modification did more than correct a few stray lines of text in the 1991 Forest Plan. The Service's decision thus failed to "make a convincing case for its finding of no significant impact." *Van Antwerp*, 661 F.3d at 1154 (internal quotation marks and citation omitted).

**[26]**For those reasons, the Service's environmental analysis and Finding of No Significant Impact were arbitrary and capricious.[11]

[11] The Campaign, in a footnote, also lobs an accusation of prejudgment and bad-faith at the Service, charging it with acting at the behest of the Farm Bureau. The Campaign has not come close to meeting the high bar necessary to prove such allegations. *See, e.g.*, *Air Transp. Ass'n of America, Inc. v. National Mediation Bd.*, 663 F.3d 476, 487–488 (D.C. Cir. 2011). Regardless, its footnoted allegation is insufficient to preserve this argument on appeal. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument on appeal; hiding an argument there and then articulating it in only a conclusory fashion results in forfeiture.").

* * * * *

"Facts are stubborn things."[12] But record facts are the grist of reasoned agency decisionmaking. In this case, the Service brushed aside critical facts about its past treatment of and official statements about the boundaries of the Devil's Garden Wild Horse Territory. As a result, the Service failed: (i) to acknowledge and adequately ***710** explain its change in course regarding the size of the Devil's Garden Wild Horse Territory and its management of wild horses within the Middle Section, and (ii) to consider or to adequately analyze the environmental consequences of those changes. Accordingly, we reverse the district court's grant of summary judgment in part and direct the district court to remand to the Service for further consideration.

[12] *See* Statement of John Adams Made When Defending the Accused British Regulars at the Boston Massacre Trial, *quoted in* WILLIAM GORDON, THE HISTORY OF THE RISE, PROGRESS, AND ESTABLISHMENT, OF THE INDEPENDENCE OF THE UNITED STATES OF AMERICA: INCLUDING AN ACCOUNT OF THE LATE WAR; AND OF THE THIRTEEN COLONIES, FROM THEIR ORIGIN TO THAT PERIOD , Vol. 1, p. 296 (1788).

*So ordered.*

**All Citations**

865 F.3d 691

End of Document © 2017 Thomson Reuters. No claim to original U.S. Government Works.

9th Circuit Case Number(s) 16-70496

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

*********************************************************************************

CERTIFICATE OF SERVICE
When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 10/4/17 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) /s/ Donald M. Falk

*********************************************************************************

CERTIFICATE OF SERVICE
When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)