**No. 16-70496 and No. 16-70497**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**ALTERA CORPORATION AND SUBSIDIARIES,**

**Petitioner-Appellee**

**v.**

**COMMISSIONER OF INTERNAL REVENUE,**

**Respondent-Appellant**

**ON APPEAL FROM DECISIONS OF**
**THE UNITED STATES TAX COURT**

# SUPPLEMENTAL BRIEF OF AMICI CURIAE REUVEN AVI-YONAH, LILY BATCHELDER, JOSHUA BLANK, NOËL CUNNINGHAM, VICTOR FLEISCHER, ARI GLOGOWER, DAVID KAMIN, MITCHELL KANE, MICHAEL KNOLL, REBECCA KYSAR, LEANDRA LEDERMAN, ZACHARY LISCOW, RUTH MASON, SUSAN MORSE, DANIEL SHAVIRO, STEPHEN SHAY, JOHN STEINES, DAVID SUPER, CLINTON WALLACE, BRET WELLS IN SUPPORT OF RESPONDENT-APPELLANT

Susan C. Morse
727 E. Dean Keeton St.
Austin, TX 78703
(512) 232-9346

Stephen E. Shay
1585 Massachusetts Ave.
Cambridge, MA 02138
(617) 384-5311

Allison Bray
1585 Massachusetts Ave.
Cambridge, MA 02138
(206) 948-2804

# TABLE OF CONTENTS


IDENTITY AND INTEREST OF AMICI CURIAE……………..………..iii

STATEMENT OF AUTHORSHIP AND FUNDING OF BRIEF……..........v

TABLE OF AUTHORITIES ……………………..…………………….....vi

TABLE OF ABBREVIATIONS …..………………………………………ix

SUMMARY OF ARGUMENT ……..……………………………………1

ARGUMENT ……..…………………………………………................3

I. The purpose of the arm's length standard is to reflect clearly taxpayers' income, and the cost-sharing regulations advance that goal…………………………………………………..…….3

A. The arm's length standard is a flexible tool not tethered to comparable transaction analysis……………………………….....3

B. Ninth Circuit precedent and other cases confirm that the arm's length standard is results-oriented and is not founded on or limited by comparable transactions…………………………….4

C. The 1968 regulations authorized use of methods not tied to comparables……………………………………………………7

D. The commensurate with income standard backstops and is consistent with a results-oriented arm's length standard………8

II. Qualified cost-sharing arrangements are covered by Section 482's "commensurate with the income" and "transfer (or license)" provisions...…………………………………………………10

III. Remand is the proper remedy for any infirmity in the regulations…..........................................................................14

CONCLUSION ……..…………………………………………...…..15

STATEMENT OF RELATED CASES …………………...………...........16

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE AND TYPE STYLE REQUIREMENTS ……………………....................16

CERTIFICATE OF SERVICE ………………….………………………...17

## IDENTITY AND INTEREST OF AMICI

Amici are tax law professors who conclude that the stock-based compensation cost sharing regulations at issue in this case are not arbitrary and capricious, but rather are consistent with the arm's length standard and are valid and reasonable under Section 482 of the Internal Revenue Code. Amici have no financial interest in the outcome of this case.

The individual amici are as follows:

- Reuven Avi-Yonah, Irwin I. Cohn Professor of Law and Director of the International Tax LLM Program, University of Michigan Law School,
- Lily Batchelder, Frederick I. and Grace Stokes Professor of Law, New York University School of Law,
- Joshua Blank, Professor of Law, University of California, Irvine School of Law,
- Noël Cunningham, Professor of Law and Interim Faculty Director of the Graduate Tax Program, New York University School of Law,
- Victor Fleischer, Professor of Law, University of California, Irvine School of Law,
- Ari Glogower, Assistant Professor of Law, The Ohio State University Moritz College of Law,
- David Kamin, Professor of Law, New York University School of Law

- Mitchell Kane, Gerald L. Wallace Professor of Taxation, New York University School of Law,
- Michael Knoll, Theodore K. Warner Professor of Law, University of Pennsylvania Law School; Professor of Real Estate, The Wharton School; Co-Director, Center for Tax Law and Policy, University of Pennsylvania Law School,
- Rebecca Kysar, Professor of Law, Fordham University School of Law,
- Leandra Lederman, William W. Oliver Professor of Tax Law and Director of the Tax Program at Indiana University Maurer School of Law,
- Zachary Liscow, Associate Professor of Law, Yale Law School,
- Ruth Mason, Class of 1957 Research Professor of Law, University of Virginia School of Law,
- Susan Morse, Angus G. Wynne, Sr. Professor of Civil Jurisprudence, University of Texas School of Law,
- Daniel Shaviro, Wayne Perry Professor of Taxation, New York University School of Law,
- Stephen Shay, Senior Lecturer on Law, Harvard Law School. Mr. Shay was formerly Deputy Assistant Secretary (International Tax Affairs) at the U.S. Department of the Treasury. Mr. Shay was for 22 years a partner

specializing in international taxation at a leading U.S. law firm and prior to that International Tax Counsel for the U.S. Department of the Treasury (1985-1987),

- John Steines, Professor of Law, New York University School of Law,
- David Super, Professor of Law, Georgetown University Law Center,
- Clinton Wallace, Assistant Professor of Law, University of South Carolina School of Law,
- Bret Wells, Professor of Law and the George Butler Research Professor of Law, University of Houston Law Center.

## STATEMENT OF AUTHORSHIP AND FUNDING OF BRIEF

No party's counsel authored any portion of this brief, in whole or in part. No person or entity other than amici has or is expected to contribute money intended to fund preparing or submitting this brief.

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Altera Corp. v. Comm'r*,
145 T.C. 91 (2015) ........................................................1

*Altera Corp. & Subsidiaries v. Comm'r*,
Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 20524 (9th Cir. July 24, 2018) (opinion withdrawn by *Altera Corp. & Subsidiaries v. Comm'r*, Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 21925 (9th Cir. Aug. 7, 2018))........................................ *passim*

*DHL Corp. v. Comm'r*,
285 F.3d 1210 (9th Cir. 2002) ........................................ 5, 6

*E.I. DuPont de Nemours & Co. v. U.S.*,
288 F.2d 904 (Ct. Cl. 1961) ........................................13

*E.I. DuPont de Nemours & Co. v. U.S.*,
471 F.2d 1211 (Ct. Cl. 1973) ........................................13

*E.I. DuPont de Nemours & Co. v. U.S.*,
608 F.2d 445 (Ct. Cl. 1979) ........................................6

*Encyclopedia Britannica, Inc*. v. *Comm'r*,
685 F.2d 212 (7th Cir. 1982) ........................................11

*Frank v. Int'l Can. Corp.*,
308 F.2d 520 (9th Cir. 1962) ........................................5

*Grenada Industries., Inc. v. Comm'r*,
17 T.C. 231 (1951), aff'd 202 F.2d 873 (5th Cir. 1953); aff'd 346 U.S. 819 (1953) ........................................5

*Idaho Farm Bureau Federation v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ……………...……………………………………1

*Oil Base, Inc. v. Comm'r*,
362 F.2d 212 (9th Cir. 1966) …...……………………………………5

*Seagate Tech., Inc. v. Comm'r*,
102 T.C. 149 (1994) ……………………………………………….……6

*Seminole Flavor Co. v. Comm'r*,
4 T.C. 1215 (1945) ……………………………………………………...5

*U.S. Steel Corp. v. Comm'r*,
617 F.2d 942 (2nd Cir. 1980) ……………………………………...8

**Statutes and Other Legislative Materials**

Administrative Procedure Act (5 U.S.C.) § 706(2)(A) ……………….…….....1

House of Representatives, Report of the Committee on Ways and Means,
Report No. 99-426 (1985) ………………………………………………8

House of Representatives, Conference Report, Report No. 99-841
(1986)………………………………………………………………....8, 9

Internal Revenue Code (26 U.S.C.) § 482 …………………................*passim*

Internal Revenue Code (26 U.S.C.) § 1001 ……………………………13, 14

Internal Revenue Code (26 U.S.C.) § 7805(a) ……………………………14

**Regulations and Other Regulatory Materials**

Treas. Reg. § 1.482-2 (1968) …………………………………………………..7

Treas. Reg. § 1.482-2(e)(1)(iii) (1968) ……………………………………...7

Treas. Reg. § 1.482-7(a)(1) (2003) ……………………………………..............10

Treas. Reg. § 1.482-7(d)(2) (2003) ………………………………………1

Treas. Reg. § 1.482-7(f)(3)(iv)(B) (2003) ………………………………..10

Treas. Reg. § 1.482-6 (2018) …………………………………………………..7

**Secondary Sources / Prior Filings in Instant Case / Miscellaneous**

Altera Corporation, Annual Report Filed on Form 10-K for the fiscal year ending December 31, 2014 …………………………………………..12

Brief of Amicus Curiae Cisco Systems, Inc., *Altera Corp. v. Comm'r*, Nos. 16-70496, 16-70497 (Docket No. 67, Sept. 23, 2016) ...……10, 11, 12

Brief of Petitioner-Appellee Altera Corporation, *Altera Corp. v. Comm'r*, Nos. 16-70496, 16-70497 (Docket No. 48, Sept. 9, 2016) ......4, 10, 11

Reply Brief of Respondent-Appellant Commissioner of Internal Revenue, *Altera Corp. v. Comm'r*, Nos. 16-70496, 16-70497 (Docket No. 83, Nov. 11, 2016) …………………………………………………...14

Stipulation of Facts, *Altera Corp. v. Comm'r*, 145 T.C. 91 (2015) .......12, 13

Webster's Ninth New Collegiate Dictionary 1253 (1987) ………………...11

## TABLE OF ABBREVIATIONS

1986 Act – Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085

APA – Administrative Procedure Act, 5 U.S.C. § 551 et seq.

Cisco Brief – Brief for Amicus Curiae Cisco Systems, Inc., *Altera Corp. v. Comm'r*, Nos. 16-70496, 16-70497 (Docket No. 67, Sept. 23, 2016)

Government Brief – Reply Brief for the Respondent-Appellant, *Altera Corp. v. Comm'r*, Nos. 16-70496, 16-70497 (Docket No. 48, Sept. 9, 2016)

IRC – Internal Revenue Code, 26 U.S.C. § 1 et seq.

IRS – Internal Revenue Service

July 24 Opinion – *Altera Corp. & Subsidiaries v. Comm'r*, Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 20524 (9th Cir. July 24, 2018) (opinion withdrawn by *Altera Corp. & Subsidiaries v. Comm'r*, Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 21925 (9th Cir. Aug. 7, 2018)

QCSA – qualified cost-sharing agreement

Section 482 – 26 U.S.C. § 482

Treas. Reg. – 26 C.F.R.

## SUMMARY OF ARGUMENT

We write in support of the government's argument before this Court and in support of the majority opinion written in this Court's withdrawn July 24, 2018 decision, *Altera Corp. & Subsidiaries v. Comm'r*, Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 20524 (9th Cir. July 24, 2018) (opinion withdrawn by *Altera Corp. & Subsidiaries v. Comm'r*, Nos. 16-70496, 16-70497, 2018 U.S. App. LEXIS 21925 (9th Cir. Aug. 7, 2018)) (hereinafter July 24 Opinion). The July 24 Opinion would have reversed the United States Tax Court (hereinafter Tax Court) opinion that invalidated a cost-sharing regulation under I.R.C. Section 482. That regulation, Treasury Regulation Section 1.482-7(d)(2) (2003), conditions the validity of controlled taxpayers' cost-sharing agreement upon the requirement that the controlled parties share all costs, including stock-based compensation costs, proportionately with the benefits they expect to receive from development of intangibles. While not disputing Treasury's broad mandate under Section 482, the Tax Court concluded that Treasury's cost-sharing regulation was arbitrary and capricious under Section 706(2)(A) of the Administrative Procedure Act (APA). *See Altera Corp. v. Comm'r*, 145 T.C. 91, 120–27, 134–35 (2015) (citing generally *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 57 (1983)).

The July 24 Opinion would have held that the Commissioner's rulemaking complied with the APA.

We respectfully submit that the Commissioner's interpretation is consistent with the statutory language and purpose of Section 482. We endorse the discussion and application of the APA in the July 24 Opinion and agree that the Commissioner's rulemaking is not arbitrary and capricious and is entitled to deference. We respectfully submit that the Tax Court decision should be reversed.

In Part I of this brief, we provide additional support for the Court's analysis in the July 24 Opinion that the arm's length standard under Section 482 is not predicated on comparable transactions but rather adopts a "results-oriented" approach. (July 24 Op. 6–7.) In Part II of this brief, we argue that qualified cost-sharing arrangements fit within Section 482's mandate, including its "transfer (or license)" language. In Part III, we argue that if this Court invalidates the regulation at issue, remand to the Treasury for further consideration is the correct remedy.

# ARGUMENT

## I. The purpose of the arm's length standard is to reflect clearly taxpayers' income, and the cost-sharing regulations advance that goal.

### A. The arm's length standard is a flexible tool not tethered to comparable transaction analysis.

We agree with the July 24 Opinion that: "Fundamental to resolution of this dispute is an understanding of the arm's length standard, a tool that Treasury developed in the mid-twentieth century to ensure that controlled taxpayers were taxed similarly to uncontrolled taxpayers." (July 24 Op. 6.) We also agree that: "The arm's length standard is results-oriented, meaning that its goal is parity in taxable income rather than parity in the method of allocation itself." (July 24 Op. 6–7.)

As the July 24 Opinion explained, Section 482 has been designed "[f]rom the beginning . . . to give Treasury the flexibility it needed to prevent cost and income shifting between related entities for the purpose of decreasing tax liability." (July 24 Op. 14–15.) This is evident in case law and in regulatory provisions, and it is revealed in the commensurate with income provision of Section 482. This flexibility, and in particular the availability under the arm's length standard of tools other than comparable transaction analysis, frames and validates Treasury's promulgation of its

regulation requiring the sharing of stock option costs under qualified cost-sharing arrangements.

Altera describes the arm's length standard as *requiring* consideration of actual transactions between unrelated parties. (Altera Br. 39–42.) This is incorrect. Comparable transactions are simply one of many possible sources of evidence about arm's length prices. Altera disregards the fact that actual transactions *cannot* be referred to when they are unreliable as evidence of what arm's length persons would do in the circumstances under review.

### B. Ninth Circuit precedent and other cases confirm that the arm's length standard is results-oriented and is not founded on or limited by comparable transactions.

The arm's length standard has always had to address cases in which actual transactions between unrelated parties do not exist or are not reliable guides. The July 24 Opinion cited a number of cases that had rejected comparable transactions as the *sine qua non* of the arm's length standard specifically and Section 482 more generally. This Court noted that courts have encountered transfer pricing situations where no appropriate comparable exists. In such matters, courts have relied on other methods to determine the appropriate allocation of income for purposes of Section 482.

As the July 24 Opinion observed, in *Frank* this Court flatly rejected the "contention that 'arm's length bargaining' is the sole criterion for applying the statutory language of § 45 in determining what the 'true net income' is of each 'controlled taxpayer.'" (July 24 Op. 16–17 (quoting *Frank v. Int'l Can. Corp.*, 308 F.2d 520, 528 (9th Cir. 1962).) The July 24 Opinion noted that that *Frank* was later clarified to apply where "it would have been difficult for the court to hypothesize an arm's length transaction." (July 24 Op. 17 n.3 (citing *Oil Base, Inc. v. Comm'r*, 362 F.2d 212, 214 n.5 (9th Cir. 1966)). But that is a distinction without a difference here. The facts presented when related parties enter into cost-sharing arrangements for intangible development unequivocally are "difficult . . . to hypothesize" in an unrelated party context. In its July 24 Opinion, this Court also cited *Seminole Flavor Co. v. Comm'r*, 4 T.C. 1215 (1945) and *Grenada Industries., Inc. v. Comm'r*, 17 T.C. 231 (1951), aff'd 202 F.2d 873 (5th Cir. 1953); aff'd 346 U.S. 819 (1953). (July 24 Op. 16–17.)

Other cases also stand for the proposition that the arm's length standard is flexible and reaches beyond comparable transactions analysis. In *DHL Corporation*, this Court disregarded the presence of an unrelated party in related party negotiations because that unrelated party was indifferent to the relevant term. *DHL Corp. v. Comm'r*, 285 F.3d 1210, 1218–19 (9th Cir.

2002). Instead, this Court affirmed the Tax Court's valuation of a trademark based on "broad brush" methods which were appropriate given the "imprecise art of valuing an intangible asset." *Id.* at 1219–20. In *E.I. DuPont de Nemours & Company*, the United States Court of Claims determined no comparable uncontrolled resellers existed, which would have been necessary for its application of the resale price method. *E.I. DuPont de Nemours & Co. v. U.S.*, 608 F.2d 445, 450–54 (Ct. Cl. 1979). Instead the court accepted the Commissioner's allocation, noting that "the amount of reallocation would not be easy for [the court] to calculate if [it] were called upon to do it [itself], but Section 482 gives that power to the Commissioner and [the court is] content that his amount . . . was within the zone of reasonableness." *Id*. at 455.

In *Seagate Technology, Inc.*, the Tax Court analyzed whether a research and development cost-sharing agreement was at arm's length. The record before the court, however, was devoid of any third-party cost-sharing agreements, thus leaving the court with no unrelated transactions to guide its decision. *Seagate Tech., Inc. v. Comm'r*, 102 T.C. 149, 305, 314 (1994). Notwithstanding the lack of unrelated party comparables, the court used its "best judgment" and determined the correct allocation of the research and development expenses among the parties. *Id.*

### C. The 1968 regulations authorized use of methods not tied to comparables.

We agree with the Court's general characterization of the 1968 regulations as having a "focus on comparability" (July 24 Op. 17) though this was most evident in the rules for sales of tangible property and less pronounced in the rules for transfers of intangible property. 26 C.F.R. § 1.482-2 (1968). There was nonetheless considerable flexibility under the 1968 regulations, even in the case of sales of tangible property. *See* 26 C.F.R. § 1.482-2(e)(1)(iii) (1968) (if it can be established that another method (than one of three based on comparable transactions) is clearly more appropriate such other method may be used). This additional method approach, not based on comparable transactions, supported the use of the profit split method, which likewise does not rely on comparable transactions. Subsequent regulations continued to explicitly allow the profit split method as an arm's length method. *See* 26 C.F.R. § 1.482-6 (2018). As recognized in the July 24 Opinion, "direct comparables were located and applied in only 3% of IRS's adjustments prior to the 1986 amendment." (July 24 Op. 17.) There is no basis in the 1968 regulations to suggest that the arm's length standard *required* taking account of purportedly comparable third-party transactions that were not reliable evidence for what a third party

would have done in the actual circumstances of the controlled transaction under review.

Notwithstanding the potential for the 1968 regulations to achieve arm's length results, Congress became frustrated with taxpayers' success in asserting *unreliable* comparable transactions as a basis for supporting aggressive transfer pricing positions. For instance, the 1986 Act legislative history criticizes the Second Circuit's decision in *U.S. Steel Corp. v. Comm'r*, 617 F.2d 942 (2nd Cir. 1980). *See* H.R. Rep. No. 99-426, at 423–25 (1985). The criticism was that the third-party transaction data used in *United States Steel* was inherently unreliable. The solution for intangibles was the commensurate with income standard. The legislative history expressed the expectation that cost-sharing agreements would fall into line with the commensurate with income standard by adopting allocations of costs "proportionate to profit." H.R. Conf. Rep. No. 99-841, at II-638 (1986).

### D. The commensurate with income standard backstops and is consistent with a results-oriented arm's length standard.

The adoption of the commensurate with income standard for intangibles is best understood as backstopping, not rejecting, a results-oriented arm's length standard by ensuring that outcomes would be taken into account in assessing the pricing of intangibles transactions. Further, the

cost-sharing regulations plainly fall under the commensurate with income standard, which in turn falls under a results-oriented arm's length approach. This is evident both from the legislative history and from the cost-sharing regulations' requirement that costs must be shared in proportion to benefits.

With respect to the legislative history, the July 24 Opinion observes that the Conference Committee report provided that the commensurate with income standard could be satisfied by a qualified cost-sharing arrangement that reasonably reflected the actual economic activity of each party. (July 24 Op. 20–22.) The legislative history makes abundantly clear that Congress was directly sanctioning and facilitating the use of cost-sharing agreements under Section 482 when it enacted the commensurate with income standard in 1986. It also makes clear that Congress understood that cost-sharing agreements would involve the application of the commensurate with income standard. The Conference Report explained:

> In revising section 482, the conferees do not intend to preclude the use of certain bona fide research and development cost-sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each. (Conf. Rep. at II-638.)

In short, the commensurate with income standard, as Congress expressed and as the Service has uncontroversially maintained, applies to cost-sharing

agreements and requires that those agreements "reasonably reflect the actual economic activity" of each party.

The cost-sharing regulations duly follow this intent and incorporate the commensurate with income standard. Costs must be shared proportional to "reasonably anticipated benefits." 26 C.F.R. § 1.482-7(a)(1) (2003). If the anticipated benefits are not close enough to the actual benefits, then a look-back provision authorizes the IRS to adjust the payments to better match the division of deductions with the division of actual benefits and thus track the commensurate with income standard. 26 C.F.R. § 1.482-7(f)(3)(iv)(B) (2003). Taking actual outcomes into account under a QCSA is consistent with the commensurate with income provision in the statute, and it is also consistent with arm's length standard, which is results-oriented and not limited to comparable transactions.

## II. Qualified cost-sharing arrangements are covered by Section 482's "commensurate with the income" and "transfer (or license)" provisions.

The second sentence of Section 482 provides that "the income with respect to [a] transfer or license [of intangible property] shall be commensurate with the income attributable to the intangible." Altera and its amicus Cisco Systems, Inc. ("Cisco") argue that this sentence is not relevant for interpreting the QCSA regulation, including the stock option cost-sharing

regulation at issue here, because there is no "transfer (or license)" in a qualified cost-sharing arrangement. (Altera Br. 35–36, Cisco Br. 3–7.) Instead, Cisco asserts that under a QCSA, "[r]ights in co-developed intangibles spring upon creation to each participant." (Cisco Br. 4–5.) In the July 24 Opinion in this case, Judge O'Malley expressed agreement with this argument that QCSAs do not fall under the commensurate with income standard in her dissent. (July 24 Op. 73, O'Malley, J., dissenting.) This understanding is incorrect.

First, consider the dictionary definition of transfer, which is "to convey from one person . . . to another" or "to cause to pass from one to another." Webster's Ninth New Collegiate Dictionary 1253 (1987). Altera (and its amicus Cisco) agree that the subject matter of a QCSA is the rights to new intangibles, not already-developed intangibles. (Altera Br. 67, Cisco Br. 4–5.) Without the QCSA, these rights to future-developed intangibles would be owned by the party that developed them. *Cf. Encyclopedia Britannica, Inc*. v. *Comm'r*, 685 F.2d 212, 214 (7th Cir. 1982) (describing the ownership of intangible property by the employer of an employee or independent contractor who develops the intangible). For example, without the QCSA, when Altera Corporation (the U.S. parent of the Altera group) developed intangible property through the research efforts of its employees,

Altera Corporation would own the resulting intangible property, not subject to any other party's right to license the intangible property. As a result of the QCSA, Altera's non-U.S. subsidiaries, such as Altera International, Inc., a subsidiary incorporated in the Cayman Islands, acquired a right to license future-developed intangible property covered by the agreement in exchange for contributing to development costs. Altera Corporation, Annual Report (Form 10-K) (December 31, 2014), Ex. 21.1 (listing subsidiaries); Stip. of Facts at ¶¶ 19–21, *Altera*, 145 T.C. 91. Altera's QCSA caused a right to license future-developed intellectual property to pass from Altera Corporation to Altera International, Inc. The QCSA transferred a right.

Second, cost-sharing agreements plainly involve transfers because of the transaction pattern that happens during the course of related parties' interactions while they are subject to the QCSA. The idea that "rights in cost-shared intangibles arise *ab initio* to the cost sharing participants" (Cisco Br. 5) suggests that the parties initially jointly acquire an undivided interest in jointly developed intangibles. But the parties to the Altera cost-sharing agreement did not end up owning undivided interests for tax purposes. Instead of undivided interests, the Altera cost-sharing agreement, like most such agreements, produces the result that each party beneficially owns for

tax purposes a segment of the developed intangible property that is relevant for that party's market.

For instance, in Altera's case, the cost-sharing agreement between Altera U.S. and Altera International provided for a division of "beneficial ownership of all intangible property developed under the cost-sharing arrangement in their respective territories." (Stip. of Facts at ¶ 20.) Altera International received "rights, interests and beneficial ownership of all intangible property developed under the Cost Sharing Agreement for exploitation in all parts of the world with the exception of the United States and Canada." (*Id.* at ¶ 21.) This split of beneficial ownership along geographic lines does not happen automatically when two parties jointly develop property. Rather, the transformation of an undivided interest in property into divided beneficial ownership is a transfer of property for purposes of the federal income tax law. *See E.I. DuPont de Nemours & Co. v. U.S.*, 288 F.2d 904, 911–12 (Ct. Cl. 1961) (holding a patent license, which was exclusive within a geographic area, a transfer for purposes of capital gain provision); *E.I. DuPont de Nemours & Co. v. U.S.*, 471 F.2d 1211, 1219–21 (Ct. Cl. 1973) (holding a nonexclusive patent license a transfer for purposes of I.R.C. § 351). Whether such a transfer is a realization event or produces recognized income or loss for tax purposes are separate questions.

*See* I.R.C. § 1001. In the instant case, these questions are obviated by the application of the rules of the cost-sharing regulations.

Finally, there is the matter of the Treasury's responsibility to adopt a reasonable understanding of "transfer (or license)." As discussed in Part I, Treasury's cost-sharing regulations closely follow the intent of Congress when it enacted the commensurate with income standard. Moreover, "nothing in § 482 precludes a broad interpretation of the word 'transfer' that would include the relinquishment of future exploitation rights pursuant to a cost-sharing arrangement." (Gov't Reply Br. 17 (citations omitted).) "Indeed, Treasury's broad discretion under § 482 suggests the opposite" (Gov't Reply Br. 18) especially in light of its "statutory mandate to 'prescribe all needful rules and regulations for the enforcement of this title.'" (Gov't Reply Br. 18 (quoting I.R.C. § 7805(a).)

## III. Remand is the proper remedy for any infirmity in the regulations.

If this Court decides, contrary to the arguments presented in this brief, that Treasury's 2003 regulations have an infirmity, the best remedy is to remand to Treasury for further consideration. This is consistent with applicable judicial precedent, which allows remand to an agency to correct a procedural deficiency "when equity demands." *See Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir. 1995). The cost-sharing

regulations are a *de facto* regulatory safe harbor that provides an enormous advantage to taxpayers like Altera. Altera appears to assume that the requirements in the cost-sharing safe harbor may be cherry-picked, such that inclusion of stock-based compensation in the cost-sharing base may be deleted, while the remainder of the regime is left intact. On the contrary, deletion of stock-based compensation expense from the pool of allocable costs would leave in place an unbalanced regime that would fail clearly to reflect income and would therefore contradict the statute. The proper remedy would be to remand to Treasury to correct any procedural deficiencies.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court reverse the judgment of the Tax Court.

Respectfully submitted,


| | | |
|---|---|---|
| Susan C. Morse | Stephen E. Shay | Allison Bray |
| /s/ Susan C. Morse | /s/ Stephen E. Shay | /s/ Allison Bray |
| 727 E. Dean Keeton St.<br>Austin, TX 78703<br>(512) 232-9346 | 1585 Massachusetts Ave.<br>Cambridge, MA 02138<br>(617) 384-5311 | 1585 Massachusetts Ave.<br>Cambridge, MA 02138<br>(206) 948-2804 |

## STATEMENT OF RELATED CASES

Amici respectfully inform the Court that they are not aware of any cases related to the instant appeal that are pending before the Court.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,110 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). The word count was computed by Microsoft Word, the word processing program used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

/s/ Susan C. Morse

Dated: September 28, 2018

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 28, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system, except for the following participant, whom we will serve by U.S. mail.

Robert R. Di Trolio
Clerk, U.S. Tax Court
400 Second Street, N.W.
Washington, DC 20217

Dated: September 28, 2018

Respectfully submitted,

/s/ Susan C. Morse

Susan C. Morse
727 E. Dean Keeton Street
Austin, TX 78705