**Nos. 16-70496, 16-70497**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ALTERA CORPORATION & SUBSIDIARIES,
*Petitioner-Appellee*,

vs.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellant*.

# SUPPLEMENTAL BRIEF OF *AMICUS CURIAE* CISCO SYSTEMS, INC. SUPPORTING APPELLEE AND AFFIRMANCE ON BEHALF OF CISCO SYSTEMS, INC.

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12
Hon. L. Paige Marvel

Roderick K. Donnelly
MORGAN LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone No. (650) 843-7289
Facsimile No. (650) 843-4001

Thomas M. Peterson
MORGAN LEWIS & BOCKIUS LLP
One Market Street, Spear Tower
San Francisco, CA 94105
Telephone No. (415) 442-1000
Facsimile No. (415) 442-1001

Attorneys for *Amicus Curiae*
Cisco Systems, Inc.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1(a), Cisco Systems, Inc. certifies that it is a California corporation whose organized under the laws of the referenced jurisdiction. Cisco Systems, Inc. has no parent company and no publicly held company owns more than 10 percent of its stock.

Cisco is a large technology company and a recognized leader in networking and communications technology. Cisco designs, manufactures, and sells networking and other products, and spends billions of dollars each year on research and development. Cisco has used cost sharing for global research and development projects that facilitate its ability to compete in the global marketplace. Cisco has a direct and substantial interest in the Court's disposition of the appeal. Cisco is concerned about the Commissioner's misuse in this case of the commensurate-with-income rule and its legislative history.

Pursuant to FRAP 29(c)(5), *amicus curiae* states that no counsel for any party authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than *amicus curiae* contributed money that was intended to fund preparing or submitting this brief.

Dated: September 28, 2018

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for *Amicus Curiae*
Cisco Systems, Inc.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................ i
TABLE OF AUTHORITIES ...................................................................... iv
SUMMARY ............................................................................................. 1
ARGUMENT ........................................................................................... 2
I. The Commissioner's rulemaking must fail *Chevron* step two because of CWI ........................................................... 2
II. Clarifying basic QCSA concepts ............................................. 5
A. Common sense suggests there's no transfer or license of cost-shared intangibles under a QCSA .......... 5
B. Although cost-shared intangibles aren't transferred or licensed, *pre-existing* intangibles used in a cost-sharing arrangement are deemed transferred.................. 6
III. Further reasons why CWI doesn't apply to cost-shared intangibles under QCSAs ...................................................... 8
A. The Commissioner's position that CWI applies to cost-sharing arrangements is contrary to his cost-sharing regulations ....................................................... 8
B. Treating cost-shared intangibles as *not* licensed or transferred has important consequences ......................... 9
C. Treasury regulations further show that cost-shared intangibles are not transferred or licensed under a QCSA ............................................................................ 10
IV. The Thomas Opinion erred in its interpretation of CWI ........ 12
V. Conclusion.............................................................................. 15
STATEMENT OF RELATED CASES ..................................................... 17
CERTIFICATE OF COMPLIANCE......................................................... 18
CERTIFICATE OF SERVICE .................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984)........................................................................ *passim*

*Comm'r v. First Sec. Bank of Utah*,
405 U.S. 394 (1972)........................................................................ 12

*Estate of Mittleman v. Comm'r*,
522 F.2d 132 (D.C. Cir. 1975)..........................................................9

*Pacific Nat. Bank of Seattle v. Comm'r*,
91 F.2d 103 (9th Cir. 1937)..............................................................9

*Shannon v. United States*,
512 U.S. 573 (1994)..........................................................................4

**REGULATIONS**

67 Fed. Reg. 48997 (July 29, 2002)..................................................5

70 Fed. Reg. 51116 (Aug. 29, 2005) ............................................ 6, 7

Treas. Reg.
§ 1.482-4 ........................................................................................ 5, 7
§ 1.482-7A .................................................................................... *passim*
§ 1.881-2 ........................................................................................ 10

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 99-841 (1986) ...................................................3

OECD, Report of the Committee on Fiscal Affairs, *Transfer Pricing and Multinational Enterprises* (1979)........................................ 10

*White Paper* 1988-2 C.B. 458................................................... 4, 10

## SUMMARY

Cisco's prior *amicus brief* ("***1st Amicus Brief***") explained how the Commissioner—who argues the commensurate-with-income standard ("***CWI***") applies to "intangibles transactions in general, and cost-sharing arrangements in particular"—seriously misinterprets § 482's CWI provision and its legislative history.[1] Cisco detailed how CWI's language doesn't apply to intangibles developed under a QCSA, as confirmed by Treasury's omnibus § 482 *White Paper*. This is because there's no transfer of such intangibles within the QCSA. Rather, a QCSA participant's rights in cost-shared intangibles arise upon creation of the intangibles, based on each participant having shared costs of developing those intangibles. Because CWI cannot apply to intangibles developed under a QCSA, the Commissioner's attempt on appeal to use CWI, or language in the 1986 *Conference Report*, to justify his QCSA stock-based compensation rule must fail.

Cisco makes four sets of points. First, the Commissioner's rulemaking must fail *Chevron* step two for reasons consistent with the withdrawn O'Malley dissent. Second, we clarify potential confusion about basic QCSA concepts. Third, we give further reasons why CWI doesn't

---

[1] See also Altera's discussion of CWI. Altera brief, pp. 65–68.

apply to QCSAs. Participants in a QCSA *do not* get their rights in cost-shared intangibles by way of a *transfer or license* (to which CWI can apply). This distinction has important real world consequences. Fourth, Cisco identifies CWI-related errors in the withdrawn Thomas Opinion.

## ARGUMENT

### I. The Commissioner's rulemaking must fail *Chevron* step two because of CWI

*Chevron* step two analysis takes place after APA analysis. We ignore for purposes of this discussion the APA points (which we believe are dispositive in Altera's favor).[2]

To pass *Chevron* step two, the Commissioner's rulemaking cannot be "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844 (1984). The Commissioner asserts his rulemaking allows him to ignore, in QCSAs, evidence that similarly situated unrelated parties wouldn't share SBC costs.

The Commissioner links his rulemaking to language in the 1986 *Conference Report*.[3] He ignores the language of § 482: "In the case of any

---

2 Altera explains why the Commissioner's rulemaking fails APA requirements.

3 "In revising section 482, the conferees do not intend to preclude the use of certain bona fide research and development cost-sharing arrangements

transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." (Emphasis added). Under the plain language of § 482, only related-party transfers or licenses of intangibles are governed by CWI, not intangible rights springing upon creation to parties funding development in a QCSA.[4]

The Commissioner's post hoc rulemaking tried to change the arm's length standard *for cost sharing* based on the CWI rule in the second sentence of § 482. However, the language of the first sentence of § 482,[5] in which the arm's length standard is "implicit" (Appellant's Br. at 31), did not change in 1986. As to any effect the CWI has on the first sentence of § 482,

---

as an appropriate method of allocating income attributable to intangibles among related parties, if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each." H.R. Conf. Rep. No. 99-841, at II-638 (1986).

4 *1st Amicus Brief*, pp. 3–7.

5 The first sentence of § 482 provides:

"In any case of two or more organizations . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, . . . if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organization[] . . . ."

it would be limited to licenses or transfers of intangibles, not the development of new intangibles under QCSAs. Thus, Treasury does not have authority under this rulemaking with respect to cost-shared intangibles.

Treasury relies upon the Conference Report for its authority instead of the statutory language. Even if the legislative history is considered, the court must try to read the legislative history in harmony with the clear statutory language. *See e.g.*, *Shannon v. United States*, 512 U.S. 573, 583–584 (1994) ("We are not aware of any case, however . . . in which we have given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute. . . . We agree with the [DC Circuit] that 'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" (citation omitted)). Here, the Conference Report must be read in conjunction with the statutory requirement of a transfer or license.

The Commissioner 's position on appeal is inconsistent with Treasury's repeated assurances that it would interpret and apply CWI *consistent with* the arm's length standard.[6] As Treasury explained in the

---

[6] *See, e.g.*, *White Paper* 1988-2 C.B. 458 ("Shortly after passage of the 1986 Act, various U.S. taxpayers and representatives of foreign governments expressed concern that the enactment of [CWI] was inconsistent with the 'arm's length' standard as embodied in tax treaties and adopted by many countries for transfer pricing matters. . . . . To allay

notice of proposed rulemaking here, "Congress intended that Treasury and the IRS apply and interpret [CWI] consistently with the arm's length standard." 67 Fed. Reg. 48997, 48998 (July 29, 2002). This position allows CWI to function as Congress intended—as a backstop if evidence of comparable transfers of intangibles is lacking—while preserving the primacy of the arm's length standard whenever evidence of unrelated party behavior is available.

The Commissioner cannot bootstrap himself past *Chevron* step two by linking his rulemaking to the *Conference Report* language *only*. See our *1st Amicus Brief*, pp. 21–22, identifying precedent holding that legislative history language, untethered to statutory text, lacks legal force.

## II. Clarifying basic QCSA concepts

### A. Common sense suggests there's no transfer or license of cost-shared intangibles under a QCSA

Suppose two related parties decide to develop a new electric car from scratch, and they set up a QCSA. They agree one party can exploit

---

fears that Congress intended [CWI] to be implemented in a manner inconsistent with international transfer pricing norms and U.S. treaty obligations, Treasury officials publicly stated that Congress *intended no departure from the arm's length standard*, and that the Treasury Department *would so interpret the new law*." (emphasis added; footnotes omitted)); and Treas. Reg. § 1.482-4(f)(2)(i) ("[CWI] [a]djustments made pursuant to [§ 1.482-4(f)(2)] *shall be consistent with the arm's length standard* and the provisions of [§ 1.482-1]." (emphasis added)).

developed intangible property rights in the new electric car outside the U.S., and the other within the U.S. At the start they own no car-related intangible property, but they split R&D costs on the basis of benefits they anticipate from exploiting QCSA-developed intangibles. In this situation the cost-shared intangibles are not transferred from one party to the other. Rather, the rights each owns in any developed intangibles spring directly upon creation of the intangibles.

### B. Although cost-shared intangibles aren't transferred or licensed, *pre-existing* intangibles used in a cost-sharing arrangement are deemed transferred

QCSAs starting from scratch, like the electric car example, are known as "green field" arrangements.[7] No relevant intangible property exists at the inception of such arrangements; the property is only developed (hopefully) as a result of R&D under the arrangement. The parties to the arrangement are assigned rights in intangibles under the arrangement, and they split R&D costs in proportion to benefits anticipated from exploiting the intangibles. There is no transfer or license of intangibles developed and assigned to the parties under a green field QCSA.

In a typical QCSA, however, one of the parties already owns and provides to the arrangement pre-existing intangible property to be used in

---

[7] *See, e.g.*, REG–144615–02, 70 Fed. Reg. 51116, 51119 (Aug. 29, 2005)

developing new intangibles.[8] Modifying the example, perhaps one party owns battery technology relevant to the first-generation electric car. The QCSA allows the parties to develop the second-generation car. If a party to a QCSA makes pre-existing intangible property (as defined) available for purposes of R&D, that party is, under the regulations, *deemed* to have *transferred* interests in the pre-existing intangibles to the other party.[9] A typical QCSA will, therefore, involve two different sets of intangibles: (1) pre-existing intangibles, rights in which are deemed transferred from the owning party to the other party; and (2) cost-shared intangibles, newly created under the arrangement. Because there's a deemed transfer of rights in pre-existing intangibles (1), CWI can apply to that transfer.[10] Congress enacted CWI to deal just with such a *transfer* of intangible property. Transfers of *pre-existing* intangibles are not at issue in this case. At issue are the costs of developing *newly created*, cost-shared intangibles (2), rights in which spring *ab initio*, without transfer, to the parties who share development costs.

---

8 *Id*.

9 Treas. Reg. § 1.482-7A(g)(1) ("A controlled participant that makes intangible property available to a [QCSA] will be treated as having transferred interests in such property to the other controlled participants . . . .").

10 Treas. Reg. §§ 1.482-7A(g)(1) and 1.482-4(f)(2)(i).

## III. Further reasons why CWI doesn't apply to cost-shared intangibles under QCSAs

### A. The Commissioner's position that CWI applies to cost-sharing arrangements is contrary to his cost-sharing regulations

*If* CWI applied to cost-shared intangibles under QCSAs—as the Commissioner contends—that could only be because such arrangements involve transfers or licenses of cost-shared intangibles. *If* CWI applies to QCSAs, therefore, the second sentence of § 482[11] would require parties to pay amounts "commensurate with the income attributable to" intangibles developed under the QCSA. This is contrary to the Commissioner's regulations governing QCSAs—which require parties to pay (split) only *costs* of developing intangibles,[12] not income earned from those intangibles. The Commissioner cannot take a position contrary to his regulations. *Pacific Nat. Bank of Seattle v. Comm'r*, 91 F.2d 103, 105 (9th Cir. 1937); *Estate of Mittleman v. Comm'r*, 522 F.2d 132, 141 (D.C. Cir. 1975). The Commissioner's argument—based on his assertion that CWI applies to

---

11 "In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."

12 Treas. Reg. § 1.482-7A(a)(1).

"intangibles transactions in general, and cost-sharing arrangements in particular" (Appellant's Br. at 57)—must accordingly fail.

### B. Treating cost-shared intangibles as *not* licensed or transferred has important consequences

The distinction between cost-shared intangibles and transferred or licensed intangibles has important tax consequences. These consequences flow from the different treatment of payments relating to the two sorts of intangibles. Because cost-shared intangibles are not transferred from one party to the other, cost sharing *payments* made from one party to the other—i.e., payments made so total R&D costs are shared appropriately—are treated as *reimbursements* of expenses,[13] rather than as payment for a transfer of intangibles. This distinction is important because the U.S., like many countries, imposes *withholding tax* on outbound payments (royalties) in exchange for a license of rights in intangibles.[14] Not so for cost sharing payments, according to Treasury:

> [C]ost sharing payments are not income to the recipient but, instead, reduce costs which are otherwise deductible . . . . Since cost sharing payments are not gross income to the recipient

---

[13] Treas. Reg. § 1.482-7A(h)(1) provided "[p]ayments made pursuant to a [QCSA] (other than payments [for pre-exsiting intangibles]) generally will be considered costs of developing intangibles of the payor and reimbursements of the same kind of costs of developing intangibles of the payee." (Emphasis added)

[14] *See, e.g.*, Treas. Reg. § 1.881-2(b)(1).

> [i.e., they are reimbursements], no U.S. withholding tax would be imposed on outbound cost sharing payments made by a U.S. person to a foreign person.[15]

The distinct treatment of cost sharing payments, as compared with payments for transfers of intangibles, is not unique to the U.S. Treasury explained that there is a general consensus among OECD member countries of the that "withholding taxes should not apply to cost-sharing payments when made."[16]

### C. Treasury regulations further show that cost-shared intangibles are not transferred or licensed under a QCSA

In our *1st Amicus Brief* we explained why CWI is inapplicable to intangibles developed under a QCSA.[17] The cost-sharing regulations themselves provide further evidence.

Those regulations refer to rights parties get in cost-shared intangibles as "interests in the intangibles assigned to [the parties] under the arrangement."[18] Nothing suggests those rights are transferred or licensed. Contrast that with how the regulations deal with *pre-existing* intangibles

---

15 *White Paper*, 1988-2 C.B. at 497.

16 *White Paper*, 1988-2 C.B. at 494 (citing ¶ 123 of the OECD, Report of the Committee on Fiscal Affairs, *Transfer Pricing and Multinational Enterprises* (1979)).

17 *1st Amicus Brief*, pp. 3–7.

18 Treas. Reg. § 1.482-7A(a)(1).

(discussed above) made available by a party for purposes of R&D under the arrangement: the party contributing the pre-existing intangibles "will be treated as having transferred interests in such property to the other [parties]."[19]

Also pertinent is a provision in the regulations explaining how cost-sharing payments will be treated. Continuing the electric car example, suppose the year's total R&D costs are $100, incurred initially by one party, and that the parties should—based on anticipated benefits from exploiting developed car intangibles inside and outside the U.S.—split costs 50:50. Under the regulations, the $50 owing from the payor party to the payee party (who initially incurred the full, $100 R&D costs) "generally will be considered costs of developing intangibles of the payor and reimbursements

---

19 Treas. Reg. § 1.482-7A(g)(1). Treas. Reg. § 1.482-7A(a)(2) provides: "[i]f a [party] acquires an interest in intangible property from another [party] taxpayer (<u>other than in consideration for bearing a share of the costs of the intangible's development</u>), then the district director may make appropriate allocations to reflect an arm's length consideration for the acquisition of the interest in such intangible under the rules of Sections 1.482-1 and 1.482-4 through 1.482-6. See [Treas. Reg. § 1.482-7A(g)]." (emphasis added). This regulation makes clear that interests in cost shared intangibles obtained in consideration for bearing a share of the costs are not treated as transferred from one party to another within a QCSA, no matter how the written agreement documenting the QCSA is structured.

of the same kind of costs of developing intangibles of the payee."[20] Payor and payee are each treated as spending $50 to develop intangibles. A party incurring R&D costs to develop intangibles under a QCSA thus directly gets its interest in cost-shared intangibles it is treated as having co-developed.

## IV. The Thomas Opinion erred in its interpretation of CWI

The Thomas Opinion first addresses the purpose of § 482:

> Thus, Congress's purpose in enacting and amending § 482 in 1986 is key to resolution of this issue. That purpose is parity. *First Sec. Bank of Utah*, 405 U.S. at 400. The 1986 amendment reflected Congress's recognition that the traditional arm's length standard did not serve the purpose of § 482.

This is wrong. *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972), has no bearing on Congress's purpose in adding CWI to § 482 in 1986. Congress enacted CWI not because it felt the arm's length standard didn't serve the purpose of § 482, but to address a lack of evidence of comparable transactions involving transfers or licenses of intangibles.[21] Moreover, when Congress enacted CWI, Treasury made clear CWI was consistent with the arm's length standard.[22]

The Thomas Opinion asserts:

[20] Treas. Reg. § 1.482-7A(h)(1).

[21] *1st Amicus Brief*, pp. 7–14.

[22] *Id*. at pp. 11–13; *see also* footnote 6, above.

> legislative history supports Treasury's application of [CWI] in the QCSA context. Congress did not want to interfere with controlled cost-sharing arrangements, but only to the degree that the allocation of costs and income "reasonably reflect[s] the actual economic activity undertaken by each." . . . . Treasury's decision to dispense with a comparability analysis was reasonable.[23]

This statement contains three errors. First, CWI by its plain language only applies to transfers or licenses of intangibles, so it's inapplicable in the QCSA context to R&D costs of developing cost-shared intangibles, which are not transferred or licensed. The Commissioner cannot use CWI to fashion rulemaking that addresses situations CWI *cannot* address. Second, if by "comparability analysis" the Thomas Opinion means the arm's length standard, which relies on evidence of the behavior of similarly situated unrelated parties, the legislative history does not support dispensing with this standard. Treasury has stated that Congress intended CWI to work consistently with the arm's length standard. If by "comparability analysis" the Thomas Opinion means analysis of comparable transactions, CWI was never intended to *dispense* with such analysis, but to deal with certain situations involving transfers or licenses of intangibles where actual results turn out to be greater than results projected at the time of transfer. So even if CWI applied to QCSAs—it doesn't—the IRS cannot dispense with

---

[23] *Slip Op.* at 39–40.

comparability analysis. Third, going to *Chevron* step two, the Commissioner's rulemaking clearly has no basis in § 482.[24] Language in the *Conference Report* by itself, unconnected with the text of the enacted statute, has no legal significance.[25] It certainly cannot function as a fulcrum to overturn the arm's length standard.

The Thomas Opinion states that Altera's interpretation of CWI—

> would render [CWI] meaningless except in two circumstances: (1) to allow the Commissioner to periodically adjust prices initially assigned following a comparability analysis; and (2) to reflect a party's contribution of existing intangible property or "buy-in" to a [QCSA]. This <u>narrow reading</u> of § 482 is not supported by the text or history of the 1986 amendment.[26]

If in (1) the Thomas Opinion addresses pricing of *transfers or licenses* of intangibles, this interpretation is *entirely* supported by the text of CWI and the legislative history,[27] which show clearly that CWI only applies to transfers or licenses of intangibles. Circumstance (2) is just a special instance of (1)—in the context of a QCSA, CWI only applies to the *deemed transfer* arising if one party contributes pre-existing intangibles (as defined) to the arrangement. But to call this reading of CWI "narrow" is patently

---

[24] *See* discussion in section I.

[25] *1st Amicus Brief*, pp. 16–17.

[26] *Slip Op.* at 42–43 (emphasis added).

[27] *1st Amicus Brief*, pp. 7–14.

wrong. Cisco's aggregate historical transactions described in (1) and (2) amount to *billions* of dollars. The aggregate of such transactions for U.S. and foreign multinational corporations must be much greater. By suggesting that the only interpretation of CWI consistent with its plain language (i.e., restricted to transfers or licenses of intangibles) and legislative history is "narrow," the Thomas Opinion misinterprets what led Congress to fashion CWI, and the ubiquity of transactions to which CWI can apply.

## V. Conclusion.

CWI applies only to transfers or licenses of intangibles, so it cannot apply to intangibles developed under a QCSA, which aren't transferred or licensed. The Commissioner's rulemaking, based on CWI, fails *Chevron* step two. Language in the *Conference Report*, disconnected from the text of the statute, cannot be used to extend the reach of CWI beyond the terms of the statute, to costs of developing intangibles under a cost-sharing arrangement. The Commissioner's argument on appeal must fail; the Tax Court's decision should be affirmed.

Dated: September 28, 2018

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for *Amicus Curiae*
Cisco Systems, Inc.

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, at the time of filing undersigned counsel is not aware of any related cases pending in this Court.

Dated: September 28, 2018

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for *Amicus Curiae*
Cisco Systems, Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rules 28-4 and 32-1, I certify that the attached brief is proportionately spaced using Microsoft Word, version 2010, is set in Times New Roman Font, has a typeface of 14 points or more, and contains 3,246 words.

Dated: September 28, 2018

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for *Amicus Curiae*
Cisco Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2018, I electronically filed the foregoing Supplemental Brief of *Amicus Curiae* Cisco Systems, Inc. Supporting Appellee and Affirmance on Behalf of Cisco Systems, Inc. with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly