Nos. 16-70496, 16-70497

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**ALTERA CORPORATION AND SUBSIDIARIES,**
*Petitioner-Appellee,*

vs.

**COMMISSIONER OF INTERNAL REVENUE,**
*Respondent-Appellant.*

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12
Hon. L. Paige Marvel, Tax Court Judge, Presiding

# SUPPLEMENTAL BRIEF OF *AMICI CURIAE* SUPPORTING APPELLEE AND AFFIRMANCE ON BEHALF OF NATIONAL ASSOCIATION OF MANUFACTURERS, SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION, FINANCIAL EXECUTIVES INTERNATIONAL, INFORMATION TECHNOLOGY INDUSTRY COUNCIL, SILICON VALLEY TAX DIRECTORS GROUP, SOFTWARE FINANCE AND TAX EXECUTIVES COUNCIL, NATIONAL FOREIGN TRADE COUNCIL, COMPUTING TECHNOLOGY INDUSTRY ASSOCIATION, THE TAX COUNCIL

Bennett Evan Cooper
STEPTOE & JOHNSON LLP
201 E. Washington St., Suite 1600
Phoenix, Arizona 85004-2382
(602) 257-5200

Charles G. Cole
Michael C. Durst
Alice E. Loughran
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

Attorneys for *Amici Curiae*

## DISCLOSURE STATEMENT

In accordance with FRAP 26.1(a), each of the amicus parties is a not-for-profit corporation organized under the laws of the referenced jurisdiction and has no stock, and therefore no publicly traded company owns 10 percent or more of its stock:

| | |
|---|---|
| National Association of Manufacturers | New York |
| Software Finance and Tax Executives Council | D.C. |
| National Foreign Trade Council | D.C. |
| Software and Information Industry Association | D.C. |
| Information Technology Industry Council | D.C. |
| Financial Executives International | New Jersey |
| Silicon Valley Tax Directors Group | California |
| Computing Technology Industry Association | D.C. |
| The Tax Council | D.C. |

## TABLE OF CONTENTS

*Page*

Disclosure Statement ........................................ i

Interest of the *Amici Curiae* ........................................ 1

I. Treasury Was Not Candid About Any Plan To Change The Legal Landscape ........................................ 2

II. Treasury Violated The APA In Three Separate Ways ........................................ 6

Certificate of Compliance ........................................ 14

Certificate of Service ........................................ 15

# TABLE OF AUTHORITIES

*Pages*

## Cases

*Chevron U.S.A. v. Nat. Resource Def. Council*,
467 U.S. 837 (1984) .......... 6

*Encino Motorcars LLC v. Navarro*,
136 S. Ct. 2117 (2016) .......... 6

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) .......... 7, 8

*Hewlett-Packard v. Commissioner*,
875 F.3d 494 (9th Cir. 2017) .......... 5

*Motor Vehicles Manufacturers Association v. State Farm Mutual Auto Ins. Co.*,
463 U.S. 29 (1983) .......... 6

*Nw. Environmental Defense Center v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .......... 7

*R.T. French Co. v. Commissioner*,
60 T.C. 836 (1973) .......... 9

*SEC v. Chenery Corp.*,
318 U.S. 80 (1984) .......... 9

## Statutes and Legislative History

26 U.S.C. § 482 .......... *passim*

Tax Reform Act of 1985, 99th Cong., 1st Sess. 424 (1985) .......... 10

## Regulations

26 C.F.R. § 1.482-1(b)(1) .......... 2, 3

26 C.F.R. § 1.482-4(f)(2) .................................................................. 11

**Academic Papers**

Kimberly A. Clausing & Reuven S. Avi-Yonah, *Reforming Corporate Taxation in a Global Economy: A Proposal to Adopt Formulary Apportionment*, Hamilton Project, The Brookings Institution (2007) ............................................................ 11

Reuven S. Avi-Yonah & Ilan Benshalom, *Formulary Apportionment: Myths and Prospects - Promoting Better International Policy and Utilizing the Misunderstood and Under-Theorized Formulary Alternative*, 3 World Tax J. 371 (2011)................................................................................. 11

Reuven S. Avi-Yonah, 15 Va. Tax Rev. 89, 153-59 (Summer 1995)......................................................................................... 11

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici Curiae* include representatives of the software, semiconductor, manufacturing, chemistry, biotechnology and other high-tech industries. With the consent of the parties, *Amici* filed an amicus brief before the original panel in this case on September 23, 2016. *See* ECF No. 65 (Sept. 23, 2016). As explained in the prior brief, *Amici* and their members have a direct interest in the outcome of this case. *Amici*'s members have long relied upon Treasury's adherence to the arm's length standard in pricing their intercompany transactions under 26 U.S.C. § 482. Several *Amici* participated in the underlying rulemaking and submitted comments to Treasury.

*Amici* file this supplemental brief because, contrary the opinion authored by Chief Judge Thomas, Treasury has not been candid about any intent to change the legal landscape. Treasury did not give the taxpayers fair notice in the rulemaking of a new, non-empirical approach to the long-standing arm's length standard, or an opportunity to explain why this new approach is unworkable. In fact, this new, non-empirical approach was announced for the first time in litigation.

---

[1] No counsel for any party to this proceeding authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amici curiae or their members contributed money that was intended to fund preparing or submitting this brief.

Treasury thus never reconciled its new definition of arm's length with the central concept of the arm's length standard that has long been embodied in U.S. and international law. Treasury thereby defeated the purpose of the notice-and-comment requirement of the rulemaking.

## ARGUMENT

### I. Treasury Was Not Candid About Any Plan To Change The Legal Landscape

The rulemaking at issue took place against the background of a well-established legal framework. As explained in *Amici*'s prior brief, Treasury's regulations have consistently stated for more than eighty years that the governing standard to be applied under 26 U.S.C. § 482 is the arm's length standard. *See* Amici Br. 11-12 (ECF No. 65); 26 C.F.R. § 1.482-1(b)(1). Further, courts have consistently recognized that Treasury's regulations on arm's length impose a fact-intensive, empirical inquiry concerning the behavior of unrelated parties. *See* Amici Br. 13-14 (ECF No. 65). This standard controls not only in the United States but, with Treasury's encouragement, has been widely used as a basis for bi-lateral tax treaties between governments. *Id.* at 14-16.

Amici and their members understood at the time of the rulemaking that Treasury was following the empirically-based arm's length standard. This understanding was based on Treasury's own statements in the preambles.

In the 2002 notice of proposed rulemaking, Treasury proposed to define an "arm's length" result for stock-based compensation. *See* 67 Fed. Reg. 48997 (July 29, 2002). The notice reaffirmed that a transaction meets the arm's length standard "if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." *Id.* at 48998. This rule is set forth in a separate regulation, which remains in effect today. 26 C.F.R. § 1.482-1(b)(1). Treasury's notice of proposed rulemaking cited to the legislative history for the 1986 amendments to 26 U.S.C. § 482, but only for a limited proposition.

As Treasury explained, the legislative history reflects that "Congress did not intend to preclude the use of bona fide . . . cost-sharing arrangements" when it enacted the commensurate-with-the-income (CWI) standard in Section 482. 67 Fed. Reg. at 48998. Treasury did not indicate that the CWI amendment abrogated the arm's length standard. To the contrary, Treasury reaffirmed its previously-stated view that Congress intended the agency to apply and interpret CWI "consistently with the arm's length standard." *Id.* Thus, these references to the legislative history did not communicate to taxpayers that Treasury intended to abrogate the arm's length standard.

In response to the notice of proposed rulemaking, a number of parties—including some *Amici*—submitted evidence of what unrelated

parties would do at arm's length, including actual agreements negotiated by unrelated parties at arm's length. (ER30-33; ER67-73; SER75-158; SER175-78; SER181.) This evidence showed that unrelated parties transacting with one another at arm's length do not and would not share stock-based compensation. (ER60-64.) Thus, as the Tax Court later explained, this is not a situation where the arm's length standard breaks down due to the lack of empirical evidence of how unrelated parties would behave at arm's length. Rather, there is empirical evidence of what unrelated parties would do and that evidence shows that unrelated parties do not reimburse one another for stock-based compensation. (ER60.)

In the notice of final rulemaking, Treasury again did not indicate that it was forsaking empirical analysis of what unrelated parties would do. *See* 68 Fed. Reg. 51171 (Aug. 26, 2003). Instead, Treasury acknowledged that the "regulations relating to QCSAs have as their focus reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." *Id.* at 51173. Treasury asserted that the "uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." *Id.* Thus, Treasury took the position that the other

transactions, while relevant to the rulemaking's inquiry, were not sufficiently similar to show arm's length behavior. *See id.*; *see also* ER37, 68-69, 72-73.

Later, in the course of the proceedings before the Tax Court, Treasury announced that it was now proceeding on a non-empirical theory divorced from the evidence. The Tax Court rejected Treasury's arguments and found that the rulemaking violated the APA. (ER40-66.) Significantly, not a single judge of the *en banc* Tax Court found that the arm's length standard had been abrogated or modified by the 1986 CWI amendments. *See Hewlett-Packard v. Commissioner*, 875 F.3d 494, 497-500 & n.2 (9th Cir. 2017) (explaining that the Tax Court has unique institutional competence).

U.S. technology companies are entitled to a reasoned application of the existing standard. If the agency decides to change the standard, taxpayers are entitled to a statement that the standard is changing and an explanation of why. The agency's explanations cannot arrive in the midst of litigation, but must be in the agency's decisional documents. These basic principles do not represent "excessive proceduralism" (slip op. 33) but the fundamental protections for fairness in the regulatory state.

## II. Treasury Violated The APA In Three Separate Ways

Treasury seeks to sidestep the Tax Court's findings in large part by seeking deference to its interpretation of 26 U.S.C. § 482. (Opening Br. 31.) As the U.S. Supreme Court recently confirmed, however, agencies are entitled to deference under *Chevron U.S.A. v. Nat. Resource Def. Council*, 467 U.S. 837 (1984), only if they comply with the Administrative Procedure Act. "An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). A rulemaking that violates the APA is invalid. This is not "excessive proceduralism" (slip op. 33) but respect for the rule of law. Treasury violated the APA in three separate ways.

*First*, Treasury "offered an explanation for its decision that runs counter to the evidence before the agency" in that Treasury's analysis of the evidence was inadequate under the arm's length standard. (ER73-74.) This violated the reasoned decision-making requirements of *Motor Vehicles Manufacturers Association v. State Farm Mutual Auto Insurance Company*, 463 U.S. 29, 43 (1983). The Tax Court found that the proffered agreements and other evidence established that unrelated parties would not reimburse each other for stock-based compensation. Treasury has not challenged this finding on appeal. Nor has Treasury tried to defend its judgments empirically.

*Second*, because Treasury did not acknowledge in the underlying rulemaking that it was seeking to change the legal landscape, Treasury failed to supply good reasons for a migration to a new standard. This is a separate APA violation. *See FCC v. Fox Television Stations*, 556 U.S. 502, 515, 516 (2009). A justification for a change is particularly important here because of the substantial reliance interests, as set forth in the industry amicus brief. (ECF No. 65 at 18-19, 21-22, 25-26.)

It is a long-established principle of administrative law that

> an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedent without discussion it may cross the line from the tolerably terse to the intolerably moot.

*Nw. Environmental Defense Center v. Bonneville Power Admin.*, 477 F.3d 668, 687–88 (9th Cir. 2007), *quoting Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C. Cir. 1970).

In *Fox Television*, the U.S. Supreme Court elaborated on this: An agency changing its course must "display an awareness that it *is* changing position." 556 U.S. at 515. It must show there are "good reasons" reasons for the new policy. *Id*. And it must provide a more detailed justification when "the prior policy has engendered serious reliance interests that must be taken into account." *Id*.

Here, Treasury's position shifted from reliance on the results of transactions between unrelated parties to a focus on abstract economic analysis that is uninformed by the actual behavior of unrelated parties. Treasury acknowledges on appeal that this current position "change[s] the legal landscape" (Opening Br. 30, 46) but Treasury never acknowledged such a change in the rulemaking. If it had, Treasury would have needed to supply good reasons for the change. And Treasury did not address the substantial reliance interests of Amici and its members in the longstanding definition of the arm's-length standard.

Treasury claims that preambles to the rulemaking notified taxpayers of a change in position by citing the legislative history of the 1986 legislative amendments. (Opening Br. 58-59; slip op. 31.) One might fairly question whether a citation to legislative history is notice to the public of a change in agency policy. In any event, the 1986 legislative history cited here does not preclude using evidence of unrelated party behavior, where available, to determine what parties would do at arm's length. That legislative history simply reflected the view that the additional source of data authorized for transfers of intangibles was not intended to preclude the use of qualified cost sharing arrangements to exploit intangibles.

Treasury did not acknowledge a change in position that made evidence of actual unrelated party behavior "extraneous." (Opening Br.

64.) It did not provide a sound justification for its changed position. And it did not seek to protect firms from the risk of double taxation due to their reliance on the arm's-length standard. Hence, Treasury's change in position does not satisfy *Fox Television*.

*Third*, this new standard was not announced in the rulemaking, but in the agency's briefing in this litigation. This violates the principle announced in *SEC v. Chenery Corporation*, 318 U.S. 80, 87 (1984). Treasury argued to this Court that its coordinating regulations had "changed the legal landscape," although this was not the basis of its rulemaking. (Opening Br. 30, 46.) Treasury purports to justify this dramatic change based on congressional direction in 1986. The opinion of Chief Judge Thomas expands on these themes, arguing a position that Treasury did not advance: that Section 482 is not inextricably linked to the arm's length standard. If an adequate justification is not presented in the contemporaneous preambles, however, it cannot be supplied by this Court. *See Chenery*, 318 U.S. at 87.

Contrary to the withdrawn opinion (slip op. 20), Congress did not dilute the fact-driven, arm's length standard in 1986 by enacting the CWI rule. The CWI rule instead has a more limited purpose. Congress enacted the CWI rule to provide that in the case of a license or other transfer of intangible property, the income actually earned from the property will constitute strong evidence of the appropriate level of royalty or other compensation under Section 482. The case of *R.T.*

*French Co. v. Commissioner,* 60 T.C. 836 (1973), illustrates the kind of problem that Congress sought to remedy. In that case, the royalty for an intangible transferred between related parties (a formula for instant mashed potatoes) had been set before the amount of income to be earned from exploitation of the intangible was known. When the intangible turned out to be highly profitable, the IRS sought to increase the level of the royalty retrospectively, but the Tax Court held that under the arm's-length standard, it was impermissible for the IRS to take into account information that would not have been known to the taxpayer at the time the royalty was originally determined.[2] In 1986, Congress sought to overturn this result by prescribing that information concerning the actual profitability of an intangible could be taken into account in determining retrospectively a royalty rate.

---

[2] In describing the purpose of the new CWI rule, the House Ways & Means Committee said:

> Taxpayers may transfer … intangibles to foreign related corporations … at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product. Even in the case of a proven high-profit intangible, taxpayers frequently take the position that intercompany royalty rates may appropriately be set on the basis of industry norms for transfers of much less profitable items.

H.R. Rep. No. 426, Tax Reform Act of 1985, 99th Cong., 1st Sess. 424 (1985).

In response to Congress' enactment of the CWI rule, Treasury amended the applicable regulations to authorize retrospective changes to royalty rates or other compensation, in limited circumstances, when the income earned from a transferred intangible has proven to be significantly higher than previously projected by the taxpayer. *See* 26 C.F.R. § 1.482-4(f)(2). Nothing in the CWI rule has affected the limits on the Secretary created by the first sentence of Section 482, which maintains the centrality of the arm's length standard under U.S. law. Indeed, at the oral argument in this appeal, Treasury's counsel reaffirmed that the arm's length standard remains an integral and necessary part of 26 U.S.C. § 482. *See* Oral Argument Video Recording at 9 minutes.

To support the contrary proposition, the withdrawn opinion authored by Chief Judge Thomas relies on a law review article by Professor Reuven Avi-Yonah. (Slip op. 17.) Professor Avi-Yonah, who has long advocated replacing the arm's-length standard with a "formulary" approach to transfer pricing,[3] does not take the position

---

[3] *See, e.g.*, Kimberly A. Clausing & Reuven S. Avi-Yonah, *Reforming Corporate Taxation in a Global Economy: A Proposal to Adopt Formulary Apportionment*, Hamilton Project, The Brookings Institution (2007); Reuven S. Avi-Yonah & Ilan Benshalom, *Formulary Apportionment: Myths and Prospects - Promoting Better International Policy and Utilizing the Misunderstood and Under-Theorized Formulary Alternative*, 3 World Tax J. 371 (2011).

that U.S. law no longer prescribes the arm's-length standard. Rather, his article advocates that the current law *should be changed* to a more formulary approach because the transfer pricing rules have become increasingly indeterminate in application over time. *See* 15 Va. Tax Rev. 89, 153-59 (Summer 1995). To effectuate this change, Treasury would need to announce it in the proposed rulemaking and explain its change in position.[4]

## CONCLUSION

For the foregoing reasons and those stated in *Amici*'s prior brief in this case, the Court should affirm the judgment of the Tax Court.

DATED this 28th day of September, 2018.

STEPTOE & JOHNSON LLP

By s/ Alice E. Loughran
Charles G. Cole
Michael C. Durst
Alice E. Loughran
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

Bennett Evan Cooper
201 E. Washington Street,
Suite 1600
Phoenix, Arizona 85004-2382

Attorneys for *Amici Curiae*

[4] The supplemental brief filed by a group of academics argues that Treasury has broad discretion under Section 482. *See* Supp. Br. at 1, 3, 5, 7, 14 (ECF No. 117-1). Even if true, this would make it more imperative for Treasury to explicitly announce, in advance, the considerations on which its proposed regulation rests.

## CERTIFICATE OF COMPLIANCE

This supplemental brief contains 2646 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Century Schoolbook.

DATED this 28th day of September, 2018.

s/ Alice E. Loughran
Alice E. Loughran

## CERTIFICATE OF SERVICE

I certify that on September 28, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Alice E. Loughran
Alice E. Loughran