**Nos. 16-70496 & 16-70497**
**(Before the Honorable Sidney R. Thomas, C.J., and Susan P. Graber and Kathleen M. O'Malley, JJ.**
**Opinion filed June 7, 2019)**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

ALTERA CORPORATION & SUBSIDIARIES,
*Petitioner – Appellee*,

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent – Appellant*.

---

Appeal from the United States Tax Court, Nos. 6253-12 & 9963-12

---

# PETITION FOR REHEARING *EN BANC* OF PETITIONER-APPELLEE ALTERA CORPORATION & SUBSIDIARIES

---

Ginger D. Anders
MUNGER TOLLES & OLSON LLP
1155 F Street NW
Washington, DC 20004
(202) 220-1100

Mark R. Yohalem
MUNGER TOLLES & OLSON LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 683-9100

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
(202) 452-7000

Nicole A. Saharsky
Brian D. Netter
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
(650) 331-2000

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

*Counsel for Petitioner-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Intel Corporation is the parent corporation of Altera Corporation and subsidiaries. Intel is a publicly traded corporation.

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement .......... i
Table of Authorities .......... iii
Introduction and Rule 35(b) Statement .......... 1
Statement .......... 3
A. Factual Background .......... 3
B. Statutory and Regulatory Background .......... 4
C. The 1995 Cost-Sharing Regulation and the *Xilinx* Decision .......... 6
D. The 2003 Regulation and the Present Dispute .......... 7
E. The Tax Court's Decision .......... 9
F. The Panel's Decision .......... 10
Reasons for Granting the Petition .......... 12
I. The Panel's Decision Upsets Settled Principles of Tax Law .......... 12
II. The Panel's Decision Validates Bad Rulemaking .......... 15
III. The Panel's Decision Is Irreconcilable with *Xilinx* and Prevents Uniform Application of the Tax Laws .......... 19
IV. The Stock-Based Compensation Issue Is Exceptionally Important .......... 21
Conclusion .......... 23
Appendices
Panel's Opinion .......... App. A
Tax Court's Opinion .......... App. B
Public Companies Affected by the *Altera* Issue .......... App. C

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Altera Corp. v. Comm'r*,
Nos. 16-70496 & 16-70497,
2018 WL 3542989 (9th Cir. July 24, 2018) .......... 11

*Chevron USA, Inc. v. NRDC, Inc.*,
467 U.S. 837 (1984) .......... 11

*Chisom v. Roemer*,
501 U.S. 380 (1991) .......... 17

*Comm'r v. First Sec. Bank of Utah, N.A.*,
405 U.S. 394 (1972) .......... 4, 12

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) .......... 16

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .......... 18, 19

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 18

*Golsen v. Comm'r*,
54 T.C. 742 (1970) .......... 20

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) .......... 15

*Pine Mountain Preserve, LLLP v. Comm'r*,
No. 8956-13, 2018 WL 6841801 (T.C. Dec. 27, 2018) .......... 20

*Procacci v. Comm'r*,
94 T.C. 397 (1990) .......... 5

*SEC v. Chenery*,
332 U.S. 194 (1947) .......... 2, 18

**TABLE OF AUTHORITIES**
**(continued)**

**Cases – continued** **Page(s)**

*Xilinx Inc. v. Comm'r*,
125 T.C. 37 (2005) .......... 6

*Xilinx Inc. v. Comm'r*,
598 F.3d 1191 (9th Cir. 2010) .......... *passim*

*Yovino v. Rizo*,
139 S. Ct. 706 (2019) .......... 11

**Statutes**

5 U.S.C. § 551 *et seq.* .......... 15

5 U.S.C. § 553(b) .......... 15

5 U.S.C. § 553(c) .......... 15

26 U.S.C. § 482 .......... 4, 5

**Regulations**

26 C.F.R. § 1.482-1(a)(1) .......... 4

26 C.F.R. § 1.482-1(b) .......... 13, 14

26 C.F.R. § 1.482-1(b)(1) .......... 4, 14

26 C.F.R. § 1.482-1(c) .......... 4, 13, 14

26 C.F.R. § 1.482-7(d)(1) (1995) .......... 6

26 C.F.R. § 1.482-7(d)(2) (2003) .......... 8, 22

26 C.F.R. § 1.482-7(d)(3) .......... 22

Art. 45-1(b), Regulations 86 (1935) .......... 5

**TABLE OF AUTHORITIES**
**(continued)**

**Regulations – continued** **Page(s)**

Compensatory Stock Options Under Section 482,
67 Fed. Reg. 48,997 (proposed July 22, 2002) .................................... 17

Compensatory Stock Options Under Section 482,
68 Fed. Reg. 51,171 (Aug. 26, 2003) ........................................... *passim*

Section 482: Methods to Determine Taxable Income in
Connection With a Cost Sharing Agreement,
76 Fed. Reg. 80,082 (Dec. 22, 2011)................................................... 22

**Other Authorities**

*A Study of Intercompany Pricing Under Section 482 of the Code*, IRS Notice 88-123, 1988-2 C.B. 458 ........................................ 4, 5

Alphabet Inc., Form 10-K (Feb. 3, 2017) ............................................... 22

Peter J. Connors et al., *A Second Bite at the APA:* Altera*'s Rehearing and the Potential Invalidity of Cost-Sharing Regulations*, Bloomberg Daily Tax Report (Oct. 31, 2018) ................ 22

Groupon, Inc., Form 10-K (Feb. 12, 2016) ............................................. 21

IRS, *Report on Application and Administration of Section 482* (1992)........................................................................................... 15

Silicon Laboratories Inc., Form 10-K (Feb. 5, 2016)............................... 21

Tripadvisor, Inc., Form 10-K (Feb. 17, 2017) ........................................ 21

## INTRODUCTION AND RULE 35(B) STATEMENT

A divided panel of this Court reversed a 15-0 decision of the Tax Court on an important issue of tax law. The issue affects companies across the United States, to the tune of billions of dollars. The panel's decision upends settled law, creates an intra-circuit conflict, and threatens the uniform enforcement of the tax laws. This Court should rehear the case *en banc*.

The issue is whether commonly controlled companies that work together to develop intangible property, and agree to share research-and-development costs, must include stock-based compensation as a shared cost. This Court said no in *Xilinx Inc. v. Commissioner*, 598 F.3d 1191 (9th Cir. 2010). In that case, which addressed a 1995 Treasury regulation, the Court applied tax law's settled arm's-length transaction standard. Under that standard, whether *related* parties must share a cost depends on whether *unrelated* parties would do so. Because unrelated parties do not share stock-based compensation, the *Xilinx* Court held that related parties do not have to share it, either.

While *Xilinx* was pending, Treasury promulgated its 2003 regulation – the regulation at issue here – again requiring related

companies to share stock-based compensation. In the rulemaking, the agency acknowledged that the arm's-length standard applied. But it did not provide any evidence that unrelated parties share stock-based compensation as part of their research-and-development agreements. And all of the evidence submitted by industry groups, tax professionals, and others was to the contrary. To justify its rule, the agency relied only on a hypothetical and its own unsupported belief. Not surprisingly, the Tax Court unanimously found the regulation arbitrary and capricious.

On appeal, the government changed position. It abandoned the settled arm's-length standard in favor of its own "internal" standard under which stock-based compensation always must be shared. IRS C.A. Br. 50-51. The IRS is not allowed to do that; a regulation can be sustained only on the administrative record, and an agency that shifts position mid-stream runs head-long into *SEC v. Chenery*, 332 U.S. 194 (1947). Two judges accepted the IRS's newfound justification for the regulation; one judge dissented. The result is remarkable: The panel allowed the IRS to say that it is complying with the arm's-length standard, while imposing a result that is exactly the opposite of what companies actually do at arm's length.

The panel's decision is contrary to longstanding principles of tax law. It turns the Administrative Procedure Act on its head, and it is irreconcilable with *Xilinx*. If allowed to stand, it will subject taxpayers to inconsistent rules based merely on geography and will require companies to pay billions of dollars based on a standard the IRS made up in litigation. This is a paradigmatic case for rehearing *en banc*.

## STATEMENT

### A. Factual Background

Altera Corporation was the U.S. parent company of a group of companies that made programmable logic devices and related hardware and software. Altera entered into an agreement with a foreign subsidiary to work together to develop intangible property, where the companies would share research-and-development costs, and each would own part of the property created. ER 145-89.

Agreements like this are common. Unrelated companies routinely enter into them to share the costs and the risks of a new venture; if the venture is successful, each company can use the jointly developed intellectual property without paying a royalty. *See* T.C. Op. 24. The IRS has long recognized that cost-sharing arrangements serve valid business

purposes by spreading the risk of often highly speculative research-and-development activities. *See A Study of Intercompany Pricing Under Section 482 of the Code*, IRS Notice 88-123, 1988-2 C.B. 458, 493 (White Paper).

**B. Statutory and Regulatory Background**

Federal law authorizes the Secretary of the Treasury to allocate income, deductions, credits, or allowances between related organizations "clearly to reflect the income" of each organization. 26 U.S.C. § 482. "[C]learly to reflect the income" incorporates the tax parity principle – the principle that related parties should be treated the same as unrelated parties for tax purposes. *Comm'r v. First Sec. Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972); *see* 26 C.F.R. § 1.482-1(a)(1).

To ensure tax parity, Treasury regulations mandate that the Commissioner use the arm's-length standard "in every case" under Section 482. 26 C.F.R. § 1.482-1(b)(1). The regulations specify how the arm's-length standard works: It depends on "the results of comparable transactions" between unrelated parties "under comparable circumstances," *id.* – meaning evidence of how unrelated parties actually behave, *id.* § 1.482-1(c). This empirical analysis of unrelated-party

behavior is "essentially and intensely factual." *Procacci v. Comm'r*, 94 T.C. 397, 412 (1990).

Federal tax law has incorporated the arm's-length standard for 80 years, *see* Art. 45-1(b), Regulations 86 (1935), and the United States has exported that standard to other nations through tax treaties, T.C. Op. 8-9; Altera C.A. Br. 9-10.

In 1986, Congress added language to Section 482 to address a different issue – how to value transfers of *existing* intangible property from one related entity to another. Altera C.A. Br. 10-11. Congress provided that "[i]n the case of any transfer (or license) of intangible property," an organization's "income with respect to such transfer or license shall be commensurate with the income attributable to" that property. 26 U.S.C. § 482. That language clarifies that existing intangible property is valued by considering the income it actually generates, rather than industry averages or the parties' forecasted expectations. *E.g.*, White Paper 472. It was not meant to address intangible property yet to be created, Op. 78 (O'Malley, J., dissenting), and Congress "intended no departure from the arm's length standard" embodied in the first sentence of Section 482, White Paper 475 & n.149.

### C. The 1995 Cost-Sharing Regulation and the *Xilinx* Decision

As stock-based compensation became more common, Treasury decided to require related parties to share that item when they jointly develop intangible property. In 1995, Treasury promulgated a regulation requiring related taxpayers to share "all of the costs" of developing intangibles, 26 C.F.R. § 1.482-7(d)(1) (1995), and it interpreted "all of the costs" to include stock-based compensation, *Xilinx Inc. v. Comm'r*, 125 T.C. 37, 52 (2005), *aff'd*, 598 F.3d 1191 (9th Cir. 2010).

The agency provided no evidence that unrelated parties would consider one company's stock-based compensation to be a shared research-and-development cost. That is unsurprising, because stock-based compensation is speculative, difficult to value, and depends on factors outside the company's control. *Xilinx*, 125 T.C. at 59; *see* T.C. Op. 25-26.

Xilinx challenged the IRS's position that related companies must share stock-based compensation. *Xilinx*, 125 T.C. at 54. The Tax Court held that the Commissioner failed to satisfy the arm's-length standard because he "presented no evidence or testimony establishing that his determinations are arm's length." *Id.*

This Court affirmed. Judge Noonan's opinion for the Court explained that the "paramount" purpose of Section 482 is "parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions," which requires analyzing "how parties operating at arm's length would behave." 598 F.3d at 1196. Because the government "d[id] not dispute" that "unrelated parties would not share [stock-based compensation]," the government could not require related parties to share it. *Id.* at 1194, 1196.

In his concurring opinion, Judge Fisher expressed concern that the IRS raised new arguments before this Court to justify its position, depriving taxpayers of "fair notice of how the regulations will affect them." 598 F.3d at 1198. Judge Reinhardt dissented, but he expressed "serious doubts" about the IRS's view and was "particularly troubled by the international tax consequences" of it. *Id.* at 1200.

**D. The 2003 Regulation and the Present Dispute**

In 2003, Treasury issued a new cost-sharing regulation, this time specifically mandating that related parties that enter into cost-sharing agreements share stock-based compensation. *See* Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171 (Aug. 26, 2003)

(promulgating 26 C.F.R. § 1.482-7(d)(2) (2003)). As before, Treasury purported to use the arm's-length standard, calling it an "established principle[]" of tax law. *Id.* at 51,172. Also as before, Treasury provided no evidence to support its belief that unrelated parties would share stock-based compensation in their research-and-development agreements. *See* T.C. Op. 22-28.

Many companies that would be affected by the regulation participated in the notice-and-comment process. They provided undisputed evidence showing that unrelated parties do not share stock-based compensation in any kind of transaction, including in comparable research-and-development agreements. T.C. Op. 22-26; *see* 68 Fed. Reg. at 51,172-73. Treasury dismissed that evidence, instead relying on its own "belie[f]" that related parties should be required to share those costs, and on a hypothetical comparable transaction the agency made up to support its belief. 68 Fed. Reg. at 51,173. The agency never announced that it was adopting a wholly new approach to cost-sharing.

The IRS applied its new regulation to Altera and issued notices of deficiency for 2004 through 2007. Altera challenged those determinations.

### E. The Tax Court's Decision

In a 15-0 decision, the Tax Court invalidated the 2003 regulation, concluding that it was not the product of reasoned decisionmaking. The Tax Court recognized that Section 482 and its implementing regulations require the agency to use the arm's-length standard. T.C. Op. 44-45. It concluded that the agency failed to justify the new regulation under that standard because it did not provide "any evidence of any actual transaction between unrelated parties" in which stock-based compensation was shared or any "expert opinions, empirical data, or published or unpublished articles, papers, surveys, or reports" supporting its view. *Id.* at 27. In fact, the Tax Court found, all evidence in the administrative record – including evidence of comparable transactions – supported Altera's view. *Id.* at 66.

The Tax Court concluded that the government's "*ipse dixit* conclusion, coupled with its failure to respond to contrary arguments resting on solid data, epitomize[d] arbitrary and capricious decisionmaking." T.C. Op. 69-70 (internal quotation marks omitted). All judges on the Tax Court understood the government to be using the settled arm's-length standard; no judge read the 2003 regulation to

dispense with that standard. *See id.* at 45 ("[T]he preamble to the final rule does not justify the final rule on the basis of any modification or abandonment of the arm's-length standard.").

### F. The Panel's Decision

On appeal, the IRS changed position. Rather than using the settled arm's-length standard, the IRS claimed that the 2003 regulation "changed the legal landscape" so that now "comparability analysis plays no role in determining" what costs must be shared "in order to achieve an arm's length result." IRS C.A. Br. 30. According to the IRS, the "commensurate with the income" language in Section 482 allows the IRS to make its own "internal" judgment about what would be an "arm's length result." *Id.* at 44.[1]

The IRS's new, "internal" standard has nothing to do with how companies actually transact at arm's length; instead, it depends on the IRS's own view of the "relative benefits realized by the parties." IRS C.A.

[1] Before the Tax Court, the IRS pointed to the "commensurate with the income" language as an additional basis for the regulation. IRS T.C. Partial Summ. J. Mem. 41. But the Tax Court did not understand the IRS to be arguing for a new standard that "supplant[ed]" the settled arm's-length standard. T.C. Op. 49-50. That only became clear before this Court.

Br. 50-51. In essence, the IRS has now mandated for *all* taxpayers the rule the *Xilinx* Court already rejected for *one* taxpayer. And needless to say, this new approach appeared nowhere in the rulemaking record.

A divided panel of this Court accepted the IRS's argument and reversed. *See Altera Corp. v. Comm'r*, Nos. 16-70496 & 16-70497, 2018 WL 3542989 (9th Cir. July 24, 2018). Judge Reinhardt was a member of the panel majority, and the opinion was issued after his death. *See Yovino v. Rizo*, 139 S. Ct. 706, 707 n.* (2019) (per curiam). The Court withdrew the opinion and reheard the case with a new judge. 898 F.3d 1266 (9th Cir. 2018).

The new panel again reversed, again over a dissent. The panel majority first asked whether the IRS's re-interpretation of the statute was "permissible" under *Chevron USA, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), Op. 24-33 – even though the Tax Court found the regulation procedurally defective and therefore ineligible for *Chevron* deference. Relying on the "commensurate with the income" language, the panel accepted the IRS's view that it could ignore all evidence of what unrelated parties do and use its own "purely internal methodology" instead. *Id.* at 27-31, 39.

The panel also concluded that the regulation was not arbitrary or capricious. It took the view that the passing "citations to legislative history" of the "commensurate with the income" language gave sufficient notice during the rulemaking that the agency was "do[ing] away with analysis of comparable transactions." Op. 38-39. And because the agency abandoned the settled standard, it was not required to respond to the many comments establishing that unrelated parties would not share stock-based compensation. *Id.* at 40-42.

In dissent, Judge O'Malley explained that the panel violated foundational principles of administrative law by upholding the regulation on a "justification [the agency] never provided" during the rulemaking process. Op. 50-51. She agreed with the Tax Court that the regulation is arbitrary and capricious, *id.* at 61-70, and explained that the panel cannot save a procedurally invalid regulation by invoking *Chevron*, *id.* at 70-77. In her view, *Xilinx* controls this case. *Id.* at 78.

## REASONS FOR GRANTING THE PETITION

### I. THE PANEL'S DECISION UPSETS SETTLED PRINCIPLES OF TAX LAW

The arm's-length standard has been a settled feature of tax law for decades. *See, e.g.*, *First Sec. Bank of Utah, N.A.*, 405 U.S. at 400; *see also*

Altera C.A. Br. 7-10. Indeed, the IRS has conceded that the arm's-length standard is "[i]mplicit" in the statute. IRS C.A. Br. 49-50. Federal regulations explain that the arm's-length standard applies "in every case" and is judged "by reference to the results of comparable transactions under comparable circumstances," meaning actual evidence of unrelated-party behavior. 26 C.F.R. § 1.482-1(b)-(c).

In the rulemaking proceeding here, Treasury repeatedly insisted that it was applying the arm's-length standard, and it understood the arm's-length standard to require evidence of unrelated-party behavior. 68 Fed. Reg. at 51,172-73. The parties that submitted comments and the experts on the Tax Court understood that Treasury was attempting to justify its rule under that settled standard. T.C. Op. 46 (explaining that the regulation rests on "an empirical determination" and "in no way depends on [an] interpretation of section 482").

Yet a panel of this Court allowed the government to cast aside the settled arm's-length standard, in favor of a new standard the government belatedly discovered in the "commensurate with the income" language. The panel concluded that the 2003 regulation reflects the government's considered decision to "do away with analysis of comparable

transactions" in favor of its "internal" view, Op. 38-39 – even though the rulemaking record contains no such determination, and existing regulations require the government to use the arm's-length standard "in every case," 26 C.F.R. § 1.482-1(b)(1). The panel also concluded that the arm's-length standard is "fluid" and does not require consideration of unrelated-party behavior, Op. 10, 29 – even though federal regulations say just the opposite, 26 C.F.R. § 1.482-1(b)-(c); *see Xilinx*, 598 F.3d at 1195.

By accepting the IRS's "purely internal" standard, the panel has upended tax law. Tax professionals previously understood and relied on the arm's-length standard; now, they must figure out how to comply with the IRS's new "purely internal" standard – a standard made up for litigation and never explained (or even mentioned) during the rulemaking process. This standard does not depend on how arm's-length parties behave in the real world; indeed, the results are directly contrary to all evidence of arm's-length behavior. The consequences of this reimagining of Section 482 potentially are far-reaching; nothing in the panel's decision limits the "purely internal" standard to stock-based compensation.

Those impacts could extend beyond U.S. law. The United States has included the arm's-length standard in numerous tax treaties. If the United States moves away from the settled understanding of that standard, other nations may follow suit, resulting in a patchwork of regulations that subjects companies to double-taxation. *See* Software & Information Indus. Assoc. *Amicus* Br. 15-16 (SIIA *Amicus* Br.); *see also Xilinx,* 598 F.3d at 1200 (Reinhardt, J., dissenting) (noting the "particularly troubl[ing] . . . international tax consequences" of the IRS's view). As the IRS itself has warned, "[a]ny deviation from the arm's length standard would contradict long-standing international norms and would raise substantial concerns among U.S. treaty partners." IRS, *Report on Application and Administration of Section 482* 4-12 (1992).

## II. THE PANEL'S DECISION VALIDATES BAD RULEMAKING

The requirements of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, are not mere formalities. The APA mandates notice-and-comment rulemaking for regulations that have the force of law so that regulated parties have "fair notice" and can provide input to help the agency develop a well-reasoned, workable rule. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007); *see* 5 U.S.C. § 553(b)-(c); *see*

*also* U.S. Chamber *Amicus* Br. 18-20. The APA requires agencies to give reasoned explanations for their decisions "to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

The panel's decision turns the APA on its head by allowing the IRS to assess billions of dollars in taxes based on reasoning that appeared nowhere in the administrative record and thus never was subject to public scrutiny. In the rulemaking proceeding, everyone understood that the settled arm's-length standard applied, and that the agency could require related parties to share stock-based compensation only if evidence established that unrelated parties operating at arm's length would do so. *See* 68 Fed. Reg. at 51,171-77 (mentioning arm's-length standard 33 times). Accounting firms, organizations of tax professionals, industry groups, and other experts provided evidence demonstrating that unrelated parties would not share stock-based compensation, including examples of arm's-length joint-development agreements in which parties did not share it; surveys of their members and searches of databases finding no agreements in which parties shared it; and model accounting

procedures and federal government regulations that prohibit that sharing. T.C. Op. 22-26; *see* Altera C.A. Br. 18-23.

Only after the IRS lost in the Tax Court did it abandon the settled understanding of the arm's-length standard and seek to achieve its desired result by interpreting "commensurate with the income" to permit a new standard. IRS C.A. Br. 48-52. No one involved in the rulemaking thought the IRS was interpreting "commensurate with the income" to justify a new standard that did not depend on empirical evidence. The notice of proposed rulemaking mentioned the "commensurate with the income" language to support the existing arm's-length standard, not to justify a new standard. Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997, 48,998 (proposed July 29, 2002). The final rule mentioned the "commensurate with the income" language only once, to reaffirm that it is "*consistent with* the arm's length standard." 68 Fed. Reg. at 51,172 (emphasis added). If the agency had given any indication that it was making a dramatic change to the arm's-length standard, the tax community no doubt would have submitted extensive comments addressing whether that change is allowed and what the new standard should be. *See Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

And if the agency wanted to change position, it would have had to acknowledge and explain that change. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Tellingly, not one of the fifteen Tax Court judges – experts who closely analyzed the rulemaking record – understood the agency to be using a new, "purely internal" standard instead of the settled, empirical arm's-length standard. *See* T.C. Op. 45, 49.

The panel's decision violates the foundational principle of administrative law that courts "must judge the propriety of [the agency's] action solely by the grounds invoked by the [agency]" in the administrative record. *Chenery*, 332 U.S. at 196. That is the point Judge Fisher made in *Xilinx*: When the IRS makes "complex, theoretical" arguments to justify its interpretation of regulations for the first time in litigation, "taxpayers have not been given clear, fair notice of how the regulations will affect them." 598 F.3d at 1198 (Fisher, J., concurring).

The panel could not cure the deficiencies in the rulemaking record by resorting to *Chevron* deference. *Chevron* deference is not available when a regulation is "procedurally defective" because (for example) the

agency failed to give "adequate reasons for its decisions." *Encino Motorcars, LLC*, 136 S. Ct. at 2125. In those circumstances, the regulation is "arbitrary and capricious and so cannot carry the force of law." *Id.*

## III. THE PANEL'S DECISION IS IRRECONCILABLE WITH *XILINX* AND PREVENTS UNIFORM APPLICATION OF THE TAX LAWS

The panel's decision stands in stark contrast to the Court's prior decision in *Xilinx*. The two cases raise the same issue: whether "related companies engaged in a joint venture to develop intangible property must include the value of certain stock option compensation one participant gives to its employees in the pool of costs to be shared under a cost sharing agreement." 598 F.3d at 1192. Although *Xilinx* concerned the 1995 regulation, and this case concerns the 2003 regulation, the government took the same position in both cases, requiring related parties to share stock-based compensation even though it had no evidence that unrelated parties would do so.

Yet the *Xilinx* Court and the panel here applied different reasoning and reached the opposite results. The *Xilinx* Court applied the settled arm's-length standard and recognized that the government could not

require related parties to share stock-based compensation when unrelated parties operating at arm's length would not do so. 598 F.3d at 1194, 1196. The panel in this case allowed the agency to "do away with" arm's-length evidence in favor of its own belief about what items should be shared. Op. 31.

If the panel had applied the reasoning in *Xilinx*, it would have upheld the Tax Court's determination that the regulation is arbitrary and capricious. *See* Op. 78 (O'Malley, J., dissenting). This Court should grant rehearing *en banc* to reconcile those divergent decisions.

*En banc* review also is warranted because the panel's decision threatens the uniform application of the tax laws. In a 15-0, unanimous decision, the Tax Court concluded that the 2003 regulation is invalid. T.C. Op. 69. The Tax Court has nationwide jurisdiction, and it is not bound by the panel's decision in cases outside this Circuit. *See Golsen v. Comm'r*, 54 T.C. 742, 757 (1970). In a case arising in a different Circuit, the Tax Court undoubtedly would apply its unanimous view that the regulation is invalid. *See, e.g.*, *Pine Mountain Preserve, LLLP v. Comm'r*, No. 8956-13, 2018 WL 6841801, at *14 (T.C. Dec. 27, 2018).

The result is that taxpayers in California almost certainly will be treated differently from taxpayers in Massachusetts, Illinois, and Texas, simply because of geography. That is not a mere theoretical possibility; companies from each of those States have reported that they are affected by the issue in this case.[2]

## IV. THE STOCK-BASED COMPENSATION ISSUE IS EXCEPTIONALLY IMPORTANT

Whether related parties must share stock-based compensation is an important and recurring issue. The issue already has been to this Court twice in less than ten years. Many interested parties filed amicus briefs in both cases, demonstrating the importance of the issue. *See* Nos. 06-74246, 06-74269 Docket (five *amicus* briefs in *Xilinx*); Nos. 16-70496, 16-70497 Docket (nine *amicus* briefs in this case).

This issue affects a wide range of companies across the United States, including companies in the software, finance, chemistry, semiconductor, biotechnology, and manufacturing industries. SIIA

---

[2] *See, e.g.*, Tripadvisor, Inc., Form 10-K at 107 (Feb. 17, 2017) (Massachusetts company reporting $19 million at stake); Groupon, Inc., Form 10-K at 79 (Feb. 12, 2016) (Illinois company reporting $14 million at stake); Silicon Laboratories Inc., Form 10-K at 46 (Feb. 5, 2016) (Texas company reporting $29.6 million at stake).

*Amicus* Br. 1-5. Many publicly-held companies have mentioned the stock-based compensation issue in their annual reports to the SEC. *See* App. C. And many more companies no doubt are affected as well. *See* SIIA *Amicus* Br. 5-6 (explaining that all companies with cross-border operations potentially are impacted by this case).

Further, the dollar amounts involved are enormous. The issue affects tax years 2004 to the present.[3] Billions of dollars are at stake.[4] In light of the overwhelming importance of this case, this Court should grant rehearing *en banc*.

---

[3] Although Treasury promulgated new cost-sharing regulations in 2011, *see* Section 482: Methods to Determine Taxable Income in Connection With a Cost Sharing Agreement, 76 Fed. Reg. 80,082 (Dec. 22, 2011), the new stock-based compensation rule is materially the same as the 2003 regulation. *Compare* 26 C.F.R. § 1.482-7(d)(3) (current version), *with id.* § 1.482-7(d)(2) (2003).

[4] *See, e.g.*, Peter J. Connors et al., *A Second Bite at the APA:* Altera*'s Rehearing and the Potential Invalidity of Cost-Sharing Regulations*, Bloomberg Daily Tax Report (Oct. 31, 2018). Indeed, one company alone reported $4.4 billion at stake. *See* Alphabet Inc., Form 10-K at 78 (Feb. 3, 2017).

## CONCLUSION

The Court should grant rehearing *en banc* and affirm the decision of the Tax Court.

Respectfully submitted,

Dated: July 22, 2019

/s/ *Nicole A. Saharsky*

Nicole A. Saharsky
Brian D. Netter
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

Donald M. Falk
MAYER BROWN LLP
3000 El Camino Real #300
Palo Alto, CA 94306
(650) 331-2000

Thomas Kittle-Kamp
William G. McGarrity
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600

Ginger D. Anders
MUNGER TOLLES & OLSON LLP
1155 F Street NW
Washington, DC 20004
(202) 220-1100

Mark R. Yohalem
MUNGER TOLLES & OLSON LLP
350 S. Grand Avenue
Los Angeles, CA 90071
(213) 683-9100

A. Duane Webber
Phillip J. Taylor
Joseph B. Judkins
BAKER & MCKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
(202) 452-7000

*Counsel for Petitioner-Appellee*

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Fed. R. App. P. 32(a) and Ninth Cir. R. 32-1, the undersigned hereby certifies that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 4,200 words, exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B).

2. The brief has been prepared in proportionally-spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word-count feature of this word-processing system in preparing this certificate.

July 22, 2019

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky
*Counsel for Petitioner-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 22, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

July 22, 2019

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky
*Counsel for Petitioner-Appellee*

# APPENDIX A

## Panel's Opinion

**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| ALTERA CORPORATION & SUBSIDIARIES, *Petitioner-Appellee*, <br> v. <br> COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant.* | Nos. 16-70496 <br> 16-70497 <br><br> Tax Ct. Nos. <br> 6253-12 <br> 9963-12 <br><br> OPINION |

Appeal from Decisions of the
United States Tax Court

Argued and Submitted October 16, 2018
San Francisco, California

Filed June 7, 2019

Before: Sidney R. Thomas, Chief Judge, and Susan P. Graber[*] and Kathleen M. O'Malley,[**] Circuit Judges.

Opinion by Chief Judge Thomas;
Dissent by Judge O'Malley

---

[*] The Honorable Stephen R. Reinhardt was originally assigned to this panel. Following his death, the Honorable Susan P. Graber was drawn by lot to replace him on the panel.

[**] The Honorable Kathleen M. O'Malley, United States Circuit Judge for the U.S. Court of Appeals for the Federal Circuit, sitting by designation.

## SUMMARY[***]


### Tax

The panel reversed a decision of the Tax Court that 26 C.F.R. § 1.482-7A(d)(2), under which related entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements, was invalid under the Administrative Procedure Act.

At issue was the validity of the Treasury regulations implementing 26 U.S.C. § 482, which provides for the allocation of income and deductions among related entities. The panel first held that the Commissioner of Internal Revenue did not exceed the authority delegated to him by Congress under 26 U.S.C. § 482. The panel explained that § 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QCSA. The panel held that the Treasury reasonably interpreted § 482 as an authorization to require internal allocation methods in the QCSA context, provided that the costs and income allocated are proportionate to the economic activity of the related parties, and concluded that the regulations are a reasonable method for achieving the results required by the statute. Accordingly, the regulations were entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).


[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next held that the regulations at issue were not arbitrary and capricious under the Administrative Procedure Act.

Dissenting, Judge O'Malley would find, as the Tax Court did, that 26 C.F.R. § 1.482-7A(d)(2) is invalid as arbitrary and capricious.

---

**COUNSEL**

Arthur T. Catterall (argued), Richard Farber, and Gilbert S. Rothenberg, Attorneys; Travis A. Greaves, Deputy Assistant Attorney General; Richard E. Zuckerman, Principal Deputy Assistant Attorney General; Tax Division, United States Department of Justice, Washington, D.C.; for Respondent-Appellant.

Donald M. Falk (argued), Mayer Brown LLP, Palo Alto, California; Thomas Kittle-Kamp and William G. McGarrity, Mayer Brown LLP, Chicago, Illinois; Brian D. Netter and Travis Crum, Mayer Brown LLP, Washington, D.C.; A. Duane Webber, Phillip J. Taylor, and Joseph B. Judkins, Baker & McKenzie LLP, Washington, D.C.; for Petitioner-Appellee.

Susan C. Morse, University of Texas School of Law, Austin, Texas; Stephen E. Shay and Allison Bray, Certified Law Students, Harvard Law School, Cambridge, Massachusetts; for Amici Curiae J. Richard Harvey, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noël Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Michael Knoll, Rebecca Kysar, Leandra Lederman, Zachary Liscow, Ruth Mason, Susan Morse, Daniel Shaviro, Stephen

Shay, John Steines, David Super, Clinton Wallace, and Bret Wells.

Jonathan E. Taylor, Gupta Wessler PLLC, Washington, D.C.; Clint Wallace, Vanderbilt Hall, New York, New York; for Amici Curiae Anne Alstott, Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noel Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Sally Katzen, Edward Kleinbard, Michael Knoll, Rebecca Kysar, Zachary Liscow, Daniel Shaviro, John Steines, David Super, Clint Wallace, and George Yin.

Larissa B. Neumann, Ronald B. Schrotenboer, and Kenneth B. Clark, Fenwick & West LLP, Mountain View, California, for Amicus Curiae Xilinx Inc.

Christopher J. Walker, The Ohio State University Moritz College of Law, Columbus, Ohio; Kate Comerford Todd, Steven P. Lehotsky, and Warren Postman, U.S. Chamber Litigation Center, Washington, D.C.; for Amicus Curiae Chamber of Commerce of the United States of America.

John I. Forry, San Diego, California, for Amicus Curiae TechNet.

Alice E. Loughran, Michael C. Durst, and Charles G. Cole, Steptoe & Johnson LLP, Washington, D.C.; Bennett Evan Cooper, Steptoe & Johnson LLP, Phoenix, Arizona; for Amici Curiae Software and Information Industry Association, Financial Executives International, Information Technology Industry Council, Silicon Valley Tax Directors Group, Software Finance and Tax Executives Counsel, National Association of Manufacturers, American Chemistry Council, BSA | the Software Alliance, National Foreign Trade

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 37 of 197



Council, Biotechnology Innovation Organization, Computing Technology Industry Association, The Tax Council, United States Council for International Business, Semiconductor Industry Association.

Kenneth P. Herzinger and Eric C. Wall, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Peter J. Connors, Orrick Herrington & Sutcliffe LLP, New York, New York; for Amici Curiae Charles W. Calomiris, Kevin H. Hassett, and Sanjay Unni.

Roderick K. Donnelly and Neal A. Gordon, Morgan Lewis & Bockius LLP, Palo Alto, California; Thomas M. Peterson, Morgan Lewis & Bockius LLP, San Francisco, California; for Amicus Curiae Cisco Systems Inc.

Christopher Bowers, David Foster, Raj Madan, and Royce Tidwell, Skadden Arps Slate Meagher & Flom LLP, Washington, D.C.; Nathaniel Carden, Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois; for Amicus Curiae Amazon.com Inc.

## OPINION

THOMAS, Chief Judge:

This appeal presents the question of the validity of 26 C.F.R. § 1.482-7A(d)(2),[1] under which related business entities must share the cost of employee stock compensation in order for their cost-sharing arrangements to be classified as qualified cost-sharing arrangements ("QCSA"). Although the case appears complex, the dispute between the Department of the Treasury and the taxpayer is relatively straightforward. The parties agree that, under the governing tax statute, the "arm's length" standard applies; but they disagree about how the standard may be met. The taxpayer argues that Treasury must employ a specific method to meet the arm's length standard: a comparability analysis using comparable transactions between unrelated business entities. Treasury disagrees that the arm's length standard requires the specific comparability *method* in all cases. Instead, the standard generally requires that Treasury reach an arm's length *result* of tax parity between controlled and uncontrolled business entities. With respect to the transactions at issue here, the governing statute allows Treasury to apply a purely internal method of allocation, distributing the costs of employee stock options in proportion to the income enjoyed by each related taxpayer.

Our task, of course, is not to assess the better tax policy, nor the wisdom of either approach, but rather to examine

[1] The 2003 amendments are at issue. Although they are still in effect, the Tax Code has been reorganized, and what was § 1.482-7 in 2003 is now numbered § 1.482-7A. To minimize confusion, our citations are to the current version of the regulation unless otherwise specified.

whether Treasury's regulations are permitted under the statute. Applying the familiar tools used to examine administrative agency regulations, we conclude that the regulations withstand scrutiny. Therefore, we reverse the judgment of the Tax Court.

## I

For many years, Congress and the Treasury have been concerned with American businesses avoiding taxes through the creation and use of related business entities. In the last several decades, Congress has directed particular attention to the potential for tax abuse by multinational corporations with foreign subsidiaries. If, for example, the parent business entity is in a high-tax jurisdiction, and the foreign subsidiary is in a low-tax jurisdiction, the business enterprise can shift costs and revenue between the related entities so that more taxable income is allocated to the lower tax jurisdiction. Similarly, a parent and foreign subsidiary can enter into significant tax-avoiding cost sharing arrangements.

This potential for tax abuse is generally not present when similar transactions occur between unrelated business entities. In those instances, each separate unrelated entity has the incentive to maximize profit, and thus to allocate costs and income consistent with economic realities. However, among related parties, those incentives do not exist. Rather, among related parties, after-tax maximization of profit may depend on how costs and income are allocated between the parent and the subsidiary regardless of economic reality, given that after-tax profits are commonly shared.

The concern about tax avoidance through the use of related business entities is not new. In the Revenue Act of

1928, Congress granted the Secretary of the Treasury the authority to reallocate the reported income and costs of related businesses "in order to prevent evasion of taxes or clearly to reflect the income of any such trades or businesses." Revenue Act of 1928, ch. 852, § 45, 45 Stat. 791, 806. This statute was designed to give Treasury the flexibility it needed to prevent transaction-shuffling between related entities for the purpose of decreasing tax liability. *See* H.R. REP. NO. 70-2, at 16–17 (1927) ("[T]he Commissioner may, in the case of two or more trades or businesses owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking'), and in order clearly to reflect their true tax liability."); *accord* S. REP. NO. 70-960, at 24 (1928). The purpose of the statute was "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting 26 C.F.R. § 1.482-1(b)(1) (1971)). In short, the primary aim of the statute was to prevent tax evasion by related business taxpayers.[2]

In 1934, the Commissioner adopted regulations implementing the statute and first adopted the familiar "arm's length" standard: "The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer." Treas. Reg. 86, art. 45-1(b) (1935). In the context of a controlled transaction,

[2] An important, but secondary purpose was to avoid double taxation of multi-national corporations, which the United States effected through various tax treaties. *See, e.g.*, Convention Concerning Double Taxation, Fr.-U.S., art. IV, Apr. 27, 1932, 49 Stat. 3145.

the arm's length standard is satisfied "if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)." 26 C.F.R. § 1.482-1(b)(1). The relevant regulation also noted: "However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances." *Id.*

Although the Secretary adopted the arm's length standard, courts did not hold related parties to that standard by exclusively requiring the examination of comparable transactions. For example, in *Seminole Flavor Co. v. Commissioner*, the Tax Court rejected a strict application of the arm's length standard in favor of an inquiry into whether the allocation of income between related parties was "fair and reasonable." 4 T.C. 1215, 1232 (1945); *see also id.* at 1233 ("Whether any such business agreement would have been entered into by petitioner with total strangers is wholly problematical."); *Grenada Indus., Inc. v. Comm'r*, 17 T.C. 231, 260 (1951) ("We approve an allocation . . . to the extent that such gross income in fact exceeded the fair value of the services rendered . . . ."). And in 1962, we collected various allocation standards and outright rejected the superiority of the arm's length bargaining analysis over all others:

> [W]e do not agree . . . that "arm's length bargaining" is the sole criterion for applying the statutory language of [26 U.S.C. § 482] in determining what the "true net income" is of each "controlled taxpayer." Many decisions have been reached under [§ 482] without

> reference to the phrase "arm's length bargaining" and without reference to Treasury Department Regulations and Rulings which state that the talismanic combination of words—"arm's length"—is the "standard to be applied in every case."

*Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962).

*Frank* noted that "it was not any less proper . . . to use here the 'reasonable return' standard than it was for other courts to use 'full fair value,' 'fair price including a reasonable profit,' 'method which seems not unreasonable,' 'fair consideration which reflects arm's length dealing,' 'fair and reasonable,' 'fair and reasonable' or 'fair and fairly arrived at,' or 'judged as to fairness,' all used in interpreting [the statute]." *Id.* (footnotes omitted). We later limited *Frank* to situations in which "it would have been difficult for the court to hypothesize an arm's-length transaction." *Oil Base, Inc. v. Comm'r*, 362 F.2d 212, 214 n.5 (9th Cir. 1966). However, *Frank*'s central point remained: the arm's length standard based on comparable transactions was not the *sole* basis of reallocating costs and income under the statute.

In the 1960s, the problem of abusive transfer pricing practices created a new adherence to a stricter arm's length standard. In response to concerns about the undertaxation of multinational business entities, Congress considered reworking the Tax Code to resolve the difficulty posed by the application of the arm's length standard to related party transactions. H.R. REP. No. 87-1447, at 28–30 (1962). However, it instead asked Treasury to "explore the possibility of developing and promulgating regulations . . . which would

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 43 of 197



provide additional guidelines and formulas for the allocation of income and deductions" under 26 U.S.C. § 482. H.R. REP. NO. 87-2508, at 19 (1962) (Conf. Rep.), *as reprinted in* 1962 U.S.C.C.A.N. 3732, 3739. Legislators believed that § 482 authorized the Secretary to employ a profit-split allocation method without amendment. *Id.*; H.R. REP. No. 87-1447, at 28–29. In 1968, following Congress's entreaty, Treasury finalized the first regulation tailored to the issue of intangible property development in QCSAs. 26 C.F.R. § 1.482-2(d) (1968).

The 1968 regulations "constituted a radical and unprecedented approach to the problem they addressed—notwithstanding their being couched in terms of the 'arm's length standard,' and notwithstanding that that standard had been the nominal standard under the regulations for some 30 years." Stanley I. Langbein, *The Unitary Method and the Myth of Arm's Length*, 30 TAX NOTES 625, 644 (1986). In addition to three arm's length pricing methods, the 1968 regulations included a "fourth method," which was essentially open-ended: "Where none of the three methods of pricing . . . can reasonably be applied under the facts and circumstances as they exist in a particular case, some appropriate method of pricing other than those described . . . , or variations on such methods, can be used." 26 C.F.R. § 1.482-2(e)(1)(iii) (1968).

Following the promulgation of the 1968 regulation, courts continued to employ a comparability analysis, but not to the exclusion of other methodologies. Reuven S. Avi-Yonah, *The Rise & Fall of Arm's Length: A Study in the Evolution of U.S. International Taxation*, 15 VA. TAX REV. 89, 108–29 (1995). Indeed, a study determined that direct comparable transactions were located and applied in only 3% of the

Internal Revenue Service's adjustments prior to the 1986 amendment. U.S. GEN. ACCOUNTING OFFICE., GGD-81-81, IRS COULD BETTER PROTECT U.S. TAX INTERESTS IN DETERMINING THE INCOME OF MULTINATIONAL CORPORATIONS (1981). The decades following the 1968 regulations involved

> a gradual realization by all parties concerned, but especially Congress and the IRS, that the [comparability method of meeting the arm's length standard], firmly established . . . as the sole standard under section 482, did not work in a large number of cases, and in other cases its misguided application produced inappropriate results. The result was a deliberate decision to retreat from the standard while still paying lip service to it.

Avi-Yonah, *supra*, at 112; *see also* James P. Fuller, *Section 482: Revisited Again*, 45 TAX L. REV. 421, 453 (1990) ("[T]he 1986 Act's commensurate with income standard is not really a new approach to § 482.").

Ultimately, as controlled transactions increased in frequency and complexity, particularly with respect to intangible property, Congress determined that legislative action was necessary. The Tax Reform Act of 1986 reflected Congress's view that strict adherence to the comparability method of meeting the arm's length standard prevented tax parity. Thus, the Tax Reform Act of 1986 added a sentence to § 482 that largely forms the basis of the present dispute, providing that:

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 45 of 197



> In the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Tax Reform Act of 1986, 26 U.S.C. § 482 (1986) (as amended 2018).

The House Ways and Means Committee recommended the addition of the commensurate with income clause because it was "concerned" that the current code and regulations "may not be operating to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles." H.R. REP. NO. 99-426, at 423 (1985). The clause was intended to correct a "recurrent problem"—"the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." *Id.* at 423–24.

The House Report makes clear that the committee intended the commensurate with income standard to displace a comparability analysis where comparable transactions cannot be found:

> A fundamental problem is the fact that the relationship between related parties is different from that of unrelated parties. . . . [M]ultinational companies operate as an economic unit, and not "as if" they were unrelated to their foreign subsidiaries. . . .
>
> . . . .

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 46 of 197



> Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. While the committee is concerned that such decisions may unduly emphasize the concept of comparables even in situations involving highly standardized commodities or services, it believes that such an approach is sufficiently troublesome where transfers of intangibles are concerned that a statutory modification to the intercompany pricing rules regarding transfers of intangibles is necessary.
>
> . . . .
>
> . . . There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income attributable to the intangible. . . .
>
> . . . .

> . . . [T]he committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangible transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms.

*Id.* at 424–25 (footnote and citation omitted).[3]

Treasury's first response to the Tax Reform Act was the "White Paper," an intensive study published in 1988. *A Study of Intercompany Pricing Under Section 482 of the Code*, I.R.S. Notice 88-123, 1988-2 C.B. 458 ("White Paper"). The White Paper confirmed that Treasury believed the commensurate with income standard to be consistent with the arm's length standard (and that Treasury understood Congress to share that understanding). *Id.* at 475. Treasury wrote that a comparability analysis must be performed where possible, *id.* at 474, but it also suggested a "clear and convincing evidence" standard for comparable transactions, indicating that a comparability analysis would rarely be possible. *Id.* at 478.

---

[3] The Conference Committee suggested only one change—to broaden the sweep of the amendment so as to encompass domestic related-party transactions—in order to better serve the objective of the amendment, "that the division of income between related parties reasonably reflect the relative economic activity undertaken by each." H.R. REP. NO. 99-841, at II-637 (1986) (Conf. Rep.), *as reprinted in* 1986 U.S.C.C.A.N. 4075, 4725. The Report also clarified that cost-sharing arrangements would not generally be subject to § 482 allocations—but only "if and to the extent . . . the income allocated among the parties reasonably reflect the actual economic activity undertaken by each." *Id.* at II-638.

The White Paper signaled a shift in the interpretation of the arm's length standard as it had been defined following the 1968 regulations. Treasury advanced a new allocation method, the "basic arm's length return method," White Paper at 488, that would apply only in the absence of comparable transactions and would essentially split profits between the related parties, *id.* at 490. Commentators understood that, by attempting to synthesize the arm's length standard and the commensurate with income provision, Treasury was moving away from a view that the arm's length standard always requires a comparability analysis. Marc M. Levey, Stanley C. Ruchelman, & William R. Seto, *Transfer Pricing of Intangibles After the Section 482 White Paper*, 71 J. TAX'N 38, 38 (1989); Josh O. Ungerman, Comment, *The White Paper: The Stealth Bomber of the Section 482 Arsenal*, 42 SW. L.J. 1107, 1128–29 (1989).

In 1994 and 1995, Treasury issued new regulations that defined the arm's length standard as result-oriented, meaning that the goal is parity in *taxable income* rather than parity in the method of allocation itself. 26 C.F.R. § 1.482-1(b)(1) (1994) ("A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result)."). However, the arm's length standard remained "the standard to be applied in every case." *Id.*

The regulations also set forth methods by which income could be allocated among related parties in a manner consistent with the arm's length standard. *Id.* § 1.482-1(b)(2)(i) (1994). According to Treasury, the 1994 regulations defined the arm's length standard in terms of "the

results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997-01, 48,998 (proposed July 29, 2002).

The 1995 regulation provided that "[i]ntangible development costs" included "all of the costs incurred by [a controlled] participant related to the intangible development area." 26 C.F.R. § 1.482-7(d)(1) (1995). By contrast to the 1994 regulation, the 1995 regulation—consistent with the 1986 Conference Report —"implement[ed] the commensurate with income standard in the context of cost sharing arrangements" by "requir[ing] that controlled participants in a [QCSA] share all costs incurred that are related to the development of intangibles in proportion to their shares of the reasonably anticipated benefits attributable to that development." Compensatory Stock Options Under Section 482, 67 Fed. Reg. at 48,998.

Neither the Tax Reform Act nor the implementing regulations specifically addressed allocation of employee stock compensation, which is the issue in this dispute. However, that omission was unsurprising given that the practice did not develop on a major scale until the 1990s. Zvi Bodie, Robert S. Kaplan, & Robert C. Merton, *For the Last Time: Stock Options Are an Expense*, HARV. BUS. REV., Mar. 2003, at 62, 67. Beginning in 1997, the Secretary interpreted the "all . . . costs" language to include stock-based compensation, meaning that controlled taxpayers had to share the costs (and associated deductions) of providing employee stock compensation. *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1193–94 (9th Cir. 2010).

In 2003, Treasury issued the cost-sharing regulations that are challenged in this case. Treasury intended for the 2003 amendments to clarify, rather than to overhaul, the 1994 and 1995 regulations. The clarifications were twofold. First, the amendments directly classified employee stock compensation as a cost to be allocated between QCSA participants. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998; 26 C.F.R. § 1.482-7A(d)(2). Second, the "coordinating amendments" clarified Treasury's belief that the cost-sharing regulations, including § 1.482-7A(d)(2), operate to produce an arm's length result. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,998; 26 C.F.R. § 1.482-7A(a)(3).

Specifically, § 1.482-7A provides that costs shared by related parties to a QCSA are not subject to IRS reallocation for tax purposes if each entity's share of the intangible property development costs equals each entity's reasonably anticipated benefits. Section 1.482-7A(a)(3) incorporates and coordinates with the arm's length standard:

> A qualified cost sharing arrangement produces results that are consistent with an arm's length result . . . if, and only if, each controlled participant's share of the costs (as determined under paragraph (d) of this section) of intangible development under the qualified cost sharing arrangement equals its share of reasonably anticipated benefits attributable to such development . . . .

Section 1.482-7A(d)(2) provides that parties to a QCSA must allocate stock-based compensation between themselves:

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 51 of 197



> [In a QCSA], a controlled participant's operating expenses include all costs attributable to compensation, including stock-based compensation. As used in this section, the term stock-based compensation means any compensation provided by a controlled participant to an employee or independent contractor in the form of equity instruments, options to acquire stock (stock options), or rights with respect to (or determined by reference to) equity instruments or stock options, including but not limited to property to which section 83 applies and stock options to which section 421 applies, regardless of whether ultimately settled in the form of cash, stock, or other property.

These regulations, and the procedure employed in adopting them, form the basis of the present controversy.

II

At issue is Altera Corporation ("Altera") & Subsidiaries' tax liability for the years 2004 through 2006. During the relevant period, Altera and its subsidiaries designed, manufactured, marketed, and sold programmable logic devices, which are electronic components that are used to build circuits.

In May of 1997, Altera entered into a cost-sharing agreement with one of its foreign subsidiaries, Altera International, Inc., a Cayman Islands corporation ("Altera International"), which had been incorporated earlier that year. Altera granted to Altera International a license to use and

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 52 of 197



exploit Altera's preexisting intangible property everywhere in the world except the United States and Canada. In exchange, Altera International paid royalties to Altera. The parties agreed to pool their resources to share research and development ("R&D") costs in proportion to the benefits anticipated from new technologies. The question in this appeal is whether Treasury was permitted, for tax liability purposes, to re-allocate the cost of employee stock-based compensation.

Altera and the IRS agreed to an Advance Pricing Agreement covering the 1997–2003 tax years. Pursuant to this agreement, Altera shared with Altera International stock-based compensation costs as part of the shared R&D costs. After the Treasury regulations were amended in 2003, Altera and Altera International amended their cost-sharing agreement to comply with the modified regulations, continuing to share employee stock compensation costs.

The agreement was amended again in 2005 following the Tax Court's opinion in *Xilinx Inc. & Consolidated Subsidiaries v. Commissioner*, which involved a challenge to the 1994–1995 cost-sharing regulations. 125 T.C. 37 (2005). The parties agreed to "suspend the payment of any portion of [a] Cost Share . . . to the extent such payment relates to the Inclusion of Stock-Based Compensation in R&D Costs" unless and until a court upheld the validity of the 2003 cost-sharing regulations. The following provision explains Altera's reasoning:

> The Parties believe that it is more likely than not that (i) the Tax Court's conclusion in *Xilinx v. Commissioner*, 125 T.C. [No.] 4 (2005), that the arm's length standard controls

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 53 of 197



> the determination of costs to be shared by controlled participants in a qualified cost sharing arrangement should also apply to Treas. Reg. § 1.482-7(d)(2) (as amended by T.D. 9088), and (ii) the Parties' inclusion of Stock-Based Compensation in R&D Costs pursuant to Amendment I would be contrary to the arm's length standard.

Altera and its U.S. subsidiaries did not account for R&D-related stock-based compensation costs on their consolidated 2004–2007 federal income tax returns. The IRS issued two notices of deficiency to the group, applying § 1.482-7(d)(2) to increase the group's income by the following amounts:

| | |
|---|---|
| 2004 | $ 24,549,315 |
| 2005 | $ 23,015,453 |
| 2006 | $ 17,365,388 |
| 2007 | $ 15,463,565 |

Altera timely filed petitions in the Tax Court. The parties filed cross-motions for summary judgment, and the Tax Court granted Altera's motion. Sitting en banc, the Tax Court held that § 1.482-7A(d)(2) is invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *Altera Corp. & Subsidiaries v. Comm'r*, 145 T.C. 91 (2015).

The Tax Court unanimously determined: (1) that the Commissioner's allocation of income and expenses between related entities must be consistent with the arm's length standard; and (2) that the arm's length standard is not met unless the Commissioner's allocation can be compared to an

actual transaction between unrelated entities. The Tax Court reasoned that the Commissioner could not require related parties to share stock compensation costs, because the Commissioner had not considered any unrelated party transactions in which the parties shared such costs. The Tax Court held that the agency's decisionmaking process was fundamentally flawed because: (1) it rested on speculation rather than on hard data and expert opinions; and (2) it failed to respond to significant public comments, particularly those pointing out uncontrolled cost-sharing arrangements in which the entities did not share stock compensation costs. *Id.* at 133–34.

The Tax Court's decision rested largely on its own opinion in *Xilinx*, in which it determined that the arm's length standard mandates a comparability analysis. *Id.* at 118 (citing *Xilinx*, 125 T.C. at 53–55). In its decision in this case, as well, the Tax Court suggested that the Commissioner cannot require related entities to share stock compensation costs unless and until the Commissioner locates uncontrolled transactions in which these costs are shared. *Id.* at 118–19.

The Tax Court reached five holdings: (1) the 2003 amendments constitute a final legislative rule subject to the requirements of the APA; (2) *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), provides the appropriate standard of review because the standard set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), incorporates *State Farm*'s " reasoned decisionmaking" standard; (3) Treasury did not support adequately its decision to allocate the costs of employee stock compensation between related parties;

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 55 of 197



(4) Treasury's procedural regulatory deficiencies were not harmless;[4] and (5) § 1.482-7A(d)(2) is invalid under the APA.

III

Our task in this appeal, then, is to determine whether Treasury's 2003 regulations are lawful. In the context of the arguments made in this case, we evaluate the validity of the agency's regulations under both *Chevron* and *State Farm*, which "provide for related but distinct standards for reviewing rules promulgated by administrative agencies." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521 (2d Cir. 2017). "*State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process." *Id.* "*Chevron*, by contrast, is generally used to evaluate whether the conclusion reached as a result of that process—an agency's interpretation of a statutory provision it administers—is reasonable." *Id.*[5] "A litigant challenging a rule may challenge it under *State Farm*, *Chevron*, or both."

[4] On appeal, the Commissioner does not claim that any error in the decisionmaking process, if it existed, was harmless. Thus, we decline to address the issue.

[5] There are circumstances when the two analyses may overlap. *See, e.g.*, *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 561 (D.C. Cir. 2016) (We are mindful that, "[i]n [some] situations, what is 'permissible' under *Chevron* is also reasonable under *State Farm*." (quoting *Arent v. Shalala*, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995))).

*Id.* Altera challenges both the procedural adequacy of the APA process and the substance of the regulation.[6]

A

We first turn to *Chevron* analysis.

1

Under *Chevron*, we first apply the traditional rules of statutory construction to determine whether "Congress has directly spoken to the precise question at issue." 467 U.S. at 842. We start with the plain statutory text and, "when deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

In addition, we examine the legislative history, the statutory structure, and "other traditional aids of statutory interpretation" in order to ascertain congressional intent.

[6] We afforded the parties the opportunity to file optional supplemental briefs on the question whether the six-year statute of limitations under 28 U.S.C. § 2401(a)—which generally applies to procedural challenges to regulations under the APA—applies to this case. The Commissioner responded that it had waived this non-jurisdictional defense by failing to assert it to the Tax Court. We agree with the parties that the Commissioner waived the defense. *Day v. McDonough*, 547 U.S. 198, 210 n.11 (2006) ("[S]hould a State intelligently choose to waive a statute of limitations defense, a district court would not be at liberty to disregard that choice."); *Whidbee v. Pierce County*, 857 F.3d 1019, 1024 (9th Cir. 2017) ("[E]ven if a claim has expired under a state statute of limitations, a defendant can still waive this affirmative defense."). Therefore, we need not address it.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 57 of 197



*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). If, after conducting that *Chevron* step one examination, we conclude that the statute is silent or ambiguous on the issue, we then defer to the agency's interpretation so long as it "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. A permissible construction is one that is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

Ultimately, questions of deference boil down to whether "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). "When Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 227 (quoting *Chevron*, 467 U.S. at 843–44).

Here, the resolution of our step one *Chevron* examination is straightforward. Section 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QCSA. Thus, there is no question that the statute remains ambiguous regarding the method by which Treasury is to make allocations based on stock-based compensation.

Altera argues that the statute, by its terms, cannot apply to stock-based compensation. According to Altera, stock-

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 58 of 197



based compensation is not "transferred" between parties because only preexisting intangibles can be transferred. Thus, for Altera, Treasury has exceeded the delegation of authority apparent from the plain text of the statute.

We are not persuaded. When parties enter into a QCSA, they are *transferring* future distribution rights to intangibles, albeit intangibles that have yet to be developed. Indeed, the present-day transfer of those rights provides the main incentive for entering into a QCSA. The right to distribute intangibles to be developed later is, itself, one right in the bundle of property rights that exists at the time that parties enter into a QCSA.

Moreover, even assuming that the crucial transfer does not occur contemporaneously, § 482 applies "[i]n the case of *any* transfer . . . of intangible property" that produces income. (Emphasis added.) That phrasing is as broad as possible, and it cannot reasonably be read to exclude the transfers of expected intangible property. *See, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning . . . ."); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009) ("Of course the word 'any' (in the phrase 'any other provision of law') has an 'expansive meaning, giving us no warrant to limit the class of provisions of law [encompassed by the statutory provision]." (citation omitted)). Additionally, the sentence necessarily is forward-looking because the production of taxable income always follows the transfer.

In short, the text of the statute does not limit its application to preexisting intangibles in the way Altera's argument suggests. Because parties to a QCSA transfer cost-

shared intangibles—including stock-based compensation—they are subject to regulation under 26 U.S.C. § 482.

2

Thus, we must move on to *Chevron* step two to consider whether Treasury's interpretation of § 482 as to allocation of employee stock option costs is permissible. An agency's interpretation of statutory authority is examined "in light of the statute's text, structure and purpose." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). The interpretation fails if it is "unmoored from the purposes and concerns" of the underlying statutory regime. *Judulang v. Holder*, 565 U.S. 42, 64 (2011). Thus, Congress's purpose in enacting and amending § 482 in 1986 is key to resolution of this issue.

The congressional purpose in enacting § 482 was to establish tax parity. *First Sec. Bank of Utah*, 405 U.S. at 400. In the 1986 amendments, Congress called for an approach to allocation of costs and income that would "reasonably reflect the actual economic activity undertaken by each [party to a QCSA]," H.R. REP. No. 99-841, at II-638 (1986) (Conf. Rep.). Put another way, Congress's objective in amending § 482 was to ensure that income follows economic activity. *Id.* at II-637. Although the 1986 amendment delegates to Treasury the choice of a specific methodology to achieve that end, it suggested: "In the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." This standard is a purely internal one, that is, internal to the entity being taxed, and evidence supports Treasury's belief that Congress intended it to be. H.R. REP. NO. 99-426, at 423–35; H.R. REP. NO.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 60 of 197



99-841, at II-637 (Conf. Rep.). In the QCSA context, Congress did not want to interfere with controlled cost-sharing arrangements, but only to the degree that the allocation of costs and income "reasonably reflect[s] the actual economic activity undertaken by each." H.R. REP. No. 99-841, at II-638 (Conf. Rep.). In light of this history, Treasury's decision to adopt a methodology that followed actual economic activity was reasonable.

So was Treasury's determination that uncontrolled cost-sharing arrangements do not provide helpful guidance regarding allocations of employee stock compensation. When it amended § 482 in 1986, Congress bemoaned the difficulties associated with finding and using data involving high-profit intangibles. *See* H.R. REP. NO. 99-426, at 425 ("There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. . . . [I]t is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation be commensurate with the income attributable to the intangible."); *see also* Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171-02, 51,173 (Aug. 26, 2003) (citing H.R. REP. NO. 99-426, at 423–25) ("As recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles.").[7] It follows that Congress

[7] Although the 2017 amendment to § 482 has no bearing on our analysis, we note that Congress has not changed its mind:

> The transfer pricing rules of section 482 and the accompanying Treasury regulations are intended to preserve the U.S. tax base by ensuring that taxpayers do not shift income properly attributable to the United States to a related foreign company through pricing that

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 61 of 197



granted Treasury authority to develop methods that did not rely on analysis of these problematic comparable transactions. Indeed, Treasury echoed Congress's rationale for amending § 482 in the first place when it published the final rule. *Id.* at 51,173 ("The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.").

What is more, although Altera suggests there can be only one understanding of the methodology required by the arm's length standard, historically the definition of the arm's length standard has been a more fluid one. Indeed, as we have discussed, for most of the twentieth century the arm's length standard explicitly permitted the use of flexible methodology

---

> does not reflect an arm's-length result. . . . The arm's-length standard is difficult to administer in situations in which no unrelated party market prices exist for transactions between related parties. . . .
>
> . . . For income from intangible property, section 482 provides "in the case of any transfer (or license) of intangible property (within the meaning of section 936(h)(3)(B)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." By requiring inclusion in income of amounts commensurate with the income attributable to the intangible, Congress was responding to concerns regarding the effectiveness of the arm's-length standard with respect to intangible property—including, in particular, high-profit-potential intangibles.

H. REP. NO. 115-466, at 574–75 (2017).

in order to achieve an arm's length *result*. *See also* H.R. REP. NO. 87-2508, at 18–19 (1962) (Conf. Rep.) (noting that, in 1962, Congress stated that Treasury should "provide additional guidelines and formulas" to achieve arm's length results). It is true that, more recently, an understanding that the primary means of reaching an arm's length result suggested the analysis of comparable transactions. But, in the lead-up to the 1986 amendments, Congress voiced numerous concerns regarding reliance on this methodology. Further, as we have discussed, courts for more than half a century have held that a comparable transaction analysis was not the exclusive methodology to be employed under the statute. In light of the historic versatility of methodology, it is reasonable that Treasury would understand that Congress intended for it to depart from analysis of comparable transactions as the exclusive means of achieving an arm's length result.

In addition, Treasury reasonably concluded that doing away with analysis of comparable transactions was an efficient means of ensuring that § 482 would "operat[e] to assure adequate allocations to the U.S. taxable entity of income attributable to intangibles in [QCSAs]." H.R. REP. NO. 99-426, at 423. Congress expressed numerous concerns that pre-1986 allocation methods permitted entities to undervalue their tax liability by placing undue emphasis on "the concept of comparables" and basing allocations on industry norms, rather than on actual economic activity. *Id.* at 424–25. Doing away with analysis of comparable transactions, and instead requiring an internal method of allocation, proves a reasonable method of alleviating these concerns.

In sum, Treasury reasonably understood § 482 as an authorization to require internal allocation methods in the QCSA context, provided that the costs and income allocated are proportionate to the economic activity of the related parties. These internal allocation methods are reasonable methods for reaching the arm's length results required by statute. While interpreting the statute to do away with reliance on comparables may not have been "the only possible interpretation" of Congress's intent, it proves a reasonable one. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Thus, Treasury's interpretation is not "arbitrary, capricious, or manifestly contrary to the statute," and it is therefore permissible under *Chevron*. 467 U.S. at 844.

3

Altera contends that the Commissioner misreads § 482 and its history, arguing that the addition of the commensurate with income standard to § 482 did nothing to change the meaning and operation of the arm's length standard, thus rendering Treasury's interpretation unreasonable. Altera supports its argument with a canon of construction: "Amendments by implication, like repeals by implication, are not favored." *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964). That canon does not apply here. It operates to prevent courts from attributing unspoken motives to legislators, not to force courts to ignore legislative action and express legislative history. In addition, cases invoking the maxim typically refer to a later-enacted, *separate* statute or provision amending a previous statute or provision; most cases do not involve changes to the same statute or

provision.[8] It is illogical to argue that amending a singular statute does not alter its meaning.

Altera's interpretation of the 1986 amendment would render the commensurate with income clause meaningless except in two circumstances: (1) to allow the Commissioner periodically to adjust prices initially assigned following a comparability analysis; and (2) to reflect a party's contribution of existing intangible property or "buy-in" to a cost-sharing arrangement. This narrow reading of § 482 is not supported by the text or history of the 1986 amendment.

The Commissioner's allocation of employee stock compensation costs between related parties is necessary for Treasury to fulfill its obligation under § 482. Congress did not intend to interfere with qualified cost-sharing arrangements when those arrangements provided for the allocation of income consistent with the commensurate with income provision. H.R. REP. NO. 99-841, at II-638 (Conf. Rep.).

4

Altera makes much of the United States's treaty obligations with other countries, asserting that a purely internal standard is inconsistent with the standards agreed to

[8] *See, e.g.*, *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 650–52, 664 n.8 (2007) (considering whether a later-enacted provision of the Endangered Species Act could amend a provision of the Clean Water Act); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 134 (1974) (considering whether the Rail Act amended a remedy provided by the Tucker Act); *United States v. Dahl*, 314 F.3d 976, 977–78 (9th Cir. 2002) (considering whether a provision codified as a separate note to an existing statute amended the statute).

therein and is therefore unreasonable. However, there is no evidence that our treaty obligations bind us to the analysis of comparable transactions. As demonstrated by nearly a century of interpreting § 482 and its precursor, the arm's length standard is not necessarily confined to one methodology. It reflects neither how related parties behave nor how they are taxed. Moreover, our most recent treaties incorporate not only the arm's length standard, but also the 2003 regulations. *See, e.g.*, U.S. DEP'T OF TREASURY, TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN THE UNITED STATES AND POLAND FOR THE AVOIDANCE OF DOUBLE TAXATION 31 (2013) ("It is understood that the Code section 482 'commensurate with income' standard for determining appropriate transfer prices for intangibles operates consistently with the arm's-length standard. The implementation of this standard in the regulations under Code section 482 is in accordance with the general principles of paragraph 1 of Article 9 of the Convention . . . .").

B

Though Treasury's interpretation of its statutory grant of authority was reasonable, we also must examine whether the procedures used in its promulgation prove defective under the APA. *Catskill Mountains*, 846 F.3d at 522 ("[I]f an interpretive rule was promulgated in a procedurally defective manner, it will be set aside regardless of whether its interpretation of the statute is reasonable."). After reviewing the administrative record, we conclude that Treasury complied with the procedural requirements of the APA and, therefore, the regulations survive *State Farm* scrutiny.

Section 706 of the APA directs courts to "decide all relevant questions of law, interpret constitutional and

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 66 of 197



statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (flush language). Agencies may not act in ways that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). It "prescribes a three-step procedure for so-called 'notice-and-comment rulemaking.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015) (citing 5 U.S.C. § 553). First, a "[g]eneral notice of proposed rule making" must ordinarily be published in the Federal Register. 5 U.S.C. § 553(b). Second, provided that "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez*, 135 S. Ct. at 1203. Third, the agency must incorporate in the final rule "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

Altera does not dispute that Treasury satisfied the first step by giving notice of the 2003 regulations. *Id.* Nor does there appear to be a controversy as to whether Treasury included in the final rule "a concise general statement of [its] basis and purpose." *Id.*; 5 U.S.C. § 553. Rather, Altera argues that the regulations fail on the second step, asserting that: (1) Treasury improperly rejected comments submitted in opposition to the proposed rule, (2) Treasury's current litigation position is inconsistent with statements made during the rulemaking process, (3) Treasury did not adequately

support its position that employee stock compensation is a cost, and (4) a more searching review is required under *Fox*, because the agency altered its position. We address each in turn.

1

Under *State Farm*, the touchstone of "arbitrary and capricious" review under the APA is "reasoned decisionmaking." *State Farm*, 463 U.S. at 52. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015) (quoting *State Farm*, 463 U.S. at 43). However, we may not set aside agency action simply because the rulemaking process could have been improved; rather, we must determine whether the agency's "path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

In considering and responding to comments, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines*, 371 U.S. at 168). "[A]n agency need only respond to 'significant' comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (quoting *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977) (per

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 68 of 197



curiam)). If the comments ignored by the agency would not bear on the agency's "consideration of the relevant factors," we may not reverse the agency's decision. *Id.*

Treasury published its notice of proposed rulemaking in 2002. Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. 48,997-01. In its notice, Treasury made clear that it was relying on the commensurate with income provision. *Id.* at 48,998. To support its position, Treasury drew from the legislative history of the 1986 amendment, explaining that Congress intended a party to a QCSA to "bear its portion of all research and development costs." *Id.* (quoting H.R. REP. NO. 99-841, at II-638 (Conf. Rep.). It also informed interested parties of its intent to coordinate the new regulations with the arm's length standard, suggesting that it was attempting to synthesize the potentially disparate standards found within § 482 itself. *Id.* at 48,998, 49,000–01.

Commenters responded by attacking the proposed regulations as inconsistent with the traditional arm's length standard because the methodology did not involve analysis of comparable transactions. To support their position, they primarily discussed arm's length agreements in which unrelated parties did not mention employee stock options. They explained that unrelated parties do not share stock compensation costs because it is difficult to value stock-based compensation, and there can be a great deal of expense and risk involved.

In the preamble to the final rule, Treasury dismissed the comments (and, relatedly, the behavior of controlled taxpayers):

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 69 of 197



> Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties . . .). The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each." *See* H.R. CONF. REP. NO. 99-481, at II-638 (1986). . . . [I]n order for a QCSA to reach an arm's length result consistent with legislative intent, the QCSA must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the QCSA. Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.
>
> Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 70 of 197



> length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances. . . . The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

Compensatory Stock Options under Section 482 (Preamble to Final Rule), 68 Fed. Reg. 51,171-02, 51,172–73 (Aug. 26, 2003).

Treasury added:

> Treasury and the IRS believe that if a significant element of [the costs shared by unrelated parties] consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

*Id.* at 51,173.

By submitting the cited transactions between unrelated parties, the commentators apparently assumed that Treasury would employ analysis of comparable transactions. This assumption, however, overlooks Treasury's decision to do away with analysis of comparable transactions in the first place—a decision that was made clear enough by citations to

legislative history in the notice of proposed rulemaking and in the preamble to the final rule. As discussed in our *Chevron* analysis, Treasury's conclusion that it could require parties to a QCSA to share all costs was a reasonable one. Thus, "significant" comments that required a response would have spoken to why this interpretation was not, in fact, reasonable, so that adopting the comments would require Treasury to change the regulation. *Am. Mining Congress*, 965 F.2d at 771. As an example, Treasury would have been required to respond to comments demonstrating that doing away with analysis of comparables did not, in fact, serve the purposes of parity set out in the statute.

Indeed, the cited transactions actually reinforced the original justification for adopting a purely internal methodology—the lack of transactions comparable to those occurring between parties to a QCSA. Specifically, as Treasury remarked, the submitted transactions did not "share enough characteristics of QCSAs involving the development of high-profit intangibles" to provide grounds for accurate comparison. Because of this lack of similar transactions, Treasury justifiably chose to employ methodology that did not depend on non-existent comparables to satisfy the commensurate with income test and achieve tax parity. In this way, the comments reinforced Treasury's premise for adopting the purely internal methodology, but were irrelevant to the underlying choice of methodology. Treasury did not err in refusing to examine them more rigorously.

In sum, we cannot find a failure in Treasury's refusal to consider comments that proved irrelevant to its decisionmaking process. Here, Treasury gave sufficient notice of what it intended to do and why, and the submitted comments were irrelevant to the issues Treasury was

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 72 of 197



considering. Because the comments had no bearing on "relevant factors" to the rulemaking, nor any bearing on the final rule, there was no APA violation. *Am. Mining Congress*, 965 F.2d at 771.

2

Treasury's current litigation position is not inconsistent with the statements it made to support the 2003 regulations at the time of the rulemaking. Altera argues that its position is justified by *SEC v. Chenery Corp.*, 332 U.S. 194 (1947). "[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency." *Id.* at 196. "If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Id.*

Altera argues that the Commissioner cannot now claim that "Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis" because "[n]owhere in the regulatory history did the Secretary suggest that he 'was statutorily authorized to dispense with comparability analysis.'" But these arguments misunderstand the rulemaking requirements imposed by *Chenery*. *Chenery* does not require us to adopt Altera's position as to how the arm's length standard operates. Instead, we must "defer to an interpretation which was a necessary presupposition of [the agency's] decision," if reasonable, even when alternative interpretations are available. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 419–20 (1992).

Treasury reasonably interpreted congressional intent in the 1986 amendments as permitting it to dispense with a

comparable transaction analysis in the absence of actual comparable transactions. Its interpretation was all the more reasonable given, as we have discussed, that the arm's length standard has historically been understood as more fluid than Altera suggests. Because *Chenery* does not require agencies to provide "exhaustive, contemporaneous legal arguments to preemptively defend its action," its references to the 1986 amendments provide an adequate ground for its determination. *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 515 (4th Cir. 2011).

Altera contends further that the Commissioner's position is incompatible with Treasury's statements during the rulemaking process, when the Secretary claimed that the cost-sharing regulations were consistent with the arm's length standard (as well as the commensurate with income standard). This argument misinterprets Treasury's position. Treasury asserted then, and still asserts in this litigation, that using an internal method of reallocation is consistent with the arm's length standard because it attempts to bring parity to the tax treatment of controlled and uncontrolled taxpayers, as does comparison of comparable transactions when they exist. Treasury's position was also consistent with its White Paper,[9] and Treasury's interpretation in the 1994 regulation of the arm's length standard as result-oriented, rather than method-oriented, with the goal of achieving tax parity. 26 C.F.R. § 1.482-1(b)(1) (1994).

[9] Altera argues that a passage in the White Paper, in which Treasury wrote that "intangible income must be allocated on the basis of comparable transactions if comparables exist," demonstrates inconsistency. However, that statement is entirely consistent with Treasury's view that a different methodology must be applied when comparable transactions do *not* exist.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 74 of 197



Altera's argument is founded on its belief that an arm's length analysis always must be method-oriented, and rooted in actual transactional analysis. But the question before us is not which view is superior; it is whether Treasury's position in 2003 was incompatible with its prior position in promulgating the 1994 and 1995 regulations. As we have discussed, it was clear in 1994 and 1995 that, in implementing the commensurate with income amendment, Treasury was moving away from a purely method-based, comparable-transaction view of the arm's length standard in attempting to achieve tax parity. Treasury's citation to the amendment, and its legislative history, demonstrates that its position was not inconsistent, and there is no basis under *Chenery* to invalidate it.

3

Altera also argues that Treasury did not adequately support its position that employee stock compensation is a cost, asserting that Treasury wrongfully ignored evidence that companies do not factor stock-based compensation into their pricing decisions. As an accounting matter in the past, this issue may have been disputed. Indeed, at one point, "[t]he debate on accounting for stock-based compensation . . . became so divisive that it threatened the [Financial Accounting Standards] Board's future working relationship with some of its constituents." FINANCIAL ACCOUNTING STANDARDS BOARD, FINANCIAL ACCOUNTING FOUNDATION, ACCOUNTING FOR STOCK-BASED COMPENSATION: STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123, at 25 (1995). However, as we will discuss, it is uncontroversial today. Since 1995, the Financial Accounting Standards Board has supported treating stock options as costs. *Id.*

Treasury's rulemaking process was sufficient. Treasury articulated why treating stock-based compensation as a cost led to arm's length results. It first noted that stock-based compensation is a "critical element" of R&D costs for parties to a QCSA and noted that such compensation is "clearly related to the intangible development area." Compensatory Stock Options Under Section 482 (Preamble to Final Rule), 68 Fed. Reg. at 51,173. Logic supports these conclusions. Parties dealing at arm's length, as Treasury explained, would not "ignore" stock-based compensation if such compensation were a "significant element" of the compensation costs one party incurs and another party agrees to reimburse when developing high-profit intangibles. *Id*. Rather, "through bargaining," each party would ensure that the cost-sharing agreement is in its best interest, meaning that the parties will consider the internal costs of stock compensation without requiring the other party to recognize those costs. *Id.*

Though commentators presented evidence of some transactions in which stock-based compensation was not a cost, this evidence provided little guidance because it did not concern parties to a QCSA developing high-profit intangibles. This out-of-context data did not require a different decision. In the absence of applicable evidence, Treasury's analysis provides a logical explanation of how treating stock-based compensation as a cost leads to arm's length results.

In addition, as we have noted, generally accepted accounting principles supported Treasury's conclusion, and Treasury cited generally to "tax and other accounting principles" for its determination that there is a "cost associated with stock-based compensation." Compensatory Stock Options Under Section 482 (Proposed), 67 Fed. Reg. at 48,999. One such principle is that a distinction exists

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 76 of 197



between the economic costs of stock compensation—which are debatable—versus the accounting costs—which are not. Because entities account for the cost of providing employee stock options, it is reasonable for Treasury to allocate that cost. In light of these fundamental understandings, Treasury's reference to "tax and other accounting principles" provides a solid foundation for the Commissioner's interpretation.[10]

Most notably, the Tax Code classifies stock-based compensation as a trade or business "expense." 26 U.S.C. § 162(a). And the challenged regulation cites the provision providing that this expense is a deductible expense. 26 C.F.R. § 1.482-7A(d)(2)(iii)(A) ("[T]he operating expense attributable to stock-based compensation is equal to the amount allowable . . . as a deduction for Federal income tax purposes . . . (for example, under [26 U.S.C. § 83(h)])."). The reference to the Tax Code's classifications in the regulation itself serves as yet another articulation of Treasury's reasoning, the reasonableness of which is made clear by the Tax Code's treatment of stock-based compensation as a cost.

Though it could have been more specific, Treasury "articulated a rational connection" between its decision and these industry standards. *County of Amador v. U.S. Dep't of Interior*, 872 F.3d 1012, 1027 (9th Cir. 2017) (internal

[10] *See, e.g.*, Andrew Barry, *How Much Do Silicon Valley Firms Really Earn?*, BARRON'S (June 27, 2015), http://www.barrons.com/articles/how-much-do-silicon-valley-firms-really-earn-1435372718)) (noting that numerous companies, including Google and Qualcomm, reported stock compensation "total[ling] five percent or more of revenue in recent years").

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 77 of 197



quotation marks omitted), *cert. denied*, 139 S. Ct. 64 (2018). Presuming that Treasury was authorized to dispense with a comparability analysis, making the economic behavior of uncontrolled taxpayers irrelevant, Altera does not offer any compelling argument against the reasonableness of Treasury's determination.

4

Finally, in addition to its general *State Farm* argument, Altera asks for a more searching review under *Fox*. Altera claims that the cost-sharing amendments present a major shift in administrative policy such that Treasury could not issue the regulations without carefully considering and broadcasting its decision. Altera argues that "[t]he assertion that the commensurate with income clause supplants the arm's-length standard with a 'purely internal' analysis is a sharp—but unacknowledged—reversal from Treasury's long-standing prior policy."

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). Indeed, "[w]hen an agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* at 2125–26 (quoting *Fox*, 556 U.S. at 515). However, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515.

> [A] policy change complies with the APA if the agency

> (1) displays "awareness that it is changing position,"
>
> (2) shows that "the new policy is permissible under the statute,"
>
> (3) "believes" the new policy is better, and
>
> (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (format altered) (quoting *Fox*, 556 U.S. at 515–16).

At its core, this argument is not meaningfully different from Altera's general APA argument. If the arm's length standard allows the Commissioner to allocate costs between related parties without a comparability analysis, there is no policy change, merely a clarification of the same policy. Further, as we have discussed, the policy change was occasioned by the congressional addition of the "commensurate with income" sentence in the Tax Reform Act of 1984 and the 1994 and 1995 implementing regulations. Those changes occurred well before 2003. The 2003 regulations clarified, rather than altered, prior policy. And the enactment of a statutory amendment obviously makes a concomitant regulatory amendment appropriate.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 79 of 197



5

Thus, the 2003 regulations are not arbitrary and capricious under the standard of review imposed by the APA. Treasury's regulatory path may be reasonably discerned. Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach in dealing with related companies. It provided adequate notice of its intent and adequately considered the objections. Its conclusion that stock based compensation should be treated as a cost was adequately supported in the record, and its position did not represent a policy change under *Fox*.

C

Altera also argues that the outcome of this case is controlled by our court's decision in *Xilinx*. We disagree. Although the *Xilinx* panel could have reached a holding that would foreclose the Commissioner's current position, it did not.

In *Xilinx*, we considered the 1994 and 1995 cost-sharing regulations. The case involved a matter of regulatory interpretation, not executive authority. Xilinx, Inc., another maker of programmable logic devices, challenged the Commissioner's allocation of employee stock options between Xilinx and its Irish subsidiary. 598 F.3d at 1192. As framed by the panel, the issue was whether § 1.482-1 (1994)—which sets forth the arm's length standard—could be reconciled with § 1.482-7(d)(1) (1995)—under which parties to a QCSA were required to share "all . . . costs" incurred in developing intangibles. *Id.* at 1195.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 80 of 197



*Xilinx* does not govern here. First, the parties in *Xilinx* were not debating administrative authority, and we did not consider the "commensurate with income" standard, which Congress itself did not see as inconsistent with the arm's length standard. Second, and more significantly, the *Xilinx* panel was faced with a conflict between two rules. If the rules were conceptually distinguishable, they were also in direct conflict. The arm's length rule, § 1.482-1(b)(1) (1994), listed specific methods for calculating an arm's length result. The all-costs provision was not one of those methods, as the first *Xilinx* majority noted. 567 F.3d at 491. Treasury issued the coordinating amendment in 2003, *after* the tax years at issue in *Xilinx*, and the arm's length regulation now expressly references the cost-sharing provision that Altera challenges. The *Xilinx* panel did not address the "open question" of whether the 2003 regulations remedied the error identified in that decision. 598 F.3d at 1198 n.4 (Fisher, J., concurring). Today, there is no conflict in the regulations, and Altera does not challenge the regulations on the ground that a conflict exists.

*Xilinx* did not involve the question of statutory interpretation, the Commissioner's authority, or the regulation at issue in this appeal: 26 C.F.R. § 1.482-7A(d)(2). Accordingly, it does not assist Altera.

IV

The 1986 amendment focused specifically on intangibles, and it gave Treasury the ability to respond to rapid changes in the high tech industry. "The broad language of [§ 482] reflects an intentional effort to confer the flexibility necessary to forestall . . . obsolescence." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). In the modern economy, employee

stock options are integral to R&D arrangements. In fact, in Altera's 2015 annual report, its stock-based compensation cost equaled nearly five percent of total revenue. ALTERA CORP., ANNUAL REPORT FOR THE FISCAL YEAR ENDED DEC. 31, 2014 (FORM 10-K). Simply speaking, the rise in employee stock compensation is an economic development that Treasury cannot ignore without rejecting its obligations under § 482.

In sum, we disagree with the Tax Court that the 2003 regulations are arbitrary and capricious under the standard of review imposed by the APA. While the rulemaking process was less than ideal, the APA does not require perfection. We are able to reasonably discern Treasury's path—Treasury understood § 482 to authorize it to employ a purely internal, commensurate with income approach where comparable transactions are not comparable.

In light of the statute's plain text and the legislative history, Treasury also reasonably concluded that Congress intended to hone the definition of the arm's length standard so that it could work to achieve an arm's length *result*, instead of forcing application of a particular comparability *method*. Given the long history of the application of other methods, and the text and legislative history of the Tax Reform Act of 1984, Treasury's understanding of its power to use methodologies other than a pure transactional comparability analysis was reasonable, and we defer to its interpretation under *Chevron*. The Commissioner did not exceed the authority delegated to him by Congress in issuing the regulations.

**REVERSED.**

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 82 of 197



O'MALLEY, Circuit Judge, dissenting:

"[T]he foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp.* ("*Chenery I*"), 318 U.S. 80, 87 (1943)). Prior to promulgating Treas. Reg. § 1.482-7A(d)(2), whose validity we consider here, Treasury repeatedly recognized that 26 U.S.C. § 482 requires application of an arm's length standard when determining the true taxable income of a controlled taxpayer—i.e., it requires Treasury to assess what a taxpayer dealing with an uncontrolled taxpayer would do in the same circumstances. And, Treasury just as consistently asserted that a comparability analysis is the only way to determine the arm's length standard; indeed, Treasury made clear that a comparability analysis is the cornerstone of the arm's length standard. Despite these consistent practices and declarations, in its preamble to § 1.482-7A(d)(2), Treasury stated, for the first time and with no explanation, that it may, *instead*, employ the "commensurate with income" standard to reach the required arm's length result.

Today, the majority justifies Treasury's about-face in three steps: (1) it finds that, by citing to the legislative history surrounding the enactment of the Tax Reform Act of 1986 in the preamble to § 1.482-7A(d)(2), Treasury implicitly communicated its understanding that Congress "permitt[ed] it to dispense with a comparable transaction analysis," Op. 40–41; (2) it finds that, by including that same cryptic citation to legislative history in its proposed notice of rulemaking, Treasury made it "clear enough" to interested parties that Treasury was changing its longstanding practice of applying a comparability analysis, Op. 38–39; and (3) it

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 83 of 197



justifies Treasury's resort to the commensurate with income standard by invoking the second sentence of § 482 to conclude that Treasury may jettison the arm's length standard altogether—a justification Treasury never provided and one which does not withstand careful scrutiny.

The majority, thus, "suppl[ies] a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194, 196 (1947)), encourages "executive agencies' penchant for changing their views about the law's meaning almost as often as they change administrations," *BNSF Ry. Co. v. Loos*, 586 U.S. ___, No. 17-1042, slip op. at 9 (2019) (Gorsuch, J., dissenting), and endorses a practice of requiring interested parties to engage in a scavenger hunt to understand an agency's rulemaking proposals. That practice is inconsistent with another fundamental Administrative Procedure Act ("APA") principle: that a notice of proposed rulemaking "should be sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Am. Mining Cong. v. U.S. EPA*, 965 F.2d 759, 770 (9th Cir. 1992) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C. Cir. 1976) (en banc)). In so doing, the majority stretches "highly deferential" review, *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (quoting *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007)), beyond its breaking point.

I would instead find, as the Tax Court did, that Treasury's explanation of its rule (to the extent any was provided) failed to satisfy the *State Farm* standard, that Treasury did not provide adequate notice of its intent to change its

longstanding practice of employing the arm's length standard and using a comparability analysis to get there, and that its new rule is invalid as arbitrary and capricious. I would also hold that this court's previous decision in *Xilinx, Inc. v. Commissioner of Internal Revenue* ("*Xilinx II*"), 598 F.3d 1191 (9th Cir. 2010), controls and mandates an order affirming the Tax Court's decision. I therefore would affirm the judgment of the Tax Court that expenses related to stock-based compensation are not among the costs to be shared in qualified cost sharing arrangements ("QCSAs") under Treas. Reg. § 1.482-7(d)(1) (as amended in 2013). *See Altera Corp. v. Comm'r*, 145 T.C. 91, 92 (2015). For these reasons, I respectfully dissent.

## I. BACKGROUND

### A. The Arm's Length Standard

#### 1. Before 1986

"The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." *Comm'r v. First Sec. Bank of Utah*, 405 U.S. 394, 400 (1972) (quoting Treas. Reg. § 1.482-1(b)(1) (1971)). The "touchstone" of this tax parity inquiry is the arm's length standard. *Xilinx II*, 598 F.3d at 1198 n.1 (Fisher, J., concurring). Indeed, the first sentence of § 482 states that, "[i]n any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may . . . allocate gross income . . . if he determines that such . . . allocation is necessary in order to prevent evasion of

taxes or clearly to reflect the income of any of such organizations, trades, or businesses." This sentence has always been viewed as requiring an arm's length standard. *See First Sec. Bank of Utah*, 405 U.S. at 400; *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 305 (1994).

Since the 1930s, Treasury regulations consistently have explained that, "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied *in every case* is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." Treas. Reg. § 1.482-1(b)(1) (2003) (emphasis added). That is, income and deductions are to be allocated among related companies in the same way that unrelated companies negotiating at arm's length would allocate income and deductions. As far back as 1968, Treasury's regulations also required that, "[i]n order for the sharing of costs and risks to be considered on an arm's length basis, the terms and conditions *must be comparable* to those which would have been adopted by unrelated parties similarly situated had they entered into such an arrangement." Allocation of Income and Deductions Among Taxpayers, 33 Fed. Reg. 5848, 5854 (April 16, 1968) (emphasis added). That same regulation provided that Treasury may not allocate income with respect to QCSAs involving the development of intangible property unless doing so would be consistent with the arm's length standard. *Id.* (providing that, in "a bona fide cost sharing arrangement with respect to the development of intangible property, the district director shall not make allocations with respect to such acquisition except as may be appropriate to reflect each participant's arm's length share of the costs and risks of developing the property."). Therefore, at the time Congress enacted the 1986 amendment, Treasury's own regulations explicitly required a determination of what an arm's length result would show *and*

required a comparability analysis to reach that result where comparable transactions exist.

The majority attempts to water down the text of Treasury's own regulations at the time. It contends that, "[a]lthough the Secretary adopted the arm's length standard, courts did not hold related parties to the standard by exclusively requiring the examination of comparable transactions." Op. 9. To support its position, the majority cites this court's decision in *Frank v. Int'l Canadian Corp.*, 308 F.2d 520, 528–29 (9th Cir. 1962), which disagreed that "'arm's length bargaining' is the sole criterion for applying the statutory language of [§ 482] in determining what the 'true net income' is of each 'controlled taxpayer.'" But, in *Oil Base, Inc. v. Commissioner of Internal Revenue*, 362 F.2d 212, 214 n.5 (9th Cir. 1966), this court clarified that the holding in *Frank* was an outlier, limited only to the peculiar facts of that case. *Frank*'s departure from the arm's length analysis, the court held, was justified, in part, because "there was no evidence that arm's-length bargaining upon the specific commodities sold had produced a higher return" and because "the complexity of the circumstances surrounding the services rendered by the subsidiary" made it "difficult for the court to hypothesize an arm's-length transaction." *Id.* Significantly, the parties in *Frank* had stipulated to applying a standard other than the arm's length standard. *Id.*

There really can be no doubt that, prior to the 1986 amendment, this Circuit believed that an arm's length standard based on comparable transactions was the sole basis for allocating costs and income under the statute in all but the narrow circumstances outlined in *Frank*—including the presence of the stipulation therein. The majority's attempt to breathe life back into *Frank* is, simply, unpersuasive.

### 2. The 1986 Amendment

The 1986 amendment passed against the backdrop of Treasury's own longstanding practices did not change the obligation to employ an arm's length standard. Indeed, Congress left the first sentence of § 482—the sentence that undisputedly incorporates the arm's length standard—intact. It merely added a second sentence providing that, "[i]n the case of any transfer (or license) of intangible property . . . , the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. No. 99-514, § 1231(e)(1), 100 Stat. 2085, 2562 (1986) (codified as amended at 26 U.S.C. § 482). The plain text of the statute limits the application of the commensurate with income standard to only *transfers* or *licenses* of intangible property.

This is consistent with the underlying purpose of the 1986 amendment. Congress explained in the committee report that it was introducing the commensurate with income standard to address a "recurrent problem" with transfers of highly valuable intangible property: "the absence of comparable arm's length transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables." H.R. REP. NO. 99-426, at 423–24 (1985). Congress noted that "[i]ndustry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases," and that "[t]here are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable." *Id.* at 424–25. To address this *specific* gap, Congress found it "appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation . . . be commensurate with the income

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 88 of 197



attributable to the intangible." *Id.* at 425. Congress did not make any other findings regarding the use of the commensurate with income standard for any transactions other than transfers or licenses of intangible property. Thus, the statute—read in light of this legislative history—did not grant Treasury the flexibility to depart from a comparability analysis whenever it sees fit; rather, it permitted a departure in the limited context of "any transfer (or license) of intangible property" because it had found that comparable transactions in such cases are frequently unrealistic.

Treasury reiterated the limited circumstances in which the commensurate with income standard applies in its 1988 "White Paper." It stated there that, even in the context of transfers or licenses of intangible property, the "intangible income must be allocated on the basis of comparable transactions if comparables exist." *A Study of Intercompany Pricing under Section 482 of the Code* ("White Paper"), I.R.S. Notice 88-123, 1988-1 C.B. 458, 474; *see also id.* at 473 (noting that, where "there is a true comparable for" the licensing of a "high profit potential intangible," the royalty rate for the license "must be set on the basis of the comparable because that remains the best measure of how third parties would allocate intangible income"). Only "in situations in which comparables do not exist" for transfers of intangible property would the commensurate with income standard apply. *Id.* at 474. Indeed, the United States continued to insist in tax treaties, and in documents that Treasury issued to explain these treaties, that § 482 mandated the arm's length principle, in all but this narrow category of intangible transfers. *See Xilinx II*, 598 F.3d at 1196–97 (citing tax treaty explanations); *see also id.* at 1198 n.1 (Fisher, J., concurring) (noting that "the 1997 United States–Ireland Tax Treaty, . . . and others like it, reinforce the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 89 of 197



arm's length standard as Congress' intended touchstone for § 482").[1]

**B. Treatment of Stock-Based Compensation**

In the early 1990s, related companies began to compensate certain employees who performed research and development activities pursuant to QCSAs by granting stock options and other stock-based compensation. *See id.* at 1192–93. This manner of compensation allowed companies to avoid the income reallocation mechanisms available under § 482 by including only the employees' cash compensation in the cost pool under the agreement, but not their stock-based compensation.

To address this loophole, Treasury promulgated new regulations governing the tax treatment of controlled transactions in 1994 and 1995. These regulations affirmed that "the standard to be applied in every case" was the arm's length standard and that "an arm's length result generally will be determined by reference to the results of comparable transactions" because "identical transactions can rarely be located." Treas. Reg. § 1.482-1(b)(1) (as amended in 1994). They also provided that intangible development costs included "all of the costs incurred by . . . [an uncontrolled] participant related to the intangible development area."

[1] As the majority observes, more recent tax treaty explanations have also cited the alternative commensurate with income standard. Op. 32–33 (citing Technical Explanation of the US-Poland Tax Treaty, at 31 (Feb. 13, 2013)). Even these explanations, however, emphasize the primacy of the arm's length standard, and they assure the reader that the commensurate with income standard "operates consistently with the arm's-length standard." Technical Explanation of the US-Poland Tax Treaty, at 30–31 (Feb. 13, 2013).

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 90 of 197



Treas. Reg. § 1.482-7(d)(1) (as amended in 1995). The IRS interpreted this latter "all costs" provision to include stock-based compensation, so that related companies in cost-sharing agreements would have to share costs of providing such compensation. *Xilinx II*, 598 F.3d at 1193–94.

When Xilinx, Inc. ("Xilinx") challenged the IRS's interpretation, the Tax Court decided that the agency's interpretation was inconsistent with Treas. Reg. § 1.482-1 because the IRS had not adduced evidence sufficient to show that unrelated parties transacting at arm's length would, in fact, share expenses related to stock-based compensation. *Xilinx v. Commissioner* ("*Xilinx I*"), 125 T.C. 37, 53 (2005). The Commissioner did not appeal this underlying factual finding and, instead, argued on appeal to this court that Treas. Reg. § 1.482-7 superseded the arm's length requirement of Treas. Reg. § 1.482-1. All three members of the divided panel therefore assumed that sharing expenses related to stock-based compensation would be inconsistent with the arm's length standard. *Xilinx II*, 598 F.3d at 1194 ("The Commissioner does not dispute the tax court's factual finding that unrelated parties would not share [employee stock options] as a cost."); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the Tax Court "correctly resolved" the issue of whether sharing stock-based compensation costs would constitute an arm's length result). The panel also assumed that Treas. Reg. § 1.482-7 required stock-based compensation expenses to be shared. *Id.* at 1196 (majority opinion) (noting that the "all costs" provision "does not permit any exceptions, even for costs that unrelated parties would not share"); *id.* at 1199 (Reinhardt, J., dissenting) (assuming that the "all costs" provision includes "employee stock option costs"). But a majority of the panel ultimately held that the arm's length standard, which it described as the fundamental

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 91 of 197



"purpose" of the regulations, trumped Treas. Reg. § 1.482-7, and that stock-based compensation expenses could not be shared in the absence of evidence that unrelated parties would share such costs. *Id.* at 1196 (majority opinion); *see also id.* at 1198 n.1 (Fisher, J., concurring) (finding "the arm's length standard" to be "Congress' intended touchstone for § 482"). On that ground, this court affirmed the Tax Court's judgment in favor of Xilinx. *Id.* at 1196 (majority opinion).

### C. The Regulations at Issue

While *Xilinx II* was pending before this court, Treasury promulgated the regulations at issue here. Compensatory Stock Options Under Section 482, 68 Fed. Reg. 51,171, 51,172 (Aug. 26, 2003) (codified at 26 C.F.R. pts. 1 and 602). The amended regulations sought to reconcile the apparent contradiction between the arm's length standard in Treas. Reg. § 1.482-1 and the requirement that stock-based compensation expenses be shared under Treas. Reg. § 1.482-7. The former provision now specifies that § 1.482-7 "provides the specific methods to be used to evaluate whether a [QCSA] produces results consistent with an arm's length result." Treas. Reg. § 1.482-1(b)(2)(i) (2003). And § 1.482-7, in turn, now provides that a QCSA produces an arm's length result "if, and only if," the participants share all of the costs of intangible development—explicitly including costs associated with stock-based compensation—in proportion to their shares of reasonably anticipated benefits attributable to such development. Treas. Reg. § 1.482-7(d)(2) (2003).

Altera Corp. ("Altera U.S."), a Delaware corporation, and its subsidiary Altera International, a Cayman Islands corporation, (collectively "Altera") entered into a technology

research and development cost-sharing agreement under which the related participants "agreed to pool their respective resources to conduct research and development using the pre-cost-sharing intangible property" and "to share the risks and costs of research and development activities they performed on or after May 23, 1997." *Altera*, 145 T.C. at 93. This agreement was effective from May 23, 1997 through 2007. *Id.* During the 2004–2007 taxable years, Altera U.S. granted stock options and other stock-based compensation to certain employees who performed research and development activities pursuant to the agreement. *Id.* The employees' cash compensation was included in the cost pool under the agreement, but their stock-based compensation was not. *Id*.

Altera timely filed an income tax return for its 2004–2007 taxable years. *Id.* at 94. Treasury responded by mailing notices of deficiency for those years, allocating income from Altera International to Altera U.S. by increasing Altera International's cost-sharing payments. *Id.* Treasury claimed its cost-sharing adjustments were for the purpose of bringing Altera in compliance with § 1.482-7(d)(2), now § 1.482-7A(d)(2). *Id.* Altera challenged the validity of § 1.482-7A(d)(2) in Tax Court, arguing that the new rule is arbitrary and capricious. *Id.* at 92. The Tax Court unanimously held, as discussed in more detail below, that the explanation Treasury offered in the preamble accompanying the new regulations was insufficient to justify those regulations under *State Farm*. *Id.* at 120–33. The Commissioner appeals that decision.

## II. Discussion

The Tax Court considered and rejected Treasury's plainly stated explanation for its regulation—that Treasury applied

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 93 of 197



the commensurate with income test because it could find no transactions comparable to the QCSAs at issue and that Treasury's analysis was actually *consistent* with the arm's length standard. The Commissioner now argues on appeal, however—and the majority accepts its new claim—that what Treasury was *actually* saying is that § 482 no longer requires a comparability analysis when Treasury concludes that any comparable transactions are imperfect and that the methodology for arriving at an arm's length result is, and always has been, fluid. I disagree. Specifically, as explained below, I believe that: (1) Treasury's rule is procedurally invalid and the majority's attempt to recreate the record surrounding its adoption cannot cure that flaw; (2) Treasury's purported interpretation of § 482 is wrong; and (3) related companies may not be required to share the cost of stock-based compensation under current law because comparable uncontrolled taxpayers would not do so.

### A. The New Rule is Procedurally Invalid

Under the Administrative Procedure Act, we must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our review of an agency regulation is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009) (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). But "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50 (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). For that reason, "[w]e may not supply a reasoned basis for the agency's action

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 94 of 197



that the agency itself has not given." *Id.* at 43 (quoting *Chenery II*, 332 U.S. at 196).

I start, therefore, with what Treasury said when it promulgated the regulation at issue. In Treasury's notice of proposed rulemaking, the agency explained the origins of the commensurate with income standard and discussed the White Paper. Compensatory Stock Options Under Section 482, 67 Fed. Reg. 48,997, 48,998 (proposed July 29, 2002) (to be codified at 26 C.F.R. pt. 1). Treasury noted, in particular, the White Paper's observation "that Congress intended that Treasury and the IRS apply and interpret the commensurate with income standard consistently with the arm's length standard." *Id.* (citing White Paper, 1988-1 C.B. at 458, 477).

Treasury then detailed how the proposed rules would function, including that the new rules required stock-based compensation costs to be included among the costs shared in a QCSA to produce "results consistent with an arm's length result." *Id.* at 49,000–01. It acknowledged that "[t]he Tax Reform Act of 1986 . . . amended section 482 to require that consideration for intangible property *transferred* in a controlled transaction be commensurate with the income attributable to the intangible" property. *Id.* at 48,998 (emphasis added). But it then conclusively stated, based on a vague reference to the "legislative history of the Act," that parties may continue to enter into bona fide *research and development* cost sharing arrangements so long as "the income allocated among the parties reasonably reflect actual economic activity undertaken by each"—i.e., so long as these agreements to develop intangible property survive the commensurate with income standard. *Id.* (emphasis added). Not once did Treasury justify its application of the commensurate with income standard by stating that QCSAs

of this kind constitute "transfers" of intangible property under the Tax Reform Act. And, while it generally cited to the legislative history of the 1986 amendments to § 482—a fact on which the majority places great weight—it did not explain what portions of the legislative history it found pertinent or how any of that history factored into its thinking.

Treasury expanded on its reasoning in the preamble to the final rule. It explained that the tax treatment of stock-based compensation in QCSAs would have to be consistent "with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties and with the OECD transfer pricing guidelines)." 68 Fed. Reg. at 51,172. Treasury observed, however, that the legislative history of the 1986 amendment to § 482 "expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that participants' shares of income 'reasonably reflect the actual economic activity undertaken by each.'" *Id.* (quoting H.R. REP. NO. 99-481, at II-638 (1986) (Conf. Rep.)). Again, Treasury never explained why QCSAs in which controlled parties share costs to develop intangibles would constitute "transfers" of intangibles sufficient to trigger the commensurate with income standard in the first place. Instead, it simply declared that, "in order for a QCSA to reach an arm's length result consistent with legislative intent," the QCSA must include stock-based compensation among the costs shared. *Id.*

Throughout the preamble, Treasury repeatedly emphasized that it was continuing to apply the arm's length standard. Treasury explained, for example, that "[t]he regulations relating to QCSAs *have as their focus* reaching

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 96 of 197



results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development of high-profit intangibles." *Id.* (emphasis added). Treasury determined that "[p]arties *dealing at arm's length* in [a cost-sharing] arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation." *Id.* (emphasis added). And Treasury concluded that "[t]he final regulations provide that stock-based compensation must be taken into account in the context of QCSAs *because* such a result is consistent with the arm's length standard." *Id.* (emphasis added).

Yet, Treasury failed to consider comparable transactions submitted by commentators demonstrating that unrelated companies would never share the cost of stock-based compensation. Treasury responded to these comments invoking the arm's length standard. *See id.* (rejecting "comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances"). Treasury acknowledged that these comparable arm's-length transactions are typically relevant, but it determined that there were no comparable transactions available for QCSAs for the development of high-profit intangibles:

> While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available. As

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 97 of 197



> recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles. The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

*Id.* at 51,172–73 (internal citation omitted).

The Tax Court held that Treasury's explanation for its regulation was insufficient under *State Farm*. *Altera*, 145 T.C. at 120–33. It found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Id.* at 123. The court acknowledged that agencies need not gather empirical evidence for *some* policy-based propositions, but it held that "the belief that unrelated parties would share stock-based compensation costs in the context of a QCSA" was not such a proposition. *Id.* In reaching this conclusion, the court observed that commentators submitted significant evidence during the rulemaking process indicating that unrelated parties would not share stock-based compensation costs in QCSAs; that the Tax Court itself had made a factual determination on that issue in *Xilinx I*—concluding they would not; and, that Treasury was required at least to attempt to gather empirical evidence before declaring that no such evidence was available. *Id.* at 123–24.

The Tax Court then detailed why Treasury's explanation for the regulations was insufficient. The court noted that only some QCSAs involved high-profit intangibles or included stock-based compensation as a significant element of compensation, yet Treasury failed to distinguish between QCSAs with and without those characteristics. *Id.* at 125–27. And the court found that Treasury responded only in conclusory fashion to a number of comments identifying comparable transactions or explaining why unrelated parties would not share stock-based compensation costs in QCSAs. *Id.* at 127–30. On these grounds, the Tax Court struck down the regulation. *Id.* at 133–34.

On appeal, the Commissioner does not meaningfully dispute the Tax Court's determination that Treasury's analysis under the arm's length standard was inadequate and unsupported. In its opening brief, it contends, instead, "that, in the context of a QCSA, the arm's-length standard does *not* require an analysis of what unrelated entities do under comparable circumstances." Appellant's Br. 57 (internal quotation marks omitted). In the Commissioner's view, Treasury's detailed explanations regarding its comparability analysis were merely "extraneous observations"—"since Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis in this narrow context, there was no need for it to establish that the uncontrolled transactions cited by commentators were insufficiently comparable." Appellant's Br. 64.

In its supplemental brief, the Commissioner reiterates that—despite its own earlier machinations to the contrary—one should not conflate comparability analysis with the arm's length standard. Appellant's Suppl. Br. 29–31. It also argues for the first time that Treasury's passing reference to the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 99 of 197



legislative history of § 482 not only justified its departure from a comparability analysis, but also explained that QCSAs to *develop* intangibles constitute *transfers* of intangibles under the second sentence of § 482.

The majority accepts the latest of the Commissioner's ever-evolving post-hoc rationalizations and then, amazingly, goes even further to justify what Treasury did here. First, it accepts the Commissioner's new explanation that the taxpayer's agreement to "divide beneficial ownership of any Developed Technology" constitutes a transfer of intangibles. E.R. 145. Second, it holds that Treasury's reference to the legislative history communicated its understanding that, when Congress enacted the 1986 amendment, it "delegate[d] to Treasury the choice of a specific methodology to" "ensure that income follows economic activity." Op. 27. The majority finds that Treasury implicitly communicated its understanding that Congress called upon it to move away from a comparability analysis and "to develop methods that [d]o not rely on analysis of" what it deems "problematic comparable transactions" when it sees fit. Op. 28–29. The majority finds that Treasury was therefore entitled to ignore the comparable transactions submitted by commentators because they purportedly did not "bear[] on 'relevant factors' to the rulemaking." Op. 39–40 (quoting *Am. Mining Cong.*, 965 F.2d at 771). As to Altera's rejoinder that Treasury never suggested that it had the authority to "dispense with" the comparability analysis entirely, Appellee's Br. 43, the majority dismisses this argument, stating that, "historically[,] the definition of the arm's length standard has been a more fluid one." Op. 29. Finally, the majority concludes that the second sentence of § 482 not only allowed Treasury to dispense with a comparability analysis *but also allowed it to ignore the arm's length test altogether*.

I do not share the majority's views. Treasury may well have thought—incorrectly, I believe—that QCSAs involving the development of high-profit intangibles constitute transfers of intellectual property under the second sentence of § 482. It may also have believed that, given the fundamental characteristics of stock-based compensation in QCSAs and what the majority here calls the "fluid" definition of the arm's length standard, it could dispense with a comparability analysis entirely, regardless of whether QCSAs constitute transfers. *Cf. Xilinx II*, 598 F.3d at 1197 (Fisher, J., concurring) (hypothesizing why unrelated companies may not share stock-based compensation costs). It may—despite never taking this position before rehearing in this appeal—have even believed that the arm's length standard was not required at all in these circumstances by virtue of the second sentence of § 482. But the APA required Treasury to *say* that it was taking these positions, which depart starkly from Treasury's previous regulations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.").

The APA's safeguards ensure that those regulated do not have to guess at the regulator's reasoning; just as importantly, they afford regulated parties a meaningful opportunity to respond to that reasoning. Treasury's notice of proposed rulemaking ran afoul of these safeguards by failing to put the relevant public on notice of its intention to depart from a traditional arm's length analysis.[2] *See CSX Transp., Inc. v.*

[2] The majority also glosses over the Tax Court's criticism that the final rule applied to all QCSAs but was based only on Treasury's beliefs about the subset of QCSAs involving "high-profit intangibles" where

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 101 of 197



*Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (holding that a final rule "violates the APA's notice requirement where 'interested parties would have had to divine [the agency's] unspoken thoughts'" (alteration in original) (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259–60 (D.C. Cir. 2005))). Asking Treasury to show its work in the preamble to its final rule—that is, to set forth when and why the agency believed that a comparability analysis is not required or even why an arm's length analysis can be eschewed—does not, as the majority states, "require agencies to provide 'exhaustive, contemporaneous legal arguments to preemptively defend its action.'" Op. 41 (quoting *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 515 (4th Cir. 2011)). It is the essence of the review that the APA demands.

When the Tax Court conducted that review, it considered the explanation that Treasury offered, and it found that Treasury "failed to provide a reasoned basis" for its "belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs." *Altera*, 145 T.C. at 123. The Tax Court set forth in detail why Treasury's explanation for the regulations was insufficient. *Id.* at 125–30. Treasury offers no response to these findings; it simply invites this court to recreate the record and interpret § 482 in a way it never asked the Tax Court to do in order to supply a post-hoc justification for its decisionmaking. I

stock-based compensation is a "significant element" of compensation. *Altera*, 145 T.C. at 125–26 (quoting Compensatory Stock Options Under Section 482, 68 Fed. Reg. at 51,173). Treasury's failure to explain this leap and the Commissioner's failure to defend it provide another reason that Treasury failed to comply with the APA.

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 102 of 197



would hold, as the Tax Court did, that Treasury's belated arguments are insufficient to justify the 2003 regulations and that those regulations are, thus, are procedurally invalid.

### B. *Chevron* Does Not Save Treasury's Flawed Interpretation of Section 482

Even if Treasury did not err procedurally, I would still find that the regulations are impermissible under *Chevron*. The Commissioner does not argue that its interpretation of § 482 is compelled by the unambiguous text of the statute at step one of *Chevron*. Rather, he contends that § 482 does not directly resolve the question of whether Treasury may allocate the cost of stock-based compensation between related parties. The majority similarly reasons that "[§] 482 does not speak directly to whether the Commissioner may require parties to a QCSA to share employee stock compensation costs in order to receive the tax benefits associated with entering into a QSCA." Op. 25. It thus concludes that "there is no question that the statute remains ambiguous regarding the method by which Treasury is to make allocations based on stock-based compensation." Op. 25.

While I agree with the majority and the Commissioner that the statute is silent as to the precise question of whether the Commissioner may require parties to a QCSA to share the cost of stock-based compensation, I believe that the statute unambiguously communicates the types of cases in which each methodology applies. Specifically, § 482 dictates that the status quo—i.e, the arm's length standard—controls in "any case of two or more organizations, trades, or businesses owned or controlled directly or indirectly by the same interests." It also allows Treasury to employ the commensurate with income standard, but only "[i]n the case

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 103 of 197



of any transfer (or license) of intangible property." Accordingly, the precise gap left by Congress in this case is the question of whether QCSAs constitute a "transfer" of "intangible property" under the second sentence of the statute. If yes, then Treasury may employ the commensurate with income standard to determine if related parties to a QCSAs would share the cost of stock-based compensation. If no, then Treasury must make that determination by employing a comparability analysis to reach an arm's length result. Because the statute does not expressly state that QCSAs for the development intangibles constitute "transfers" of intangibles, I would proceed to step two of *Chevron*.

At step two, we consider whether Treasury's interpretation is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (internal citations omitted). The agency's interpretation is not arbitrary and capricious if it is "rationally related to the goals of the Act." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999). "If the [agency]'s interpretation is permissible in light of the statute's text, structure and purpose, we must defer under *Chevron*." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). Accordingly, I begin with the text of the statute.

The statutory text provides in relevant part:

> In any case of two or more organizations, trades, or businesses . . . owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 104 of 197



> organizations . . . *if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses*. In the case of any *transfer (or license) of intangible property* (within the meaning of section 367(d)(4)), the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible.

Section 482 (emphases added). It is undisputed that the first sentence of the statute requires an arm's length analysis; even the majority agrees with that longstanding principle. As previously explained, moreover, at the time Congress amended § 482, the arm's length standard was understood to require a comparability analysis. But, because transfers of intangible property oftentimes lacked comparable transactions, Congress added a second sentence to the statute. This sentence allows the Secretary to apply the commensurate with income standard to reach an arm's length result in the case of any *transfer* of intangible property.

The Commissioner contends, based on Treasury's purported belief that QCSAs are transfers of intangible property, that Treasury correctly interpreted § 482 to require that controlled companies share the cost of stock-based compensation. But, as noted above, Treasury never made, much less supported, a finding that QCSAs constitute transfers of intangible property. We cannot and should not conclude that the Commissioner's post-hoc interpretation would be permissible when Treasury never articulated such an interpretation. Even if it had, Treasury's own characterization of QCSAs as arrangements "for the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 105 of 197



*development* of high-profit intangibles" contradicts any conclusion that QCSAs constitute *transfers* of already existing intangible property. 68 Fed. Reg. at 51,173 (emphasis added). No rights are transferred when parties enter into an agreement to *develop* intangibles; this is because the rights to later-developed intangible property would spring *ab initio* to the parties who shared the development costs without any need to transfer the property. And, there is no guarantee when the cost-sharing arrangements are entered into that any intangible will, in fact, be developed. In such circumstances, Treasury should not have employed the commensurate with income standard.

The majority attempts to justify Treasury's departure from the comparability analysis in these circumstances by stating it was reasonable for Treasury to "determin[e] that uncontrolled cost-sharing arrangements," such as those submitted by the commentators, "do not provide helpful guidance regarding allocations of employee stock compensation." Op. 28. According to the majority, the legislative history "makes clear" that Congress "intended the commensurate with income standard to displace a comparability analysis where comparable transactions cannot be found." Op. 13. This reasoning fails for several reasons.

As noted, the text of the statute provides that Treasury may employ the commensurate with income standard only in the case of a transfer or license of intangible property—not whenever Treasury finds that uncontrolled transactions fail to provide helpful guidance. Congress did not leave a gap in the statute allowing Treasury to choose when one methodology displaces the other. Rather, it made its own findings regarding the relative helpfulness of comparable uncontrolled transactions in the case of a transfer or license of intangible

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 106 of 197



property. It then amended § 482 to allow for the use of the commensurate with income methodology in those specific cases, but not in others. Congress's findings in the legislative history do not invite Treasury to make its own determinations regarding the helpfulness of other uncontrolled transactions. Nor do they allow Treasury to expand the category of cases in which the commensurate with income standard would apply when the statutory text states otherwise. Here, Treasury's only justification for eschewing the comparability analysis was its insistence that the legislative history allows it to disregard comparable transactions that it deems imperfect. This rationale is inconsistent with the plain text of the statute and thus, is impermissible under *Chevron*.

Even if Treasury could dispense with a comparability analysis whenever it believed no comparables exist, that interpretation would still fail step two of *Chevron* because uncontrolled comparable transactions do exist here. Even the majority acknowledges Treasury's view that a different methodology may only be applied "*when comparable transactions do not exist*." Op. 41 n.9 (emphasis added). Treasury itself explained, in effect, that a precondition for the applicability of the commensurate with income standard is the lack of real-world comparable transactions with which to make an arm's length comparison. Such transactions, as Treasury admitted, would "ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard." 68 Fed. Reg. at 51,173. According to the majority, however, imperfect comparables are tantamount to the absence of comparables.

But the arm's length standard of § 482 does not require perfectly identical transactions—only comparable ones. As Altera notes, the Commissioner cannot "avoid the statutory

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 107 of 197



limits on his ability to reallocate income by asserting that a related-party transaction is fundamentally different from all similar transactions between unrelated parties by virtue of the very fact that the parties are related." Appellee's Suppl. Br. 33. Such an interpretation would allow Treasury to dispense with the comparability analysis altogether because related parties, by virtue of common ownership, are always positioned differently than unrelated parties. Legislative history can only do so much—if any—work, and it certainly cannot set out an exception that swallows a rule codified by statute.

Even if Treasury were correct that no comparable transactions exist, Treasury's reasoning would still fail. Treasury concluded that it could allocate costs because there were no transactions in which parties at arm's length would even consider taking stock options into account in the context of an arrangement similar to a QCSA. *See* 68 Fed. Reg. at 51,173. But the absence of evidence is not evidence of absence. Indeed, the absence of any comparable transactions could itself mean that uncontrolled taxpayers would not share the costs of stock-based compensation. Treasury believes, however, that uncontrolled taxpayers would not enter into such transactions, and, rather than find the absence of such transactions meaningful to a comparison, believes it is justified in using different methodologies to assess income. But the fact that evidence of the absence of comparable transactions might support more favorable tax treatment does not mean that no comparison can be made.

Finally, while Treasury's interpretation of § 482 is "entitled to no less deference . . . simply because it has changed over time, . . . the agency must nevertheless engage in reasoned analysis sufficient to command our deference."

*Good Fortune Shipping SA v. Comm'r of Internal Rev. Serv.*, 897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotations and citations omitted); *Judalang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011) (clarifying that the court's analysis of whether an agency provided a reasoned explanation under *State Farm* and its analysis of whether an agency's interpretation is permissible under *Chevron* step two is "the same, because under *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance'"). Such a reasoned explanation, at a minimum, requires Treasury to "display awareness that it *is* changing position." *Good Fortune Shipping*, 897 F.3d at 263 (quoting *Fox*, 556 U.S. at 515). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515. And an agency may need to "provide a more detailed justification than what would suffice for a new policy created on a blank slate . . . when, for example, . . . its prior policy has engendered serious reliance interests that must be taken into account." *Id.* (citing *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 736, 742 (1996)). "'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

As this court held in *Xilinx II*, the previous regulations preserved the primacy of the arm's length standard and its requirement of comparability analysis. *See Xilinx II*, 598 F.3d at 1195–96 (explaining the then-operative version of Treas. Reg. § 1.482-1). In amending those regulations, however, Treasury never indicated—either in the notice of proposed rulemaking or in the preamble accompanying the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 109 of 197



final rule—any awareness that it was changing course. Treasury instead repeated its previous policy that it need not conduct a comparability analysis where no comparable transactions can be found. *See* 68 Fed. Reg. at 51,172–73. It then ignored existing comparable transactions to reach what it claimed was "an arm's length result." *Id.*

The majority contends that this does not constitute a change because, "historically[,] the definition of the arm's length standard has been a more fluid one." Op. 29. But, as explained above, the comparability analysis has always been a defining aspect of the arm's length standard. The mere fact that Treasury may have been inconsistent in the way it has applied the arm's length standard, as the majority contends, does not mean that the statute permits a fluid definition of the standard. *City of Arlington v. FCC*, 569 U.S. 290, 327 (2013) (Roberts, C.J., dissenting) ("We do not leave it to the agency to decide when it is in charge."). Because Treasury departed from the comparability analysis and failed to provide a reasoned explanation for why the commensurate with income standard is permissible under the statute, I would find that Treasury's regulations constitute an impermissible interpretation of the statute at *Chevron* step two.

### C. Stock-based Compensation Is Not a Shared Cost Under Section 482

Because I would find that Treasury's regulations are procedurally and substantively defective, I would interpret the statute in the first instance, without deference. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("*Chevron* deference is not warranted where the regulation is procedurally defective—that is, where the agency errs by failing to follow the correct procedures in issuing the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 110 of 197



regulation." (internal quotations and citations omitted)); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[A]n agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference." (internal citations and quotations omitted)).

Because I would find the 2003 regulations were invalid, I believe that this court's decision in *Xilinx II* controls, and that the Tax Court properly entered judgment in favor of Altera. *Altera*, 145 T.C. at 134. Even if *Xilinx II* did not control, I would hold that related parties in QCSAs need not share costs associated with stock-based compensation.

I agree with the majority that § 482 does not address this issue expressly. But I agree with *amicus curiae* Cisco Systems, Inc. ("Cisco"), that, under the best reading of § 482, QCSAs are not subject to the commensurate with income standard. As Cisco points out, the commensurate with income standard applies only to a "transfer (or license) of intangible property," § 482, which is distinct from a cost sharing agreement for the joint development of intangibles, *see* White Paper, 1988-1 C.B. at 474 (noting that "bona fide research and development cost sharing arrangements" provide a way to "avoid[] section 482 transfer pricing issues related to the licensing or other transfer of intangibles"). The plain meaning of "transfer" indicates shifting ownership of an existing right from one party to another. But under a cost-sharing arrangement, parties agree to develop intangibles together. Because the intangible does not exist at the time the cost sharing arrangement is entered into, there can be no transfer either.

The majority contends that Congress's choice to use the word "any" is significant. It reasons that, because "§ 482

applies '[i]n the case of *any* transfer . . . of intangible property,'" the statute "cannot reasonably be read to exclude the transfers of expected intangible property." Op. 26. But, while "any" can be a broadening modifier, it must be read in the context of its surrounding text. *Cf. United States v. Gonzales*, 520 U.S. 1, 5 (1997) (finding that use of "any" modifies the term it precedes.); *see Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (narrowing the effect of "any" based on the context in which it appears because "a word is known by the company it keeps." (internal citations and quotations omitted)).

Here, "any" does not modify "intangible property." Rather, it precedes and thus, applies only to "transfer." This indicates that, while the statutory text may cover any kind of transfer, including expected transfers, it does not cover any kind of intangible property—say, for example, intangible property that does not yet exist. Indeed, § 482 expressly defines the term "intangible property" by referencing the definition provided in § 367(d)(4). *See* § 482 (". . . any transfer (or license) of intangible property (*within the meaning of section 367(d)(4)*)." (emphasis added)). We need not guess at whether Congress intended a broad reading of the term because § 367(d)(4) enumerates specific categories of intangible property covered under the statute, and none of those categories contemplates the mere possibility that intangible property may someday exist.

While "any" may modify "transfer," moreover, QCSAs do not provide for future transfers; rather, as noted above, rights to later-developed intangible property—if ever developed—would spring *ab initio* to the parties who shared the development costs and would thereby dispense with any need to transfer those rights at some time in the future. I

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 112 of 197



would conclude, absent additional evidence to conclude otherwise, that QCSAs are not transfers subject to the commensurate with income standard under § 482.

Rather, I would find that QCSAs are governed under the first sentence of § 482 and that Treasury may only allocate the cost of stock-based compensation among related companies if unrelated companies dealing at arm's length would do so under comparable circumstances. The evidence of comparable transactions submitted by commentators demonstrates that unrelated companies do not and would not share such costs. Thus, I would hold that an arm's length result is one in which related parties in QCSAs do not share costs associated with stock-based compensation.

The Commissioner contends that the backdrop against which Congress enacted the 1986 amendment demonstrates that Congress intended § 482 to require related companies to share stock-based compensation. But, as the majority admits, "[n]either the Tax Reform Act nor the implementing regulations specifically addressed allocation of employee stock compensation." Op. 17. This is because the practice of providing stock-based compensation did not develop on a major scale until the 1990s—after Congress passed the 1986 amendment. Therefore, Congress could not have been legislating against the backdrop of this particular type of tax avoidance. While it may choose to address this practice now, it cannot be deemed to have done so then.

Not all forms of tax avoidance amount to illegal tax evasion. The very definition of a loophole is a gap in the law or a set of rules. While Treasury may promulgate regulations to close such gaps, it must do so in a manner consistent with its statutory authority under the Tax Reform Act and with the

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 113 of 197



procedures outlined in the APA. When it fails to comply with those requirements, its actions cannot be justified by the mere existence of the loophole. In other words, an arm's length result is not simply any result that maximizes one's tax obligations. For these reasons, I dissent.

COVER

# How Much Do Silicon Valley Firms Really Earn?

By Andrew Bary June 27, 2015



cited in Altera Corp. v. CIR
No. 16-70496 archived on June 4, 2019

When Ruth Porat gave up her job as chief financial officer at Morgan Stanley earlier this year to take the same position at Google , a funny thing happened. Her annual pay rose, of course. Next year, it will top $20 million, up from $14 million in 2014. But the amount of her compensation that will be expensed in Google's preferred earnings measure will be only an estimated $650,000.

By leaving New York and going to California, Porat entered a weird world where a wide range of technology companies, such as Google (ticker: GOOGL), Facebook (FB), Twitter (TWTR), Salesforce.com (CRM), and Qualcomm (QCOM), encourage investors to ignore the large and very real cost of stock compensation when calculating expenses and earnings. Other tech-related companies outside California, such as Amazon.com (AMZN), do the same thing.

The result is an inflated and distorted earnings figure -- a number that doesn't conform with generally accepted accounting principles, or GAAP, yet is widely embraced by analysts and investors in valuing tech companies. We estimate that a dozen leading companies this year will fail to expense $16 billion in stock compensation against their non-GAAP earnings.




Photo: Yvan Duba / Getty Images

It's true that tech companies also report GAAP earnings, which require the expensing of stock compensation. However, many companies highlight the non-GAAP numbers that exclude stock compensation and other expenses, including the amortization of intangible assets. Stock compensation usually is the major factor that separates GAAP and non-GAAP earnings.

Many investors don't realize that the tech profit projections they see from analysts and in consensus estimates are usually non-GAAP figures. Technology firms are more richly valued than they appear relative to their nontech brethren -- like financials such as Morgan Stanley (MS), which rarely offer an alternative earnings measure that excludes stock-comp expense. Exceptions in the tech world include Microsoft (MSFT), Intel (INTC), and Apple (AAPL), which report only GAAP earnings.

cited in Altera Corp. v. CIR No. 16-70496 archived on June 4, 2019

The earnings of a host of tech companies, including Amazon.com, Salesforce.com, Twitter, and LinkedIn (LNKD), melt away when stock compensation is appropriately reflected in earnings.

One of the misconceptions about stock compensation is that it mainly involves hard-to-value options. That was the case in the late 1990s, but this pay now is distributed primarily in the form of restricted stock, a cash-like form of compensation that typically vests over a period of years. Tech employees favor restricted stock because it's like cash, and thus differs from options, which have no value if the underlying shares fail to appreciate.

"You can't fault companies, to a certain degree, for doing it," says A.M. "Toni" Sacconaghi, a Bernstein technology analyst. "They want to make reported earnings numbers look as good as possible." He says tech companies regularly say, "Here are the GAAP numbers, but the entire discussion on conference calls will be non-GAAP earnings, and all the financial models will be non-GAAP." And analysts typically follow what the company prefers.

Sacconaghi says some portfolio managers, who screen stocks across industries based on consensus estimates, may not realize the tech estimates are non-GAAP, without stock comp. "It's an apples-to-oranges comparison," he observes.

Many leading investors, including Warren Buffett, David Einhorn of Greenlight Capital, Clifford Asness of AQR Capital Management, and *Barron's* Roundtable member Scott Black, argue stock-compensation expense should

be included in earnings. Netflix (NFLX) CEO Reed Hastings also has been a proponent of expensing stock compensation.




"It's patently incorrect to ignore, as an expense item, compensation that happens to be paid in stock rather than in cash," says Robert Willens, a corporate accounting expert who runs the New York consulting firm Robert Willens LLC.

Google is a prime example, with a projected stock-comp expense of $4.4 billion this year, or an average of about $80,000 for each of Google's 55,000 employees. Google's stock comp has doubled since 2011. Google anticipates an increase to $5.9 billion in 2016.

We have written critically before about the use of stock compensation in Silicon Valley, including "Beware the Hidden Costs in Tech," June 3, 2013.

Virtually all of the compensation paid to Google's top executives is in stock. The company has doled out huge, share-laden compensation packages totaling more than $300 million in the past year to three executives -- Porat, Executive Chairman Eric Schmidt, and Chief Business Officer Omid Kordestani. Only a small portion of their pay will be reflected in the non-GAAP profit measure favored by the Street. Are these executives working for a relative pittance? Hardly. But that's the impression you'd get from Google's non-GAAP earnings.

The exceptions are founders Larry Page and Sergey Brin, who take just $1 a year in compensation and no restricted stock grants. But each has Google stock worth about $12 billion.

cited in Altera Corp v. CIR
No. 16-70496 archived on June 4, 2019

**WHEN PORAT JOINED** Google in May, she received a $71 million signing package, including $65 million in restricted stock that will vest over the next four years. In 2016, she will receive a base salary of $650,000 and restricted stock of $20 million, based on the compensation letter that Google made public. At Morgan Stanley, Porat's pay was roughly half in stock and half in cash.

Google, moreover, has disclosed that, starting next year, senior vice presidents, Porat included, will no longer get cash bonuses, and instead will get base salaries plus equity grants every two years that vest on a pro rata quarterly basis, rather than the four-year "cliff vest" that requires employees to remain at the company for four years before getting their stock. This will skew compensation more toward stock and also make it more cash-like, because senior employees can redeem their vested stock each quarter.

Why the increasing use of stock compensation? Google hasn't responded to our request for comment. The rising use of stock comp should make Google's non-GAAP financial results look more favorable at a time when its stock has lagged the tech sector.

Google's stock compensation reflects what some investors view as undisciplined financial management. Google's research-and-development expenditures totaled $9.8 billion in 2014, 38% above the level in the prior year, and they range far from its core search-advertising business, to driverless cars and balloon-based Internet services in the Southern Hemisphere. Capital expenditures also are elevated, at $11 billion in 2014. Despite its strong earnings power and net cash of $62 billion, Google refuses to pay a dividend or buy back shares.

### Silicon Valley Math

Ruth Porat's pay as Google's CFO next year will exceed what she earned at Morgan Stanley, but only a fraction of it likely will be expensed in Google's non-GAAP earnings, which excludes stock comp.

| | 2014 MORGAN STANLEY | 2016 Estimated GOOGLE |
|---|---|---|
| Base Salary (Cash) | $1,000,000 | $650,000 |
| Bonus (Cash) | $5,901,325 | $0 |
| Bonus (Stock) | $7,476,460 | $20,000,000 |
| Total Comp Pkg. | $14,377,785 | $20,650,000 |
| Total Expensed Amt. | $14,377,785 | $650,000 |
| % of Comp Expensed | 100% | 3% |
| Pretax Comp to CFO | $14,377,785 | $20,650,000 |
| Reported Cost to Shareholders | $14,377,785 | $650,000 |




Photo: Chip Somodevilla/Getty Images

Google's compensation policy drew the ire recently of proxy advisory service ISS, which said "generous executive pay packages lack a measurable connection to company performance goals." It urged investors to withhold support for the three Google directors on its compensation committee.

The gap between tech GAAP and non-GAAP earnings is often wide and growing. Google's projected 2015 non-GAAP profit, according to the current consensus compiled by Thomson Reuters, comes to $28.35 per share, while the GAAP consensus is $22.70 per share, with the difference consisting mostly of stock compensation. With Google recently trading around $560, its more appropriate 2015 price/earnings ratio should be 25, based on the GAAP consensus, not the more reasonable 19, based on the non-GAAP figure.

In comparison, Apple, which reports only GAAP financials, trades at 14 times earnings, a marked discount to the Google GAAP P/E.

Various justifications are offered for excluding equity compensation from expenses, but none hold up to scrutiny. Some tech boosters argue that stock awards are noncash and therefore not a true expense. Comparability is

cited in Altera Corp v. CIR No. 16-70496 archived on June 4, 2019

another argument: Since so many do it, a company might as well follow suit. Some also say that stock comp is reflected in a rising share count, and thus to reflect it in earnings would be "double counting," since a higher share count dilutes earnings.

"Treating compensation paid in the form of stock (or other forms of equity) as an expense is not double counting, since it's indefensible to treat companies that pay compensation in the form of stock and those that pay in cash or some other medium differently," argues Willens. "If you allowed those who pay compensation in stock to avoid recording an expense, it would become impossible to compare the two types of companies, and uniformity in accounting matters is a principal objective of the accounting model." Willens notes that the Financial Accounting Standards Board examined and rejected this double-counting idea when it mandated the expensing of all stock compensation more than a decade ago in order for companies to meet GAAP requirements.

Some say that the stock-comp issue is old and irrelevant. Most investors don't seem to care, and it hasn't stopped the technology sector from levitating in recent years. Some of the best-performing techs, such as Facebook, have been big issuers of stock compensation.

cited in Altera Corp. v. CIR
No. 16-70496 archived on June 4, 2019

**WE ACKNOWLEDGE THAT** stock comp is just one factor in evaluating tech companies. Concur Technologies was purchased for $7.7 billion by SAP in 2014, despite lacking GAAP profits. Salesforce.com, which has minimal GAAP earnings, has been the subject of takeover speculation recently and is valued at $50 billion. One potential suitor is said to be Microsoft. That would be an odd pairing, linking Microsoft and its conservative GAAP accounting with Salesforce, which emphasizes non-GAAP earnings.

There are some nuances, as well. About half of Facebook's stock comp this year is related to its 2014 acquisition of WhatsApp. This suggests that its ongoing level of stock compensation is below the $3.2 billion projected for this year. As a result, an appropriate 2015 profit estimate may be in between the $1-a-share GAAP estimate and $2 non-GAAP estimate. Facebook's true forward price/earnings ratio may be close to 50, based on its recent share price of $88.

In a report last year, "U.S. Technology: Caveat Investors -- EPS and FCF Multiples Are Not Created Equal," Bernstein's Sacconaghi wrote, "Stock-based compensation varies widely -- the more that is given, the most likely it is to be excluded from reported earnings."

At Salesforce.com, Adobe Systems (ADBE), LinkedIn, Google, Facebook,

Case: 16-70497, 07/22/2019, ID: 11371788, DktEntry: 161, Page 119 of 197

and Qualcomm, stock compensation totaled 5% or more of revenue in recent years, and these companies report non-GAAP earnings that exclude it, he calculated. In contrast, Apple and IBM (IBM) have issued 1% or less and reflect the cost in their earnings.

As Sacconaghi noted, "A company that pays employees entirely from its income statement is more attractive than a company that needs to issue and repurchase millions of shares per year for its employees." Adobe, for instance, trumpets its buybacks, calling them a return of cash to shareholders. However, its equity issuance to employees has exceeded its buybacks in the past three years, resulting in a higher share count over that span. Some companies, like Google, Amazon, and Facebook, don't repurchase shares, resulting in a steady increase in their share count.

In justifying the exclusion of stock compensation from non-GAAP earnings, Google cites "varying available valuation methodologies, subjective assumptions, and the variety of award types" that differing companies use for their equity-based compensation. Facebook offers a similar argument.

Willens is dismissive, saying that while stock compensation may involve estimates, it shouldn't be excluded from expenses.

cited in Altera Corp. v. CIR
No. 16-70496 archived on June 4, 2019

Google acknowledges some issues with its approach, noting in its earnings release that "non-GAAP operating income excludes some costs, namely SBC [stock-based compensation], that are recurring. SBC has been, and will continue to be for the foreseeable future, a significant recurring expense in Google's business" and "an important part of our employees' compensation."

Twitter offers an extreme example of the impact of stock compensation. It swings to a projected 2015 loss of 90 cents from a profit of 34 cents when employee share awards and other costs are reflected in its results. Stock compensation at Twitter is off the charts, relative to the company's size, at a projected $770 million this year -- a third of its revenue.

It's amazing that investors and analysts are willing to take Twitter's non-GAAP earnings seriously, given the exclusion of a huge slug of stock compensation. Twitter may have strategic value and could be bought by the likes of Google or Facebook at a nice premium to its recent price of $35 -- down from a peak of $73 a month after its 2013 initial public offering. Its market value of $23 billion is digestible. But it's hard to use profitability to justify its stock price, when positive GAAP earnings may be a few years away.

The current situation persists because most participants in the game --

investors, managers, and Street analysts -- have too much invested in distorted accounting that presents an overly rosy view of the technology sector's performance. Still, it's time for tech outfits to follow the Google mission statement of "don't be evil" and stop pretending that stock compensation isn't an expense.

**E-mail:** editors@barrons.com

Show comments

cited in Altera Corp. v. CIR
No. 16-70496 archived on June 4, 2019

MORE FROM NEWS CORP

The Biggest Losers in the Trade War Might Not Be the U.S. or China
Barron's

Sandra Lee and Gov. Andrew Cuomo Selling New York Storybook Stunner
Realtor.com

Young adults 'hate' Republicans, David Brooks says
MarketWatch

3 Things We Loved About San Francisco's $30M Petit Trianon (and 3 Minor Quibbles)
Realtor.com

We Spent Game 1 of the NBA Finals Watching Only Drake
Wall Street Journal

The end.
But let's stay in touch
Privacy Policy
Cookie Policy
Copyright Policy
Data Policy
Your Ad Choices
Subscriber Agreement & Terms of Use
Copyright ©2019 Dow Jones & Company, Inc. All Rights Reserved.
Barron's

# APPENDIX B

## Tax Court's Opinion

145 T.C. No. 3

UNITED STATES TAX COURT

ALTERA CORPORATION AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6253-12, 9963-12. Filed July 27, 2015.

In Xilinx Inc. v. Commissioner, 125 T.C. 37 (2005), aff'd, 598 F.3d 1191 (9th Cir. 2010), we held that, under the 1995 cost-sharing regulations, controlled entities entering into qualified cost-sharing agreements (QCSAs) need not share stock-based compensation (SBC) costs because parties operating at arm's length would not do so. In 2003 Treasury issued sec. 1.482-7(d)(2), Income Tax Regs. (final rule). The final rule requires controlled parties entering into QCSAs to share SBC costs.

P is an affiliated group of corporations that filed consolidated returns for the years in issue. A-US, the parent company, is a Delaware corporation, and A-I, a subsidiary of A-US, is a Cayman Islands corporation. A-US and A-I entered into a QCSA. During its 2004-07 taxable years A-US granted SBC to its employees. A-US did not share the SBC costs with A-I. R determined deficiencies based on I.R.C. sec. 482 allocations R made pursuant to the final rule.

P and R have filed cross-motions for partial summary judgment. P contends that the final rule is arbitrary and capricious under 5 U.S.C. sec. 706(2)(A) and Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29 (1983). R contends that the final rule is valid under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), or alternatively, under State Farm.

Held: The final rule is a legislative rule--i.e., it is not an interpretive rule under 5 U.S.C. sec. 553(b)--because it has the force of law. See Am. Mining Cong. v. Mine Safety & Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993). The final rule has the force of law because in I.R.C. sec. 7805(a) "Congress has delegated legislative power to" Treasury, id., and Treasury "intended to exercise that power" when it issued the final rule, id.

Held, further, whether State Farm or Chevron supplies the standard of review is immaterial because Chevron step 2 incorporates the reasoned decisionmaking standard of State Farm, see Judulang v. Holder, 565 U.S. ___, ___, 132 S. Ct. 476, 483 n.7 (2011), and we are being asked to decide whether Treasury reasonably concluded that the final rule is consistent with the arm's-length standard.

Held, further, Treasury failed to support its belief that unrelated parties would share SBC costs with any evidence in the administrative record, see State Farm, 463 U.S. at 43; failed to articulate why all QCSAs should be treated identically, see id.; and failed to respond to significant comments, see Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C. Cir. 1977). Additionally, Treasury's "explanation for its decision * * * runs counter to the evidence before" it. State Farm, 463 U.S. at 43.

Held, further, the harmless error rule of 5 U.S.C. sec. 706 is inapplicable because it is not clear that Treasury would have adopted the final rule if it had been determined to be inconsistent with the arm's-length standard.

Held, further, the final rule fails to satisfy State Farm's reasoned decisionmaking standard and is therefore invalid. See 5 U.S.C. sec. 706(2)(A); State Farm, 463 U.S. at 43.

Andrew P. Crousore, Donald M. Falk, Joseph B. Judkins, Thomas Lee Kittle-Kamp, William G. McGarrity, Kristyn A. Medina, Brian D. Netter, Phillip J. Taylor, and Allen Duane Webber, for petitioner.

Farhad Asghar, Kevin G. Croke, Anne O'Brien Hintermeister, Allan Lang, Aaron T. Vaughan, and Mary E. Wynne, for respondent.

OPINION

MARVEL, Judge: These consolidated cases are before the Court on the parties' cross-motions for partial summary judgment under Rule 121.[1] The issue presented by the parties' cross-motions is whether section 1.482-7(d)(2), Income Tax Regs. (the final rule)--which the Department of the Treasury (Treasury) issued in 2003 and which requires participants in qualified cost-sharing arrangements

(QCSAs) to share stock-based compensation costs to achieve an arm's-length result--is arbitrary and capricious and therefore invalid.

## Background

Petitioner is an affiliated group of corporations that filed consolidated Federal income tax returns for the years at issue. During all relevant years, Altera Corp. (Altera U.S.), the parent company, was a Delaware corporation, and Altera International, a subsidiary of Altera U.S., was a Cayman Islands corporation. When petitioner filed its petitions with this Court, the principal place of business of Altera U.S. was in California.

### I. Petitioner's R&D Cost-Sharing Agreement

Petitioner develops, manufactures, markets, and sells programmable logic devices (PLDs) and related hardware, software, and pre-defined design building blocks for use in programming the PLDs (programming tools). Altera U.S. and Altera International entered into concurrent agreements that became effective May 23, 1997: a master technology license agreement (technology license agreement) and a technology research and development cost-sharing agreement (R&D cost-sharing agreement).

Under the technology license agreement, Altera U.S. licensed to Altera International the right to use and exploit, everywhere except the United States and

Canada, all of Altera U.S.'s intangible property relating to PLDs and programming tools that existed before the R&D cost-sharing agreement (pre-cost-sharing intangible property). In exchange for the rights granted under the technology license agreement, Altera International paid royalties to Altera U.S. in each year from 1997 through 2003. As of December 31, 2003, Altera International owned a fully paid-up license to use the pre-cost-sharing intangible property in its territory.

Under the R&D cost-sharing agreement, Altera U.S. and Altera International agreed to pool their respective resources to conduct research and development using the pre-cost-sharing intangible property. Under the R&D cost-sharing agreement, Altera U.S. and Altera International agreed to share the risks and costs of research and development activities they performed on or after May 23, 1997. The R&D cost-sharing agreement was in effect from May 23, 1997, through 2007.

During each of petitioner's taxable years ending December 31, 2004, December 30, 2005, December 29, 2006, and December 28, 2007 (2004-07 taxable years), Altera U.S. granted stock options and other stock-based compensation to certain of its employees. Certain of the employees of Altera U.S. who performed research and development activities subject to the R&D cost-sharing agreement received stock options or other stock-based compensation. The

employees' cash compensation was included in the cost pool under the R&D cost-sharing agreement. Their stock-based compensation was not included.

Pursuant to the R&D cost-sharing agreement, Altera International made the following cost-sharing payments to Altera U.S. for its 2004-07 taxable years:

| Year | Cost-sharing payment |
|---|---|
| 2004 | $129,469,233 |
| 2005 | 160,722,953 |
| 2006 | 164,836,577 |
| 2007 | 192,755,438 |

II. Petitioner's Tax Reporting and Respondent's Section 482 Allocations

Petitioner timely filed its Forms 1120, U.S. Corporation Income Tax Return, for its 2004-07 taxable years. Respondent timely mailed notices of deficiency to petitioner with respect to its 2004-07 taxable years. The notices of deficiency allocated, pursuant to section 482, income from Altera International to Altera U.S. by increasing Altera International's cost-sharing payments for 2004-07 by the following amounts:

| Year | Cost-sharing payment adjustment |
|---|---|
| 2004 | $24,549,315 |
| 2005 | 23,015,453 |
| 2006 | 17,365,388 |
| 2007 | 15,463,565 |

Bringing petitioner into compliance with the final rule was the sole purpose of the cost-sharing adjustments in the notice of deficiency.

III. Section 482

A. Arm's-Length Standard

Section 482 authorizes the Commissioner to allocate income and expenses among related entities to prevent tax evasion and to ensure that taxpayers clearly reflect income relating to transactions between related entities. The first sentence of section 482 provides, in relevant part, as follows:

> In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the Secretary[2] may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. * * *

---

[2]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

Section 1.482-1(a)(1), Income Tax Regs., explains the purpose of section 482 as follows:

> The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer[3] on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. * * *

Section 1.482-1(b)(1), Income Tax Regs., provides that

> [i]n determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. * * *

The arm's-length standard is also incorporated into numerous income tax treaties between the United States and foreign countries. See, e.g., Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and on Capital Gains, U.S.-U.K. (2001 U.S.-U.K.

---

[3]The term "controlled taxpayer" means "any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers." Sec. 1.482-1(i)(5), Income Tax Regs.

Income Tax Convention), art. 9, July 24, 2001, Tax Treaties (CCH) para. 10,901.09, at 201,019; U.S. Model Income Tax Convention of Nov. 15, 2006 (2006 U.S. Model Income Tax Convention), art. 9, Tax Treaties (CCH) para. 209.09, at 10,559; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306 ("This Article incorporates in the Convention the arm's-length principle reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482."); Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties (CCH) para. 215, at 10,640 (same).

B. Commensurate-With-Income Standard

In 1986 Congress amended section 482 by adding, in relevant part, the following sentence: "In the case of any transfer (or license) of intangible property * * *, the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible." Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 1231(e)(1), 100 Stat. at 2562.

The House report that accompanied the House version of the 1986 amendment to section 482 states, in relevant part, as follows:

> Many observers have questioned the effectiveness of the "arm's length" approach of the regulations under section 482. A recurrent problem is the absence of comparable arm's length

transactions between unrelated parties, and the inconsistent results of attempting to impose an arm's length concept in the absence of comparables.

*       *       *       *       *       *       *

The problems are particularly acute in the case of transfers of high-profit potential intangibles. Taxpayers may transfer such intangibles to foreign related corporations or to possession corporations at an early stage, for a relatively low royalty, and take the position that it was not possible at the time of the transfers to predict the subsequent success of the product. Even in the case of a proven high-profit intangible, taxpayers frequently take the position that intercompany royalty rates may appropriately be set on the basis of industry norms for transfers of much less profitable items.

Certain judicial interpretations of section 482 suggest that pricing arrangements between unrelated parties for items of the same apparent general category as those involved in the related party transfer may in some circumstances be considered a "safe harbor" for related party pricing arrangements, even though there are significant differences in the volume and risks involved, or in other factors. * * *

In many cases firms that develop high profit-potential intangibles tend to retain their rights or transfer them to related parties in which they retain an equity interest in order to maximize their profits. * * * Industry norms for transfers to unrelated parties of less profitable intangibles frequently are not realistic comparables in these cases.

There are extreme difficulties in determining whether the arm's length transfers between unrelated parties are comparable. The committee thus concludes that it is appropriate to require that the payment made on a transfer of intangibles to a related foreign corporation or possessions corporation be commensurate with the income attributable to the intangible. * * *

* * * * * * *

> The basic requirement of the bill is that payments with respect to intangibles that a U.S. person transfers to a related foreign corporation or possessions corporation must be commensurate with the income attributable to the intangible. * * *
>
> In making this change, the committee intends to make it clear that industry norms or other unrelated party transactions do not provide a safe-harbor minimum payment for related party intangibles transfers. Where taxpayers transfer intangibles with a high profit potential, the compensation for the intangibles should be greater than industry averages or norms. * * *
>
> * * * * * * *
>
> In requiring that payments be commensurate with the income stream, the bill does not intend to mandate the use of the "contract manufacturer" or "cost-plus" methods of allocating income or any other particular method. As under present law, all the facts and circumstances are to be considered in determining what pricing methods are appropriate in cases involving intangible property, including the extent to which the transferee bears real risks with respect to its ability to make a profit from the intangible or, instead, sells products produced with the intangible largely to related parties (which may involve little sales risk or activity) and has a market essentially dependent on, or assured by, such related parties' marketing efforts. However, the profit or income stream generated by or associated with intangible property is to be given primary weight.

H.R. Rept. No. 99-426, at 423-426 (1985), 1986-3 C.B. (Vol. 2) 1, 423-426.

The conference report that accompanied the 1986 amendment to section 482 states, in relevant part, as follows:

In view of the fact that the objective of these provisions--that the division of income between related parties reasonably reflect the relative economic activity undertaken by each--applies equally to inbound transfers, the conferees concluded that it would be appropriate for these principles to apply to transfers between related parties generally if income must otherwise be taken into account.

* * * * * * *

The conferees are also aware that many important and difficult issues under section 482 are left unresolved by this legislation. The conferees believe that a comprehensive study of intercompany pricing rules by the Internal Revenue Service should be conducted and that careful consideration should be given to whether the existing regulations could be modified in any respect.

In revising section 482, the conferees do not intend to preclude the use of certain bona fide research and development cost-sharing arrangements as an appropriate method of allocating income attributable to intangibles among related parties, if and to the extent such agreements are consistent with the purposes of this provision that the income allocated among the parties reasonably reflect the actual economic activity undertaken by each. Under such a bona fide cost-sharing arrangement, the cost-sharer would be expected to bear its portion of all research and development costs, on unsuccessful as well as successful products within an appropriate product area, and the costs of research and development at all relevant development stages would be included. In order for cost-sharing arrangements to produce results consistent with the changes made by the Act to royalty arrangements, it is envisioned that the allocation of R&D cost-sharing arrangements generally should be proportionate to profit as determined before deduction for research and development. In addition, to the extent, if any, that one party is actually contributing funds toward research and development at a significantly earlier point in time than the other, or is otherwise effectively putting its funds at risk to a greater extent than the other, it would be expected that an

> appropriate return would be required to such party to reflect its investment.

H.R. Conf. Rept. No. 99-841 (Vol. II), at II-637 through II-638 (1986), 1986-3 C.B. (Vol. 4) 1, 637-638.

C. Treasury's Position That the Commensurate-With-Income Standard Was Intended To Work Consistently With the Arm's-Length Standard

As the conference report suggested, Treasury and the Internal Revenue Service (IRS) conducted a comprehensive study of the regulations under section 482, the results of which they published in Notice 88-123, 1988-2 C.B. 458 (1988 White Paper).

The 1988 White Paper concluded that the arm's-length standard is the international norm for making transfer pricing adjustments. Id., 1988-2 C.B. at 475 ("The arm's length standard is embodied in all U.S. tax treaties; it is in each major model treaty, including the U.S. Model Convention; it is incorporated into most tax treaties to which the United States is not a party; it has been explicitly adopted by international organizations that have addressed themselves to transfer pricing issues; and virtually every major industrial nation takes the arm's length standard as its frame of reference in transfer pricing cases." (Fn. ref. omitted.)). The 1988 White Paper further concluded that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length

standard. See id. ("To allay fears that Congress intended the commensurate with income standard to be implemented in a manner inconsistent with international transfer pricing norms and U.S. treaty obligations, Treasury officials publicly stated that Congress intended no departure from the arm's length standard, and that the Treasury Department would so interpret the new law.").

The 1988 White Paper explained that the commensurate-with-income standard is consistent with the arm's-length standard because

> [l]ooking at the income related to the intangible and splitting it according to relative economic contributions is consistent with what unrelated parties do. The general goal of the commensurate with income standard is, therefore, to ensure that each party earns the income or return from the intangible that an unrelated party would earn in an arm's length transfer of the intangible.

Id., 1988-2 C.B. at 472. Accordingly, in technical explanations to numerous income tax treaties that the United States has entered into since then, Treasury has repeatedly affirmed that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard. See, e.g., Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,307 ("It is understood that the 'commensurate with income' standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986,

was designed to operate consistently with the arm's-length standard."); Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties (CCH) para. 215, at 10,640-10,641 (same).

## IV. 1995 Cost-Sharing Regulations

We have previously considered whether controlled taxpayers must include stock-based compensation in the pool of costs to be shared. Most recently, in Xilinx Inc. v. Commissioner, 125 T.C. 37 (2005), aff'd, 598 F.3d 1191 (9th Cir. 2010), we addressed the treatment of stock-based compensation with respect to taxable years subject to cost-sharing regulations that Treasury finalized in 1995 (1995 cost-sharing regulations). Because our findings and conclusions, and the conclusions of the U.S. Court of Appeals for the Ninth Circuit, in Xilinx are relevant in these cases, we briefly review the 1995 cost-sharing regulations, our Opinion in Xilinx, and the opinions of the U.S. Court of Appeals for the Ninth Circuit in that case.

### A. Regulatory Provisions

The 1995 cost-sharing regulations prohibited the District Director from making allocations under section 482 "except to the extent necessary to make each controlled participant's share of the costs * * * of intangible development under the qualified cost-sharing arrangement equal to its share of reasonably anticipated

benefits attributable to such development". T.D. 8632, 1996-1 C.B. 85, 90. The 1995 cost-sharing regulations further provided that "a controlled participant's costs of developing intangibles * * * [include] all of the costs incurred by that participant related to the intangible development area". Id., 1996-1 C.B. at 92.

B. Our Opinion in Xilinx

In Xilinx Inc. v. Commissioner, 125 T.C. 37, the taxpayer challenged deficiencies determined under the 1995 cost-sharing regulations on the basis of the Commissioner's determination that the taxpayer should have included the value of stock-based compensation in the intangible development cost pool. Assuming arguendo that the value of stock-based compensation is a cost under the 1995 cost-sharing regulations, we held that the Commissioner's allocations failed to satisfy the arm's-length standard of section 1.482-1(b)(1), Income Tax Regs. See id. at 53.

In reaching this holding we concluded that, consistent with the 1995 cost-sharing regulations, (1) in determining the true taxable income of a controlled taxpayer, the arm's-length standard applies in all cases, see id. at 54-55; (2) the arm's-length standard requires an analysis of what unrelated entities would do, see id. at 53-54; (3) the commensurate-with-income standard was never intended to supplant the arm's-length standard, see id. at 56-58; and (4) unrelated parties

would not share the exercise spread or grant date value[4] of stock-based compensation, see id. at 58-62.

In concluding that unrelated parties would not share either the exercise spread or grant date value of stock-based compensation, (1) we observed that the Commissioner's expert agreed that unrelated parties would not explicitly share the exercise spread or grant date value of stock-based compensation because unrelated parties would find it hard to agree how to measure such value and because doing so would leave them open to potential disputes, see id. at 58; (2) we found that the taxpayers proved that companies do not take into account either the exercise spread or grant date value of stock-based compensation for product pricing purposes, see id. at 59; (3) we observed that the Commissioner produced no credible evidence showing that unrelated parties implicitly share the exercise spread or grant date value of stock-based compensation, see id.; (4) we credited the testimony of the taxpayers' numerous fact witnesses who testified that unrelated parties do not share either the exercise spread or grant date value of stock-based compensation in cost-sharing agreements, see id.; (5) we found that

---

[4]The exercise spread value is the spread between the option strike price and the price of the underlying stock when the option is exercised. See Xilinx Inc. v. Commissioner, 125 T.C. 37, 47 (2005), aff'd, 598 F.3d 1191 (9th Cir. 2010). The grant date value is the fair market value of the option on its grant date. See id. at 50.

the taxpayers proved that "if unrelated parties believed that the spread and grant date value were costs", they "would be very explicit about their treatment", id.; (6) we credited the testimony of the taxpayers' expert who testified that unrelated parties would not agree to share spread-based cost because doing so would create perverse incentives for each party to diminish the stock price of the other, see id. at 61; and (7) we observed that during the years in issue the grant value of stock-based compensation was generally not treated as an expense for tax and financial accounting purposes, see id. at 61-62.

C. The Ninth Circuit Opinions in Xilinx

The U.S. Court of Appeals for the Ninth Circuit initially reversed our Opinion in Xilinx. The majority opinion by Judge Fisher reasoned that "[b]ecause the all costs requirement [of the 1995 cost-sharing regulations] is irreconcilable with the arm's length standard," the more specific all costs requirement controls. Xilinx Inc. v. Commissioner, 567 F.3d 482, 489 (9th Cir. 2009), rev'g and remanding 125 T.C. 37, withdrawn, 592 F.3d 1017 (9th Cir. 2010). The dissenting opinion by Judge Noonan agreed that the regulations were irreconcilable, see id. at 497 (Noonan, J., dissenting), but concluded that the all costs requirement should be construed as not applying to stock-based compensation because (1) the regulations should be interpreted in the light of the dominant purpose of the

statute--“parity between taxpayers in uncontrolled transactions and taxpayers in controlled transactions”, id. at 498; (2) any inconsistencies in the regulations should be construed against the Government, see id.; and (3) Treasury’s technical explanation of the income tax convention between the United States and Ireland confirms that the commensurate-with-income standard is meant to work consistently with the arm’s-length standard, see id. at 498-500 (“‘This article incorporates in the Convention the arm’s[-]length principle reflected in the U.S. domestic transfer pricing provision, particularly Code section 482. * * * It is understood that the ‘commensurate with income’ standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm’s-length standard.’” (quoting Treasury Department Technical Explanation of the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains Signed at Dublin on July 28, 1997, and the Protocol Signed at Dublin on July 28, 1997 (1997 U.S.-Ir. Income Tax Convention and Protocol), U.S.-Ir., Tax Treaties (CCH) para. 4435, at 103,223)).

The Court of Appeals subsequently withdrew its opinion in Xilinx and issued a new opinion affirming our Opinion in Xilinx. The new opinion by Judge Noonan was in substance similar to his original dissenting opinion, with the

exception that the new opinion did not rest its reasoning on the notion that inconsistencies in the regulations should be resolved against the Government. See Xilinx Inc. v. Commissioner, 598 F.3d at 1191-1197 (Noonan, J.).

Judge Fisher's concurring opinion first explained the parties' "dueling interpretations of the 'arm's length standard'". Id. at 1197 (Fisher, J., concurring). According to Judge Fisher, Xilinx contended that the arm's-length standard required "controlled parties * * * [to] share only those costs uncontrolled parties share." Id. By contrast, the Commissioner contended that

> analyzing comparable transactions is unhelpful in situations where related and unrelated parties always occupy materially different circumstances. As applied to sharing * * * [employee-stock-option (ESO)] costs, the Commissioner argues (consistent with the tax court's findings) that the reason unrelated parties do not, and would not, share ESO costs is that they are unwilling to expose themselves to an obligation that will vary with an unrelated company's stock price. Related companies are less prone to this concern precisely because they are related--i.e., because XI is wholly owned by Xilinx, it is already exposed to variations in Xilinx's overall stock price, at least in some respects. * * *

Id. Judge Fisher concluded "that Xilinx's understanding of the regulations is the more reasonable even if the Commissioner's current interpretation may be theoretically plausible." Id. at 1198. He further explained that "we need not defer to * * * [the Commissioner's interpretation of the arm's-length standard] because he has not clearly articulated his rationale until now." Id. (citing United States v.

Thompson/Ctr. Arms Co., 504 U.S. 505, 518-519 & n.9 (1992)). In a footnote Judge Fisher added: "It is an open question whether these flaws have been addressed in the new regulations Treasury issued after the tax years at issue in this case." Id. n.4. Notwithstanding Judge Fisher's concerns, Judge Reinhardt, dissenting, would have continued to adhere to the panel's original opinion. See id. at 1199-1200 (Reinhardt, J., dissenting).

## V. 2003 Cost-Sharing Regulations

### A. Notice of Proposed Rulemaking

In July 2002 Treasury issued a notice of proposed rulemaking and notice of a public hearing (NPRM) with respect to proposed amendments to the 1995 cost-sharing regulations. The NPRM set a public hearing on the proposed amendments for November 20, 2002. See 67 Fed. Reg. 48997 (July 29, 2002). The preamble to the NPRM states that the proposed amendments to the 1995 cost-sharing regulations sought to clarify

> that stock-based compensation must be taken into account in determining operating expenses under § 1.482-7(d)(1)[, Income Tax Regs.,] and to provide rules for measuring stock-based compensation costs * * * [, and] to include express provisions to coordinate the cost sharing rules of § 1.482-7[, Income Tax Regs.,] with the arm's length standard as set forth in § 1.482-1[, Income Tax Regs].

Id. at 48998.

B. Comments Submitted in Response to the Proposed Regulations

In response to the NPRM the following persons and organizations submitted written comments to Treasury: (1) American Electronics Association (AeA); (2) Baker & McKenzie, LLP, on behalf of the Software Finance and Tax Executives Council (SoFTEC); (3) Deloitte & Touche, LLP; (4) Ernst & Young LLP, on behalf of the Global Competitiveness Coalition (Global); (5) Fenwick & West, LLP (Fenwick); (6) Financial Executives International (FEI); (7) Information Technology Association of America; (8) Information Technology Industry Council; (9) KPMG, LLP; (10) PricewaterhouseCoopers, LLP (PwC); (11) Irish Office of the Revenue Commissioners; (12) Joseph A. Grundfest, W.A. Franke Professor of Law and Business, Stanford Law School; (13) Xilinx Inc. Additionally, the following four persons spoke at the November 20, 2002, public hearing: (1) Eric D. Ryan, of PwC; (2) Ron Schrotenboer, of Fenwick; (3) John M. Peterson, Jr., of Baker & McKenzie, LLP and on behalf of SoFTEC; and (4) Caroline Graves Hurley, of AeA.[5]

---

[5]Tax Analysts prepared a written transcript of the November 20, 2002, hearing. Treasury did not request or pay for the transcript and did not identify it as an "official" transcript.

Several of the commentators informed Treasury that they knew of no transactions between unrelated parties, including any cost-sharing arrangement, service agreement, or other contract, that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation.

AeA provided to Treasury the results of a survey of its members. AeA member companies reviewed their arm's-length codevelopment and joint venture agreements and found none in which the parties shared stock-based compensation. For those agreements that did not explicitly address the treatment of stock-based compensation, the companies reviewed their accounting records and found none in which any costs associated with stock-based compensation were shared.

AeA and PwC represented to Treasury that they conducted multiple searches of the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system[6] and found no cost-sharing agreements between unrelated parties in which the parties agreed to share either the exercise spread or grant date value of stock-based compensation.

---

[6]EDGAR is maintained by the Securities and Exchange Commission (SEC) and is a public and searchable database that provides users with free access to registration statements, periodic reports, and other forms filed by companies, including "material contracts" that are required by law to be attached as exhibits to certain SEC forms.

Several commentators identified arm's-length agreements in which stock-based compensation was not shared or reimbursed. For example, (1) AeA identified, and PwC provided, a 1997 collaboration agreement between Amylin Pharmaceuticals, Inc., and Hoechst Marion Roussel, Inc. (Amylin-HMR collaboration agreement), that did not include stock options in the pool of costs to be shared; (2) PwC identified a joint development agreement between the biotechnology company AgraQuest, Inc., and Rohm & Haas under which only "out-of-pocket costs" would be shared; (3) PwC identified a 1999 cost-sharing agreement between software companies Healtheon Corp. and Beech Street Corp. that expressly excluded stock options from the pool of expenses to be shared. Additionally, in written comments, and again at the November 20, 2002, hearing, Ms. Hurley offered to provide Treasury with more detailed information regarding several agreements involving AeA member companies, provided that the companies received adequate assurances that their proprietary information would not be disclosed.[7]

FEI submitted model accounting procedures from the Council of Petroleum Accountant Societies (COPAS) for sharing costs among joint operating agreement

partners in the petroleum industry. FEI noted that COPAS recommends that joint operating agreements should not allow stock options to be charged against the joint account because they are difficult to accurately value.

AeA, SoFTEC, KPMG, and PwC cited the practice of the Federal Government, which regularly enters into cost-reimbursement contracts at arm's length. They noted that Federal acquisition regulations prohibit reimbursement of amounts attributable to stock-based compensation.[8]

AeA, Global, and PwC explained that, from an economic perspective, unrelated parties would not agree to share or reimburse amounts related to stock-based compensation because the value of stock-based compensation is speculative, potentially large, and completely outside the control of the parties. SoFTEC provided a detailed economic analysis from economists William Baumol and Burton Malkiel reaching the same conclusion.

Finally, the Baumol and Malkiel analysis concluded that there is no net economic cost to a corporation or its shareholders from the issuance of stock-based compensation. Similarly, Mr. Grundfest asserted that a company's

[8]Federal acquisition regulations prohibit contractors from charging the

"decision to grant options to employees * * * does not change its operating expenses" and does not factor into its pricing decisions.

C. Final Rule

1. Regulatory Provisions

In August 2003 Treasury issued the final rule. The final rule explicitly required parties to QCSAs to share stock-based compensation costs. See sec. 1.482-7(d)(2), Income Tax Regs. The final rule also added sections 1.482-1(b)(2)(i) through 1.482-7(a)(3), Income Tax Regs., to provide that a QCSA produces an arm's-length result only if the parties' costs are determined in accordance with the final rule. See T.D. 9088, 2003-2 C.B. 841, 847-848.

The final rule provides two methods for measuring the value of stock-based compensation: a default method and an elective method. Under the default method, "the costs attributable to stock-based compensation generally are included as intangible development costs upon the exercise of the option and measured by the spread between the option strike price and the price of the underlying stock." Id., 2003-2 C.B. at 844. Under the elective method, "the costs attributable to stock options are taken into account in certain cases in accordance with the 'fair value' of the option, as reported for financial accounting purposes either as a charge against income or in footnoted disclosures." Id. The elective method, however, is

available only with respect to options on stock that is publicly traded "on an established United States securities market and is issued by a company whose financial statements are prepared in accordance with United States generally accepted accounting principles for the taxable year." Sec. 1.482-7(d)(3)(iii)(B)(2), Income Tax Regs.

2. Lack of Evidence From Uncontrolled Transactions

When it issued the final rule, the files maintained by Treasury relating to the final rule did not contain any expert opinions, empirical data, or published or unpublished articles, papers, surveys, or reports supporting a determination that the amounts attributable to stock-based compensation must be included in the cost pool of QCSAs to achieve an arm's-length result. Those files also did not contain any record that Treasury searched any database that could have contained agreements between unrelated parties relating to joint undertakings or the provision of services. Additionally, Treasury was unaware of any written contract between unrelated parties, whether in a cost-sharing arrangement or otherwise, that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation; or any evidence of any actual transaction between unrelated parties, whether in a cost-sharing arrangement or otherwise, in which

one party paid or reimbursed the other party for amounts attributable to stock-based compensation.

3. Response to Comments

The preamble to the final rule responded to comments that asserted that the proposed amendments to the 1995 cost-sharing regulations were inconsistent with the arm's-length standard, in relevant part, as follows:

> Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account for purposes of QCSAs is consistent with the legislative intent underlying section 482 and with the arm's length standard (and therefore with the obligations of the United States under its income tax treaties and with the OECD transfer pricing guidelines). The legislative history of the Tax Reform Act of 1986 expressed Congress's intent to respect cost sharing arrangements as consistent with the commensurate with income standard, and therefore consistent with the arm's length standard, if and to the extent that the participants' shares of income "reasonably reflect the actual economic activity undertaken by each." See H.R. Conf. Rep[t]. No. 99-481 [Vol. II], at II-638 (1986). * * * In order for the costs incurred by a participant to reasonably reflect its actual economic activity, the costs must be determined on a comprehensive basis. Therefore, in order for a QCSA to reach an arm's length result consistent with legislative intent, the QCSA must reflect all relevant costs, including such critical elements of cost as the cost of compensating employees for providing services related to the development of the intangibles pursuant to the QCSA. Treasury and the IRS do not believe that there is any basis for distinguishing between stock-based compensation and other forms of compensation in this context.
>
> Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the

QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances. Section 1.482-1(b)(1)[, Income Tax Regs.,] provides that a "controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances." * * * While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may not be available. As recognized in the legislative history of the Tax Reform Act of 1986, there is little, if any, public data regarding transactions involving high-profit intangibles. H.R. Rep[t]. No. 99-426, at 423-[4]25 (1985). The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA. Government contractors that are entitled to reimbursement for services on a cost-plus basis under government procurement law assume substantially less entrepreneurial risk than that assumed by service providers that participate in QCSAs, and therefore the economic relationship between the parties to such an arrangement is very different from the economic relationship between participants in a QCSA. The other agreements highlighted by commentators establish arrangements that differ significantly from QCSAs in that they provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement. Such terms, which may have the effect of mitigating the impact of using a cost base to be shared or reimbursed that is less than comprehensive, would not be permitted by the QCSA regulations. * * *

The regulations relating to QCSAs have as their focus reaching results consistent with what parties at arm's length generally would do if they entered into cost sharing arrangements for the development

> of high-profit intangibles. These final regulations reflect that at arm's length the parties to an arrangement that is based on the sharing of costs to develop intangibles in order to obtain the benefit of an independent right to exploit such intangibles would ensure through bargaining that the arrangement reflected all relevant costs, including all costs of compensating employees for providing services related to the arrangement. Parties dealing at arm's length in such an arrangement based on the sharing of costs and benefits generally would not distinguish between stock-based compensation and other forms of compensation.
>
> For example, assume that two parties are negotiating an arrangement similar to a QCSA in order to attempt to develop patentable pharmaceutical products, and that they anticipate that they will benefit equally from their exploitation of such patents in their respective geographic markets. Assume further that one party is considering the commitment of several employees to perform research with respect to the arrangement. That party would not agree to commit employees to an arrangement that is based on the sharing of costs in order to obtain the benefit of independent exploitation rights unless the other party agrees to reimburse its share of the compensation costs of the employees. Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation.

T.D. 9088, 2003-2 C.B. at 842-843.

The preamble to the final rule responded to comments that asserted that stock-based compensation does not constitute an economic cost, or relevant economic cost, as follows:

> Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account in the context of QCSAs is

> appropriate. The final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard. Treasury and the IRS agree that the disposition of financial reporting issues does not mandate a particular result under these regulations.

Id., 2003-2 C.B. at 843.

The preamble to the final rule responded to comments that asserted that parties at arm's length would not share either the exercise spread or grant date value of stock-based compensation because they would produce results that are too speculative or not sufficiently related to the employee services that are compensated, as follows:

> Treasury and the IRS believe that it is appropriate for regulations to prescribe guidance in this context that is consistent with the arm's length standard and that also is objective and administrable. As long as the measurement method is determined at or before grant date, either of the prescribed measurement methods can be expected to result in an appropriate allocation of costs among QCSA participants and therefore would be consistent with the arm's length standard.

Id., 2003-2 C.B. at 844.

Finally, the preamble to the final rule states that "[i]t has also been determined that [APA] section 553(b) * * * does not apply to these regulations." Id., 2003-2 C.B. at 847.

Discussion

I. Summary Judgment

Rule 121(a) provides that either party may move for summary judgment upon all or any part of the legal issues in controversy. Full or partial summary judgment may be granted only if it is demonstrated that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). We conclude that there is no genuine dispute as to any material fact relating to the issue presented by the parties' cross-motions for partial summary judgment and that the issue may be decided as a matter of law.

II. Applicable Principles of Administrative Law

A. Notice and Comment Rulemaking

Pursuant to APA sec. 553, in promulgating regulations through informal rulemaking an agency must (1) publish a notice of proposed rulemaking in the Federal Register,[9] see APA sec. 553(b); (2) provide "interested persons an opportunity to participate in the rule making through submission of written data,

---

[9]The notice of proposed rulemaking must include "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." APA sec. 553(b).

views, or arguments with or without opportunity for oral presentation", id. subsec. (c); and (3) "[a]fter consideration of the relevant matter presented, * * * incorporate in the rules adopted a concise general statement of their basis and purpose", id. These requirements do not apply to interpretive rules,[10] see id. subsec. (b)(A), or when an agency for good cause finds--and incorporates its findings in the rules issued--that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest", id. para. (B).

Generally, interpretive rules merely explain preexisting substantive law. See Hemp Indus. Ass'n v. DEA, 333 F.3d 1082, 1087 (9th Cir. 2003). Substantive (or legislative) rules by contrast, "create rights, impose obligations, or effect a change in existing law". Id. Stated simply, "legislative rules, unlike interpretive rules, have the 'force of law.'" Id. (quoting Am. Mining Cong. v. Mine Safety &

Health Admin., 995 F.2d 1106, 1109 (D.C. Cir. 1993)); see also Chrysler Corp. v. Brown, 441 U.S. 281, 301-302 (1979).

A rule has the force of law "only if Congress has delegated legislative power to the agency and if the agency intended to exercise that power in promulgating the rule." Am. Mining Cong., 995 F.2d at 1109 (citing Am. Postal Workers Union v. USPS, 707 F.2d 548, 558 (D.C. Cir. 1983)). The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in these cases appears to lie absent a stipulation to the contrary, see sec. 7482(b)(1)(B), (2), has held that we can infer that an agency intends for a rule to have the force of law in any of the following circumstances: "(1) when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action; (2) when the agency has explicitly invoked its general legislative authority; or (3) when the rule effectively amends a prior legislative rule," Hemp Indus., 333 F.3d at 1087 (citing Am. Mining Cong., 995 F.2d 1106), or "'effect[s] a change in existing law or policy'", D.H. Blattner & Sons, Inc. v. Sec'y of Labor, Mine Safety & Health Admin., 152 F.3d 1102, 1109 (9th Cir. 1998) (alteration in original) (quoting Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir. 1983)). In determining whether a rule is interpretive or legislative we "need not accept the agency characterization at face

value." Hemp Indus., 333 F.3d at 1087 (citing Gunderson v. Hood, 268 F.3d 1149, 1154 n.27 (9th Cir. 2001)).

The notice and comment requirements of APA sec. 553 "are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule." Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 (D.C. Cir. 1977). Accordingly, "there must be an exchange of views, information, and criticism between interested persons and the agency." Id. Additionally, because "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public", an agency is required to respond to significant comments.[11] Id. at 35-36. However, "'[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" Sherley v. Sebelius, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting Covad Commc'ns v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006)).

---

[11] "[O]nly comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency. Moreover, comments which themselves are purely speculative and do not disclose the factual or policy basis on which they rest require no response." Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977); see also Am. Mining Cong. v. EPA, 965 F.2d 759, 771 (9th Cir. 1992) (citing Home Box Office, 567 F.2d at 35 & n.58).

B. Judicial Review of Agency Decisionmaking--State Farm Review

Pursuant to APA sec. 706(2)(A), a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". A court's review under this "standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Judulang v. Holder, 565 U.S. ___, ___, 132 S. Ct. 476, 483 (2011); Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). However, a reviewing court must ensure that the agency "engaged in reasoned decisionmaking." Judulang, 565 U.S. at ___, 132 S. Ct. at 484. To engage in reasoned decisionmaking, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

In reviewing an agency action a court must determine "'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Id. (quoting Bowman Transp., Inc. v.

Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)); see also Judulang, 565 U.S. at ___, 132 S. Ct. at 484. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43.

In providing a reasoned explanation for agency action that departs from an agency's prior position the agency must "display awareness that it is changing position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (citing United States v. Nixon, 418 U.S. 683, 696 (1974)). However, the agency need not demonstrate "that the reasons for the new policy are better than the reasons for the old one". Id.

In examining an agency's explanation for issuing a rule a reviewing court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" State Farm, 463 U.S. at 43 (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)); see also Carpenter Family Invs., LLC v. Commissioner, 136 T.C. 373, 380, 396 n.30 (2011). Similarly, when an agency "relie[s] on multiple rationales (and has not done so in the alternative), and * * * [a reviewing court]

conclude[s] that at least one of the rationales is deficient," Nat'l Fuel Gas Supply Corp. v. FERC, 468 F.3d 831, 839 (D.C. Cir. 2006) (citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-151 (D.C. Cir. 1993), and Consol. Edison Co. of N.Y. v. FERC, 823 F.2d 630, 641-642 (D.C. Cir. 1987)), the court cannot sustain the agency action on the basis of the sufficient rationale unless the court is certain that the agency would have taken the same action "even absent the flawed rationale", id. However, the reviewing court must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" State Farm, 463 U.S. at 43 (quoting Bowman Transp., 419 U.S. at 286).

C. Judicial Review of Agency Statutory Construction--Chevron Review

A court reviews an agency's authoritative construction of a statute under the two-step test first articulated in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). See Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 55-58 (2011). In Mayo, the Supreme Court clarified that both specific authority regulations and general authority regulations are to be accorded Chevron deference.[12] See id.

---

[12]The Supreme Court explained that "Chevron deference is appropriate 'when it appears that Congress delegated authority to the agency generally to

(continued...)

Under Chevron step 1, "applying the ordinary tools of statutory construction," City of Arlington v. FCC, 569 U.S. ___, ___, 133 S. Ct. 1863, 1868 (2013), a court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-843. Under Chevron step 2, a court must defer to the agency's authoritative interpretation of an ambiguous statute "unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" Mayo Found., 562 U.S. at 53 (quoting Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 242 (2004)); see also Judulang, 565 U.S. at ___, 132 S. Ct. at 483 n.7.

Chevron deference applies even where an agency adopts a construction that conflicts with a prior judicial construction of the statute. See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982-983 (2005).

However, if a precedential case holds that a statute unambiguously expresses a congressional intent that is contrary to the agency's construction of the statute, the prior judicial construction controls. See id.; see also United States v. Home Concrete & Supply, LLC, 566 U.S. ___, ___, 132 S. Ct. 1836, 1844 (2012).

D. Harmless Error

APA sec. 706 instructs reviewing courts to take "due account * * * of the rule of prejudicial error." See also Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 659-660 (2007) ("'In administrative law, as in federal civil and criminal litigation, there is a harmless error rule[.]'" (quoting PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004))). This rule reflects the notion that "[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate" the agency action. PDK Labs., 362 F.3d at 799.

III. Preliminary Administrative Law Issues

The parties disagree whether the final rule is a legislative rule or an interpretive rule. The parties also disagree regarding the standard of review that we should apply. We therefore address these issues before considering the validity of the final rule.

A. APA Sec. 553 Applies to the Final Rule.

Petitioner contends that the final rule is a legislative rule under APA sec. 553(b) and is therefore subject to the notice and comment requirements of APA sec. 553 because, if valid, it would have the force of law. Alternatively, petitioner contends that if the final rule were an interpretive rule, it would "not have the force and effect of law", Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 99 (1995), and therefore the final rule would not be binding on this Court. Respondent agrees that the final rule has the force of law but disagrees with petitioner's contention that it is a legislative rule. However, respondent declined to argue this issue on brief or at oral argument.

Instead, respondent contends that we need not decide this issue because Treasury complied with the notice and comment requirements. However, petitioner contends that Treasury failed to adequately explain the basis of the final rule, and Treasury's obligation to explain the basis of the final rule depends, at least in part, on its being a legislative rule subject to the notice and comment requirements of APA sec. 553. See APA sec. 553(c); cf. Internal Revenue Manual pt. 32.1.5.4.7.5.1(2) (Sept. 30, 2011) ("[M]ost IRS/Treasury regulations will be interpretative regulations because they fill gaps in legislation or have a prior existence in the law."); id. pt. 32.1.5.4.7.3(1) ("In the Explanation of Provisions

section, the drafting team should describe the substantive provisions of the regulation in clear, concise, plain language * * *. It is not necessary to justify the rules that are being proposed or adopted or alternatives that were considered.").[13] Petitioner also contends that Treasury failed to respond to significant comments, and Treasury's obligation to respond to significant comments is derived, at least in part, from the notice and comment requirements of APA sec. 553. See Home Box Office, 567 F.2d at 35-36. Moreover, we cannot avoid this issue because petitioner alternatively contends that the final rule would not bind this Court if it were an interpretive rule. Consequently, we will decide this issue.

Pursuant to section 7805(a) the Secretary is authorized to "prescribe all needful rules and regulations for the enforcement of" the Code. Such regulations carry the force of law, and the Code imposes penalties for failing to follow them. See, e.g., sec. 6662(b)(1). We therefore conclude that "Congress has delegated legislative power to" Treasury. Am. Mining Cong., 995 F.2d at 1109.

We further conclude that Treasury intended for the final rule to have the force of law for the following reasons: (1) the parties stipulated--and we agree, see Xilinx Inc. v. Commissioner, 125 T.C. 37--that the adjustments to petitioner's

income can be sustained only on the basis of the final rule, see Hemp Indus., 333 F.3d at 1087, and (2) in promulgating the final rule Treasury invoked its general legislative rulemaking authority under section 7805(a), see id. The final rule is therefore a legislative rule. See Am. Mining Cong., 995 F.2d at 1109.

Because it is a legislative rule and Treasury did not find for good cause that notice and comment were impracticable, unnecessary, or contrary to the public interest, see APA sec. 553(b)(A) and (B), APA sec. 553 applies to the final rule. We must therefore also consider whether Treasury satisfied its obligations under APA sec. 553(b) and (c) in issuing the final rule.

B. The Final Rule Must Satisfy State Farm's Reasoned Decisionmaking Standard.

Petitioner contends that we should review the final rule under State Farm. Respondent contends that we should review the final rule under Chevron. For the reasons that follow, we conclude that--regardless of the ultimate standard of review--the final rule must satisfy State Farm's reasoned decisionmaking standard.

Respondent contends that State Farm review is not appropriate because the interpretation and implementation of section 482 do not require empirical analysis. Similarly, respondent repeatedly argues that section 482 does not require allocations to be made with reference to uncontrolled party conduct. But "'[t]he

purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.'" Commissioner v. First Sec. Bank of Utah, 405 U.S. 394, 400 (1972) (quoting section 1.482-1(b)(1) (1971), Income Tax Regs.); accord sec. 1.482-1(a)(1), (b)(1), Income Tax Regs.; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9; Treasury Department Technical Explanation of the 1997 U.S.-Ir. Income Tax Convention and Protocol, art. 9, Tax Treaties (CCH) para. 4435, at 103,223; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9. For these reasons we have previously stated that "the determination under section 482 is essentially and intensely factual". Procacci v. Commissioner, 94 T.C. 397, 412 (1990).

Section 1.482-1(b)(1), Income Tax Regs., provides that "[i]n determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer." In Xilinx Inc. v. Commissioner, 125 T.C. at 53-55, we held that the

arm's-length standard always requires an analysis of what unrelated entities do under comparable circumstances. Similarly, in promulgating the final rule Treasury explicitly considered whether unrelated parties would share stock-based compensation costs in the context of a QCSA. See T.D. 9088, 2003-2 C.B. at 843 ("Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation."). Treasury necessarily decided an empirical question when it concluded that the final rule was consistent with the arm's-length standard.

Respondent counters that Treasury should be permitted to issue regulations modifying--or even abandoning--the arm's-length standard. But the preamble to the final rule does not justify the final rule on the basis of any modification or abandonment of the arm's-length standard,[14] and respondent concedes that the

[14]For example, the preamble does not say that controlled transactions can never be comparable to uncontrolled transactions because related and unrelated parties always occupy materially different circumstances. Cf. Xilinx Inc. v. Commissioner, 598 F.3d at 1197 (Fisher, J., concurring) ("The Commissioner * * * contends that analyzing comparable transactions is unhelpful in situations where related and unrelated parties always occupy materially different circumstances.").

purpose of section 482 is to achieve tax parity.[15] The preamble also did not dismiss any of the evidence submitted by commentators regarding unrelated party conduct as addressing an irrelevant or inconsequential factor. See id., 2003-2 C.B. at 842-843. We therefore need not decide whether, under Brand X, 545 U.S. at 982-983, Treasury would be free to modify or abandon the arm's-length standard because it has not done so here. See Chenery Corp., 332 U.S. at 196; Carpenter Family Invs., LLC v. Commissioner, 136 T.C. at 380, 396 n.30.

The validity of the final rule therefore turns on whether Treasury reasonably concluded, see State Farm, 463 U.S. at 43, that it is consistent with the arm's-length standard, and that is necessarily an empirical determination. The reasonableness of Treasury's conclusion in no way depends on its interpretation of section 482 or any other statute. As the Supreme Court recently articulated, State Farm review is "the more apt analytic framework" where the challenged regulation

---

[15]The preamble states that "Treasury and the IRS do not agree with the comments that assert that taking stock-based compensation into account in the QCSA context would be inconsistent with the arm's length standard in the absence of evidence that parties at arm's length take stock-based compensation into account in similar circumstances." T.D. 9088, 2003-2 C.B. 841, 842. However, the preamble never suggests that the final rule could be consistent with the arm's-length standard if evidence showed that unrelated parties would not share stock-based compensation costs or that an evidentiary inquiry was unnecessary. See id., 2003-2 C.B. at 842-843.

does not rely on an agency's interpretation of a statute. Judulang, 565 U.S. at ___ n.7, 132 S. Ct. at 483.

Nevertheless, respondent contends that we should not review the final rule under State Farm because the Supreme Court has never, and this Court has rarely, reviewed Treasury regulations under State Farm. However, respondent concedes that Treasury is subject to the APA, and respondent has not advanced any justification for exempting Treasury regulations from State Farm review. The Supreme Court has stated that "[i]n the absence of such justification, we are not inclined to carve out an approach to administrative review good for tax law only. To the contrary, we have expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" Mayo Found., 562 U.S. at 55 (quoting Dickinson v. Zurko, 527 U.S. 150, 154 (1999) (alteration in original)); see also Dominion Res., Inc. v. United States, 681 F.3d 1313, 1319 (Fed. Cir. 2012) (invalidating the associated-property rule in section 1.263A-11(e)(1)(ii)(B), Income Tax Regs., under State Farm).

Ultimately, however, whether State Farm or Chevron supplies the standard of review is immaterial because Chevron step 2[16] incorporates the reasoned

---

[16]The parties agree that sec. 482 is ambiguous. These cases would therefore be resolved at Chevron step 2.

decisionmaking standard of State Farm. See Judulang, 565 U.S. at ___ n.7, 132 S. Ct. at 483 (stating that, under either standard, the "analysis would be the same, because under Chevron step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance'" (quoting Mayo Found., 562 U.S. at 53)); Torres-Valdivias v. Holder, 766 F.3d 1106, 1114 n.5 (9th Cir. 2014) (citing Judulang, 565 U.S. at ___ n.7, 132 S. Ct. at 483); Agape Church, Inc. v. FCC, 738 F.3d 397, 410 (D.C. Cir. 2013) (citing Judulang, 565 U.S. at ___ n.7, 132 S. Ct. at 483). Because the validity of the final rule turns on whether Treasury reasonably concluded that it is consistent with the arm's-length standard, the final rule must--in any event--satisfy State Farm's reasoned decisionmaking standard. Accordingly, we will examine whether the final rule satisfies that standard without deciding whether Chevron or State Farm provides the ultimate standard of review.

## IV. Whether the Final Rule Satisfies State Farm's Reasoned Decisionmaking Standard

Petitioner contends that the final rule is invalid because (A) it lacks a basis in fact, (B) Treasury failed to rationally connect the choice it made with the facts it found, (C) Treasury failed to respond to significant comments, and (D) the final rule is contrary to the evidence before Treasury. Respondent disagrees.

A. The Final Rule Lacks a Basis in Fact.

Petitioner contends that the final rule lacks a basis in fact because Treasury issued the final rule without any evidence that unrelated parties would ever agree to share stock-based compensation costs. Respondent contends that (1) Treasury did not rely solely on its belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs but also on the commensurate-with-income standard and (2) Treasury was sufficiently experienced with cost-sharing agreements to conclude that unrelated parties entering into QCSAs would generally share stock-based compensation costs.

1. The Commensurate-With-Income Standard Cannot Justify the Final Rule.

Although Treasury referred to the commensurate-with-income standard in the preamble to the final rule, it relied on its belief that the final rule was required by--or was at least consistent with--the arm's-length standard.[17] In Xilinx Inc. v. Commissioner, 125 T.C. at 56-58, we concluded that Congress never intended for

[17]In its response to comments asserting that stock-based compensation does not constitute an economic cost to the issuing corporation, Treasury appears to have relied exclusively on the arm's-length standard. See T.D. 9088, 2003-2 C.B. at 843 ("Treasury and the IRS continue to believe that requiring stock-based compensation to be taken into account in the context of QCSAs is appropriate. The final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard.").

the commensurate-with-income standard to supplant the arm's-length standard. In the 1988 White Paper Treasury and the IRS similarly concluded that Congress intended for the commensurate-with-income standard to work consistently with the arm's-length standard. See Notice 88-123, 1988-2 C.B. 458, 472, 475. Treasury has since repeatedly reinforced this conclusion in technical explanations to numerous income tax treaties.[18] See, e.g., Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306-201,307; Treasury Department Technical Explanation of the 1997 U.S.-Ir. Income Tax Convention and Protocol, Tax Treaties (CCH) para. 4435, at 103,223; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9, Tax Treaties (CCH) para. 215, at 10,640-10,641. The preamble to the final rule does not

indicate that Treasury intended to abandon this conclusion and we conclude that it did not.[19]

Moreover, because Treasury did not rely exclusively on the commensurate-with-income standard, we cannot sustain the final rule solely on that basis if we decide that Treasury's reliance on the arm's-length standard in issuing the final rule was unreasonable. See Chenery Corp., 332 U.S. at 196; Nat'l Fuel Gas Supply, 468 F.3d at 839 (citing Allied-Signal, 988 F.2d at 150-151, and Consol. Edison, 823 F.2d at 641-642). Accordingly, the commensurate-with-income standard, as interpreted by Treasury, cannot provide a sufficient basis for the final rule.

2. Treasury's Unsupported Assertion Cannot Justify the Final Rule.

A court will generally not override an agency's "reasoned judgment about what conclusions to draw from technical evidence or how to adjudicate between rival scientific [or economic] theories". Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 437 F.3d 75, 83 (D.C. Cir. 2006).

---

[19] Even were we to conclude that Treasury intended to adopt a more expansive understanding of the commensurate-with-income standard, we would be unable to sustain the final rule on that basis because Treasury never acknowledged that it was changing its position. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (citing United States v. Nixon, 418 U.S. 683, 696 (1974)).

However, "where an agency has articulated no reasoned basis for its decision--where its action is founded on unsupported assertions or unstated inferences--* * * [a court] will not 'abdicate the judicial duty carefully to "review the record to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence."'" Id. (quoting Am. Mining Cong. v. EPA, 907 F.2d 1179, 1187 (D.C. Cir. 1990)).

Respondent concedes that (1) in adopting the final rule, Treasury took the position that it was not obligated to engage in fact finding or to follow evidence gathering procedures; (2) the files maintained by Treasury relating to the final rule did not contain any empirical or other evidence supporting Treasury's belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs; (3) the files maintained by Treasury relating to the final rule did not have any record that Treasury searched any database that could have contained agreements between unrelated parties; and (4) Treasury was unaware of any written agreement--or of any transaction--between unrelated parties that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation.[20]

---

[20]Treasury's failure to conduct any factfinding before issuing the final rule is also evident in the preamble to the final rule. See T.D. 9088, 2003-2 C.B. at

(continued...)

The preamble to the final rule offered only Treasury's belief that unrelated parties entering into QCSAs would generally share stock-based compensation costs. Specifically, the preamble to the final rule states that, in the context of a hypothetical QCSA between unrelated parties to develop patentable pharmaceutical products, "Treasury and the IRS believe that if a significant element of that compensation consists of stock-based compensation, the party committing employees to the arrangement generally would not agree to do so on terms that ignore the stock-based compensation." T.D. 9088, 2003-2 C.B. at 843. Treasury, however, failed to provide a reasoned basis for reaching this conclusion from any evidence in the administrative record. See Tripoli Rocketry, 437 F.3d at 83. Indeed, "every indication in the record points the other way", State Farm, 463 U.S. at 57 (internal quotation omitted). See infra part IV.C.

Respondent defends Treasury's failure to provide a reasoned basis for its conclusion from any evidence in the administrative record on the notion that "[t]here are some propositions for which scant empirical evidence can be marshaled". See Fox Television, 556 U.S. at 519. This may be true regarding

certain propositions, see id. ("the harmful effect of broadcast profanity on children is one of them"), but we do not agree that the belief that unrelated parties would share stock-based compensation costs in the context of a QCSA is one of them. First, commentators submitted significant evidence regarding this proposition. See infra part IV.C. Second, we were able to reach a definitive factual determination on the basis of significant evidence regarding this very proposition in Xilinx. See Xilinx Inc. v. Commissioner, 125 T.C. at 58-62. Third, Treasury could not have rationally concluded that this is a proposition "for which scant empirical evidence can be marshaled", see Fox Television, 556 U.S. at 519, without attempting to marshal empirical evidence in the first instance, which respondent concedes it did not do.

Relying on Peck v. Thomas, 697 F.3d 767 (9th Cir. 2012), respondent further contends that we must defer to Treasury's expertise with respect to whether the parties operating at arm's length would share stock-based compensation. At issue in Peck was a regulation issued by the Bureau of Prisons that denied early release to inmates with a felony conviction for certain enumerated offenses. In issuing the regulation the Bureau of Prisons expressly relied on its "'correctional experience'" in determining which offenses warrant preclusion from early release but did not disclose any statistical studies to support its conclusions. See id. at

773 (quoting 74 Fed. Reg. 1895 (Jan. 14, 2009)). The U.S. Court of Appeals for the Ninth Circuit rejected an inmate's argument that the Bureau of Prisons violated the APA in issuing this regulation because it did not develop statistical evidence to support its conclusions. See id. at 775-776. The Court of Appeals reasoned that the Bureau of Prisons was entitled to rely on its experience and the APA did not require it to develop statistical evidence to support its conclusions. See id. (citing Sacora v. Thomas, 628 F.3d 1059, 1067, 1069 (9th Cir. 2010)).

Respondent's reliance on Peck is misplaced. First, in Peck, the Bureau of Prisons relied on its extensive correctional experience in determining which offenses warrant preclusion from early release. Here, by contrast, Treasury admits that it had no knowledge of any transactions in which parties operating at arm's length shared stock-based compensation.

Second, the preamble to the regulation at issue in Peck expressly relied on the Bureau of Prisons' extensive, hands-on correctional experience. Here, by contrast, the preamble to the final rule does not rely on Treasury's experience as a party to arm's-length cost-sharing agreements--or even on any experience Treasury may have had in examining the arm's-length cost-sharing agreements of taxpayers it regulates. Indeed, the preamble to the final rule all but disclaimed Treasury's reliance on any such experience.

Third, the administrative record for the regulation at issue in Peck contained no evidence contradicting the Bureau of Prisons' correctional experience. Here, by contrast, commentators introduced significant evidence showing that parties operating at arm's length would not share stock-based compensation. See infra part IV.C. Peck does not support the contention that an agency can rely on unsupported assertions in the face of significant contrary evidence in the administrative record.

We conclude that (1) by failing to engage in any fact finding, Treasury failed to "examine the relevant data", State Farm, 463 U.S. at 43, and (2) Treasury failed to support its belief that unrelated parties would share stock-based compensation costs in the context of a QCSA with any evidence in the record. Accordingly, the final rule lacks a basis in fact.

B. Treasury Failed To Rationally Connect the Choice It Made With the Facts It Found.

Petitioner contends that the preamble to the final rule fails to rationally connect the choice that Treasury made in issuing a uniform final rule with the facts on which it purported to rely. See id. The preamble to the final rule indicates that Treasury relied on its belief that unrelated parties entering into QCSAs to develop "high-profit intangibles" would share stock-based compensation if the stock-based

compensation was a "significant element" of the compensation. T.D. 9088, 2003-2 C.B. at 842-843. However, petitioner alleges, and respondent does not dispute, that (1) many QCSAs do not deal with "high-profit intangibles" and (2) stock-based compensation is often not a "significant element" of the compensation of the employees of taxpayers that enter into QCSAs. Yet the final rule does not distinguish between QCSAs to develop "high-profit intangibles" in which stock-based compensation was a "significant element" of the compensation and QCSAs in which these elements are not present. Petitioner contends--and we agree--that the preamble's explanation for Treasury's decision is therefore inadequate. See State Farm, 463 U.S. at 43.

Indeed, respondent does not directly refute petitioner's contention. Instead, respondent defends the final rule's inflexibility by arguing that the final rule is reasonable because it eases administrative burdens.[21]

Improving administrability can be a reasonable basis for agency action. See Mayo Found., 562 U.S. at 59 ("[Treasury] reasonably concluded that its full-time

employee rule would ‘improve administrability[.]’” (quoting T.D. 9167, 2005-1 C.B. 261, 262)). However, Treasury failed to give this--or any other--explanation for treating all QCSAs identically in the preamble to the final rule,[22] cf. id., and we cannot reasonably discern, see State Farm, 463 U.S. at 43, that this was Treasury’s rationale for adopting a uniform final rule because the administrative benefits of a uniform final rule are entirely speculative.[23]

Moreover, even if we could discern that this was Treasury’s intent, we would be unable to sustain the final rule on that basis because Treasury did not disclose its factual findings and we would therefore be unable to evaluate whether Treasury reasonably concluded that the purported administrative benefits of a uniform final rule can justify erroneously allocating income in some of those

[22]The preamble to the final rule discusses administrability only with respect to Treasury’s selection of the exercise spread method and the elective grant date method as the only available valuation methods. See T.D. 9088, 2003-2 C.B. at 844.

cases. We therefore conclude that, by treating all QCSAs identically, Treasury failed to articulate a "'rational connection between the facts found and the choice made,'" State Farm, 463 U.S. at 43 (quoting Burlington Truck Lines, 371 U.S. at 168).

C. Treasury Failed To Respond to Significant Comments.

Petitioner contends that Treasury failed to respond to significant comments submitted by commentators. Respondent contends that Treasury was not persuaded by the submitted comments.

Several commentators informed Treasury that they knew of no evidence of any transaction between unrelated parties that required one party to reimburse the other party for amounts attributable to stock-based compensation. Additionally, AeA informed Treasury that a survey of its member companies' arm's-length codevelopment and joint venture agreements found none in which the parties agreed to share stock-based compensation costs. We found similar evidence to be relevant in Xilinx. See Xilinx Inc. v. Commissioner, 125 T.C. at 59. Treasury never directly responded to this evidence. Instead, Treasury reasoned that the final rule would not be inconsistent with the arm's-length standard in the absence of evidence that unrelated parties share stock-based compensation costs because relevant data may not be available. See T.D. 9088, 2003-2 C.B. at 842.

Treasury's response, however, in no way refutes the commentators' evidence that unrelated parties never share such compensation.

AeA and PwC further represented to Treasury that they conducted multiple searches of the EDGAR system and found no cost-sharing agreements between unrelated parties in which the parties agreed to share either the exercise spread or grant date value of stock-based compensation. Treasury never responded to this evidence.

Several commentators identified arm's-length agreements in which stock-based compensation was not shared or reimbursed. Treasury responded to these comments by stating that "[t]he uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." Id. In particular, Treasury stated that

> [t]he other agreements highlighted by commentators establish arrangements that differ significantly from QCSAs in that they provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement. Such terms, which may have the effect of mitigating the impact of using a cost base to be shared or reimbursed that is less than comprehensive, would not be permitted by the QCSA regulations. * * *

Id. However, the Amylin-HMR collaboration agreement that AeA identified and PwC submitted did not "provide for the payment of markups on cost or of non-cost-based service fees to service providers within the arrangement or for the payment of royalties among participants in the arrangement." Id. Respondent contends that the Amylin-HMR collaboration agreement is not comparable to a QCSA for other reasons, but Treasury failed to identify those reasons in the preamble to the final rule.[24] See Chenery Corp., 332 U.S. at 196; Carpenter Family Invs., LLC v. Commissioner, 136 T.C. at 380, 396 n.30. More significantly, Treasury did not explain why identical transactions are necessary to prove whether unrelated parties would share stock-based compensation costs in the context of a QCSA. In Xilinx Inc. v. Commissioner, 125 T.C. at 58-62, we found that unrelated parties would not share the exercise spread or grant date value of stock-based compensation, and in doing so we did not rely on transactions that were identical or substantially similar to QCSAs. Rather, we

[24]The Amylin-HMR collaboration agreement also would permit the sharing of stock-based compensation based on the intrinsic value method, under which options issued in-the-money would be recognized as an expense. However, the treatment of in-the-money stock options is not at issue here, and the final rule explicitly rejected the use of the intrinsic value method. See T.D. 9088, 2003-2 C.B. at 844.

relied on the behavior of uncontrolled parties in comparable business transactions as well as on other evidence. See id.[25]

FEI provided model accounting procedures from COPAS that recommended against sharing stock-based compensation because it is difficult to value. Treasury never responded to this evidence.

AeA, SoFTEC, KPMG, and PwC cited regulations that prohibit contractors from charging the Federal Government for stock-based compensation. Treasury responded to this evidence by stating that "[g]overnment contractors that are entitled to reimbursement for services on a cost-plus basis under government procurement law assume substantially less entrepreneurial risk than that assumed by service providers that participate in QCSAs". See T.D. 9088, 2003-2 C.B. at 842. However, this distinction rings hollow in the face of other evidence submitted by commentators that showed that even parties to agreements in which the parties assume considerable entrepreneurial risk do not share stock-based compensation costs.

AeA, Global, and PwC explained that, from an economic perspective, unrelated parties would be unwilling to share stock-based compensation costs

because the value of stock-based compensation is speculative, potentially large, and completely outside the control of the parties. SoFTEC submitted Baumol and Malkiel's detailed economic analysis reaching the same conclusion. We found similar evidence to be relevant in Xilinx. See Xilinx Inc. v. Commissioner, 125 T.C. at 61. Treasury never directly responded to this evidence. Instead, Treasury construed these comments as objections to Treasury's selection of the exercise spread method and the grant date method as the only available valuation methods. See T.D. 9088, 2003-2 C.B. at 844. Treasury responded that these methods are consistent with the arm's-length standard and are administrable. See id. Treasury, however, never explained how these methods could be consistent with the arm's-length standard if unrelated parties would not share them or why unrelated parties would share stock-based compensation costs in any other way.

The Baumol and Malkiel analysis also concluded that there is no net economic cost to a corporation or its shareholders from the issuance of stock-based compensation. Treasury identified this evidence in the preamble to the final rule but did not directly respond to it. See id., 2003-2 C.B. at 843. Instead, the preamble states that "[t]he final regulations provide that stock-based compensation must be taken into account in the context of QCSAs because such a result is consistent with the arm's length standard." Id. Treasury, however, never

explained why unrelated parties would share stock-based compensation costs--or how the commensurate-with-income standard could justify the final rule--if stock-based compensation is not an economic cost to the issuing corporation or its shareholders.[26]

Mr. Grundfest informed Treasury that companies do not factor stock-based compensation into their pricing decisions. We found similar evidence to be relevant in Xilinx. See Xilinx Inc. v. Commissioner, 125 T.C. at 59. Treasury never responded to this evidence.

Indeed, Treasury failed to respond directly to any of the evidence that unrelated parties would not share stock-based compensation costs, other than by asserting that the transactions cited by the commentators did not "share enough characteristics of QCSAs involving the development of high-profit intangibles" to be relevant. T.D. 9088, 2003-2 C.B. at 842. This was a mere assertion; Treasury offered no analysis addressing the extent of the supposed differences or explaining why any differences make the cited transactions irrelevant or unpersuasive. By

contrast, in Xilinx we examined a broad array of evidence to determine whether unrelated parties would share such costs. See Xilinx Inc. v. Commissioner, 125 T.C. at 58-62. Tellingly, respondent does not even attempt to explain why Treasury failed to address similar evidence in the preamble to the final rule.

Although Treasury's failure to respond to an isolated comment or two would probably not be fatal to the final rule, Treasury's failure to meaningfully respond to numerous relevant and significant comments certainly is. See Home Box Office, 567 F.2d at 35-36. Meaningful judicial review and fair treatment of affected persons require "an exchange of views, information, and criticism between interested persons and the agency." Id. at 35. Treasury's failure to adequately respond to commentators frustrates our review of the final rule and was prejudicial to affected entities.

D. The Final Rule Is Contrary to the Evidence Before Treasury.

Petitioner contends that the final rule is contrary to the evidence before Treasury when it issued the final rule. We agree.

We have already discussed Treasury's failure to cite any evidence supporting its belief that unrelated parties to QCSAs would share stock-based compensation costs, see supra part IV.A; the significant evidence submitted by commentators showing that unrelated parties to QCSAs would not share stock-

based compensation costs, see supra part IV.C; and Treasury's failure to respond to much of the submitted evidence, see id.

Significantly, Treasury never said that it found any of the submitted evidence incredible. Treasury also seemed to accept the commentators' economic analyses, which concluded that--and explained why--unrelated parties to a QCSA would be unwilling to share the exercise spread or grant date value of stock-based compensation. Finally, respondent has not identified any evidence in the administrative record that supports Treasury's belief that unrelated parties to QCSAs would generally share stock-based compensation costs.

Although we are mindful that "a court is not to substitute its judgment for that of the agency", State Farm, 463 U.S. at 43, we conclude that Treasury's "explanation for its decision * * * runs counter to the evidence before" it, see id.

V. Harmless Error

Respondent contends that, pursuant to the harmless error rule of APA sec. 706, any deficiencies in Treasury's reasoning should not invalidate the final rule because (1) Treasury had sufficient alternative reasons for adopting the final rule and (2) in the years following Treasury's adoption of the final rule the Financial Accounting Standards Board (FASB), the International Accounting Standards

Board (IASB), and the Organisation for Economic Cooperation and Development (OECD)[27] have adopted policy positions that concur with Treasury's.[28]

A. Alternative Reasons for Adopting the Final Rule

Although the preamble refers to the commensurate-with-income standard, we have already concluded that Treasury never indicated that it was prepared to independently rely on the commensurate-with-income standard--or any other reason--as a basis for adopting the final rule. See supra parts III.B and IV.A.1. Moreover, because the arm's-length standard is incorporated into numerous income tax treaties, see, e.g., 2001 U.S.-U.K. Income Tax Convention, art. 9; 2006

U.S. Model Income Tax Convention, art. 9; Treasury Department Technical Explanation of the 2001 U.S.-U.K. Income Tax Convention, art. 9, Tax Treaties (CCH) para. 10,911, at 201,306-201,307; Treasury Department Technical Explanation of the 2006 U.S. Model Income Tax Convention, art. 9; Tax Treaties (CCH) para. 215, at 10,640-10,641, respondent cannot reasonably contend that Treasury would have clearly adopted the final rule had it concluded that the final rule conflicted with that standard. See PDK Labs., 362 F.3d at 799.

B. Settled Policy

Respondent's argument that the policy debate underlying the final rule has long been settled is irrelevant and misapprehends the role of this Court under State Farm. It is irrelevant because Treasury expressly disavowed reliance on financial reporting standards when it issued the final rule, see T.D. 9088, 2003-2 C.B. at 843 ("Treasury and the IRS agree that the disposition of financial reporting issues does not mandate a particular result under these regulations."), and the policy positions to which respondent refers did not exist and were therefore unavailable to Treasury when it issued the final rule, see Chenery Corp., 332 U.S. at 196; Carpenter Family Invs., LLC v. Commissioner, 136 T.C. at 380, 396 n.30. Respondent's argument misapprehends the role of this Court because, under State Farm, our role is not to decide whether the final rule is good policy--it is simply to

"ensur[e] that * * * [Treasury] engaged in reasoned decisionmaking." Judulang, 565 U.S. at ___, 132 S. Ct. at 483-484.

Because it is not clear that Treasury would have adopted the final rule had it concluded that the final rule is inconsistent with the arm's-length standard, the harmless error rule is inapplicable.

VI. Conclusion

Because the final rule lacks a basis in fact, Treasury failed to rationally connect the choice it made with the facts found, Treasury failed to respond to significant comments when it issued the final rule, and Treasury's conclusion that the final rule is consistent with the arm's-length standard is contrary to all of the evidence before it, we conclude that the final rule fails to satisfy State Farm's reasoned decisionmaking standard and therefore is invalid.[29] See APA sec. 706(2)(A); State Farm, 463 U.S. at 43. Indeed, Treasury's "ipse dixit conclusion,

---

[29]Because we conclude that the final rule fails to satisfy State Farm's reasoned decisionmaking standard, the final rule would be invalid even if we were to conclude that Chevron supplies the ultimate standard of review. See supra part III.B. The analysis under Chevron would proceed as follows: The parties agree that sec. 482 is ambiguous. We would therefore proceed to Chevron step 2. Under Chevron step 2, we would conclude the final rule is invalid because it is "'arbitrary or capricious in substance'", Judulang v. Holder, 565 U.S. ___, ___ n.7, 132 S. Ct. 476, 483 (2011) (quoting Mayo Found., 562 U.S. at 53), and therefore cannot be justified as being a reasonable interpretation of what sec. 482 requires.

coupled with its failure to respond to contrary arguments resting on solid data, epitomizes arbitrary and capricious decisionmaking." Ill. Pub. Telecomms. Ass'n v. FCC, 117 F.3d 555, 564 (D.C. Cir. 1997).

By reason of the above respondent erred in making the section 482 allocations at issue, and petitioner is therefore entitled to partial summary judgment. We will grant petitioner's motion and deny respondent's motion.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

An appropriate order will be issued.

Reviewed by the Court.

THORNTON, COLVIN, HALPERN, FOLEY, VASQUEZ, GALE, GOEKE, HOLMES, PARIS, KERRIGAN, BUCH, LAUBER, NEGA, and ASHFORD, JJ., agree with this opinion of the Court.

MORRISON and PUGH, JJ., did not participate in the consideration of this opinion.

# APPENDIX C

## Public Companies Affected by the *Altera* Issue

**Public Companies Affected by the *Altera* Issue**

The following public companies noted the *Altera* issue in their annual reports (Forms 10-K) to the SEC.[1]

1. A10 Networks, Inc., Form 10-K at 34 (Mar. 18, 2019)
2. Agilent Technologies, Inc., Form 10-K at 38 (Dec. 21, 2017)
3. Alpha & Omega Semiconductor Ltd., Form 10-K at 96 (Aug. 23, 2018)
4. Alphabet Inc., Form 10-K at 78 (Feb. 3, 2017) (reporting $4.4 billion at stake)
5. Ambarella, Inc., Form 10-K at 91 (Mar. 29, 2019)
6. Apple Inc., Form 10-K at 28 (Nov. 5, 2018)
7. Arista Networks, Inc., Form 10-K at 44 (Feb. 15, 2019)
8. Cavium, Inc., Form 10-K at 79 (Mar. 1, 2018)
9. Citrix Systems, Inc., Form 10-K at 43 (Feb. 15, 2019)
10. Cypress Semiconductor Corp., Form 10-K at 42 (Feb. 26, 2018)
11. eBay Inc., Form 10-K at 40 (Mar. 30, 2019)
12. Electronic Arts Inc., Form 10-K at 64 (May 27, 2016) (reporting $41 million at stake)
13. Electronics For Imaging, Inc., Form 10-K at 53 (Feb. 27, 2019)
14. EMC Corp., Form 10-K at 23 (Feb. 25, 2016)

[1] The list was generated by searching Lexis Securities Mosaic, a commercial database of public company filings, for all Forms 10-K filed between 2015 and the present that mention the *Altera* opinions issued by the Tax Court or this Court.

15. Facebook, Inc., Form 10-K at 26 (Jan. 31, 2019)

16. Fairchild Semiconductor International, Inc., Form 10-K at 37 (Aug. 18, 2016)

17. Fitbit, Inc., Form 10-K at 44 (Mar. 1, 2019)

18. Forrester Research, Inc., Form 10-K at 22 (Mar. 9, 2018) (reporting $0.6 million at stake)

19. Fortinet, Inc., Form 10-K at 27 (Feb. 27, 2019)

20. Groupon, Inc., Form 10-K at 79 (Feb. 12, 2016) (reporting $14 million at stake)

21. Harmonic Inc., Form 10-K at 93 (Mar. 1, 2019)

22. Immersion Corp., Form 10-K at 69 (Feb. 27, 2019)

23. Integrated Device Technology, Inc., Form 10-K at 32 (May 18, 2018)

24. InvenSense, Inc., Form 10-K at 46-47 (May 25, 2016)

25. Juniper Networks, Inc., Form 10-K at 112 & n.2 (Feb. 19, 2016) (reporting $13.2 million at stake)

26. LAM Research Corp., Form 10-K at 37 (Aug. 15, 2017) (reporting $99 million at stake)

27. Liberty TripAdvisor Holdings, Inc., Form 10-K at 32 (Feb. 22, 2019)

28. Lumentum Holdings Inc., Form 10-K at 91 (Aug. 28, 2018)

29. McKesson Corp., Form 10-K at 84 (May 22, 2017) (reporting $25 million at stake)

30. Mentor Graphics Corp., Form 10-K at 32 (Mar. 21, 2016)

31. Microsoft Corp., Form 10-K at 41 (July 28, 2016)

32. Monolithic Power Systems, Inc., Form 10-K at 71 (Mar. 1, 2019)

33. NetApp, Inc., Form 10-K at 80 (June 22, 2016)

34. Oracle Corp., Form 10-K at 117 (June 22, 2018)

35. PayPal Holdings, Inc., Form 10-K at 105 (Feb. 8, 2017)

36. Plantronics, Inc., Form 10-K at 68 (May 16, 2016) (reporting $3 million at stake)

37. Polycom, Inc., Form 10-K at 47 (Feb. 29, 2016)

38. Power Integrations, Inc., Form 10-K at 56 (Feb. 13, 2019)

39. QLogic Corp., Form 10-K at 27 (May 26, 2016)

40. Rackspace Hosting, Inc., Form 10-K at 88 (Jun 13, 2016)

41. Salesforce.com, Inc., Form 10-K at 98 (Mar. 7, 2016) (reporting $30 million at stake)

42. Silicon Laboratories Inc., Form 10-K at 43 (Feb. 1, 2017) (reporting $33 million at stake)

43. SolarWinds Corp., Form 10-K at 40 (Feb. 25, 2019)

44. Stitch Fix, Inc., Form 10-K at 19 (Oct. 3, 2018)

45. SunPower Corp., Form 10-K at 71 (Feb. 14, 2019)

46. Synaptics Inc., Form 10-K at 41 (Aug. 24, 2018)

47. Synopsys, Inc., Form 10-K at 82-83 (Dec. 17, 2018)

48. Tableau Software, Inc., Form 10-K at 102 (Feb. 22, 2019)

49. Take Two Interactive Software, Inc., Form 10-K at 12 (May 14, 2019)

50. Teradata Corp., Form 10-K at 63 (Mar. 1, 2019)

51. Tesla, Inc., Form 10-K at 129 (Feb. 19, 2019)

52. TripAdvisor, Inc., Form 10-K at 107 (Feb. 17, 2017) (reporting $19 million at stake)

53. Twitter, Inc., Form 10-K at 38 (Feb. 21, 2019)

54. Ubiquiti Networks, Inc., Form 10-K at 77-78 (Aug. 24, 2018)

55. Workday, Inc., Form 10-K at 76 (Mar. 18, 2019)

56. Yahoo! Inc., Form 10-K at 63 (Feb. 29, 2016)

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 11. Certificate of Compliance for Petitions for Rehearing or Answers

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 16-70496, 16-70497

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for panel rehearing/petition for rehearing en banc/answer to petition is (*select one*):

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words**: 4,200.
*(Petitions and answers must not exceed 4,200 words)*

**OR**

○ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** /s/ Nicole A. Saharsky **Date** July 22, 2019
*(use* "s/[typed name]" *to sign electronically-filed documents)*