**Nos. 16-70496, 16-70497**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**ALTERA CORPORATION & SUBSIDIARIES,**
*Petitioner-Appellee*,

v.

**COMMISSIONER OF INTERNAL REVENUE,**
*Respondent-Appellant.*

On Appeal from the United States Tax Court
Nos. 6253-12, 9963-12

# BRIEF OF PRICEWATERHOUSECOOPERS LLP, DELOITTE TAX LLP, AND KPMG LLP AS AMICI CURIAE IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING EN BANC

Miriam L. Fisher
*Counsel of Record*
Melissa Arbus Sherry
Eric J. Konopka
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
miriam.fisher@lw.com

August 1, 2019

*Counsel for Amici Curiae PricewaterhouseCoopers LLP, Deloitte Tax LLP, and KPMG LLP*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), PricewaterhouseCoopers LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), Deloitte Tax LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

In accordance with Federal Rules of Appellate Procedure 26.1, 29(a)(4)(A), and 29(b)(4), KPMG LLP states that it is a limited liability partnership organized under the laws of Delaware, that it has no stock, and that therefore no publicly traded company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICI CURIAE .................................................................1

ARGUMENT .............................................................................................4

I. THE MAJORITY OPINION CREATES NATIONAL AND INTERNATIONAL UNCERTAINTY AS TO WHETHER STOCK-BASED COMPENSATION MUST BE SHARED BY THE PARTIES TO A QCSA .......................................................................4

II. THE MAJORITY OPINION MAY FOSTER UNCERTAINTY, AND INCREASE DISAGREEMENTS, ABOUT THE MEANING AND APPLICATION OF THE ARM'S LENGTH STANDARD ..........................8

A. The Majority Opinion Raises Numerous Questions About The Meaning And Application Of The Arm's Length Standard .................9

B. The Majority Opinion's Lack Of Clarity On The Arm's Length Standard Could Lead To Significant Adverse Collateral Consequences ..................................................................13

CONCLUSION ........................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altera Corp. v. Commissioner*,
145 T.C. 91 (2015) .......... 5

*Altera Corp. v. Commissioner*,
926 F.3d 1061 (9th Cir. 2019) .......... 11, 12, 13

*Barclays Bank PLC v. Franchise Tax Board of California*,
512 U.S. 298 (1994) .......... 10

*Fehlhaber v. Commissioner*,
94 T.C. 863 (1990), *aff'd*, 954 F.2d 653 (11th Cir. 1992) .......... 6

*Frank v. International Canadian Corp.*,
308 F.2d 520 (9th Cir. 1962) .......... 11

*Madden v. Commissioner*,
514 F.2d 1149 (9th Cir. 1975) .......... 7

*Mitchell v. Commissioner*,
106 T.C.M. (CCH) 215 (2013), *aff'd*, 775 F.3d 1243 (10th Cir. 2015) .......... 5

*Oil Base, Inc. v. Commissioner*,
362 F.2d 212 (9th Cir. 1966) .......... 12

*United States v. Gilbert Associates, Inc.*,
345 U.S. 361 (1953) .......... 6

*Xilinx, Inc. v. Commissioner*,
125 T.C. 37 (2005) .......... 5

*Xilinx, Inc. v. Commissioner*,
598 F.3d 1191 (9th Cir. 2010) .......... 5

## TREASURY REGULATIONS

Treas. Reg. § 1.482-1(b)(1) .......... 9

**Page(s)**

Treas. Reg. § 1.482-1(c)(2) .......... 12

Treas. Reg. § 1.482-1(d) .......... 12

Treas. Reg. § 1.482-1(d)(1) .......... 9

Treas. Reg. § 1.482-6(c)(3)(ii)(B) .......... 12

Treas. Reg. § 1.482-7A(b) .......... 4

Treas. Reg. § 1.482-7A(d)(2) .......... 3, 5

Treas. Reg. § 1.6662-3(b)(3) .......... 8

Treas. Reg. § 1.6662-4(d)(3)(iii) .......... 8

**OTHER AUTHORITIES**

Comment, *Heresy in the Hierarchy: Tax Court Rejection of Court of Appeals Precedents*, 57 Colum. L. Rev. 717 (1957) .......... 6

Fed. R. App. P. 35(a)(2) .......... 4

Fed. R. App. P. 35(b) .......... 6

Deborah A. Geier, *The Emasculated Role of Judicial Precedent in the Tax Court and Internal Revenue Service*, 39 Okla. L. Rev. 427 (1986) .......... 6

IRS Notice 88-123, *A Study of Intercompany Pricing Under Section 482 of the Code*, 1988-2 C.B. 458 .......... 10

Patricia Gimbel Lewis & Neal M. Kochman, *Option Wars: Upping the Ante for Cost Sharing Arrangements*, 31 Tax Mgmt. Int'l J. 547 (2002) .......... 5

Organisation for Economic Co-operation and Development, *OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations* (July 2017), https://dx.doi.org/10.1787/tpg-2017-en .......... 10

**Page(s)**

David F. Shores, *Rethinking Deferential Review of Tax Court Decisions*, 53 Tax Law. 35 (1999)....................................................................6

U.S. Dep't of the Treasury, *United States Model Income Tax Convention* (2016), https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Treaty-US%20Model-2016.pdf...............................14

U.S. Dep't of the Treasury, *United States Model Technical Explanation Accompanying the United States Model Income Tax Convention of November 15, 2006* (2006), https://www.irs.gov/pub/irs-trty/temod006.pdf....................................................9

## INTEREST OF AMICI CURIAE[1]

PricewaterhouseCoopers LLP, Deloitte Tax LLP, and KPMG LLP (collectively, "Amici Curiae" or "Amici") are professional services firms that provide tax services, including services related to transfer pricing, in the United States. The networks of professional firms to which Amici belong provide such services in over 150 countries around the world. Amici and their respective networks represent three of the world's "Big Four" accounting, tax, and advisory professional service organizations.[2]

PricewaterhouseCoopers LLP, a Delaware limited liability partnership, is the United States member firm of the global network of member firms of PricewaterhouseCoopers International Limited, a UK private company limited by guarantee. Each member firm is a separate and independent legal entity. The global network provides audit, assurance, advisory, and tax services to many of the world's largest corporations. During its 2018 fiscal year, the PricewaterhouseCoopers global network employed more than 250,000 people across offices in 158 countries, and provided services to 429 of the companies comprising the Fortune 500.

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part; and no such counsel, any party, or any other person or entity—other than Amici Curiae and their counsel—made a monetary contribution intended to fund the preparation or submission of this brief.

[2] Ernst & Young LLP is the financial statement auditor of Intel Corporation, Altera Corporation's parent company, and accordingly declined to participate as an amicus.

Deloitte Tax LLP, a Delaware limited liability partnership owned by Deloitte LLP and its individual partners and principals who actively participate in its business, provides tax services to a variety of clients located in the United States and throughout the world. Deloitte LLP is the United States member firm of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee. Deloitte Touche Tohmatsu Limited's global network of member firms consists of separate and independent legal entities with approximately 286,000 people in more than 150 countries and territories, and is a leading global provider of audit and assurance, consulting, financial advisory, risk advisory, tax, and related services, serving four out of five Fortune Global 500 companies.

KPMG LLP, a Delaware limited liability partnership, is the United States member firm of the KPMG International network of independent member firms affiliated with KPMG International, a Swiss cooperative. Each member firm is an independent entity and describes itself as such. KPMG LLP, with cooperation from other members of the KPMG International network, provides audit, advisory, and tax services to many of the world's largest corporations. KPMG International's member firms have more than 162,000 professionals, including more than 10,500 partners, in 152 countries.

Amici and the networks of which they are members employ thousands of professionals and audit client financial statements in accordance with applicable

auditing standards to provide reasonable assurance that financial statements provided to investors are free of material misstatements. Auditing and accounting are vital to the integrity of our capital markets.

In addition, Amici assist multinational enterprises with issues related to transfer pricing. These transfer pricing services are designed to assist multinational enterprises in their preparation of accurate tax returns in the countries where they operate. As three of the Big Four accounting, tax, and advisory firms, Amici have a unique, global perspective on—and substantial expertise and interest in—transfer pricing matters.

Amici are thus uniquely qualified to explain how two primary aspects of the majority opinion create significant uncertainty and may result in adverse collateral consequences. *First*, this case involves the validity of Treasury Regulation § 1.482-7A(d)(2), which requires controlled entities that are parties to a qualified cost sharing arrangement ("QCSA") to include stock-based compensation in shared intangible development costs. Because a majority of the three-judge panel overturned a 15-0 decision by the United States Tax Court, that regulation is now considered valid within the Ninth Circuit—but the Tax Court is free to (and likely will) follow its own decision in cases not appealable to this Court. That lack of uniformity creates uncertainty nationally and even internationally, and directly affects the tax and financial reporting of billions of dollars. *Second*, the majority opinion can be

interpreted to raise significant questions about the meaning and application of the arm's length standard, the long-accepted cornerstone of the international transfer pricing system developed collaboratively by nations of the world over the course of more than 80 years. The majority opinion has already prompted questions from taxpayers regarding the application of the arm's length standard, and continued uncertainty could lead to more transfer pricing disputes—which would impose significant costs on both multinational enterprises and taxing authorities. For both reasons, Amici believe that this case is exceptionally important and warrants en banc review. *See* Fed. R. App. P. 35(a)(2).

## ARGUMENT

### I. THE MAJORITY OPINION CREATES NATIONAL AND INTERNATIONAL UNCERTAINTY AS TO WHETHER STOCK-BASED COMPENSATION MUST BE SHARED BY THE PARTIES TO A QCSA

In a cost sharing arrangement, related entities agree to share the costs and risks of developing intangibles, with each participant possessing an interest in the intangibles ultimately developed. Treas. Reg. § 1.482-7A(b). Cost sharing arrangements are important to multinational enterprises, and a clear understanding of the scope and meaning of the QCSA rules is essential to calculating multinational enterprises' tax liabilities in the United States and elsewhere. Yet taxpayers and the

IRS have long disputed a basic but important question: Whether the parties to a QCSA must include stock-based compensation as part of the shared costs.[3]

That question is now resolved for stock-based compensation incurred before 2003—the year that the regulation at issue here, Treasury Regulation § 1.482-7A(d)(2), took effect. In *Xilinx, Inc. v. Commissioner*, the Tax Court held that "the arm's-length standard is applicable in determining the appropriate allocation of costs," and that the parties to a QCSA need *not* share stock-based compensation costs because unrelated parties would not do so. 125 T.C. 37, 55, 62 (2005). This Court affirmed that decision in 2010. *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191 (9th Cir. 2010). In promulgating § 1.482-7A(d)(2), the Treasury Department tried to prospectively change that rule by explicitly requiring the inclusion of stock-based compensation in the costs shared by QCSA participants. But the Tax Court—in a reviewed, 15-0 decision—found that regulation invalid. *Altera Corp. v. Comm'r*, 145 T.C. 91 (2015) (case below). The split panel decision in this case, which reversed the Tax Court and upheld § 1.482-7A(d)(2), unsettles what would otherwise be a uniform rule. The Tax Court may—and likely will—continue to rely on its unanimous decision in cases not appealable to this Court. *See Mitchell v. Comm'r*, 106 T.C.M. (CCH) 215, 220

---

[3] *See, e.g.*, Patricia Gimbel Lewis & Neal M. Kochman, *Option Wars: Upping the Ante for Cost Sharing Arrangements*, 31 Tax Mgmt. Int'l J. 547, 547 (2002) ("The IRS and taxpayers have been at loggerheads on this issue since the mid 1990s.").

n.7 (2013) ("[T]he Court will follow the clearly established position of a Court of Appeals to which a case is appealable. However, we will give effect to our own views in cases appealable to courts that have not yet decided the issue."), *aff'd*, 775 F.3d 1243 (10th Cir. 2015); *e.g.*, *Fehlhaber v. Comm'r*, 94 T.C. 863, 867 (1990) (adhering to holding in prior case outside the Ninth Circuit after reversal by the Ninth Circuit), *aff'd*, 954 F.2d 653 (11th Cir. 1992).[4] Due to the inconsistency between the panel decision and the Tax Court decision, whether the parties to a QCSA include stock-based compensation as part of shared intangible development costs could turn largely on geography.

The practical consequences are thus akin to a circuit split, which would itself warrant en banc review. *See* Fed. R. App. P. 35(b). Rehearing is similarly warranted here for four reasons. *First*, this case concerns federal taxation, where the interest in national uniformity and certainty is paramount. *See, e.g.*, *United States v. Gilbert*

[4] *See also, e.g.*, David F. Shores, *Rethinking Deferential Review of Tax Court Decisions*, 53 Tax Law. 35, 39 (1999) ("[T]he Tax Court follows court of appeals decisions with which it disagrees in cases appealable to that court of appeals, but it has traditionally adhered to its original position in cases appealable to other courts of appeals."); Deborah A. Geier, *The Emasculated Role of Judicial Precedent in the Tax Court and Internal Revenue Service*, 39 Okla. L. Rev. 427, 427-46 (1986); Comment, *Heresy in the Hierarchy: Tax Court Rejection of Court of Appeals Precedents*, 57 Colum. L. Rev. 717, 718-20 (1957).

*Assocs., Inc.*, 345 U.S. 361, 364 (1953); *Madden v. Comm'r*, 514 F.2d 1149, 1152 (9th Cir. 1975).

*Second*, the validity of § 1.482-7A(d)(2) affects the tax and financial reporting of billions of dollars, and is an issue of extraordinary importance for many of Amici's clients. That numerous Securities & Exchange Commission filings mention the issue and this case specifically further highlights its continuing importance.[5]

*Third*, lack of uniformity in the interpretation of § 1.482-7A(d)(2) is not *just* a national issue—it has an international dimension as well. Taxing authorities in other countries are unlikely to understand why local subsidiaries of some multinational enterprises with QCSAs share stock-based compensation costs, whereas local subsidiaries of others do not. The majority opinion has already increased the uncertainty for multinational enterprises with QCSAs in the short time since the opinion was issued. It will likely give rise to a large number of transfer pricing disputes involving QCSAs in the future, which will impose significant costs on both multinational enterprises and taxing authorities.

*Fourth*, the majority opinion results in uncertainty and potential inconsistency in the financial reporting of income taxes for multinational enterprises with QCSAs.

---

[5] *See* Petition for Rehearing *En Banc*, at Appendix C, Docket No. 161 (listing 56 public companies that "noted the *Altera* issue in their annual reports (Forms 10-K) to the SEC").

A multinational enterprise could, for example, use the Tax Court's opinion as authority not to follow § 1.482-7A(d)(2) when filing its federal income tax returns. *See* Treas. Reg. §§ 1.6662-3(b)(3), -4(d)(3)(iii) (a Tax Court case can provide a "reasonable basis" or "substantial authority" for a return position to avoid penalties, even if it has been overruled or reversed by a court of appeals "to which a taxpayer does not have a right of appeal"). For financial reporting purposes, however, a multinational enterprise might take a different position on whether it may recognize any benefit from relying on the Tax Court's opinion. That determination depends on a judgment that could vary from company to company, even when the relevant facts are similar.[6] Such variations in reporting make it more difficult for investors to compare financial statements across different companies.

## II. THE MAJORITY OPINION MAY FOSTER UNCERTAINTY, AND INCREASE DISAGREEMENTS, ABOUT THE MEANING AND APPLICATION OF THE ARM'S LENGTH STANDARD

Although the panel's holding nominally extends only to stock-based compensation and § 1.482-7A(d)(2), its reasoning may call into question the meaning and application of the arm's length standard more generally. In this respect

[6] Under Accounting Standards Codification Topic 740, the benefit of a tax position is recognized in the financial statements only if company management concludes that it is more likely than not that the position would be sustained based on its technical merits if challenged by the relevant taxing authorities and taken by company management to the court of last resort.

too, the majority opinion may foster uncertainty and increased disagreement among taxpayers and taxing authorities.

### A. The Majority Opinion Raises Numerous Questions About The Meaning And Application Of The Arm's Length Standard

The arm's length standard—under which income and expense allocations between related entities are tested for tax purposes by reference to what the allocations would be if there were an "arm's length" relationship between the entities—is the bedrock of the international transfer pricing system. *See, e.g.*, Treas. Reg. § 1.482-1(b)(1), (d)(1); U.S. Dep't of the Treasury, *United States Model Technical Explanation Accompanying the United States Model Income Tax Convention of November 15, 2006*, at 30 (2006).[7] Over the course of more than 80 years, the United States and many other countries have coalesced around that standard to allocate income and deductions among the members of a multinational enterprise.

The central role of the arm's length standard is reflected in decades of case law, regulations, and administrative practice, as well as in the network of tax treaties around the world, including those negotiated between the United States and its treaty

[7] Available at https://www.irs.gov/pub/irs-trty/temod006.pdf.

partners.[8] Indeed, as the Organisation for Economic Co-operation and Development ("OECD") has put it, "the arm's length principle . . . is the international transfer pricing standard that OECD member countries"—including the United States—"have agreed should be used for tax purposes by [multinational enterprise] groups and tax administrations." Organisation for Economic Co-operation and Development, *OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations* 33 (July 2017).[9]

A key objective of the international treaty network is to ensure that taxing authorities of all nations use consistent principles in determining how profits and deductions are allocated among related parties in order to minimize double taxation. The effective functioning of the international system of transfer pricing therefore depends on the arm's length standard being understood and applied consistently by taxpayers and taxing authorities.

The United States is a leader in setting the tone on matters of importance in the international tax system, and foreign taxing authorities take note of and monitor significant transfer pricing cases such as this one. Sometimes, foreign taxing

---

[8] *See, e.g.*, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 305 (1994); IRS Notice 88-123, *A Study of Intercompany Pricing Under Section 482 of the Code*, 1988-2 C.B. 458, 459-61 (recounting the history of the arm's length standard).

[9] Available at https://dx.doi.org/10.1787/tpg-2017-en.

authorities even rely on court opinions from cases like this one when developing their positions in transfer pricing disputes.

Altera Corporation and other amici have raised questions about the majority opinion's treatment of both the core principles underlying the arm's length standard and the manner in which that standard should be applied in related-party transactions. At a minimum, Amici believe that the majority opinion can be read to allow a selective application of the arm's length standard. That selective application raises significant questions about how the arm's length standard should be understood and applied by taxpayers and taxing authorities. In the short time since the panel decision was issued, many taxpayers have approached Amici with questions about the decision. Amici have also observed that many taxpayers view the majority opinion's characterization of the arm's length standard as a significant departure from their understanding of the arm's length standard.

Amici believe that this view (and any resulting confusion) could stem from three main aspects of the majority opinion. *First*, the majority opinion characterizes the arm's length standard as "flexible" and "fluid" based on case law that did not apply, or even purport to apply, the arm's length standard. *Altera Corp. v. Comm'r*, 926 F.3d 1061, 1078 (9th Cir. 2019); *see id.* at 1068-69. Even though the majority opinion claimed to apply the arm's length standard, it relied on cases, like *Frank v. International Canadian Corp.*, that actually rejected that standard. *See* 308 F.2d 520,

528-29 (9th Cir. 1962). Indeed, the majority did so even though it recognized that this Court later limited *Frank* to its facts. *See Altera Corp.*, 926 F.3d at 1069 (citing *Oil Base, Inc. v. Comm'r*, 362 F.2d 212, 214 n.5 (9th Cir. 1966)). Thus, the majority opinion leaves unclear whether the arm's length standard remains the applicable standard, as this Court previously recognized in *Xilinx*, or whether it is instead one standard among many that may be selected by taxpayers, the IRS, and courts considering transfer pricing cases.

*Second*, and relatedly, the majority opinion could be read to treat comparability with uncontrolled transactions as just one of many equally reliable factors in determining whether a particular method reaches an arm's length result—even though the regulations promulgated under I.R.C. § 482 often specifically emphasize the importance of comparability in assessing the reliability of a method. *See* Treas. Reg. § 1.482-1(d); *e.g.*, *id.* §§ 1.482-1(c)(2), -6(c)(3)(ii)(B). This raises questions about whether taxpayers and the IRS must first look for market-based evidence of arm's length results when assessing the reliability of a particular method, or whether other factors stand on equal footing with comparability in all cases.

*Third*, the majority opinion discusses the "commensurate with income" standard in various ways that may be read to obscure its effect on and relationship with the arm's length standard. For example, the majority opinion cites scholarship and other authorities suggesting that the "'commensurate with income standard is

not really a new approach to § 482'" and is "consistent with the arm's length standard." *Altera*, 926 F.3d at 1071-72 (citation omitted). But elsewhere, the majority opinion both hints that the addition of the "commensurate with income" standard to § 482 in 1986 changed the meaning of the arm's length standard, *id.* at 1078, and implies that the arm's length and "commensurate with income" standards operate independently, *id.* at 1083. The "commensurate with income" standard either is a manifestation of the traditional arm's length standard, changed that standard, or is independent of that standard; it cannot be all three.

### B. The Majority Opinion's Lack Of Clarity On The Arm's Length Standard Could Lead To Significant Adverse Collateral Consequences

Because the majority opinion appears to lack a clear and consistent understanding and articulation of the nature of the arm's length standard, numerous adverse collateral consequences will likely follow.

*First*, if the application of the arm's length standard is weakened, and taxing authorities begin to employ "flexible" or "fluid" standards (as the majority opinion suggests might be appropriate), resolution of international tax disputes may become more complex and time consuming, and less predictable and consistent. Tax treaty mutual agreement procedures provide countries with a mechanism to agree on the

proper division of the tax base under the arm's length standard.[10] Although disagreements among taxing authorities do exist and negotiations between countries have material consequences for national income tax revenue, the international commitment to follow a single standard—the arm's length standard—has made agreement possible in almost all cases. If one or another of the negotiating countries asserts the authority to abandon the internationally accepted arm's length standard in a particular situation, companies and taxing authorities will spend more time and more resources addressing such disputes as they seek to find common ground on the basic analytical framework applicable to each dispute. Moreover, companies and taxing authorities will be less likely to resolve tax disputes successfully and equitably, resulting in a higher incidence of double taxation.

*Second*, multinational enterprises' tax reporting burdens could increase markedly. Preparing consistent transfer pricing documentation across a number of jurisdictions is already difficult; that difficulty will increase if the relevant countries do not apply a consistent income allocation standard. Multinational enterprises will have to dedicate more time and resources to risk assessment and evaluation, and they

---

[10] *See, e.g.*, U.S. Dep't of the Treasury, *United States Model Income Tax Convention* 56-63 (2016), https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Treaty-US%20Model-2016.pdf.

will become far less confident in their ability to comply with their legal obligations in all the countries where they operate.

It is important to remember that tax compliance concerns for multinational enterprises are global matters. The need to comply with the tax laws in every country is imperative. If those laws are premised on conflicting principles or standards, the ability of multinational enterprises to comply will be compromised, and the ability of Amici to accurately advise multinational enterprises regarding the certainty of their compliance obligations will be diminished.

*Third*, the potential lack of clarity arising from the majority opinion could cause the preparation and auditing of multinational enterprises' financial statements to become more difficult and costly. Uncertainty and complexity in tax compliance lead to greater uncertainty and complexity in financial reporting: Every tax position requires further analysis as multinational enterprises assess whether tax benefits recognized under the arm's length standard may be recognized under the applicable financial reporting standard. *See supra* note 6.

*Finally*, and relatedly, different companies and tax advisors could take different positions on the meaning and scope of the arm's length standard based on the majority opinion. Companies could also take different views of whether to report tax benefits from that standard in their financial statements. As discussed above, inconsistency in financial statements undermines their comparability for investors.

Based on the exceptional importance of the issues in this case, including the significant adverse collateral consequences, Amici respectfully submit that rehearing en banc is warranted.

## CONCLUSION

The petition for rehearing en banc should be granted.

Dated: August 1, 2019

Respectfully submitted,

/s/ *Miriam L. Fisher*
Miriam L. Fisher
*Counsel of Record*
Melissa Arbus Sherry
Eric J. Konopka
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
miriam.fisher@lw.com

*Counsel for Amici Curiae PricewaterhouseCoopers LLP, Deloitte Tax LLP, and KPMG LLP*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 29-2(c)(2). The brief is 3,435 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f), if applicable. The brief's type size and type face comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

/s/ *Miriam L. Fisher*
Miriam L. Fisher