Nos. 16-70496, 16-70497

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**ALTERA CORPORATION AND SUBSIDIARIES,**
*Petitioner-Appellee,*

vs.

**COMMISSIONER OF INTERNAL REVENUE,**
*Respondent-Appellant.*

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12

**BRIEF OF *AMICI CURIAE***
**NATIONAL ASSOCIATION OF MANUFACTURERS,**
**SOFTWARE FINANCE AND TAX EXECUTIVES COUNCIL,**
**SEMICONDUCTOR INDUSTRY ASSOCIATION,**
**NATIONAL FOREIGN TRADE COUNCIL,**
**FINANCIAL EXECUTIVES INTERNATIONAL,**
**SILICON VALLEY TAX DIRECTORS GROUP,**
**COMPUTING TECHNOLOGY INDUSTRY ASSOCIATION,**
**THE TAX COUNCIL,**
**INFORMATION TECHNOLOGY INDUSTRY COUNCIL,**
**SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION**
**IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING *EN BANC***

Alexander Volokh
EMORY UNIVERSITY SCHOOL OF LAW
1301 Clifton Road NE
Atlanta, GA 30322-2770
(404) 712-5225

Charles G. Cole
Alice E. Loughran
Gregory N. Kidder
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Ave., NW
Washington, D.C. 20036
(202) 429-3000

Attorneys for *Amici Curiae*

## Disclosure Statement

In accordance with FRAP 26.1(a), each of the amicus parties is a not-for-profit corporation organized under the laws of the referenced jurisdiction and has no stock, and therefore no publicly traded company owns 10 percent or more of its stock:

| | |
|---|---|
| National Association of Manufacturers | New York |
| Software Finance and Tax Executives Council | D.C. |
| Semiconductor Industry Association | California |
| National Foreign Trade Council | New York |
| Financial Executives International | New Jersey |
| Silicon Valley Tax Directors Group | California |
| Computing Technology Industry Association | Illinois |
| The Tax Council | D.C. |
| Information Technology Industry Council | D.C. |
| Software and Information Industry Association | D.C. |

## TABLE OF CONTENTS


DISCLOSURE STATEMENT .......... i

INTEREST OF THE *AMICI CURIAE* .......... 1

A. Who Are *Amici Curiae*? .......... 1

B. *Amici*'s Interest in this Case .......... 2

INTRODUCTION .......... 3

ARGUMENT .......... 6

I. Treasury Violated Four Fundamental Principles of Administrative Law .......... 6

A. Treasury Virtually Ignored Numerous Relevant Comments .......... 6

B. Treasury Changed Theories During Litigation .......... 10

1. Treasury Has a New Theory That Comparables Are Not Relevant .......... 10

2. Treasury Has a New Theory That an Agreement to Develop Intangibles Is a "Transfer" .......... 13

C. Treasury Has Acted Arbitrarily and Capriciously By Making Findings Contradicted by the Record .......... 14

D. Treasury Has Interpreted the Statute Unreasonably .......... 16

II. The Panel's Decision Has Adverse Practical Implications for U.S. Tech Companies .......... 18

CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE .......... 21

CERTIFICATE OF SERVICE .......... 22

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Am. Mining Cong. v. EPA*,
965 F.2d 759 (9th Cir. 1992) ... 8

*Azar v. Allina Health Servs.*,
139 S.Ct. 1804 (U.S. June 3, 2019) ... 6

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ... 4, 5, 10

*Encino Motor Cars, LLP v. Navarro*,
136 S. Ct. 2117 (2016) ... 16

*Gifford Pinchot Task Force v. FWS*,
378 F.3d 1059 (9th Cir. 2004) ... 10

*HBO, Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) ... 8

*Kisor v. Wilkie*,
139 S. Ct. 2400 (U.S. June 26, 2019) ... 6, 16

*Meruelo v. Comm'r*,
691 F.3d 1108 (9th Cir. 2012) ... 6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 15, 16

*Xilinx, Inc. v. Comm'r*,
125 T.C. 37 (2005) ... 8

*Xilinx, Inc. v. Comm'r*,
598 F.3d 1191 (9th Cir. 2010) ... 20

### Statutes

5 U.S.C. § 706(2)(A) ... 5

26 U.S.C. § 482 ........................................................................... *passim*

**Regulatory Materials**

26 C.F.R. § 1.482-1(b)(1)........................................................................ 3

33 Fed. Reg. 5848 (1968) ........................................................................ 6, 7

68 Fed. Reg. 51,171 (2003) ........................................................ 9, 10, 11, 14

Art. 45-1(a)(6), Regulation 86 (1935) ........................................................ 6

*A Study of Intercompany Pricing Under Section 482 of the Code*, I.R.S. Notice 88-123, 1988-2 C.B. 458, 474..................... 4, 12, 13

IRS, Report on Application and Administration of Section 482 (1999) ................................................................................ 19

## INTEREST OF THE *AMICI CURIAE* [1]

### A. Who Are *Amici Curiae*?

*Amici* are trade associations and industry membership organizations representing companies from virtually every sector of our economy.

The National Association of Manufacturers is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states.

The Software Finance and Tax Executives Council is the voice of the software industry on matters of state, federal, and international tax policy.

The Semiconductor Industry Association is the voice of the U.S. semiconductor industry, one of America's top export industries and a key driver of America's economic strength, national security, and global competitiveness.

The National Foreign Trade Council represents more than 250 U.S. company members and encourages policies to eliminate major tax inequities in the treatment of U.S. companies abroad.

---

[1] All parties have consented to the filing of this amici brief. No counsel for any party to this proceeding authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than *amici curiae* or their members contributed money that was intended to fund preparing or submitting this brief.

Financial Executives International represents the interests of more than 10,000 chief financial officers and other senior financial executives from over 8,000 major companies in the U.S. and Canada.

The Silicon Valley Tax Directors Group, composed of 97 company members, promotes sound, long-term tax policies that support the global competitiveness of the U.S. high-technology industry.

The Computing Technology Industry Association is a non-profit trade association with more than 2,000 members that addresses the needs of the information technology industry.

The Tax Council is a non-partisan organization promoting sound tax and fiscal policies since 1966 and is comprised of Fortune 500 companies.

The Information Technology Industry Council represents the interests of the information and communications technology industry.

### B. *Amici*'s Interest in this Case

*Amici*'s members are the engines of growth for the U.S. economy. They dedicate billions of dollars to research and development to bring new products and services to the world market. These innovations have made America a global leader in computer hardware and software, e-commerce and Internet services.

*Amici*'s members have first-hand knowledge of the issues raised in the case: for decades, they have engaged in intercompany transfer pricing. They are subject to the Treasury regulations at issue and,

through their foreign subsidiaries, are subject to the tax obligations imposed by foreign countries. Because *amici*'s members have a substantial interest in the outcome and can explain the broader implications, they submit this brief in support of Altera's petition for rehearing *en banc*.

## INTRODUCTION

While this is an important tax case, it is also an important administrative law case whose implications extend far beyond tax law or Treasury. The regulation approved by the panel majority is a textbook example of agency rulemaking run amok. The opinion, if allowed to stand, will open the door to regulatory abuses by agencies across the executive branch, be it the EPA, HHS, or ICE.

Since 1935, American businesses have understood how to apply 26 U.S.C. § 482. Everyone involved in this case—including the panel majority and dissent, *see* slip op. at 6, 53—agrees that the statute establishes an "arm's-length" standard for allocating income and deductions between related entities. This standard means that, "in every case," the IRS will look to what unrelated parties transacting at arm's length would have done. *See* 26 C.F.R. § 1.482-1(b)(1).

Only with respect to the narrow category of "transfer[s] (or license[s]) of intangible property," 26 U.S.C. § 482, has Congress since 1986 required a different rule, the "commensurate with income" standard. Even then, Treasury has historically taken the view that

"intangible income must be allocated on the basis of comparable transactions if comparables exist." *A Study of Intercompany Pricing Under Section 482 of the Code* ("White Paper"), I.R.S. Notice 88-123, 1988-2 C.B. 458, 474; slip op. at 15; *id.* at 56 (dissent).

With its 2003 regulation, Treasury upended decades of settled understanding of § 482—calling for an approach to qualified cost-sharing arrangements (QCSAs) that dispensed with the need to look for comparable transactions, while still claiming that this was consistent with the arm's-length standard. While agency interpretations of governing statutes are not set in stone, agencies' power to change the rules has important procedural and substantive limitations, which courts are responsible for enforcing.

In this case, Treasury has transgressed no fewer than four fundamental principles of administrative law:

1. When an agency engages in notice-and-comment rulemaking, the APA requires that it take significant comments seriously and respond to them in the preamble to the final rule. Treasury did not do that here. Instead, it virtually ignored numerous comments showing that unrelated companies do not share the costs of stock-based compensation.

2. When an agency action is challenged in court, the law requires that the agency defend its action based on the factors that it considered and articulated at the time. *See, e.g.*, *SEC v. Chenery Corp.*, 318 U.S.

80, 92–93 (1943). Treasury did not do that here either. During this appeal, Treasury adopted two new theories: first, that it did not have to consider comparable transactions at all; and second, that cost-sharing arrangements to *develop* intangibles count as *transfers* of intangibles and are thus subject to the "commensurate with income" rule.

3. When an agency acts, it has a duty to act reasonably—that is, to avoid being "arbitrary and capricious" or "abuse [its] discretion," 5 U.S.C. § 706(2)(A). Nor did Treasury do that here. Treasury did not merely discount the commenters' evidence, it took the *exact opposite view*: that unrelated parties *would* share the costs of stock-based compensation. It had no evidence for this view, had not looked for such evidence, and told the Tax Court that it was not obliged to look. As a result, the unanimous *en banc* Tax Court explained, "the final rule lacks a basis in fact." 145 T.C. 91, 125 (2015).

4. Finally, the agency's rulemaking must yield a result that is consistent with the command of the governing statute. Treasury failed here too, taking the position that an arrangement to *develop* intangibles counts as a "transfer" under § 482. Even if Treasury had taken that position from the start, it would be incorrect, because the arrangement here can't be shoehorned into the category of "transfer."

The Supreme Court cares about constraining agencies to respect the limits imposed by administrative law. It is interested in policing agency compliance with the requirements of notice-and-comment

rulemaking, *see Azar v. Allina Health Servs.*, No. 17-1484 (U.S. June 3, 2019), and its most recent statements about deference show that the scope and limits of *Chevron* are very much on its mind. *See Kisor v. Wilkie*, No. 18-15 (U.S. June 26, 2019) (reaffirming but limiting *Auer* deference); *id.* at 2 (Roberts, C.J., concurring in part) (reserving the question of *Chevron*); *id.* at 2 (Kavanaugh, J., concurring in judgment) (same); *id.* at 39 n.114 (Gorsuch, J., concurring in judgment) (raising questions about *Chevron*).

The unanimous *en banc* Tax Court recognized that Treasury's regulation was arbitrary and capricious. The Tax Court is entitled to substantial respect because of its expertise in this highly technical area. *See Meruelo v. Comm'r*, 691 F.3d 1108, 1114 (9th Cir. 2012). Given the importance of the issues as a matter of both tax law and administrative law, this Court should rehear this case *en banc*.

## ARGUMENT

## I. Treasury Violated Four Fundamental Principles of Administrative Law

### A. Treasury Virtually Ignored Numerous Relevant Comments

The rulemaking at issue took place against the background of a well-established legal framework. The arm's-length standard, as well as the focus on comparable transactions of unrelated parties, dates back to the 1930s. *See* Art. 45-1(a)(6), Regulation 86 (1935); *see also* 33 Fed.

Reg. 5848, 5854 (1968). The addition of the "commensurate with income" standard in 1986 applied only to transfers and licenses and, in any event, Treasury had interpreted this standard to be consistent with the rest of the longstanding framework—to respect comparables when they are available. Slip op. at 56 (dissent).

Given the importance of this provision, it is unsurprising that the proposed rule generated comments from over a dozen corporations, interest groups, and tax specialists, some of whose representatives also spoke at a public hearing. 145 T.C. at 104. *Amici* and their members presented comments and evidence. *Id.* The notice of proposed rulemaking did not announce that—contrary to decades of practice—comparable transactions were to be made irrelevant. The commenters thus focused on arguments against the proposed rule grounded in comparables: They showed that unrelated corporations in similar arrangements did not share responsibility for stock-based compensation. *Id.* at 104–06.

What the commenters told Treasury—if unrebutted—seriously undermined the proposed regulation:

- The commenters "knew of no transactions between unrelated parties . . . that required one party to pay or reimburse the other party for amounts attributable to stock-based compensation."

- No such agreements were evident from a survey of companies that were members of the American Electronics Association (AeA).
- No such agreements could be found in the EDGAR database.
- Model accounting procedures from the Council of Petroleum Accountant Societies (COPAS) recommended that stock options *not* be included in cost-sharing.
- "Federal acquisition regulations prohibit reimbursement of amounts attributable to stock-based compensation."

And the commenters presented several examples of agreements in which stock-based compensation was *not* reimbursed. 145 T.C. at 104–06.

This is exactly the sort of evidence that Treasury was required to take seriously and address—the sort that the Tax Court had considered relevant in *Xilinx, Inc. v. Comm'r*, 125 T.C. 37, 59 (2005). "[T]here must be an exchange of views, information, and criticism between interested persons and the agency." *HBO, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977). The requirement that the agency respond to comments is designed to promote agency rationality and guard against agencies simply vindicating a result they reached beforehand. And it is designed to enable judicial review. *See, e.g.*, *id.*; *Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992).

What, then, did Treasury do with the comments it received? In some cases, nothing; in others, very little. For example, Treasury had no response to the AeA survey, the EDGAR search, or the COPAS accounting standards. *See* 145 T.C. at 127–30 (also discussing other items from the comments that Treasury didn't respond to or responded to summarily).

Treasury said little about the evidence of agreements where the costs of stock-based compensation *were not* shared. To the extent Treasury said anything, its response was a strong endorsement of the general principle of relying on comparable arrangements. Treasury said, though in an extremely cursory way, that the cited transactions did "not share enough characteristics . . . to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA." 68 Fed. Reg. 51,171, 51,173 (2003). The Tax Court was right: "Treasury's failure to adequately respond to commentators frustrates our review of the final rule and was prejudicial to affected entities." *Id.* at 130; *see also* slip op. at 64–66.

Given Treasury's comparables-focused response to some of the comments, no one could have understood that Treasury believed comparable transactions were irrelevant. Nonetheless, the Commissioner took just that position in this appeal—though he came up with it years after the rulemaking.

### B. Treasury Changed Theories During Litigation

The panel accepted this late formulation in contravention of a principle older even than the APA itself. Under the so-called *Chenery I* principle, an agency action stands or falls based on considerations articulated at the time of the action itself. *SEC v. Chenery Corp.*, 318 U.S. 80, 92–93 (1943); *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1072 & n.9 (9th Cir. 2004). Unlike a regulation, a statute can be upheld as "rational" based on theories that are first articulated during judicial review. But administrative agencies cannot get away with post hoc rationalizations.

#### 1. Treasury Has a New Theory That Comparables Are Not Relevant

Here, Treasury rejected the commenters' evidence of transactions where parties didn't share the cost of stock-based compensation *because it believed that the transactions weren't truly comparable.* "The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles . . . ," 68 Fed. Reg. at 51,173—comparability was the ideal, even if an unattainable one. "While the results actually realized in similar transactions under similar circumstances ordinarily provide significant evidence in determining whether a controlled transaction meets the arm's length standard, in the case of QCSAs such data may

not be available." *Id. If only true comparables existed*, Treasury was clearly saying, *we would gladly use them*.

Anyone reading the preamble to the final rule would have understood that Treasury was still focused on what unrelated parties would do under similar circumstances—as had been true for decades under the arm's-length standard—but it was merely stymied by (in its view) the unavailability of good data.

Fast-forward thirteen years to the Commissioner's appellate brief in this case, where he argues that the 2003 regulations "make clear that, in the context of a QCSA, the arm's-length standard does *not* require an analysis of what unrelated entities do under comparable circumstances." Appellant's Br. at 57 (internal quotation marks and brackets removed); *see also id.* at 46–47. The Commissioner argues that the promulgation of the new regulations "did not require an examination of data, fact-finding, or consideration of evidence before the agency." *Id.* at 57–58 (internal quotation marks and brackets removed).

*That clearly was not Treasury's view in 2003*, or else it would not have explained that the commenters' comparables were not truly comparable—it would have just rejected the comparables as being irrelevant to its new standard.

In its appellate brief, the Commissioner dismissed that discussion as "extraneous": "[S]ince Treasury reasonably determined that it was statutorily authorized to dispense with comparability analysis in this

narrow context, there was no need for it to establish that the uncontrolled transactions cited by commentators were insufficiently comparable." Appellant's Br. at 64. But this attempted save is unconvincing, because *what an agency actually says* in the rulemaking is determinative of its position. *See* slip op. at 67–68 (dissent).

The panel majority claims that the public had adequate notice because Treasury quoted from the legislative history of the 1986 statutory reforms. Slip op. at 37–38, 42. These vague references cannot possibly be taken as notice or an adequate statement that Treasury was abandoning its longtime endorsement of using comparables. Slip op. at 67 (dissent). After all, Treasury had stated in its 1988 *White Paper* (which also relied on congressional intent) that even the "commensurate with income" standard should take comparables into account where they exist. *See* slip op. at 15; *id.* at 56 (dissent). And Treasury's own endorsement of the comparability standard—in its dismissal of commenters' cited transactions for being insufficiently comparable—itself disproves that Treasury was abandoning the standard.

Nothing in the two Federal Register notices supports Treasury's novel account of what the bases for its actions were in 2002 and 2003. Such post hoc rationalizations—accepted by the panel majority—are unacceptable as a matter of administrative law.

### 2. Treasury Has a New Theory That an Agreement to Develop Intangibles Is a "Transfer"

The Commissioner offers another newly minted theory on appeal: "[T]hat QCSAs to *develop* intangibles constitute *transfers* of intangibles under the second sentence of § 482." Slip op. at 67 (dissent); Appellant's Reply Br. at 17–19. If such agreements are considered transfers, according to Treasury's reasoning, the statute would allow the "commensurate with income" standard to apply. It is unclear whether this would make a difference in the end—as noted above, Treasury said in its 1988 *White Paper* that even the "commensurate with income" standard should be applied with reference to comparables where they exist. But at least in principle, this theory might support Treasury's position.

Again, this theory does not appear in the Federal Register notices. Because of the Commissioner's late roll-out of this argument—thirteen years late—not only was the public denied an opportunity to comment on it during the rulemaking process, but the fifteen tax experts on the *en banc* Tax Court never had a chance to pass on the plausibility of this strained reading of the Internal Revenue Code.

Regardless of whether this theory is substantively invalid (see Part I.D. *infra*), the panel majority should not have permitted Treasury to rely on it now, as it is yet another post hoc rationalization.

### C. Treasury Has Acted Arbitrarily and Capriciously By Making Findings Contradicted by the Record

As explained in Part I.A *supra*, Treasury disregarded the commenters' evidence that unrelated parties in QCSAs wouldn't share the costs of stock-based compensation. But it went further than that. It found the precise opposite: that unrelated parties in QCSAs *would* share those costs. Treasury wrote that such parties "*would ensure* . . . that the arrangement reflect all relevant costs, including all costs of compensating employees"; they "*would not distinguish* between stock-based compensation and other forms of compensation"; "the party committing employees to the arrangement generally *would not do so* on terms that ignore the stock-based compensation." 68 Fed. Reg. at 51,173 (emphasis added).

These are empirical statements of what unrelated parties *would or would not do*. Treasury came to this conclusion with no empirical support. Treasury conceded to the Tax Court that "it took the position that it was not obligated to engage in fact finding or to follow evidence gathering procedures"; its files relating to this rule "did not contain any empirical or other evidence supporting [its] belief"; it didn't search any database that could have such agreements; and it didn't know of any unrelated-party transaction involving sharing of stock-based compensation. 145 T.C. at 122–23.

In short, Treasury ignored copious evidence submitted by commenters that tended one way, and instead—without any evidence—made a factual finding that goes the other way. The Tax Court had no trouble finding that Treasury's conclusion lacks "a reasoned basis," *id.* at 123, and "lacks a basis in fact," *id.* at 125.

What happened here is reminiscent of what the Department of Transportation did with automatic seatbelts in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983). Some studies had shown significant safety benefits of using automatic seatbelts, but DOT dismissed these studies as unrepresentative. DOT had no evidence pointing the other way—merely "substantial uncertainty" about the effects of automatic seatbelts. *Id.* at 51.

The Supreme Court found the DOT's position arbitrary and capricious. "It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." But that "does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions. The agency must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made." Part of that explanation, the Court wrote, would be a justification of why the agency acted "before engaging in a search for further evidence." *Id.* at 52.

Here, as in *State Farm*, Treasury discounted the *actual* evidence; and, more egregiously than in *State Farm*, it endorsed the opposite conclusion without any evidence at all. This is arbitrary and capricious. As the dissent observed, the final rule was procedurally and substantively defective. Slip op. at 77.

**D. Treasury Has Interpreted the Statute Unreasonably**

Finally, Treasury has come up with a new theory that agreements to develop intangibles count as "transfers" within the meaning of § 482 and are therefore to be judged by the "commensurate with income" standard. As explained above (*see* Part I.B.2 *supra*), this theory shows up for the first time during litigation, *see* Appellant's Reply Br. at 17–19, and is invalid for that reason alone. The Supreme Court has recently stated that *Auer* deference is not due when an agency interprets its regulations as a "convenient litigating position" or "post hoc rationalization." *Kisor*, slip op. at 17 (internal quotation marks omitted). This must be even more true when it comes to *Chevron* deference for agency statutory interpretations.

Moreover, when a rule is substantially and procedurally defective—as the dissent has observed, slip op. at 77, and as Parts I.A through I.C *supra* have established—the Supreme Court has been clear that *Chevron* analysis does not apply. *See Encino Motor Cars, LLP v. Navarro*, 136 S. Ct. 2117, 2125 (2016); slip op. at 77–80 (dissent).

But even if we ignored all the preceding defects of the rule and assumed that Treasury had urged this theory from the start, the final rule would *still* be invalid because it is an unreasonable interpretation of the statute.

The second sentence of § 482, which provides for the "commensurate with income" standard, applies only to "transfer[s]" and "license[s]" of intangible property. As the panel dissent persuasively explains, there is no transfer or license of intangible property when parties enter into a cost-sharing arrangement for developing such property. Slip op. at 73. When the arrangement is entered into, the intangible property does not exist, so there is nothing to transfer. If and when the property comes into being, it is shared by the parties from the start—so again there is no transfer. *Id.* Contrary to the panel majority's argument, slip op. at 26, the QCSA *allocates* future distribution rights to intangibles, but it does not *transfer* them. To have a transfer, some interest must initially belong to *someone* and then be *transferred* to *someone else*; this is impossible when nobody initially owns the nonexistent property, which, if it ever springs into existence, does so with its distribution rights already allocated between the contracting parties.

This could be treated as a *Chevron* Step 1 issue: The meaning of the term "transfer" simply does not cover this sort of arrangement, because there is nothing transferred. Or, as the dissent maintains, slip

op. at 71, this could be treated as a *Chevron* Step 2 issue: The term "transfer" is ambiguous, but interpreting it to cover these sorts of arrangements is unreasonable. Either way, the result is the same: § 482 does not convert development of intangibles into a "transfer" so as to trigger the "commensurate with income" standard.

The unprecedented deference the panel majority accords is at loggerheads with the Supreme Court's administrative law jurisprudence. Absent *en banc* intervention, the leeway the panel majority extends to Treasury in this case will be claimed next by other agencies. The same goes with the administrative law principles discussed in the previous Parts: Absent *en banc* intervention, agencies will feel empowered to ignore relevant comments, to change their positions in litigation, and to reach factual conclusions with flimsy evidentiary support. Because administrative law principles apply equally across agencies, the panel's holding here will increase the power of every agency.

## II. The Panel's Decision Has Adverse Practical Implications for U.S. Tech Companies

By dispensing with comparables, the panel majority eliminates the backbone of the arm's-length standard, upsetting decades of precedent and settled expectations of U.S. multinational companies. *Amici*'s members engage annually in trillions of dollars of cross-border intercompany transactions. They rely heavily upon U.S. and

international recognition of the arm's-length standard for all their cross-border transactions, including transactions involving the joint development of intangibles. Given the significant interests of U.S. multinational companies, many of them resident in the Ninth Circuit, rehearing *en banc* is warranted.

*Amici*'s members have navigated the international legal waters by relying on the objective landmarks set by well-established precedent. As Altera explains, the arm's-length standard was a common standard incorporated into international treaties. (Petition for Rehearing *En Banc* at 15.) The use of comparables provided an anchor for the arm's-length standard. It gave the standard an objective criterion and assured that the various taxing jurisdictions acted in harmony. The arm's-length standard's reference to what unrelated parties do is central to international transfer-pricing norms.[2]

*Amici*'s members have structured their cross-border transactions in reliance upon the well-established meaning of the arm's-length standard. Recognizing these concerns, this Court looked to precisely this international understanding of the arm's-length standard in *Xilinx*, the predecessor case. "It is enough that our foreign treaty partners and responsible negotiators in the Treasury thought that arm's length

---

[2] *See* IRS, Report on Application and Administration of Section, at ii-iii, 2.2–2.4 (1999), https://www.irs.gov/pub/irs-pdf/p3218.pdf.

should function as the readily understandable international measure." *Xilinx, Inc. v. Comm'r*, 598 F.3d 1191, 1197 (9th Cir. 2010); *see id.* at 1198 & n.2 (Fisher, J. concurring) (taxpayer's reading of regulation was more reasonable in light of industry's settled practice and expectations regarding the arm's-length standard). Despite the pivotal role that international understanding and consensus played in *Xilinx*, the panel majority here never grappled with the full effects of Treasury's unexplained reformulation of the arm's-length standard.

## CONCLUSION

This Court should grant Altera's petition for rehearing *en banc*.

DATED this 1st day of August 2019.

STEPTOE & JOHNSON LLP

By s/ Alice E. Loughran

Charles G. Cole
Alice E. Loughran
Gregory N. Kidder
Mark C. Savignac
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

Alexander Volokh
EMORY UNIVERSITY SCHOOL OF LAW
1301 Clifton Road NE
Atlanta, GA 30322-2770
(404) 712-5225

Attorneys for *Amici Curiae*

## Certificate of Compliance

This brief contains 4,196 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Century Schoolbook.

DATED this 1st day of August 2019.

s/ Alice E. Loughran

Alice E. Loughran

## Certificate of Service

I certify that on August 1, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Alice E. Loughran
Alice E. Loughran