**Nos. 16-70496, 16-70497**
**(Before the Honorable Sidney R. Thomas, C.J., and Susan P. Graber, and Kathleen M. O'Malley, JJ.—opinion filed June 7, 2019)**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

ALTERA CORPORATION & SUBSIDIARIES,
*Petitioner-Appellee*,

v.

COMMISSIONER OF INTERNAL REVENUE,
*Respondent-Appellant*.

# BRIEF OF CISCO SYSTEMS, INC. AND THIRTY-TWO OTHER AFFECTED COMPANIES AS AMICI CURIAE IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING EN BANC

On Appeal from Decisions of the United States Tax Court
Nos. 6253-12, 9963-12

Roderick K. Donnelly
MORGAN LEWIS & BOCKIUS LLP
1400 Page Mill Road
Palo Alto, CA 94304
Telephone No. (650) 843-4000

Thomas M. Peterson
MORGAN LEWIS & BOCKIUS LLP
One Market Street, Spear Tower
San Francisco, CA 94105
Telephone No. (415) 442-1000

Michelle L. Andrighetto
MORGAN LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Telephone No. (617) 341-7700

Attorneys for Amicus Curiae Cisco Systems, Inc.
(Counsel for other thirty-two amici are listed inside)

**ADDITIONAL COUNSEL**

| **Amicus** | **Counsel** |
|---|---|
| 3M Company | Justin McGough<br>3M Company<br>3M Center, Building 224-5N-40<br>Saint Paul, MN 55144<br>(651) 733-9622 |
| Adobe Inc. | Karen Robinson<br>Vice President, Legal<br>Adobe Inc.<br>345 Park Avenue<br>San Jose, CA 95110<br>(408) 536-6000 |
| Apple Inc. | Theodore J. Boutrous, Jr.<br>Christopher Chorba<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7000 |
| Applied Materials | Armin D. Eberhard<br>Director, International Tax Planning and M&A<br>Applied Materials<br>3225 Oakmead Village Dr., MS 1281<br>PO Box 58039<br>Santa Clara, CA 95054<br>(408) 563-5835 |
| Boston Scientific Corp. | Desiree Ralls-Morrison<br>SVP, General Counsel & Corporate Secretary<br>Boston Scientific Corporation<br>300 Boston Scientific Way<br>Marlborough, MA 01752<br>(508) 683-4800 |

| **Amicus** | **Counsel** |
|---|---|
| Dell Technologies, Inc. | Thomas J. Vallone<br>Senior Vice President, Global Tax<br>Dell Technologies, Inc.<br>401 Dell Way<br>Round Rock, TX 78682<br>(512) 723-1798 |
| Dolby Laboratories, Inc. | Andy Sherman<br>Dolby Laboratories, Inc.<br>1275 Market St.<br>San Francisco, CA 94103<br>(415) 558-0200 |
| eBay | Aaron Johnson<br>VP Legal<br>eBay<br>2065 Hamilton Avenue<br>San Jose, CA 95125 |
| Electronic Arts Inc. | Jacob Schatz<br>EVP, General Counsel and Corporate Secretary<br>Electronic Arts, Inc.<br>209 Redwood Shores Parkway<br>Redwood City, CA 94065<br>(650) 628-1500 |
| Eli Lilly and Company | Katie Lodato<br>Vice President - Global Tax<br>Eli Lilly and Company<br>Lilly Corporate Center<br>Indianapolis, Indiana 46285<br>(317) 276-2000 |

| **Amicus** | **Counsel** |
|---|---|
| Emerson Electric Co. | Dana A. Lasley<br>Emerson Electric Co.<br>8000 West Florissant Avenue, P.O. Box 4100<br>St. Louis, MO 63136<br>(314) 553-2824 |
| Facebook, Inc. | Paul S. Grewal<br>VP & Deputy General Counsel<br>Facebook, Inc.<br>1 Hacker Way<br>Menlo Park, CA 94025<br>(650) 543-4800 |
| Fortinet | John Whittle<br>Executive Vice President, General Counsel<br>Fortinet<br>899 Kifer Road<br>Sunnyvale, CA 94086<br>(408) 235-7700 |
| General Mills, Inc. | Christine Henninger<br>General Mills, Inc.<br>1 General Mills Blvd.<br>Golden Valley, MN 55426<br>(763) 293-3734 |
| Google LLC | Nora Puckett<br>Google LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043<br>(650) 253-0000 |
| GoPro, Inc. | Kyle Bonacum<br>GoPro, Inc.<br>3000 Clearview Way<br>San Mateo, CA 94402<br>(650) 436-4139 |

| **Amicus** | **Counsel** |
|---|---|
| Hewlett Packard Enterprise Company | Joshua Mishoe<br>Vice President<br>Tax Planning, Controversy, Policy and M&A<br>Hewlett Packard Enterprise Company<br>5400 Legacy Drive<br>Plano, TX 75024<br>(832) 502-9171 |
| International Paper Company | Barbara Beckerman<br>6400 Poplar Avenue, Tower 4<br>Memphis, TN 38197<br>(901) 419-4520 |
| Johnson Controls, Inc. | Michael R. Peterson<br>President and Corporate Secretary<br>Johnson Controls, Inc.<br>5757 North Green Bay Avenue<br>Milwaukee, WI 53209<br>(414) 524-7019 |
| Maxim Integrated | Mark Casper<br>Vice President, Deputy General Counsel<br>Maxim Integrated<br>160 Rio Robles<br>San Jose, CA 95134<br>(408) 601-5865 |
| NetApp, Inc. | Matthew Fawcett<br>General Counsel<br>NetApp, Inc.<br>1395 Crossman Ave.<br>Sunnyvale, CA 94089<br>(408) 822-8700 |

| **Amicus** | **Counsel** |
|---|---|
| Oracle Corporation | Margaret C. Wilson<br>Wilson Law Group LLC<br>475 Wall Street<br>Princeton, NJ 08540<br>(908) 642-3176 |
| PepsiCo, Inc. | Maryanne Bifulco<br>Vice President, Transfer Pricing Counsel<br>PepsiCo, Inc.<br>700 Anderson Hill Road<br>Purchase, NY 10577<br>(914) 253-3178 |
| Pfizer Inc. | Markus Green<br>Assistant GC, Government Relations / Litigation<br>Pfizer, Inc.<br>235 East 42nd Street<br>New York, NY 10017<br>(212) 733-3966 |
| The Procter and Gamble Company | Lowell Yoder<br>McDermott Will & Emery<br>227 W. Monroe Street<br>Chicago, IL 60606-5096<br>(312) 372-2000 |
| Qualcomm Incorporated | Beth Wapner<br>VP Tax<br>Qualcomm Incorporated<br>5775 Morehouse Drive<br>San Diego, California 92121<br>(858) 651-3883 |
| S&P Global Inc. | Tanya Guazzo<br>S&P Global Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 438-0926 |

| **Amicus** | **Counsel** |
| --- | --- |
| ServiceNow, Inc. | Russell Elmer<br>ServiceNow, Inc.<br>2225 Lawson Lane<br>Santa Clara, CA 95054<br>(408) 501-8550 |
| SurveyMonkey | Lora Blum<br>General Counsel<br>SurveyMonkey<br>1 Curiosity Way<br>San Mateo, CA 94403<br>(650) 543-8400 |
| Symantec Corporation | Scott C. Taylor<br>EVP, General Counsel & Secretary<br>Symantec Corporation<br>350 Ellis Street<br>Mountain View, CA 94043<br>(650) 527-8000 |
| United Parcel Service, Inc. | Donald P. Lancaster<br>United Parcel Service, Inc.<br>55 Glenlake Parkway<br>Atlanta, GA 30328<br>(404) 828-4317 |
| Workday, Inc. | Lisa McFall<br>VP & Deputy General Counsel<br>Workday, Inc.<br>6110 Stoneridge Mall Road<br>Pleasanton, CA 94588<br>(650) 224-2760 |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(b), amici submit the following disclosure of corporate interests for the use of the judges this Court.

The following amici state that they have no parent company and no publicly held corporation owns more than 10% of their respective stock:

3M Company
Adobe Inc.
Apple Inc.
Applied Materials
Boston Scientific Corp.
Cisco Systems, Inc.
Dell Technologies, Inc.
Dolby Laboratories, Inc.
eBay
Electronic Arts Inc.
Eli Lilly and Company
Emerson Electric Co.
Facebook, Inc.
Fortinet
General Mills, Inc.
GoPro, Inc.
Hewlett Packard Enterprise Company
International Paper Company
Maxim Integrated
NetApp, Inc.
Oracle Corporation
PepsiCo, Inc.
Pfizer Inc.
The Procter and Gamble Company
Qualcomm Incorporated
S&P Global Inc.
ServiceNow, Inc.
Symantec Corporation
United Parcel Service, Inc.
Workday, Inc.

Amicus Google LLC is an indirect subsidiary of Alphabet Inc., a publicly held company. Alphabet Inc. has no parent corporation, and no publicly held company owns 10% or more of its outstanding stock.

Amicus Johnson Controls, Inc. is an indirect subsidiary of Johnson Controls International plc (a public limited company organized under the laws of Ireland). Johnson Controls International plc is traded on the New York Stock Exchange under the symbol JCI.

Amicus SurveyMonkey is a wholly-owned subsidiary of SVMK Inc.

# TABLE OF CONTENTS


STATEMENT OF INTEREST OF AMICI ..... 1

REASONS TO GRANT REHEARING EN BANC ..... 3

I. The panel majority's decision to endorse the government's new, path-changing rule, rejecting use of comparables under § 482 merits en banc review. ..... 3

A. The panel majority abandons the law's long-time reliance on evidence of comparable, arm's-length transactions, and erroneously assumes a transfer of intangible property where none exists. ..... 3

B. The panel majority decision flatly repudiates guidance long-given to taxpayers by way of Treasury's authoritative "White Paper." ..... 5

II. Corporations competing internationally need certainty, but the panel decision creates huge uncertainties affecting billions of dollars. ..... 10

A. The panel majority endorsed an expedient government litigation position that is contrary to longstanding and authoritative Treasury guidance. ..... 11

B. The panel majority's holding cannot be harmonized with the cost-sharing regulations. ..... 13

C. The panel majority's holding creates serious ambiguity in other tax areas ..... 17

III. Conclusion. ..... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Edwards v. Wabash Ry. Co.*,
264 F. 610 (2d Cir. 1920) .......... 10

*Fior D'Italia, Inc. v. U.S.*,
242 F.3d 844 (9th Cir. 2001), *rev'd on other grounds*, 536 U.S. 238 (2002) .......... 8

*Madden v. Comm'r*,
514 F.2d 1149 (9th Cir. 1975) .......... 10

*Estate of Thomson v. Comm'r*,
495 F.2d 246 (2d Cir. 1974) .......... 11

*U.S. v. Skelly Oil Co.*,
394 U.S. 678 (1969) (Douglas, J., dissenting) .......... 8

*Xilinx, Inc. v Commissioner*,
598 F.3d 1191 (9th Cir. 2010) .......... 20

**Statutes**

26 U.S.C. § 482 .......... *passim*

**Other Authorities**

Fed. R. App. P. 35(a)(2) .......... 2

H.R. REP. NO. 99-841 (1986) .......... 5

INTL–0372–88, 1992-1 C.B. 1164 (1992) .......... 8

IRS AM 2007-007 (Mar. 23, 2007) .......... 7

Joint Committee on Taxation, *Description of Revenue Provisions Contained in the President's Fiscal Year 2013 Budget Proposal* (JCS-2-12) .......... 6

Notice 88-123 (*A Study of Intercompany Pricing Under Section 482 of the Code*), 1998-2 C.B. 458, 477 (Dec. 5, 1988) .................. *passim*

T.D. 8470, 1993-1 C.B. 90 (1993)..................................................................7

T.D. 8552, 1994-2 C.B. 93 (1994)............................................................ 7, 8

T.D. 8632, 1996-1 C.B. 85 (1995).......................................................... 7, 14

T.D. 9088, 68 Fed. Reg. 51171, 51173 (2003)...............................................9

T.D. 9441, 2009-7 I.R.B. 460 (2009) ............................................................8

Treas. Reg. § 1.482-1(b)(1) ...........................................................................4

Treas. Reg. § 1.482-4(f)(2) ............................................................................9

Treas. Reg. § 1.482-7A(a)(1)....................................................................... 14

Treas. Reg. § 1.482-7A(g)(6)....................................................................... 15

Treas. Reg. § 1.482-7A(h)(1)................................................................. 15, 18

Treas. Reg. § 1.6662-4(d)(3)(iii) ....................................................................8

# STATEMENT OF INTEREST OF AMICI[1]

> "Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences." *United States v. Byrum*, 408 U.S. 125, 135 (1972); *accord*, *Commissioner v. Greenspun*, 670 F.2d 123, 126 (9th Cir. 1982).

A coalition of thirty-three U.S. corporations representing more than $4.6 trillion in market capitalization urges this Court to grant rehearing en banc. Petitioner Altera Corporation & Subsidiaries ("***Altera***") and other amici have given the Court ample grounds to question the 2-1 panel decision. Amici reinforce those grounds and illustrate the adverse, real-world consequences inflicted on U.S. corporations by the panel majority's startling conclusions that it was reasonable for the government "to do away with reliance on comparables," and that "parties to a [cost-sharing arrangement] transfer cost-shared intangibles." *Byrum*'s admonition underscores that this Court should be "reluctant" to impose such a dramatically changed view of heretofore settled law without en banc consideration.

---

[1] No counsel for any party to this proceeding authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amici curiae contributed money that was intended to fund preparing or submitting this brief.

Amici's various business activities draw from a broad and diverse spectrum of industries that are significant to the U.S. economy. Amici collectively: (i) spend tens of billions of dollars annually on research and development ("***R&D***"); and (ii) conduct annually hundreds of billions of dollars' worth of normal intercompany transactions subject to the transfer pricing regulations promulgated under 26 U.S.C. § 482. Many amici use "cost-sharing" arrangements for global R&D projects, acting cooperatively with foreign subsidiaries, as Altera did in this case. Amicus Cisco alone has spent tens of billions of dollars on R&D covered by a cost-sharing arrangement.

By departing from longstanding Treasury pronouncements, the panel majority's decision creates confusion and adversely affects amici and numerous other taxpayers—whether engaged in cost-sharing or other international intercompany transactions. This case satisfies the "exceptional importance" prong of Fed. R. App. P. 35(a)(2), meaning en banc review is warranted.

All parties have consented to the filing of this amici curiae brief. *See* Fed. R. App. P. 29(a)(2).

## REASONS TO GRANT REHEARING EN BANC

### I. The panel majority's decision to endorse the government's new, path-changing rule, rejecting use of comparables under § 482 merits en banc review.

At issue in this case is the validity of Treasury's 2003 regulations (a) requiring parties in a cost-sharing arrangement to share stock-based compensation even if evidence shows that parties acting at arm's length do not; and (b) deeming the arm's length standard under § 482 in a cost-sharing arrangement to be met only if parties share stock-based compensation.

The panel majority accepted the government's arguments that: (1) the arm's length standard does not require use of comparables when they exist; and (2) Treasury's 2003 regulation relying not on comparable transactions ("***comparables***"), but on "a purely internal method of allocation," is permitted under § 482 (Op. at 6) and was decreed by Congress when it added the "commensurate with income" ("***CWI***") sentence to § 482, as part of the 1986 Tax Reform Act. The panel majority found support in the legislative history of the added CWI sentence.

#### A. The panel majority abandons the law's long-time reliance on evidence of comparable, arm's-length transactions, and erroneously assumes a transfer of intangible property where none exists.

Since 1935 the first sentence of § 482 has applied the arm's length standard—i.e., "the results of [a related-party] transaction [must be]

consistent with the results that would have been realized if uncontrolled [unrelated] taxpayers had engaged in the same transaction under the same circumstances (arm's length result)." Treas. Reg. § 1.482-1(b)(1). Whether a transaction produces an arm's length result "generally will be determined by reference to the results of comparable transactions under comparable circumstances." *Id*.

*Nowhere* in the 1986 CWI legislative history did Congress suggest *ignoring* comparables when they exist. Yet, as part of its erroneous holding, the panel majority decided that participants in cost-sharing arrangements must share stock-based compensation costs even if unrelated parties in comparable arrangements do not share such costs. On the intangibles-transfer point, dissenting Judge O'Malley correctly explained that the CWI standard has no bearing on cost-sharing arrangements because cost-shared intangibles are not transferred in a cost-sharing arrangement. Thus, the legislative history of the CWI standard is irrelevant to circumstances, as here, where there are no transfers. CWI focuses on what should be done when (i) there are transfers of intangibles, and (ii) there is no evidence of comparables. If there is a transfer of intangibles but no comparables, CWI allows Treasury to do an after-the-fact check on the income received by the transferor and transferee.

### B. The panel majority decision flatly repudiates guidance long-given to taxpayers by way of Treasury's authoritative "*White Paper*."

When Congress added the CWI standard to § 482, it directed Treasury to conduct a "comprehensive study" of intercompany transfer pricing rules. H.R. REP. NO. 99-841, at II-638 (1986).

> The conferees believe that a *comprehensive study* of inter-company pricing rules by the Internal Revenue Service should be conducted and that *careful consideration* should be given to whether the existing regulations could be modified in any respect.

*Id.* (emphasis added). The study was a two-year undertaking and the resulting "***White Paper***" addresses, *in particular*, the sentence added by way of the CWI amendment.

The *White Paper* concludes that the CWI amendment *did not* displace reliance on comparables when they exist: "Intangible transfer prices will in any event be determined on the basis of comparables if they exist." Notice 88-123 (*A Study of Intercompany Pricing Under Section 482 of the Code*), 1998-2 C.B. 458, 477 (Dec. 5, 1988). In this regard, the *White Paper*'s emphasis on the importance of comparables and the primacy of the arm's-length standard has been acknowledged by the Joint Committee at Taxation, which has explained:

> Treasury and the IRS characterize the commensurate-with-income principle as a clarification that prior law is consistent

> with the arm's-length standard. An important consequence of this conclusion, reflected in subsequently issued Treasury regulations, is that *comparable third-party transactions would continue to play a role* in determining appropriate transfer prices.

Joint Committee on Taxation, *Description of Revenue Provisions Contained in the President's Fiscal Year 2013 Budget Proposal* (JCS-2-12), June, 2012, at 355 (emphasis added; citations omitted).

The *White Paper* also confirmed that cost-sharing is "an appropriate method of attributing the ownership of intangibles *ab initio* to the user of the intangible, *thus avoiding section 482 transfer pricing issues related to the licensing or other transfer of intangibles*." *White Paper* at 474 (emphasis added). This means that when technology is developed under a cost-sharing arrangement, each participant automatically owns its appropriate share of the developed intangible property directly upon creation: there's no *transfer* to each participant of what it already owns. And because CWI only applies in the context of intangible transfers, CWI can't apply to cost-shared intangibles because cost-sharing participants don't transfer cost-shared intangibles between themselves. CWI thus has no bearing on cost-sharing payments.

Since its publication more than 30 years ago, taxpayers and the government alike have looked to the *White Paper* as an authoritative

resource in the area of transfer pricing. Although § 482 methods have evolved over the years, the *White Paper*'s fundamental conclusions about the legal and economic consequences of cost-sharing have remained solidly intact and have been relied on by amici. By accepting the government's argument, the panel majority's holding does damage to these fundamental conclusions; conclusions which formed the basis of U.S. treatment of all cost-sharing costs in later Treasury regulations, and are the foundation of an international consensus on how such costs should be treated. These conclusions—and the associated U.S. and international treatment—gave amici critical certainty in conducting global business.

The *White Paper*'s enormous influence in shaping transfer pricing policy over the past thirty years cannot be denied. The IRS has referred to the *White Paper* as an "authoritative study" conducted by "expert agencies" (IRS AM 2007-007 (Mar. 23, 2007)) and has cited the document as authority in numerous administrative publications.[2] Treasury explicitly relied on the *White Paper* when it issued proposed and final § 482 regulations,[3] including

---

[2] For example, the IRS references the *White Paper* in several Field Service Advice memoranda, including FSA 200148025 (Nov. 30, 2001), FSA 200011021 (Mar. 17, 2000), and 1992 WL 1466053 (Mar. 20, 1992).

[3] The *White Paper* was cited by Treasury in preambles to the following proposed and final rulemakings: T.D. 8632, 1996-1 C.B. 85 (1995); T.D. 8470, 1993-1 C.B. 90 (1993); T.D. 8552, 1994-2 C.B. 93 (1994); T.D.

the underlying cost-sharing regulations modified by the rulemaking at issue in this case. T.D. 8552, 1994-2 C.B. 93 (1994). The Joint Committee on Taxation—an influential Congressional committee charged with investigating "the operation and effects" of the tax law and aiding Congress with the revision thereof (*U.S. v. Skelly Oil Co.*, 394 U.S. 678, 690 (1969) (Douglas, J., dissenting))[4]—has referenced the *White Paper* in several reports to Congress. Taxpayers can and do rely on Treasury notices, like the *White Paper*, when defending against penalties asserted under the Code in conjunction with income adjustments under § 482. *See* Treas. Reg. § 1.6662-4(d)(3)(iii) ("authority for purposes of determining whether there is substantial authority for the tax treatment of an item [includes] . . . notices").

The *White Paper*'s pronouncements do not stand alone in illuminating the proper rules for this case. In 1994, Treasury adopted regulations under

---

9441, 2009-7 I.R.B. 460 (2009); REG–144615–02, 2005-40 I.R.B. 625 (2005); REG–106359–02, 2002-34 I.R.B. 405 (2002); INTL–0372–88, 1992-1 C.B. 1164 (1992).

[4] The role of the Joint Committee is described in §§ 8001–8005, 8021–8023 of the Code. As noted by this Court in *Fior D'Italia, Inc. v. U.S.*, 242 F.3d 844, 852 (9th Cir. 2001), *rev'd on other grounds*, 536 U.S. 238 (2002), the Joint Committee plays an important role in the development of tax law ("[B]efore the Secretary can give a regulation legal force, he must endure the scrutiny of interested groups, legislative critics and the public at large. Congress maintains a particularly vigilant oversight through the Joint Committee on Taxation, whose large staff monitors and reports on the collection activities of the Department of the Treasury.").

§ 482 implementing the CWI standard under the "periodic adjustment" rules in Treas. Reg. § 1.482-4(f)(2). Those rules clearly recognize that comparables can *trump* CWI adjustments, and so comparables must be relevant under the CWI standard. *See*, *e.g.*, Treas. Reg. § 1.482-4(f)(2)(ii)(A) (no CWI adjustment made if, in part, "the same intangible was transferred to an uncontrolled taxpayer under substantially the same circumstances as those of the controlled transaction").

Thereafter, in its 2003 final rulemaking, Treasury responded to uncontradicted public comments indicating that parties at arm's length would not share stock-based compensation costs. It noted:

> The uncontrolled transactions cited by commentators do not share enough characteristics of QCSAs involving the development of high-profit intangibles to establish that parties at arm's length would not take stock options into account in the context of an arrangement similar to a QCSA.

T.D. 9088, 68 Fed. Reg. 51171, 51173 (Aug. 26, 2003).

Amici naturally interpreted this statement to mean *not* that comparables are irrelevant, but that proffered evidence of other transactions will not always be comparable to the transactions under review ("do not share enough characteristics of"). Plainly, the government's path in rejecting the use of comparables "may [*not*] be reasonably discerned" from the rulemaking. Op. at 47.

## II. Corporations competing internationally need certainty, but the panel decision creates huge uncertainties affecting billions of dollars.

This Court has properly recognized the critical need for tax certainty so businesses can undertake reasonable and prudent decisionmaking and reporting. *Madden v. Comm'r*, 514 F.2d 1149, 1152 (9th Cir. 1975) ("the element of certainty" is "particularly desirable in tax law").[5] The United States has also shown a strong commitment to tax certainty by adopting uniform tax treaties with foreign trading partners.[6] A uniform set of rules applying to cross-border transactions is crucial for the operation of multinational companies.

In the following sections we explain why the panel decision significantly unsettles this uniformity and risks creating huge financial

---

[5] That certainty is the bedrock of business planning has been recognized for almost a century. *See, e.g.*, *Edwards v. Wabash Ry. Co.*, 264 F. 610, 617 (2d Cir. 1920) (The object of dealing with taxing statutes "must be, above that of all other acts, to maintain them and expound them in a manner which will be consistent, and which will enable the subjects of this country to know what exactly is the amount of the charge and burden which they are to sustain.").

[6] *See, e.g.*, Senate Committee on Foreign Relations, Hearing on Pending Income Tax Treaties (July 10, 2008) (statement of Michael F. Mundaca, Deputy Assistant Secretary of Treasury for International Tax Affairs), *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp1076.aspx ("One of the primary functions of tax treaties is to provide certainty to taxpayers regarding the threshold question with respect to international taxation.")

uncertainties—with correlative economic inefficiencies—for amici. These uncertainties are caused by the panel decision to adopt a position never advocated by the government at trial, and that departs from Treasury regulations and pronouncements. En banc review is needed to address the panel's upending of heretofore settled rules that carry with them enormously important economic and international consequences. *Cf. Estate of Thomson v. Comm'r*, 495 F.2d 246, 252–53 (2d Cir. 1974) (unsettled expectations "may destroy careful planning of taxpayers who relied on what was at the time of their planning established law").

### A. The panel majority endorsed an expedient government litigation position that is contrary to longstanding and authoritative Treasury guidance.

Before this Court—but not at trial—the government argued that the CWI language added to § 482, and the legislative history, sanction a CWI standard for cost-sharing arrangements that ignores evidence of comparable, arm's-length transactions in which stock-based compensation costs are not shared. To support its argument, the government claimed that the CWI standard applies to cost-sharing arrangements because there is a transfer of cost-shared intangible property in such arrangements. The panel majority held that "parties to a [cost-sharing arrangement] transfer cost-shared intangibles." Op. at 26–27.

But that decision contradicts the *White Paper*'s key conclusions about the nature of cost sharing, *ante*, section I, so the panel majority's decision has upended authoritative conclusions prepared by "expert agencies" after comprehensive study. The resulting disruption of reasonable taxpayer reliance based on previous government instructions warrants en banc review.

The panel majority was quick to characterize cost-sharing arrangements as "tax-avoiding" arrangements by corporations. Op. at 7. But Treasury and the IRS have acknowledged that, "[c]ost sharing arrangements have long existed at arm's length between unrelated parties." *White Paper* at 493. In R&D-intensive industries, cost-sharing arrangements are critically important because they facilitate global R&D. When Congress asked Treasury for its studied opinion, Treasury agreed that cost-sharing arrangements allow companies not to have to address complex § 482 transfer pricing issues related to the licensing or transfer of intangibles. But the panel majority rejected the longstanding Treasury guidance, thereby creating much uncertainty in a heretofore settled area. That will have far-reaching negative consequences—not just in the context of cost sharing, but very possibly in *all* aspects of transfer pricing. Uncertainty translates into inefficiency and it dampens the ability of U.S. multinationals to remain competitive in the global marketplace.

### B. The panel majority's holding cannot be harmonized with the cost-sharing regulations.

Before this Court—but not in the Tax Court—the government argued that the 1986 CWI standard language in § 482 directed that it ignore evidence of comparable transactions in applying the arm's length standard. But the CWI standard only applies to "a transfer (or license) of intangible property (within the meaning of [§ 936(h)(3)(B)])." So the government's new argument was premised entirely on CWI applying to cost-sharing arrangements—that is, *only if* there is transfer of cost-shared intangibles does CWI apply. The panel majority agreed with the government's premise, holding that "parties to a QCSA *transfer* cost-shared intangibles." Op. 26–27 (emphasis added). But that contradicts what Treasury said in the *White Paper*: apportioned ownership of cost-shared intangibles "*avoid[s]* section 482 transfer pricing issues related to the licensing or other transfer of intangibles." *White Paper* at 474 (emphasis added).[7] The *White Paper* result wouldn't have surprised Congress, because the Joint Committee on Taxation had previously explained that a new Code provision governing *transfers* of intangibles to foreign corporations did not apply to cost sharing

[7] *See also White Paper* at 493 ("Because each participant 'owns' specified rights to any intangibles developed under the arrangement, no royalties are paid by the participants for exploiting their rights to such intangibles.")

arrangements. Joint Committee on Taxation, *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984* (JCS-41-84) at 433 (December 1984) ("These special rules . . . apply only to situations involving a transfer of the intangible property to a foreign corporation. . . . [T]he special rule for intangibles will have no application to bona fide cost-sharing arrangements.").

Nowhere in the *White Paper* was Congress told that Treasury might later—to advance its litigation interests—completely abandon its studied position that no transfer of cost-shared intangibles occurs in a cost-sharing arrangement. Nowhere in the process leading to the 2003 final rulemaking did Treasury signal any departure from the *White Paper*.

Amici who have, collectively, cost-shared hundreds of billions of dollars of R&D payments are startled by the panel majority's holding. Not only is it directly contradicted by the *White Paper*, it is inconsistent with Treasury's cost-sharing regulations (unsurprisingly, because the cost-sharing regulations were in part based on rules suggested in the *White Paper*. T.D. 8632, 60 Fed. Reg. 65553, 65554 (Dec. 20, 1995)).

The cost-sharing regulations start by referring to rights participants get in cost-shared intangibles as "interests in the intangibles assigned to [the parties] under the arrangement." Treas. Reg. § 1.482-7A(a)(1). Nothing

suggests those rights are transferred or licensed. If a QCSA fails to assign an interest in a cost-shared intangible to one of the participants "then each controlled participant will be deemed to own a share in such interest equal to its share of the costs of developing such intangible." Treas. Reg. § 1.482-7A(g)(6). No transfer or license there, either.

Most significantly, the cost-sharing regulations explain how cost-sharing payments will be characterized for tax purposes. Such payments "generally will be considered costs of developing intangibles of the payor and reimbursements of the same kind of costs of developing intangibles of the payee." Treas. Reg. § 1.482-7A(h)(1).[8] This characterization is entirely consistent with the view that cost-shared intangibles aren't transferred: each participant is treated as paying for development of, and directly owning, its respective share of intangibles as assigned under the arrangement. This character is inconsistent with the panel majority's holding that "parties to a QCSA *transfer* cost-shared intangibles." Op. 26–27 (emphasis added).

Amici have relied on Treasury's longstanding position that cost-shared intangibles are not transferred. Amici have treated hundreds of

---

[8] The cost-sharing regulations faithfully track the *White Paper*. ("[C]ost sharing payments are not income to the recipient but, instead, reduce costs which are otherwise deductible in computing taxable income and earnings and profits." *White Paper* at 497)

billions of dollars of cost-sharing payments as "costs of developing intangibles of the payor" and "reimbursements of the same kinds of cost of developing intangibles of the payee."

The panel's holding that "parties to a QCSA" have in fact "trans-fer[red] cost-shared intangibles" is not consistent with the treatment of cost-sharing payments under the regulations. This creates confusion regarding the treatment of hundreds of billions of dollars of R&D cost-sharing payments. The inconsistency and confusion flowing from the panel majority's holding—with its upending of settled expectations—will result in substantial real-world business consequences for U.S. multinational companies.

It is not clear that the panel majority contemplated this inconsistency and correlative confusion. What *is* clear is that Treasury's rulemaking never said a peep about either cost-shared intangibles being transferred or the inconsistency and confusion that results if a transfer is now deemed to occur. Taxpayers, including amici, had no inkling of the cost-shared-intangible-transfer position the government would conjure for purposes of its appeal. In conducting their global businesses, amici relied on Treasury's longstanding position that cost-shared intangibles *weren't* transferred. What's also clear is that *if* Treasury had asserted in its rulemaking that cost-

shared intangibles are transferred, amici would have commented and sought to correct that gross misinterpretation.

### C. The panel majority's holding creates serious ambiguity in other tax areas.

The panel majority's holding that "parties to a QCSA transfer cost-shared intangibles" creates ambiguity in the taxation of cross-border cost-sharing payments. The panel has upended what had been an agreed, multi-jurisdictional framework. Like any multinational consensus, this agreed tax treatment prevented opportunistic behavior by any particular country, which might otherwise be inclined to enrich itself (at the expense of other countries) by imposing withholding taxes on outbound cost-sharing payments. Fissures in internationally agreed transactional treatment produce tax uncertainty that hinders multinational companies from making prudent business decisions. Additionally, cracks in the internationally agreed treatment of transactions can also—in the case of imposition by foreign countries of withholding taxes not fully mitigated by tax treaties—erode the U.S. fisc if such foreign taxes can be credited, or lead to double taxation if they can't.

The United States, like many countries, imposes a "withholding tax" on certain outbound payments to foreign payees. § 1442. Tax treaties between countries can reduce or eliminate withholding taxes imposed on

certain payments, such as royalties for certain transfers of intangible property rights. The United States is also a member of the Organization for Economic Cooperation and Development (OECD). The 1979 OECD report *Transfer Pricing and Multinational Enterprises* in paragraph 123 states that there was a consensus that withholding taxes should not apply to cost sharing payments when made. The *White Paper* reached the same conclusion, explaining that because cost sharing payments aren't gross income to the recipient, "no U.S. withholding tax would be imposed on outbound cost sharing payments made by a U.S. person to a foreign person." *White Paper* at 497.

The basis for this international consensus not to impose withholding tax on cost-sharing payments is—as explained in the *White Paper*—the widespread understanding that cost-sharing payments do not constitute gross income to the payee but rather are a reduction of its deductions. The U.S. cost sharing regulations later embraced this treatment. Treas. Reg. § 1.482-7A(h)(1) (cost-sharing payments "will be considered costs of developing intangibles of the payor and reimbursements of the same kind of costs of developing intangibles of the payee"). As explained above, *ante*, p. 15, this treatment of cost-sharing costs is a corollary of the conclusion that cost-shared intangibles *are not* transferred. This international consensus

surrounding cost-sharing costs is accordingly called into serious question by the panel majority's holding that "parties to a QCSA transfer cost-shared intangibles."

The United States has historically played a key role in shaping international consensus on tax policy, including through its unwavering support for the arm's length standard. As a result, U.S. multinational companies like amici can efficiently run global businesses in the context of a predictable tax framework. The panel majority's holding on the transference of cost-shared intangibles—like its endorsement of the outright rejection of comparables in determining cost-sharing costs—threatens to shatter the hard-won but fragile international consensus on treatment of hundreds of billions of dollars of intercompany payments.

We repeat: it is not clear that the panel majority contemplated the consequential uncertainty in international tax treatment of hundreds of billions of dollars of cost-sharing payments. What *is* clear is that Treasury's rulemaking never said cost-shared intangibles are transferred, and Treasury certainly never alerted taxpayers to the uncertainty that would hang over the international consensus treatment of taxation of cost-sharing payments if such intangibles are now, for the first time, deemed transferred. If Treasury in its rulemaking had signaled these consequences, amici—and likely also

foreign governments keen to preserve the international tax consensus preventing opportunistic taxing behavior—would in no uncertain terms have commented on that in negative terms.

In *Xilinx, Inc. v Commissioner*, 598 F.3d 1191 (9th Cir. 2010), this Court rejected the government's assertion that stock-based compensation is a cost that must be shared under the pre-2003 rule in § 1.482-7A(d)(1), even if unrelated parties would not share them. Writing for the majority, Judge Noonan based the decision in part on the fact that—although the legal consequences of U.S. tax treaties were not in play in the case—the U.S. Treasury and foreign treaty partners thought that the arm's length standard worked as "the readily understandable international measure." *Xilinx*, 598 F.3d at 1197. In this case, the panel majority's holding that "parties to a QCSA transfer cost-shared intangibles" threatens the sanctity of the readily understandable international consensus that cost-shared intangibles are *not* transferred, with its consequences for the tax treatment of cost-sharing payments.

## III. Conclusion.

En banc review is warranted.

Dated: August 1, 2019

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

# ADDITIONAL AMICI SIGNATORIES AND COUNSEL

| **Amicus** | **Counsel** |
|---|---|
| 3M Company | Justin McGough<br>3M Company<br>3M Center, Building 224-5N-40<br>Saint Paul, MN 55144<br>(651) 733-9622 |
| Adobe Inc. | Karen Robinson<br>Vice President, Legal<br>Adobe Inc.<br>345 Park Avenue<br>San Jose, CA 95110<br>(408) 536-6000 |
| Apple Inc. | Theodore J. Boutrous, Jr.<br>Christopher Chorba<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>(213) 229-7000 |
| Applied Materials | Armin D. Eberhard<br>Director, International Tax Planning and M&A<br>Applied Materials<br>3225 Oakmead Village Dr., MS 1281<br>PO Box 58039<br>Santa Clara, CA 95054<br>(408) 563-5835 |
| Boston Scientific Corp. | Desiree Ralls-Morrison<br>SVP, General Counsel & Corporate Secretary<br>Boston Scientific Corporation<br>300 Boston Scientific Way<br>Marlborough, MA 01752<br>(508) 683-4800 |

| **Amicus** | **Counsel** |
|---|---|
| Dell Technologies, Inc. | Thomas J. Vallone<br>Senior Vice President, Global Tax<br>Dell Technologies, Inc.<br>401 Dell Way<br>Round Rock, TX 78682<br>(512) 723-1798 |
| Dolby Laboratories, Inc. | Andy Sherman<br>Dolby Laboratories, Inc.<br>1275 Market St.<br>San Francisco, CA 94103<br>(415) 558-0200 |
| eBay | Aaron Johnson<br>VP Legal<br>eBay<br>2065 Hamilton Avenue<br>San Jose, CA 95125 |
| Electronic Arts Inc. | Jacob Schatz<br>EVP, General Counsel and Corporate Secretary<br>Electronic Arts, Inc.<br>209 Redwood Shores Parkway<br>Redwood City, CA 94065<br>(650) 628-1500 |
| Eli Lilly and Company | Katie Lodato<br>Vice President - Global Tax<br>Eli Lilly and Company<br>Lilly Corporate Center<br>Indianapolis, Indiana 46285<br>(317) 276-2000 |

| **Amicus** | **Counsel** |
|---|---|
| Emerson Electric Co. | Dana A. Lasley<br>Emerson Electric Co.<br>8000 West Florissant Avenue, P.O. Box 4100<br>St. Louis, MO 63136<br>(314) 553-2824 |
| Facebook, Inc. | Paul S. Grewal<br>VP & Deputy General Counsel<br>Facebook, Inc.<br>1 Hacker Way<br>Menlo Park, CA 94025<br>(650) 543-4800 |
| Fortinet | John Whittle<br>Executive Vice President, General Counsel<br>Fortinet<br>899 Kifer Road<br>Sunnyvale, CA 94086<br>(408) 235-7700 |
| General Mills, Inc. | Christine Henninger<br>General Mills, Inc.<br>1 General Mills Blvd.<br>Golden Valley, MN 55426<br>(763) 293-3734 |
| Google LLC | Nora Puckett<br>Google LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043<br>(650) 253-0000 |
| GoPro, Inc. | Kyle Bonacum<br>GoPro, Inc.<br>3000 Clearview Way<br>San Mateo, CA 94402<br>(650) 436-4139 |

| **Amicus** | **Counsel** |
|---|---|
| Hewlett Packard Enterprise Company | Joshua Mishoe<br>Vice President<br>Tax Planning, Controversy, Policy and M&A<br>Hewlett Packard Enterprise Company<br>5400 Legacy Drive<br>Plano, TX 75024<br>(832) 502-9171 |
| International Paper Company | Barbara Beckerman<br>6400 Poplar Avenue, Tower 4<br>Memphis, TN 38197<br>(901) 419-4520 |
| Johnson Controls, Inc. | Michael R. Peterson<br>President and Corporate Secretary<br>Johnson Controls, Inc.<br>5757 North Green Bay Avenue<br>Milwaukee, WI 53209<br>(414) 524-7019 |
| Maxim Integrated | Mark Casper<br>Vice President, Deputy General Counsel<br>Maxim Integrated<br>160 Rio Robles<br>San Jose, CA 95134<br>(408) 601-5865 |
| NetApp, Inc. | Matthew Fawcett<br>General Counsel<br>NetApp, Inc.<br>1395 Crossman Ave.<br>Sunnyvale, CA 94089<br>(408) 822-8700 |

| **Amicus** | **Counsel** |
|---|---|
| Oracle Corporation | Margaret C. Wilson<br>Wilson Law Group LLC<br>475 Wall Street<br>Princeton, NJ 08540<br>(908) 642-3176 |
| PepsiCo, Inc. | Maryanne Bifulco<br>Vice President, Transfer Pricing Counsel<br>PepsiCo, Inc.<br>700 Anderson Hill Road<br>Purchase, NY 10577<br>(914) 253-3178 |
| Pfizer Inc. | Markus Green<br>Assistant GC, Government Relations / Litigation<br>Pfizer, Inc.<br>235 East 42nd Street<br>New York, NY 10017<br>(212) 733-3966 |
| The Procter and Gamble Company | Lowell Yoder<br>McDermott Will & Emery<br>227 W. Monroe Street<br>Chicago, IL 60606-5096<br>(312) 372-2000 |
| Qualcomm Incorporated | Beth Wapner<br>VP Tax<br>Qualcomm Incorporated<br>5775 Morehouse Drive<br>San Diego, California 92121<br>(858) 651-3883 |
| S&P Global Inc. | Tanya Guazzo<br>S&P Global Inc.<br>55 Water Street<br>New York, NY 10041<br>(212) 438-0926 |

| **Amicus** | **Counsel** |
|---|---|
| ServiceNow, Inc. | Russell Elmer<br>ServiceNow, Inc.<br>2225 Lawson Lane<br>Santa Clara, CA 95054<br>(408) 501-8550 |
| SurveyMonkey | Lora Blum<br>General Counsel<br>SurveyMonkey<br>1 Curiosity Way<br>San Mateo, CA 94403<br>(650) 543-8400 |
| Symantec Corporation | Scott C. Taylor<br>EVP, General Counsel & Secretary<br>Symantec Corporation<br>350 Ellis Street<br>Mountain View, CA 94043<br>(650) 527-8000 |
| United Parcel Service, Inc. | Donald P. Lancaster<br>United Parcel Service, Inc.<br>55 Glenlake Parkway<br>Atlanta, GA 30328<br>(404) 828-4317 |
| Workday, Inc. | Lisa McFall<br>VP & Deputy General Counsel<br>Workday, Inc.<br>6110 Stoneridge Mall Road<br>Pleasanton, CA 94588<br>(650) 224-2760 |

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, at the time of filing undersigned counsel is not aware of any related cases pending in this Court.

Dated: August 1, 2019

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rules 28-4 and 32 1, I certify that the attached brief is proportionately spaced using Microsoft Word, version 2016, is set in Times New Roman Font, has a typeface of 14 points or more, and contains 4,188 words.

Dated: August 1, 2019

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly
Attorneys for Amicus Curiae
Cisco Systems, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2019, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: /s/ Roderick K. Donnelly
Roderick K. Donnelly